IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT
Case No. 23-1353

NATIONAL ASSOCIATION FOR GUN RIGHTS, ROBERT C. BEVIS, and LAW WEAPONS, INC., d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation;

v.

CITY OF NAPERVILLE, ILLINOIS, and JASON ARRES, CHIEF OF POLICE OF NAPERVILLE

_____

MOTION FOR INJUNCTION PENDING APPEAL

Pursuant to FRAP 8 and Circuit Rule 8, Plaintiffs submit the following Motion for Injunction Pending Appeal.

**PROCEDURAL BACKGROUND**

Plaintiffs filed motions for preliminary injunction with respect to the City of Naperville Ordinance on November 18, 2022, and with respect to the State of Illinois Statute on January 24, 2023. Dkt. 10. The Court denied Plaintiffs' motions for preliminary injunction in an order dated February 17, 2023. Dkt. 63. On February 21, 2023, Plaintiffs appealed the Order to the United States Court of Appeals for the Seventh Circuit. Dkt. 64. *See* 28 U.S.C. § 1292(a)(1) (order denying request for preliminary injunction appealable). Fed.R.App.P. 8(a)(1)(C) states that a party must move first in the district court for an injunction pending appeal. On February 28, 2023, Plaintiffs moved in the district court for an injunction pending appeal. Dkt. 71. The district court denied Plaintiffs' motion for injunction pending appeal on March 2, 2023. Dkt. 73. Plaintiffs have attached their declarations filed in the trial court (Dkts. 10-1, 10-3, and 71-1) in the Appendix filed with this Motion and incorporate them in and with this motion.

1

**STANDARD OF REVIEW**

A party seeking an injunction pending appeal must establish that he is [1] likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest. *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021), quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (quotation marks omitted; bracketed numbers added). Although a plaintiff need not show by a preponderance of the evidence that she will win her suit, the mere possibility of success is not enough; she must make a "strong" showing on the merits. *Id*. (internal citation omitted). This is an extraordinary remedy. *Id*.

**ARGUMENT**

**I.     Plaintiffs Have Made a Strong Showing of Likely Success on the Merits**

    **A.     Justice Thomas: Laws Like the Illinois Statute and the City's Ordinance are Clearly Unconstitutional**

This is not a close case. The Second Amendment protects arms that are "typically possessed by law-abiding citizens for lawful purposes." *D.C. v. Heller*, 554 U.S. 570, 625 (2008) (Scalia, J.). Justice Thomas, the author of the recent landmark Second Amendment decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), joined by Justice Scalia, provided a roadmap to the resolution of this matter in *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting from denial of cert.). In that case Justice Thomas examined an arms ban that was for practical purposes identical to the laws challenged here. He noted millions of Americans own AR-style semiautomatic rifles for lawful purposes, including self-defense and target shooting. *Id*. (Thomas, J., dissenting). He then

wrote: "**Under our precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons**." *Id*. (emphasis added).

When it comes to bans of commonly possessed arms, this is *Heller's* simple rule. This is a case involving an arms ban, and therefore it turns on *Heller's* simple rule. Is the banned firearm hardware commonly owned by law-abiding citizens for lawful purposes? "If the answer [is] 'yes,' the test is over." *Duncan v. Becerra ("Duncan III")*, 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019)[1]. Plaintiffs proved that millions of the banned arms are possessed by law-abiding citizens for lawful purposes. Thus, the answer to the "hardware" test is "yes." The test is over. The challenged laws are unconstitutional. It is that simple.

Unfortunately, the district court did not apply *Heller's* simple test. Instead, the district court held that the challenged laws are constitutional because the arms they ban are "particularly dangerous." This was clear error because "[the *Heller* test] is a conjunctive test: A weapon may not be banned unless it is **both** dangerous **and** unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J. concurring) (emphasis in the original). An arm that is commonly possessed by law-abiding citizens for lawful purposes is, by definition, not unusual. Thus, such an arm cannot be both dangerous and unusual and therefore it cannot be subjected to a categorical ban. *Heller*, 554 U.S. at 629. It follows, that "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano*, 577 U.S. at 418 (Alito, J. concurring).

---

[1] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 213 L. Ed. 2d 1109, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022), *and rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).

Last June the Supreme Court held in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), that Second Amendment challenges are to be decided by applying a text informed by history test. *Id.*, 142 S. Ct. at 2129–30. Moreover, the Court emphatically and repeatedly rejected the application of means-end scrutiny in Second Amendment cases. *Id.*, 142 S. Ct. at 2126. Unfortunately, not only did the district court fail to apply *Heller's* simple test, but also it compounded its error by engaging in the means-end analysis forbidden by *Bruen*. The district court engaged in a lengthy analysis of the governmental interest Defendant sought to achieve. Dkt. 63, pp. 17-30. The district court followed that discussion by holding that the challenged laws addressed those public safety concerns, and for that reason the laws are constitutional. Dkt. 63, p. 30. This, too, was clear error.

In summary, Plaintiffs made a strong showing of likely success on the merits based on *Heller's* simple test. The district court failed to apply the *Heller* test. Instead, it erred by upholding the laws for a constitutionally irrelevant reason ("relative dangerousness") and a reason forbidden by the Supreme Court (means-end scrutiny).

**B.     The Parties**

Plaintiff National Association for Gun Rights ("NAGR") is a nonprofit membership and donor-supported organization that seeks to defend the right of law-abiding individuals to keep and bear arms. Dkt. 48, p.2. NAGR has members who reside within the City and the State. Dkt. 48, p.2. NAGR represents the interests of its members who reside in the City and the State. Dkt.48, p.2.

Plaintiff Robert C. Bevis is a business owner in the City and a law-abiding citizen of the United States. Dkt. 48, p.2. Bevis owns and operates Plaintiff Law Weapons, Inc. d/b/a Law Weapons & Supply ("LWI"). Dkt. 48, p.2. LWI operates in the City and is engaged in the

4

commercial sale of firearms. Dkt. 48, p.2. A substantial part of LWI's business consists of the commercial sale of firearms and magazines that are banned by the challenged laws. Dkt. 48, p.2. Since the challenged laws went into effect a few weeks ago, LWI's business has plummeted, and if the laws remain in force, it will go out of business. Dkt. 48, p.2.

Defendant City of Naperville passed the unconstitutional Ordinance last summer with an effective date of January 1, 2023. Dkt. 1, p.3. Defendant Arres is the City's Chief of Police. In his Answer, Arres confirmed that he intends to enforce the unconstitutional Ordinance and State Law against Plaintiffs. Plaintiffs seek to enjoin Defendants from enforcing the challenged laws against them and their members. Dkt. 59, p.4.

### B. The Challenged Laws

Plaintiffs challenge Illinois HB5471, which became effective on January 10, 2023, available at IL LEGIS 102-1116 (2022), 2022 Ill. Legis. Serv. P.A. 102-1116 (the "State Law") and Chapter 19 of Title 3 of the Naperville Municipal Code (the "Ordinance"). The State Law bans certain semi-automatic firearms that it calls "assault weapons," which are defined in 720 ILCS 5/24-1.9. The State Law also bans what it calls "large capacity ammunition feeding devices," which are defined in 720 ILCS 5/24-1.10. Section 3-19-2 of the Ordinance bans the commercial sale of "assault weapons," which are defined in a way similar to the State Law. Ordinance, Section 3-19-1.

### C. The *Heller/Bruen* Standard

In *New York State Rifle and Pistol Association v. Bruen*, 521 U.S. 898 (2022), the Court rejected the two-part balancing test for Second Amendment challenges that several circuit courts adopted in the wake of *Heller* and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742

(2010). Instead, it reiterated *Heller's* text informed by history standard. That standard has two parts:

> [T]he standard for applying the Second Amendment is as follows:
>
> [Step One:] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> [Step Two:] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Bruen*, 142 S. Ct. at 2129–30.

"*Bruen* makes clear that the first step is one based **solely** on the text of the Second Amendment to determine if it presumptively protects an individual's conduct – a presumption that the [government] can **then** rebut with history and tradition." *U.S. v. Harrison*, 2023 WL 1771138 *4 (W.D. Okla. 2023) (emphasis in original). If the text "presumptively protects [Plaintiffs'] conduct, the burden shifts to the [government] to demonstrate that [its absolute ban] is 'consistent with the Nation's historical tradition of firearm regulation.'" *U.S. v. Harrison*, *supra*, *5.

### D. Plaintiffs Easily Met Their Burden Under Step One

Plaintiffs seek to keep and bear bearable arms that are banned by the challenged laws. Dkt. 71-1. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct – i.e., possessing certain bearable arms – "the Constitution presumptively protects that conduct." *Id*., 142 S. Ct. at 2126. Thus, Plaintiffs have easily met their burden. The banned arms are presumptively protected by the Constitution. That Plaintiffs seek to keep and bear bearable arms was not disputed in the district court.

### E. It is Impossible for the City to Meet its Burden Under Step Two

The challenged laws categorically ban certain commonly possessed arms (as shown in detail below). Under *Heller*, absolute bans of commonly held firearms are "categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011). ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right – like the handgun bans at issue in those cases … are categorically unconstitutional."). Therefore, it is impossible for the City to carry its burden under step two of the *Heller/Bruen* test. The reason for this is apparent from *Heller* itself – there is no historical analogue to such a ban. "[A]fter considering 'founding-era historical precedent,' including 'various restrictive laws in the colonial period,' and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional." *Bruen*, 142 S. Ct. at 2131.

In summary, the complete absence of regulations even remotely analogous to D.C.'s absolute ban allowed *Bruen* to characterize the *Heller* historical inquiry as "relatively simple." *Id.*, 142 S. Ct. at 2132. It was simple because, under *Heller*, absolute bans of commonly held firearms are, in *Ezell's* words, "categorically unconstitutional."[2] *See also People v. Webb*, 2019 IL 122951, 131 N.E.3d 93) (absolute bans of commonly possessed arms are "necessarily" unconstitutional).[3]

### F. The Banned Firearms are Commonly Possessed by Law-Abiding Citizens

At least 20 million semi-automatic firearms such as those defined as "assault weapons" in the challenged laws are owned by millions of American citizens who use those firearms for lawful purposes. Declaration of James Curcuruto ¶ 6. Dkt. 10-3. The banned rifles are perfectly

---

[2] The Court failed to apply this principle in *Friedman*, which is why Justice Thomas criticized that decision so vociferously.

[3] In that case, the Court held that a commonly held bearable arm may not be "subjected to a categorical ban." *Id.*, 2019 IL 122951, ¶ 21, 131 N.E.3d 93, 98. And since the Illinois statute in question constituted a categorical ban "that provision **necessarily** [could not] stand." *Id.* (emphasis added).

legal to build, buy, and own under federal law and the laws of over 40 states. *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (S.D. Cal. 2021), *vacated and remanded on other grounds*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). The AR-15 in particular, the quintessential arm banned by the State, is America's "most popular semi-automatic rifle." *Heller v. D.C.*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller II*"). And in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). These rifles are the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. See National Shooting Sports Foundation, Inc., *2021 Firearms Retailer Survey Report*, 9, available at https://bit.ly/3gWhI8E (last visited Jan. 30, 2023).[4]

There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles such as those banned by the challenged laws. The Supreme Court has held as much. In *Staples,* it concluded that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. Semiautomatic rifles have been commercially available for over a century. *See* David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTMP. L. 381, 413 (1994).

In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), *abrogated on other grounds by Bruen*, *supra*, Judge Traxler stated:

> **It is beyond any reasonable dispute** from the record before us that a statistically significant number of American citizens possess semiautomatic rifles (and magazines holding more than 10 rounds) for lawful purposes. Between 1990 and 2012, more than 8 million AR- and AK- platform semiautomatic rifles alone were manufactured in or imported into the United States. In 2012, semiautomatic sporting rifles accounted for twenty percent of all retail firearms sales… In terms

---

[4] *See also* Mot. 14-20 for an extensive discussion of this issue.

of absolute numbers, these statistics lead to the unavoidable conclusion that popular semiautomatic rifles such as the AR-15 are commonly possessed by American citizens for lawful purposes within the meaning of *Heller*.

*Id*., 849 F.3d at 153 (Traxler, J., dissenting) (internal citations and quotation marks omitted, emphasis added).

In 2021, a professional survey firm conducted a comprehensive assessment of firearms ownership and use patterns in America. William English, *2021 National Firearms Survey: Updated Analysis* (hereinafter, "English"), 1, available at https://bit.ly/3yPfoHw (last visited Jan. 30, 2023). The survey was administered to a representative sample of approximately 54,000 U.S. residents aged 18 and over, and it identified 16,708 gun owners. The survey found that 30.2% of gun owners, about 24.6 million people, have owned an AR-15 or similarly styled rifle. English, 33. In summary, under any reasonable analysis, the firearms banned by the challenged laws are commonly possessed by law-abiding citizens for lawful purposes, just as Justice Thomas asserted in *Friedman*.

**G.     The Banned Magazines are Commonly Possessed by Law-Abiding Citizens**

In *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), the Court noted that while recognizing the Second Amendment does not explicitly protect ammunition, "without bullets, the right to bear arms would be meaningless." *Id*. At 967. *Jackson* thus held that "'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." *Id*. In *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), this Court also noted that the Second Amendment protects that which is necessary for the right to be effective. Justice Thomas cited both *Jackson* and *Ezell* with approval in *Luis v. United States*, 578 U.S. 5 (2016), in which he explained that constitutional rights implicitly protect those closely related items necessary to their exercise. *Id*., 578 U.S. at 26-27 (Thomas, J., concurring).

9

Magazines are arms protected by the Second Amendment because they are necessary for a semi-automatic firearm to be effective. Indeed, they are what makes semi-automatic fire possible. Therefore, in *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014), the Court found that magazines are "arms" within the meaning of the Second Amendment because "they are integral components to vast categories of guns." *Id*. at 1276. And in affirming that decision, the Ninth Circuit held that the "law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render [certain] firearms operable." *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015).

And at least 150 million magazines such as those banned by the State Law (i.e., with a capacity greater than ten rounds) are owned by law-abiding American citizens, who use those magazines for lawful purposes. Declaration of James Curcuruto ¶ 7. Dkt. 10-3. According to the English survey, 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and hundreds of millions of such magazines have been owned. English, 20. There is nothing surprising about that result. Many of the most popular semi-automatic rifles are manufactured with standard magazines holding more than ten rounds. *See, e.g*., David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 and ALB. L. REV. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds."). Indeed, over three quarters of modern sporting rifle magazines in the country have a capacity of more than 10 rounds. *See* Modern Sporting Rifle Comprehensive Consumer Report, at 31, NSSF (July 14, 2022), available at https://bit.ly/3GLmErS (last visited Jan. 30, 2023). See also, *Kolbe, supra* ("It is beyond any reasonable dispute" that magazines holding more than 10 rounds are commonly possessed for lawful purposes.) (Traxler, J., dissenting).

### G. Summary

Plaintiffs have met their burden under the first step of the *Heller/Bruen* analysis. Thus, the bearable arms they seek to possess are presumptively protected by the Second Amendment. The evidence is overwhelming that the arms are commonly possessed by law-abiding citizens for lawful purposes. Therefore, the City cannot meet its burden under the second step of the test. The arms are owned by millions of law-abiding Americans. Under the Supreme Court's precedents, "that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Friedman, supra* (Thomas, J., dissenting from denial of cert.). Therefore, Plaintiffs have made a strong showing of probable success on the merits.

### II. The City's Absolute Ban on Commercial Sales is Unconstitutional

"The right to possess firearms for protection implies a corresponding right to **acquire** and maintain proficiency in their use . . ." *Ezell v. City of Chicago ("Ezell I")*, 651 F.3d 684, 704 (7th Cir. 2011) (emphasis added). Obviously, the right to keep and bear arms would be meaningless if citizens were unable to acquire arms in the first place. This is why the City's absolute ban on the sale of commonly possessed firearms is unconstitutional. In *Bruen*, the Court cited with approval the Third Circuit's decision in *Drummond v. Robinson Twp.*, 9 F.4th 217 (3rd Cir. 2021). *Id.*, 142 S.Ct. at 2133. In *Drummond*, the Court held that laws "prohibiting the commercial sale of firearms would be untenable in light of *Heller*." *Id.*, 9 F.4th at 227 (internal citation and quotation marks omitted).

### III. The District Court Properly Held That *Friedman* is No Longer Good Law

In *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015), the Court announced a unique three-part test to determine Second Amendment questions. Under this test, a court asks: whether a regulation [1] bans weapons that were common at the time of

ratification or [2] those that have some reasonable relationship to the preservation or efficiency of a well-regulated militia and [3] whether law-abiding citizens retain adequate means of self-defense. *Id*., 784 F.3d at 410. As noted, Justice Thomas criticized this holding harshly. That is because this test is not supported by *Heller*. Indeed, two of the three prongs of the test are specifically foreclosed by *Heller* as the Court made plain in *Bruen*.

[1] The Second Amendment's "reference to 'arms' does not apply only to those arms in existence in the 18th century." *Bruen*, 142 S. Ct. at 2132 (cleaned up). Indeed, *Heller* characterized this argument as "bordering on the frivolous." *Heller*, 554 U.S. at 582.

[2] The Second Amendment's operative clause "does not depend on service in the militia." *Bruen*, 142 S. Ct. at 2127, *citing Heller*, 554 U.S. at 592.

[3] As for the third prong, "[T]he right to bear other weapons is 'no answer' to a ban on the possession of protected arms." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016), *quoting Heller*, 554 U.S. at 629.

Thus, the district court was correct when it held that "*Friedman* cannot be reconciled with *Bruen*." Dkt. 63, p.16.

**IV.    The District Court Erred in Four Critical Respects**

**A.    The District Court Failed to Apply the *Heller* Common Use Test**

The challenged laws ban arms commonly possessed by law-abiding citizens for lawful purposes. *Heller's* central holding is that a categorical ban on arms held by law-abiding citizens is unconstitutional. *Id*., 554 U.S. at 625. One would suppose that the district court would apply the *Heller* test or, failing that, at least explain why it believed the test is not applicable. The district court did neither. It erred when it simply ignored *Heller's* central holding. Nowhere in its opinion does it apply, or even acknowledge, *Heller's* holding in this regard.

**B.    The District Court Misunderstood Heller's "Dangerous and Unusual" Test**

Under *Heller*, "dangerous **and** unusual" weapons may be banned. *Heller*, 554 U.S. at 627 (emphasis added). Here, apparently relying on this passage from *Heller*, the district court held that "[b]ecause assault weapons are particularly dangerous weapons and high-capacity magazines are particularly dangerous weapon accessories, their regulation accords with history and tradition." Dkt. 63, p.30. This is error. The district court misinterpreted *Heller*. Importantly, "[the *Heller* test] is a conjunctive test: A weapon may not be banned unless it is **both** dangerous **and** unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring) (emphasis in the original). An arm that is commonly possessed by law-abiding citizens for lawful purposes is, by definition, not unusual. Thus, such an arm cannot be both dangerous and unusual and therefore it cannot be subjected to a categorical ban. *Heller*, 554 U.S. at 629. It follows, that "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano*, 577 U.S. at 418.

In summary, under *Heller*, the nation's history of firearms regulation supports a law banning a "dangerous and unusual" weapon. Conversely, nothing in *Heller* suggests that the nation's history of firearms regulation supports a law banning a weapon commonly used for lawful purposes because it is "particularly dangerous." This district court did not recognize this critical distinction, and it erred when it upheld the challenged laws merely because the banned arms are, in its view, particularly dangerous.

C.  **The District Court Failed to Distinguish Between "Ban" and "Regulation"**

The district court held that because, in its view, the banned weapons are particularly dangerous, "their **regulation** accords with history and tradition." Dkt. 63, p.30. (emphasis added). The word "regulation" is misplaced. This is a ban, not a regulation, and *Heller* distinguishes between laws that ban arms and laws that regulate arms. The flaw in the district

13

court's historical analysis is that it has failed to distinguish between the two types of laws. Arms typically possessed by law-abiding citizens may not be banned. *Id*., 554 U.S. at 628. But *Heller* held that various regulations – short of bans – such as prohibitions on concealed carry, possession of firearms by felons, possession of firearms in sensitive places, and conditions on the commercial sales of weapons, are legitimate. *Id*., 554 U.S. at 627-28. The reason for this dichotomy is that nothing in the Nation's history and tradition of firearm laws, "remotely burden[s] the right of self-defense as much as an absolute ban." *Id*., 554 U.S. at 632. Whereas regulations that do not burden the right anywhere near as much as a ban may be "fairly supported by [] historical tradition." *Id*., 554 U.S. at 628. Thus, the district court erred in failing to distinguish between the two types of laws.

### D.     This District Court Erred When It Engaged in Means-End Scrutiny

This district court properly recognized that *Bruen* rejected means-end scrutiny as a mode of analysis in the context of the Second Amendment. Dkt. 63, p.17. Therefore, it did not call its analysis by that name. But the Supreme Court also warned courts to be careful not to allow means-end analysis to impact their analysis in other, less obvious ways. In particular, *Bruen* stated that "courts may [not] engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id*., 142 S. Ct. at 2133 n. 7. Unfortunately, the district court erred when it did just that. Pages 26 to 30 of its Order recite the district court's public safety concerns implicated by the semi-automatic rifles and magazines banned by the challenged laws. Dkt 63, pp. 26-30. The district court followed that discussion by stating that the challenged laws addressed these public safety concerns, and for that reason the laws are constitutional. Dkt 63, p. 30.  Indeed, the district court went further going so far as claiming constitutional rights were

irrelevant to "irreparable harm" as a backdoor means of instituting the means-end test to evade the Second Amendment rights at stake in this case. Dkt 63, p.31.

But it is just this sort of means-end scrutiny that may not be used to justify a firearms law. "To justify its regulation, the government **may not simply posit that the regulation promotes an important interest**. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added). Thus, a court may not identify an important governmental interest (such as public safety) and uphold the challenged laws on the ground that the means the State and the City chose further that governmental end.

## V. The Other Injunction Factors Are Met

### A. The Factors Are Met on the Basis of the Constitutional Violation

In *Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113 (7th Cir. 2017), the Seventh Circuit held that in a constitutional case like this one, "the analysis begins and ends with the likelihood of success on the merits of [that] claim." *Id.*, 858 F.3d at 1116 (internal quotation omitted). *See also Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (same). But even if one were to examine the other three factors, the result is the same.

The loss of Second Amendment rights necessarily establishes irreparable harm. In *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the Plaintiffs established probable success on the merits of their Second Amendment claim. The Court held no further showing of irreparable harm was required because "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.*, 651 F.3d at 699, *quoting* Charles Alan Wright, *et al*, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995).

As for the "balance of harm" and "public interest" prongs, injunctions protecting constitutional freedoms "are always in the public interest." *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012). And if the moving party establishes a likelihood of success on the merits, the balance of harms favors granting preliminary injunctive relief. *Id*. In summary, the probable success on the merits prong is determinative. Plaintiffs have established their constitutional rights are violated by the challenged laws; therefore, they have necessarily established the irreparable harm, public interest, and balance of harms prongs.

**B.    The Factors Are Met Based on Law Weapons, Inc.'s Extreme Financial Duress**

Plaintiffs LWI as well as its customers are being prohibited from exercising their Second Amendment rights, which means LWI will be forced out of business. Dkt. 71-1. 85% of the firearms LWI sells are banned under the Naperville ordinance and State law. *Id*., ¶ 12. Cash reserves have been depleted, and as a result, LWI has had to lay off employees and ask Bevis' family to work without pay. *Id*., ¶ 13. Bevis has extended his personal credit, missed personal payments like home and car payments, maxed his credit limits, and taken out loans to pay the monthly bills. *Id*. LWI will not be able to abide by the terms of its 15-year commercial lease for the business real property, as well as the equipment leases and inventory, if these bans remain in effect any longer. *Id*. In short, LWI will be put out of business if these laws are enforced. *Id*.

In *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 546 (7th Cir. 2007), the Court held that the plaintiffs "made a compelling case that it needs the injunction pending appeal to avert serious irreparable harm—the uncompensated death of its business." *See also*, *Dumanian v. Schwartz*, 2022 WL 2714994, at *14 (N.D. Ill. 2022), ("A likelihood of lost business is a form of irreparable injury because it is difficult to 'pin[ ] down what business has been or will be

16

lost.'"), *quoting Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (*quoting Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632–33 (7th Cir. 2005)); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("[A] damages remedy may be inadequate if it comes 'too late to save plaintiff's business'") (*quoting Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)).

The "balance of harms" and "public interest" prongs merge when the government is the defendant. *Eli Lilly & Co. v. Cochran*, 526 F. Supp. 3d 393, 409 (S.D. Ind. 2021), *citing Nken v. Holder*, 556 U.S. 418, 435 (2009). In addition to the reasons identified above, these interests favor granting relief, because the State is not harmed by an injunction in this court, because the law is already subject to an injunction in another court, as this Court noted in its Order. Moreover, this is not a case where Plaintiffs have sought an injunction against a law of long standing. Neither of the challenged laws was effective until 2023. Therefore, an injunction would preserve the status quo. And a "preliminary injunction is often said to be designed to maintain the status quo pending completion of the litigation." *Praefke Auto Elec. & Battery Co. v. Tecumseh Prod. Co.*, 255 F.3d 460, 464 (7th Cir. 2001).

### C. The Injunction Pending Appeal Must Apply to More Than Just the Plaintiffs

As the challenge to both laws is a facial challenge, the injunction can cover parties beyond the litigants in this case. *Smith v. Executive Dir. of Indiana War Memorials*, 742 F. 3d 282, 290 ("Because Smith has a reasonable likelihood of showing that the policy is unconstitutional both as it was applied to him and as it applies to individuals and small groups

17

generally, the preliminary injunction should prohibit its enforcement against any individual or small group").[5]

Accordingly, for this injunction pending appeal to truly avert irreparable harm and be effective, it must of necessity apply to all affected by the City ordinance and State law. Specifically, the injunction must enjoin enforcement of both laws against purchasers of the banned firearms as well as those who sell them. Otherwise, irreparable harm will still accrue to businesses such as Plaintiff LWI as they will still not be able to sell the banned firearms if those purchasing them are subject to enforcement of these laws against such purchases.

## CONCLUSION

For the foregoing reasons, Plaintiffs have met all of the criteria for an injunction pending appeal and respectfully request the Court to enter such injunction forthwith.

/s/ *Jason R. Craddock*
_____

Jason R. Craddock
Law Office of Jason R. Craddock
2021 Midwest Rd., Ste. 200
Oak Brook, IL 60523
(708) 964-4973
cradlaw1970@gmail.com or craddocklaw@icloud.com

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com
(Admission Pending)

---

[5] While *Smith* is a First Amendment case, Second Amendment cases are treated the same as First Amendment cases for purposes of constitutional analysis. *Ezell v. City of Chicago*, 651 F. 3d 684, 697 (7th Cir. 2011) ("The loss of a First Amendment right is frequently presumed to cause irreparable harm based on 'the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.'" (Citations omitted.) The Second Amendment protects similarly "intangible and unquantifiable interests," *id*, at 699).

18

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 7, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

/s/ *Jason R. Craddock*
_____
Jason R. Craddock