No. 23-1353

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS; ROBERT C. BEVIS; and LAW WEAPONS, INC., d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation,<br><br>            Plaintiffs-Appellants,<br><br>      v.<br><br>CITY OF NAPERVILLE, ILLINOIS, and JASON ARRES,<br><br>            Defendants-Appellees,<br><br>      and<br><br>THE STATE OF ILLINOIS,<br><br>          Intervening Appellee. | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division<br><br><br><br><br><br><br><br>No. 1:22-cv-04775<br><br><br><br><br><br><br><br>The Honorable VIRGINIA M. KENDALL, Judge Presiding. |

**INTERVENING STATE APPELLEE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR INJUNCTION PENDING APPEAL**

Plaintiffs seek the extraordinary remedy of a statewide injunction suspending any enforcement of a duly enacted Illinois statute—the Protect Illinois Communities Act ("Act"), Public Act 102-1116 (eff. Jan. 10, 2023)—so that they can continue to buy and sell assault weapons and large-capacity magazines ("LCMs") while this interlocutory appeal proceeds.

Plaintiffs' request is based on a misapprehension of law. Specifically, plaintiffs' argument rests on their contention that as a constitutional matter, the relevant metric is whether the regulated items are commonly owned. Mot. 2-4, 7-10, 12-13.[1] But that is inconsistent with the text-and-history framework established in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), which directs courts to first assess whether the regulated conduct is within the scope of the Second Amendment's text and then, if necessary, whether the challenged regulation is consistent with the Nation's historical tradition of regulating firearms. As the district court rightly concluded, plaintiffs are unlikely to succeed on their Second Amendment claim under that standard. Doc. 63.

Indeed, this court rejected materially identical challenges to assault weapon and LCM restrictions in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), and *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), both of which employed analyses rooted in text and history. Although plaintiffs assert that these decisions should be overruled in light of *Bruen*, *Bruen* does not dictate a different result here.

Finally, although plaintiffs request statewide relief, they failed to name any state official as a defendant, they requested much narrower relief (against a single local official) in their motion for preliminary injunction that is the subject of this

---

[1] This opposition cites plaintiffs' motion for injunction pending appeal as "Mot. ___," the district court's docket as "Doc. ___," this court's docket as "7th Cir. Doc. ___," and the two-volume separate appendix to this opposition as "A___."

interlocutory appeal, they failed to substantiate their expanded request for relief, and the State has not yet provided its defense of the Act in the district court. For these reasons, plaintiffs' request for extraordinary relief should be denied.

## BACKGROUND

On July 4, 2022, a shooter armed with an assault weapon loaded with a 30-round magazine opened fire on an Independence Day parade in Highland Park, Illinois.[2] The weapon allowed the shooter to fire 83 rounds in less than a minute, killing seven and wounding 48.[3] Among the victims were an eight-year-old boy left paralyzed from the waist down and both parents of a two-year-old child.[4] A Highland Park ordinance prohibited the sale of assault weapons, but the shooter had legally purchased the murder weapon elsewhere in Illinois.[5]

One month later, Naperville passed an ordinance prohibiting the sale of assault weapons within city limits. Doc. 57-2. And on January 10, 2023, the State of Illinois passed the Act, which generally prohibits the sale, purchase, manufacture, delivery, or importation of assault weapons (defined as semiautomatic weapons with

---

[2] Victoria Kim & Amanda Holpuch, *What We Know About The Shooting In Highland Park*, N.Y. Times, http://bit.ly/3ytxFZv (July 7, 2022).

[3] Peter Hancock, *Lawmakers Hear from Advocates for Assault Weapon Ban*, Capitol News Illinois, http://bit.ly/3Jw80WG (Dec. 12, 2022); Shia Kapos, *Illinois House Passes Assault Gun Bill*, Politico, http://bit.ly/3YwxU0E (Jan. 6, 2023).

[4] Associated Press, *Highland Park Parade Shooting Suspect Pleads Not Guilty*, http://bit.ly/423ISxG (Aug. 3, 2022); ABC7 Chicago Digital Team, *Highland Park Shooting: Orphaned Toddler Doesn't Know Parents Are Dead*, https://bit.ly/3J7WI9v (July 8, 2022).

[5] Kim & Holpuch, *supra* note 1.

3

certain unique characteristics, as well as several specific types of weapons) and LCMs (defined as magazines accepting more than 10 rounds of ammunition for a long gun or more than 15 rounds of ammunition for handguns) subject to certain exceptions for law enforcement, members of the military, and other professionals with similar firearms training and experience. 720 ILCS 5/24-1.9, 1.10. Individuals who lawfully possessed assault weapons and LCMs prior to the Act can continue to do so. *Id.* §§ 1.9(c)-(d) & 1.10(c)-(d).[6]

In September 2022, plaintiffs—an advocacy group, a gun store, and the store's owner—filed a complaint against Naperville claiming that its ordinance violated their Second Amendment rights. Doc. 1 at 1-3. Two months later, plaintiffs filed a motion for a temporary restraining order and preliminary injunction to prohibit the Naperville ordinance from taking effect. Doc. 10. Naperville filed a response and supplemental brief defending the ordinance's constitutionality. Docs. 12, 34.

On January 24, 2023, plaintiffs filed an amended complaint adding a claim that the Act violated the Second Amendment. Doc. 48 at 1, 6-7. Plaintiffs named no state officials as defendants, but named Naperville Police Chief Jason Arres on the theory that he was responsible for enforcing the Act against them. *Id.* at 1, 3. The next day, plaintiffs filed a notice that they had challenged the Act's constitutionality under Federal Rule of Civil Procedure 5.1(a). Doc. 49; *see* Fed. R. Civ. P. 5.1(a), (c)

---

[6] To continue lawfully possessing an assault weapon, an individual must submit to the State Police an endorsement affidavit by January 1, 2024. 720 ILCS 5/24-1.9(d). This registration requirement does not extend to LCMs. *Id.* § 24-1.10(d).

(party challenging "constitutionality of a . . . state statute" must notify "state attorney general," and State has 60 days to intervene).

Plaintiffs also filed a motion for a temporary restraining order and preliminary injunction seeking to enjoin Arres from enforcing the Act.  Doc. 50 at 1, 13-25. Plaintiffs' motion did not include any argument related to irreparable harm or equitable balancing.  *Id.*

Naperville responded, arguing that plaintiffs were unlikely to succeed on the merits because *Bruen* had not overruled *Friedman*, Doc. 57 at 6-8, and because the Act was constitutional under *Bruen*'s text-and-history standard, *id.* at 9-12. Naperville attached eight expert declarations, which described the unique features of LCMs and assault weapons and the history of regulating dangerous and unusual weapons.  Docs. 57-4 through 57-11.

On February 17, the district court denied plaintiffs' motions.  Doc. 63.  First, the court determined that plaintiffs "are unlikely to succeed on the merits of their claim because Naperville's Ordinance and the . . . Act are consistent with the Second Amendment's text, history, and tradition."  *Id.* at 5.  In particular, the court explained, "[t]he text of the Second Amendment is limited to only certain arms, and history and tradition demonstrate that particularly 'dangerous' weapons are unprotected."  *Id.* at 18.  "Because assault weapons are particularly dangerous weapons and high-capacity magazines are particularly dangerous weapon accessories, their regulation accords with history and tradition."  *Id.* at 30.  The court also found that plaintiffs had not demonstrated that they would suffer irreparable harm because

the gun store could "still sell almost any other type of gun" and the association's members could acquire "other effective weapons for self-defense." *Id.* at 32. Finally, as to the balancing of equities, the court found that Naperville had "compellingly argue[d]" that the Act and its ordinance would protect public safety. *Id.* at 33.

On February 21, plaintiffs filed a notice of appeal. Doc. 64. Two days later, the State filed motions to intervene in the district court and this court, which were allowed. Docs. 68, 70; 7th Cir. Docs. 3, 7.

On February 28, plaintiffs filed a motion for an injunction pending appeal in the district court, arguing for the first time that they established irreparable harm, any injunction protecting their alleged constitutional rights would be in the public interest, and the injunction should apply statewide. Doc. 71. As support, plaintiffs submitted a supplemental declaration from the gun store's owner claiming that it would be "put out of business." Doc. 71-1 at 3.

The State filed a motion for leave to respond. Doc. 72. The district court denied plaintiffs' motion based on the reasoning of its February 17 order and denied the State's motion as moot. Doc. 73. Plaintiffs moved for an injunction pending appeal in this court.

## DISCUSSION

## I. Plaintiffs Must Make A Strong Showing That They Are Entitled To An Injunction Pending Appeal.

"An injunction pending appeal is an extraordinary remedy," *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021) (per curiam), requiring the

movant to "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A movant must show more than "the mere possibility of success"; rather, it must "make a strong showing on the merits." *Protect Our Parks*, 10 F.4th at 763 (cleaned up).

## II. Plaintiffs Have Not Made A Strong Showing That They Are Likely To Succeed On The Merits.

### A. *Bruen* does not require a different result than in *Friedman* and *Wilson*.

The Second Amendment confers the right to "ordinary, law-abiding, adult citizens" to possess and carry firearms "for self-defense." *Bruen*, 142 S. Ct. at 2134. In *Bruen*, the Supreme Court clarified the two-step, text-and-history framework for analyzing Second Amendment claims. Under the first step, plaintiffs must show that "the Second Amendment's plain text covers [their proposed] conduct" and thus "presumptively protects that conduct." *Id.* at 2129-30. If plaintiffs meet their burden, then at the second step, the government must show that its regulation aligns with historical tradition, *id.*, by demonstrating that its regulation is analogous to historical regulations, *id.* at 2132.

But *Bruen* also confirmed that, "'[l]ike most rights, the right secured by the Second Amendment is not unlimited.'" *Id.* at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). On the contrary, there is no "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose"

and the right "extends only to certain types of weapons." *Heller*, 554 U.S. at 623, 626. For example, "weapons that are most useful in military service—M-16 rifles and the like—may be banned[.]" *Id.* at 627.

Although this court in *Friedman* and *Wilson* did not have the benefit of *Bruen*, it relied primarily on text and history to reject Second Amendment challenges to ordinances prohibiting the possession of assault weapons and LCMs. *See Friedman*, 784 F.3d at 410 (asking whether regulated items "were common at the time of ratification" and "whether law-abiding citizens retain adequate means of self-defense"); *Wilson*, 937 F.3d at 1033 (same). Those decisions thus control the outcome here because the Act regulates assault weapons and LCMs in substantially the same way as in *Friedman* and *Wilson*. *Compare* 720 ILCS 5/24-1.9(a)(1), 1.10(a) *with Friedman*, 784 F.3d at 407 *and Wilson*, 937 F.3d at 1029-30.

Plaintiffs do not dispute that *Friedman* and *Wilson* are directly on point; instead, they assert that *Bruen* overruled them. Mot. 11-12. This is incorrect. The Supreme Court emphasized that its holding in *Bruen*—that New York's "may issue" licensing scheme for publicly carrying handguns violated the Second Amendment, 142 S. Ct. at 2123-24—was limited to the statute before it, *id.* at 2132, 2134; *id.* at 2157 (Alito, J., concurring) (Court did not "decide anything about the kinds of weapons that people may possess"). Nor does *Bruen* require a different result than this court reached in *Friedman* and *Wilson*. Indeed, *Friedman* and *Wilson* eschewed the levels-of-scrutiny approach that *Bruen* overruled in favor of a historical analysis. *Compare Bruen*, 142 S. Ct. at 2126, 2128-29 (cases employing means-ends scrutiny

were inconsistent with *Heller*) *with Friedman*, 784 F.3d at 410 (declining to "decide

what 'level' of scrutiny applies, and how it works").

**B.     Plaintiffs have not made a strong showing that the Act regulates conduct protected by the Second Amendment.**

Even putting *Friedman* and *Wilson* to one side, plaintiffs have not made a

strong showing that they would succeed under *Bruen*'s first step because they have

failed to demonstrate that LCMs and assault weapons fall within the scope of the

"arms" protected by the Second Amendment.  To satisfy this burden, plaintiffs must

prove that the regulated items fit within the category of "bearable arms," *Bruen*, 142

S. Ct. at 2132, and that they are "commonly used" for self-defense, *id*. at 2138; *see*

*also id.* at 2132 (amendment protects only "instruments that facilitate armed self-

defense").  Plaintiffs—who incorrectly state that their ability to meet this burden

went undisputed in the district court, *see* Mot. 6; Doc. 57 at 9-12—have not done so.

First, LCMs are accessories, not "arms," and thus are not within the scope of

the Second Amendment.  As a historical matter, the term "arms" referred to weapons

and excluded related accessories like ammunition magazines.  *Heller*, 554 U.S. at 581

(citing 1773 edition of dictionary defining "arms" as "[w]eapons of offence, or armour

of defence"); *Ocean State Tactical LLC v. Rhode Island*, No. 22-cv-246, 2022 U.S.

Dist. LEXIS 227097, *33 (D.R.I. Dec. 14, 2022) (magazines not arms because, from

Founding era through Reconstruction, "[t]he word 'Arms' was a general term for

weapons such as swords, knives, rifles, and pistols, but it did not include

ammunition, ammunition containers, flints, scabbards, holsters, or 'parts' of the

weapons such as the trigger, or a cartridge box"); A522-23 (common phrase "arms and accoutrements" distinguished weapons from items like cartridge cases and boxes, which are "ammunition containers . . . analogous to today's 'magazines'").  Indeed, although LCMs can be used alongside weapons, they are not themselves weapons with offensive or defensive uses.  *E.g.*, *Ocean State Tactical*, 2022 U.S. Dist. LEXIS 227097, *31 ("LCMs, like other accessories to weapons, are not used in a way that 'cast[s] at or strike[s] another.'") (quoting *Heller*, 554 U.S. at 581); A492 ("Magazines are containers which hold ammunition in spring-loaded preparation for feeding into the receiver of a firearm.").

    For their part, plaintiffs argue that the Second Amendment covers items "necessary for a semi-automatic firearm to be effective."  Mot. 10.  Plaintiffs cite no authority for this; instead, they rely on decisions recognizing that the right extends to the ammunition, magazines, and training necessary to make firearms operable for self-defense.  *Id.* (citing *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953 (9th Cir. 2014); *Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015); *Ezell v. City of Chi.*, 651 F.3d 684 (7th Cir. 2011)).  These cases are inapposite because LCMs are not necessary to operate firearms, including for self-defense:  all firearms that can accept a detachable LCM can also accept a magazine that holds fewer rounds and work just as well.  Doc. 57-5 at 11-12; *see also* A495 (Act's limits on magazine capacity are "reasonable for self-defense requirements"); *Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391, *25 (D. Or. Dec. 6, 2022) (rejecting argument that LCMs are necessary for self-defense because no evidence that firearms

"can *only* operate with magazines that accept more than ten rounds") (emphasis in original).

Second, plaintiffs make no attempt to show that assault weapons and LCMs are used for self-defense. Mot. 7 (noting only that assault weapons are used for "lawful purposes"). Nor could they. As explained, LCMs provide a round-capacity beyond what is necessary for self-defense. And assault weapons, like M-16 rifles, are "most useful in military service," not civilian self-defense. *Heller*, 554 U.S. at 627; *see* Doc. 57-5 at 8-12; A591-95; A598-602. Indeed, assault weapons were designed for the U.S. military with features that "increase the effectiveness of killing enemy combatants in offensive battlefield situations," Doc. 57-5 at 12, and are advertised as military-style weapons, *id.* at 20-24; *see* Doc. 57-11 at 35 ("The military M-16 and the civilian AR-15 are closely related."). Assault weapons' defining characteristics, moreover, serve no self-defense function, and handguns and shotguns are preferable for self-defense. Doc. 57-4 at 22-23; Doc. 57-5 at 7-12; A420; A486-90; A493-95; A591-95; A598-602.

Third, plaintiffs have not shown that assault weapons or LCMs were in common use when the Second and Fourteenth Amendments were ratified. *Heller*, 554 U.S. at 627 (type of "weapons protected were those in common use at the time") (cleaned up); *Friedman*, 784 F.3d at 410 (assault weapons and LCMs "were not common in 1791," as "[m]ost guns . . . could not fire more than one shot without being reloaded"). Rather, assault weapons and LCMs bear no resemblance to firearms that were in common use before the 20th century. *E.g.*, Doc. 34-5 at 28

11

("[r]ifles holding more than 10 rounds made up a tiny fraction of all firearms in the United States during Reconstruction" and lawful "possession of such rifles . . . was limited almost exclusively to U.S. soldiers and civilian law enforcement officers"); Doc. 57-6 at 10 (assault weapons release energy 10 times greater than muskets); Doc. 57-10 at 25-31 (until after the Civil War, single-shot guns were commonly used; those holding more than 10 rounds were experimental and rare).

Plaintiffs do not dispute this historical evidence, asserting instead that the analysis should center on whether the regulated items are commonly owned today. Mot. 6-10. But "relying on how common a weapon is at the time of litigation [is] circular." *Friedman*, 784 F.3d at 409. Otherwise, States would be powerless to regulate new weapons—no matter how destructive or deadly—if a sufficient number made it into civilian hands first. *Id.* at 408 (submachine guns' popularity during Prohibition did not provide "constitutional immunity"); Doc. 57-5 at 7-8 (assault weapons "did not begin to sell in significant numbers until the late 2000s and particularly after the 2012 shooting at Sandy Hook Elementary"); Doc. 57-11 at 34 (historical evidence shows that "weapons must . . . achieve sufficient market penetration to create a potential for criminal abuse" before governments respond with regulation).

In any event, as explained, the Second Amendment protects only "instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132; *McDonald v. City of Chi.*, 561 U.S. 742, 749-50 (2010) ("[T]he Second Amendment protects the right to keep and bear arms for the purpose of self-defense."). Ownership statistics prove

nothing about whether assault weapons and LCMs are commonly used for self-defense.  And evidence confirms that they are not.  *E.g.*, Doc. 57-4 at 22-23 ("shotguns and 9mm pistols are generally recognized as the most suitable and effective choices for armed defense"); Doc. 57-7 at 23 (handguns and shotguns account for 67% of firearms owned in U.S. from 1986 through 2020); A602 (assault weapons' high-velocity fire, range, and complex loading and safety mechanisms render them unsuitable for "home defense in short range close quarter situations").

For their part, plaintiffs rely on an unpublished, non-peer-reviewed paper recounting an online survey estimating that 24.6 million Americans have, at some point, owned an assault weapon.  Mot. 9.  But even if ownership statistics were relevant to proving use for self-defense, industry and government data show that only 6.4 million gun owners (less than 8% of the 81 million gun owners in the U.S. and 2% of all Americans) own assault weapons.  Doc. 57-7 at 22; A27.  And even accepting plaintiffs' figure, that would mean only about 7% of the population owns an assault weapon.  For LCMs, plaintiffs cite an estimate that 150 million magazines with a capacity greater than 10 rounds are "in possession of American citizens," Doc. 10-3 at 2, and the above-mentioned online survey estimating that 39 million people have owned magazines that hold over 10 rounds, Mot. 10, a number representing an increase in LCMs that defies logic, A28.  Thus, neither of plaintiffs' sources is reliable.  *E.g.*, Doc. 57-7 at 23 n.26; A28 (ownership rates of LCMs cannot be reliably calculated because of lack of accurate data).

13

In sum, plaintiffs have not made a "strong showing," *Protect Our Parks*, 10 F.4th at 763 (cleaned up), that the Act regulates arms in common use for self-defense, such that it would regulate conduct within the plain text of the Second Amendment.

### C.     The Act is consistent with the historical tradition of prohibiting dangerous and unusual weapons.

Even if plaintiffs had shown that the Second Amendment's plain text applies to assault weapons or LCMs, they have not made a strong showing that the State will be unable to bear its burden at *Bruen*'s second step to show that the Act is "consistent with this Nation's historical tradition."  142 S. Ct. at 2126.  The State may meet that burden by showing that the challenged regulation is "relevantly similar" to a historical analogue.  *Id.* at 2132.  In *Bruen*, the Court did not "provide an exhaustive survey of the features that render regulations relevantly similar," but highlighted "two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2132-33.  In some cases, the historical inquiry is "fairly straightforward," *id.* at 2131, but others, particularly those "implicating unprecedented societal concerns or dramatic technological changes," require "a more nuanced approach," *id.* at 2132.  Regardless, the State need only identify a "well-established and representative historical analogue, not a historical twin."  *Id.*

As the Court recognized in *Heller* and *Bruen*, there is a long tradition of regulating dangerous and unusual weapons.  *Heller*, 554 U.S. at 627 (discussing

"historical tradition of prohibiting the carrying of dangerous and unusual weapons" pre-dating the Founding) (cleaned up); *Bruen*, 142 S. Ct. at 2128 (same).  Indeed, as the district court noted, Doc. 63 at 19-26, governments have restricted the sale, possession, or carriage of dangerous weapons throughout American history.  For example, between 1750 and 1799, States passed laws restricting the carrying of clubs in response to their criminal misuse.  *E.g.*, Doc. 57-10 at 51; A739-40.  In the 19th century, as crimes involving knives and percussion cap pistols increased, legislatures responded by passing laws prohibiting carrying them in public, Doc. 57-8 at 19-31; A631-44, and, in some cases, imposing criminal penalties for selling them, *e.g.*, 1837 Ga. Acts 90, §§ 1-4 (imposing fines up to $1000 for selling Bowie knives); 1837-38 Tenn. Pub. Acts 200-01, ch. 137, § 1 (imposing fines and jail terms for selling Bowie knives).  And as firearms capable of firing more than one shot without reloading became more prevalent, so did laws prohibiting them or restricting their capacity. *Friedman*, 784 F.3d at 408 (States began regulating machineguns in 1927, followed by 1934 federal ban); Doc. 57-10 at 21-22 (between 1917 and 1934, 23 States enacted laws restricting size of ammunition-feeding devices); Doc. 63 at 24-25 n.39 (collecting statutes regulating magazine capacity).[7]

---

[7]  It is appropriate to consider 20th-century regulations, given that the Act responds to "dramatic technological changes" that have generated "unprecedented societal concerns."  *Bruen*, 142 S. Ct. at 2132; *see also Friedman*, 784 F.3d at 408 (noting *Heller*'s conclusion that bans on possessing machine guns were "obviously valid" even though such laws did not arise until 1927).  Specifically, the Act responds to the emergence of modern assault weapons after World War II and their disproportionate use in mass shootings.  *See* Doc. 57-5 at 12-14; Doc. 57-7 at 6-19; Doc. 57-9 at 6-12; A10-24; A404-10; A587-91.

By prohibiting the selling and buying of items increasingly used in the deadliest mass shootings, the Act comfortably fits within this historical tradition of regulating firearms and magazines in response to new forms of violent crime perpetrated with technologically advanced weapons. *E.g.*, Doc. 57-7 at 11-12 (describing "growing use of assault weapons to carry out high-fatality mass shootings" and "disproportionately greater lethality associated with the use of assault weapons and LCMs"); Doc. 57-10 at 23 (gun laws "are enacted when [new weapons] technologies circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address"). Moreover, the Act imposes a minimal burden, if any, on the right to self-defense. And that burden is equivalent to, or less than, comparable historical regulations. As explained, *see supra* pp. 11-13, neither assault weapons nor LCMs are necessary for self-defense, and Illinois residents remain free to possess and use handguns, shotguns, and many types of rifles that are more effectively and commonly used for that purpose.

Plaintiffs do not dispute that "the nation's history of firearms regulation supports a law banning a 'dangerous and unusual' weapon," Mot. 13; they argue only that assault weapons and LCMs are not "unusual" because they are commonly

possessed, *id.* at 7-11.[8]  But as explained, *supra* p. 13, plaintiffs have not shown that assault weapons or LCMs are owned by more than a small percentage of Americans.

In any event, the historical record refutes plaintiffs' premise that no popular weapon can be considered "unusual."  Mot. 13.  History is replete with examples of weapons being both common and characterized as unusual.  *E.g.*, *State v. Huntly*, 25 N.C. 418, 422 (1843) (rejecting argument "that a double-barrelled gun, or any other gun, cannot in this country come under the description of 'unusual weapons'" just because many "in the community . . . own[ed] and occasionally use[d] a gun"); *English v. State*, 35 Tex. 473, 476-77 (1872) (characterizing "deadly devices" like "dirks, daggers, slingshots, sword canes, brass knuckles and bowie knives" as dangerous and unusual); The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290; Image 293-294 (1881) (1686 law prohibited wearing of "swords, daggers, pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons"); Doc. 57-8 at 18-19 (describing prevalence and regulation of "pistols, folding knives, dirk knives, and Bowie knives" shortly following the Founding); Doc. 57-10 at 41-49 (describing proliferation of and legislative response to Bowie knives, dirks, and other fighting knives).  Indeed, as

---

[8]  Although *Heller* used the conjunctive phrase "dangerous and unusual," 554 U.S. at 627, several of the sources the Court cited used the disjunctive phrase "dangerous or unusual," *see* William Blackstone, Commentaries 148-49 (1769); Charles Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); Henry J. Stephen, Summary of the Criminal Law 48 (1840); *see also O'Neill v. State*, 16 Ala. 65, 67 (1849) ("deadly or unusual" weapons).

discussed *supra* pp. 14-15, historical evidence shows that weapons only came to be considered dangerous and unusual—thus requiring a regulatory response—after their widespread use created new societal problems. The Act, which is a response to the modern problem of assault weapons and LCMs being used in mass shootings, adheres to that historical tradition.

## III.    Plaintiffs Did Not Make A Strong Showing That They Will Suffer Irreparable Harm.

Plaintiffs rely on two possible forms of alleged irreparable harm, but neither is persuasive. First, plaintiffs cite *Ezell* for the proposition that a probable violation of Second Amendment rights presumptively establishes irreparable harm. Mot. 15. But *Ezell* is inapposite. In *Ezell*, the ordinance required firing range training "as a prerequisite to lawful gun ownership, yet at the same time prohibit[ed] all firing ranges in the city." 651 F.3d at 689-90 (cleaned up). Because the ordinance made it "impossible" to qualify for gun ownership, it burdened the Second Amendment's "central component"—"the right to possess firearms for protection"—and this court presumed that "[i]nfringements of this right [could not] be compensated by damages." *Id.* at 690, 699. By contrast, the Act does not preclude anyone from purchasing handguns, shotguns, or other weapons for self-defense.

Second, plaintiffs allege that the gun store and its owner will suffer financial loss. Mot. 16-17. As support, they rely on *Cavel International, Inc. v. Madigan*, 500 F.3d 544 (7th Cir. 2007), but there, a horsemeat exporter challenged a statute that would have outlawed the exporter's entire business and made its failure "a virtual

18

certainty," *id.* at 545. And the defendants were "state officials sued in their official capacities" from whom the exporter "could not obtain monetary relief." *Id.* at 546. Here, the gun store does not exclusively sell assault weapons and LCMs; it also sells firearms not covered by the Act, and offers gunsmithing and firearms training services.[9] Nor did plaintiffs' declaration make clear that the store would close during this appeal; it gave no estimate of how long the business could survive. Doc. 71-1. Plaintiffs also failed to explain why a damages award could not make the store's owner whole. Doc. 48 at 7 (seeking compensatory damages); *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1024 (7th Cir. 2017) ("Harm cannot be considered irreparable if it can be fully rectified in a final judgment.").

## IV.   The Balance Of Equities And The Public Interest Favor The State.

The balance of equities and public interest also favor denying the motion. As discussed, *supra* pp. 18-19, plaintiffs have not made a strong showing that they will prevail or that their inability to purchase or sell assault weapons and LCMs will irreparably harm them. By contrast, the Act's restrictions on assault weapons and LCMs promote a compelling interest in protecting the public and saving lives. Doc. 57-6 at 11-13 (assault weapons cause wounds that are more destructive than other firearms); Doc. 57-7 at 27 (assault weapons and LCMs bans resulted in 72% decrease

---

[9]  Law Weapons & Supply, Online Store, http://bit.ly/3ZTimoU; Law Weapons & Supply, Law Weapons In-House Gun-Smithing Service, https://bit.ly/3Fby3jk; Law Weapons & Supply, Law Weapons Training Courses, https://bit.ly/3ZBbtJ8. Websites last visited March 21, 2023.

in deaths from mass shootings); Doc. 57-9 at 10-11 (assault weapons cause high mortality rate as compared to handguns); *N.Y. State Rifle & Pistol Ass'n. v. Cuomo*, 804 F.3d 242, 262 (2d Cir. 2015) (assault weapons "are disproportionately used in crime," including "mass shootings" and murders of law enforcement officers); *Ocean State Tactical*, 2022 U.S. Dist. LEXIS 227097, *46 (public interest in prohibiting LCMs "could not be more undeniably compelling").

## V.     This Court Should Deny Plaintiffs' Request For A Statewide Injunction.

Generally, injunctions should not exceed "the extent of the plaintiff's protectible right," *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995) (cleaned up), and those that extend further "present real dangers, and will be appropriate only in rare circumstances," *City of Chi. v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020).  This is not one of them.

Here, plaintiffs did not seek statewide relief in their preliminary injunction motion, Doc. 50, and only expanded their request for relief in their motion injunction pending appeal in the district court, Doc. 71 at 18-19.  They have offered no explanation for this delay, Mot. 17-18, which undercuts their claim that sweeping relief is necessary, *Simon Prop. Grp. v. mySimon, Inc.*, 282 F.3d 986, 990 (7th Cir. 2002) (failure to seek preliminary injunction "strongly undermine[d]" plaintiff's assertion of irreparable harm in later request for permanent injunction).  Nor have plaintiffs supported this broad request by offering any evidence of irreparable harm beyond the alleged financial difficulties of a single gun store.  Doc. 71-1.

Contrary to plaintiffs' argument, *Smith v. Executive Director of Indiana War Memorials Comm'n*, 742 F.3d 282, 290 (7th Cir. 2014), does not support their belated request.  Mot. 17.  In *Smith*, this court determined that the plaintiff was entitled to an injunction against an Indiana policy limiting the size of gatherings at public monuments, but remanded to the district court to determine its "proper scope."  742 F.3d at 290.  This court's only instruction was to apply the injunction "to individuals and small groups," *id.*, not, as plaintiffs request, all circumstances.  At the very least, this court should deny plaintiffs' request for a statewide injunction.

## CONCLUSION

For these reasons, this court should deny plaintiffs' motion.

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General

By:    /s/ Carson R. Griffis
CARSON R. GRIFFIS
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2575 (office)
(773)-590-7116 (cell)
Carson.Griffis@ilag.gov

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on March 21, 2023, I electronically filed the foregoing Opposition to Motion for Injunction Pending Appeal with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

I certify that the other participants in this appeal are CM/ECF users, and thus will be served using the CM/ECF system.

Michaela Snashall
msnashall@perkinscoie.com

Jason R. Craddock, Sr.
craddocklaw@icloud.com

Christopher Brennan Wilson
cwilson@perkinscoie.com

Kahin Gabriel Tong
ktong@perkinscoie.com

/s/ Carson R. Griffis
CARSON R. GRIFFIS
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2575 (office)
(773)-590-7116 (cell)
Carson.Griffis@ilag.gov