No. 23-1353

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————

National Association for Gun Rights, Robert C. Bevis, and Law Weapons,
Inc., D/B/A Law Weapons & Supply, an Illinois corporation,

*Plaintiff-Appellant,*

v.

City of Naperville, Illinois, a municipal corporation, and Jason Arres,

*Defendants-Appellees,*

State of Illinois,

*Intervening Appellee.*

———————

**On Appeal from the United States District Court
for the Northern District of Illinois, Case No. 1:22-cv-04775
The Honorable Virginia M. Kendall, Judge**

———————

**CITY OF NAPERVILLE AND JASON ARRES' RESPONSE
IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTION
PENDING APPEAL**

———————

Christopher B. Wilson (*Counsel of Record*)
Micaela Snashall
Kahin Gabriel Tong
PERKINS COIE LLP
110 N. Wacker, Ste. 3400
Chicago, IL 60606
Telephone: (312) 324-8400
Facsimile: (312) 324-9603
CWilson@perkinscoie.com
MSnashall@perkinscoie.com
KTong@perkinscoie.com

Douglas N. Letter (admission pending)
Shira Lauren Feldman (admission pending)
BRADY
840 First Street NE, Suite 400
Washington, DC 20002
Telephone: (202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

*Attorneys for Defendants-Appellees City
of Naperville, Illinois, and Jason Arres*

161241773.3

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................... 1

BACKGROUND ................................................................................... 1

STANDARD OF REVIEW ...................................................................... 3

ARGUMENT ........................................................................................ 3

I.     Plaintiffs are not likely to succeed on the merits because Naperville's Ordinance comports with the Second Amendment............................4

    A.     Assault weapons are not covered by the plain text of the Second Amendment.................................................................5

    B.     The Ordinance comports with this Nation's historical tradition of regulating dangerous or unusual weapons.....................................111

II.    Plaintiffs will not be irreparable harmed if the Court denies their Motion.................................................................................15

III.   The balance of hardships favors Naperville.....................................177

CONCLUSION .................................................................................... 188

CERTIFICATE OF COMPLIANCE .................................................... 200

CERTIFICATE OF SERVICE ............................................................. 211

161241773.3

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Am. Hosp. Supply Corp. v. Hosp. Prod. Ltd.,*
780 F.2d 589 (7th Cir. 1986) ................................................................................ 3

*Aymette v. State,*
21 Tenn. 154 (1840) ............................................................................................ 12

*Bevis et al. v. City of Naperville et al.,*
Case No. 22-cv-04775 ...................................................................................passim

*Braam v. Carr,*
37 F.4th 1269 (7th Cir. 2022) ............................................................................ 15

*Camelot Bonquet Rooms, Inc. v. United States Small Business
Administration,*
24 F.4th 640 (7th Cir. 2022) .............................................................................. 15

*Cockrum v. State,*
24 Tex. 394 (1859) .............................................................................................. 12

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .......................................................................................passim

*DM Trans, LLC v. Scott,*
38 F.4th 608 (7th Cir. 2022) .............................................................................. 16

*Friedman v. City of Highland Park, Illinois,*
784 F.3d 406 (7th Cir. 2015) .................................................................. 8, 10, 18

*Heller v. Dist. of Columbia,*
670 F.3d 1244 ...................................................................................................... 8

*Kolbe v. Hogan,*
849 F.3d 114 (4th Cir. 2017) .............................................................. 7, 8, 10, 18

*Matter of Forty-Eight Insulations, Inc.,*
115 F.3d 1294 (7th Cir. 1997) ............................................................................. 4

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
804 F.3d 242 (2d Cir. 2015).............................................................................. 17

*New York State Rifle Pistol Association, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) ........................................................................passim

*Protect Our Parks, Inc. v. Buttigieg*,
10 F.4th 758 (7th Cir. 2021)................................................................. 3

*Rakovich v. Wade*,
834 F.2d 673 (7th Cir. 1987) .............................................................. 16

*Second City Music, Inc. v. City of Chicago, Ill.*,
333 F.3d 846 (7th Cir. 2003) .............................................................. 17

*Turnell v. CentiMark Corp.*,
796 F.3d 656 (7th Cir. 2015) .............................................................. 16

*United States v. Miller*,
307 U.S. 174 (1939) ............................................................................ 7

*Wham-O, Inc. v. Manley Toys, Ltd.*,
No. 08-56188, 2009 WL 1353752 (9th Cir. May 15, 2009).................... 16

*Worman v. Healey*,
922 F.3d 26 (1st Cir. 2019)................................................................. 8

## STATUTES

720 ILCS 5/24-1.9 ............................................................................... 2

Naperville's Ordinance No. 22-000 ..............................................passim

## OTHER AUTHORITIES

Black's Law Dictionary 214 (6th ed. 1990) ........................................ 6

4 Blackstone, *Commentaries on the Laws of England* 148–49 ............. 9, 10

*Abadi et al., The 30 Deadliest Mass Shootings in Modern US History*
*Include Buffalo and Uvalde*, Bus. Insider (May 26, 2022),
https://www.businessinsider.com/deadliest-mass-shootings-in-us-
history-2017-10.................................................................................. 9

Charles Humphreys, *A Compendium of the Common Law in Force in*
*Kentucky* 482 (1822) ......................................................................... 9

Follman et al., *US Mass Shootings, 1982–2022: Data From Mother Jones' Investigation*, Mother Jones (Nov. 23, 2022), https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/ ................................................................ 9

Francis Wharton, *A Treatise on the Criminal Law of the United States* 63 (1852) ............................................................................................... 9

Henry Stephen, *Summary of the Criminal Law* 48 (1840) ......................... 9

*Modern US History Include Buffalo and Uvalde*, Bus. Insider (May 26, 2022), https://www.businessinsider.com/deadliest-mass-shootings-in-us-history-2017-10 ........................................................................ 9

*Number of victims of the worst mass shootings in the United States between 1982 and May 2022*, Statista (2022), https://www.statista.com/statistics/476101/worst-mass-shootings-in-the-us/ ..................................................................................................... 9

U.S. Const. amend. II ....................................................................... passim

*US Mass Shootings, 1982–2022: Data From Mother Jones' Investigation*, Mother Jones (Nov. 23, 2022), https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/ ................................................................ 9

## INTRODUCTION

Plaintiffs seek the "extraordinary and drastic" remedy of an injunction pending appeal to enjoin the enforcement of the City of Naperville's Ordinance that prevents the commercial sale of assault rifles. But Plaintiffs cannot meet the demanding standard for such disfavored relief. As explained herein, Plaintiffs cannot show their legal claims are likely to succeed; cannot show that they will suffer irreparable harm in the absence of an injunction; and cannot show the balance of harms and public interest favor an injunction. The Court should deny Plaintiffs' injunction motion.

## BACKGROUND

Mass shootings with assault weapons have become all too common in America. In Uvalde; Buffalo; El Paso; Pittsburgh; Parkland; Sutherland Springs; Las Vegas; San Bernadino; Orlando; and Newton, gunmen used assault weapons to kill multiple people in a matter of minutes. (*See Bevis et al. v. City of Naperville et al.*, Case No. 22-cv-04775 ("Bevis"), Memorandum Opinion and Order ("Opinion"), Dkt. 63 at 1–2). In response, states including California, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, New Jersey, and New York—along with many municipalities—have enacted bans on the possession, sale, and manufacture of assault weapons. (*Id.*)

On August 17, 2022, Naperville's City Council responded to these tragic events. In the wake of a mass shooting carried out with an assault weapon during a mere 60–90 seconds that left seven dead and 48 wounded at an Independence Day parade in Highland Park, and at the behest of concerned citizens, Naperville's City Council passed Ordinance No. 22-000 (the "Ordinance") banning the commercial sale of a

defined class of "assault rifles" within Naperville's city limits.[1] (*Bevis*, Dkt. 34 at 1–2). Plaintiffs Robert Bevis, a Naperville gun shop owner, and the National Association of Gun Rights ("NAGR"), a nonprofit organization, sued Naperville, alleging that the Ordinance violated the Second Amendment, and moved for a temporary restraining order and preliminary injunction preventing its enforcement. (*Bevis*, Dkt. 1, 10). Naperville agreed to stay the Ordinance, initially set to go into effect on January 1, 2023, pending disposition of Plaintiffs' motion. (*Bevis*, Dkt. 29).

The events in Highland Park and other mass shooting tragedies nationwide also inspired action by the Illinois General Assembly. On January 10, 2023, Illinois Governor J.B. Pritzker signed into law the Protect Illinois Communities Act (the "Act"), which prohibits the sale, purchase, manufacture, delivery, and importation of assault weapons and large capacity magazines subject to certain exceptions for law enforcement, members of the military, and other professionals with similar firearms training and experience. 720 ILCS 5/24-1.9, 1.10.[2]

Shortly thereafter, the District Court granted Plaintiffs leave to amend their complaint to add the state as a party. (*Bevis*, Dkt. 41, 47). Plaintiffs filed their

---

[1] Naperville uses the term "assault rifle" as defined in its Ordinance. (*See Bevis*, Dkt. 34-2 at Section 3-19-1); (Opinion at 2–3). Naperville also refers more generally to "assault weapons," which is more broadly defined in the State of Illinois' Protect Illinois Communities Act and includes the assault rifles defined in the Naperville Ordinance. (*See* Opinion at 3). The District Court used both terms interchangeably and found "they are widely accepted in modern parlance and effectively convey the substance of the bans." (*See* Opinion at 2 n.1).

[2] In this brief, Naperville specifically opposes Plaintiffs' Motion to enjoin enforcement of the Ordinance, which is limited to the commercial sale of assault rifles within city limits. Naperville also supports the State's opposition to Plaintiffs' Motion to enjoin enforcement of the statewide Act, for the reasons articulated in the State's opposition brief. (Dkt. 13).

Amended Complaint, also adding Jason Arres, Naperville's Chief of Police, as a defendant and asserted that the Ordinance and the Act violated the Second Amendment. (*Bevis*, Dkt. 48). Plaintiffs then moved for a temporary restraining order and preliminary injunction against both laws. (*Bevis*, Dkt. 50). The District Court denied Plaintiffs' motions on February 17, 2023. (*See generally* Opinion).

Plaintiffs appealed to this Court. (Dkt. 1). Plaintiffs then moved in the District Court for an injunction pending appeal (*Bevis*, Dkt. 71), which Judge Kendall denied. (*Bevis*, Dkt. 73). Plaintiffs now seek an injunction pending appeal ("Motion") from this Court (Dkt. 8).

## STANDARD OF REVIEW

This Court's review of a district court's denial of a preliminary injunction and thus an injunction pending an appeal is "limited." *Am. Hosp. Supply Corp. v. Hosp. Prod. Ltd.*, 780 F.2d 589, 594 (7th Cir. 1986). It will reverse a district court's denial of such relief only for an abuse of discretion. *Id.*

## ARGUMENT

"An injunction pending appeal is an extraordinary measure." *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021). Plaintiffs must show four distinct elements to obtain injunctive relief: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.*

Obtaining an injunction pending an appeal requires overcoming an exacting standard. "[T]he mere possibility of success is not enough." *Id.* Plaintiffs must make

– 3 –

a "stronger threshold showing of a likelihood of success" on appeal than required in the district court, because their arguments were already evaluated and rejected by a lower court. *Matter of Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1301 (7th Cir. 1997). Here, the District Court correctly denied Plaintiffs' motion for preliminary injunction after the parties thoroughly briefed and argued the motion. (*See* Opinion). The District Court similarly denied Plaintiffs' motion for injunction pending appeal. (*Bevis*, Dkt. 73). In seeking an interlocutory injunction for a third time, Plaintiffs cannot overcome the higher standard they face in this Court.

As explained below, Plaintiffs fail to show a likelihood of success on the merits under any standard. Plaintiffs also cannot show they will likely suffer irreparable harm during this appeal if their Motion is denied. Additionally, the balance of equities tips in Naperville's favor, given that its Ordinance is plainly directed at discouraging yet another mass murder. It is therefore manifestly in the public's best interest to keep the Naperville Ordinance in place while this appeal proceeds.

## I. Plaintiffs are not likely to succeed on the merits because Naperville's Ordinance comports with the Second Amendment.

The Supreme Court of the United States recently established a two-part standard for reviewing restrictions on firearms: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022). Thus, a plaintiff challenging a firearm regulation must first show that the regulated conduct

falls within the protection of the Second Amendment. *Id.* If they can, the burden shifts to the government to justify the regulation is consistent with the Nation's historical tradition of firearm regulation. *Id.* Here, Plaintiffs cannot meet either prong of the analysis.

First, assault weapons are not covered by the plain text of the Second Amendment. Second, even if assault weapons were protected by that text, the Ordinance falls squarely within the Nation's historical tradition of regulating dangerous or unusual weapons. As the District Court found, Naperville's Ordinance is "consistent with the Second Amendment's text, history, and tradition." (Opinion at 5). Plaintiffs are not likely to succeed on the merits.

### A. Assault weapons are not covered by the plain text of the Second Amendment.

The text of the Second Amendment recites: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to *keep and bear Arms*, shall not be infringed." U.S. Const. amend. II. (emphasis added). The Supreme Court in both *Heller* and *Bruen* conducted a textual analysis and held that the plain language of the Second Amendment covers *only certain weapons like handguns that are commonly used for lawful purposes like self-defense. See District of Columbia v. Heller*, 554 U.S. 570, 592 (2008); *Bruen*, 142 S. Ct. at 2134. Plaintiffs claim the Ordinance infringes on the alleged right to commercially sell assault rifles. But Plaintiffs have not identified a single case in which a court struck down a ban on assault rifle sales. And Plaintiffs do not contend, nor could they, that they are being deprived of the right to possess or own handguns for self-defense.

The *Heller* court determined that the Second Amendment *only* protects an individual's rights to "keep and bear arms." Parsing the plain text of the Second Amendment, the Court noted that (1) the phrase "keep arms" means to "have weapons" and "possess[] arms," *Heller*, 554 U.S. at 582–83; and (2) "bear arms" simply means "to carry" or "to wear, bear, or carry . . . upon the person or in the clothing or a pocket." *Id.* at 584 (quoting Black's Law Dictionary 214 (6th ed. 1990)). And in holding that the Second Amendment "guarantee[s] the individual right to *possess and carry weapons* in case of confrontation," *id.* at 592 (emphasis added), the Court explicitly noted that "[n]othing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. The *Bruen* court concluded the same with respect to *carrying* handguns outside the home for self-defense. *Bruen*, 142 S. Ct. at 2134. Relying on *Heller*'s textual analysis, it determined that the "textual elements" of the Second Amendment cover the "individual right to *possess and carry* weapons" and said nothing about the right to possess or sell assault weapons. *Id.* (emphasis added). Consistent with the *Heller* court's admonition that "the right secured by the Second Amendment is not unlimited," *Heller,* 554 U.S. at 626, the *Bruen* court made clear "[o]ur holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742 [] (2010), about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring).

In analyzing the Ordinance under the *Bruen* standard, Plaintiffs incorrectly claim if the banned firearm is commonly owned by law-abiding citizens for lawful purposes, the analysis ends there. (Motion at 2–3). But the established test is common use, not common ownership. *See Heller*, 554 U.S. at 624 (declaring the Second Amendment protects only those weapons that are "'in common use at the time' for lawful purposes like self-defense." (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939); *see also Bruen*, 142 S. Ct. at 2134 (referencing whether the subject "weapons [are] 'in common use' today for self-defense" (quoting *Heller*, 554 U.S. at 627)). The *Bruen* court was clear that this "common use" inquiry comes in at the textual stage of its analysis, rather than the historical stage at which the government bears the burden. *Id.* at 2134.

Assault weapons, like the assault rifles banned by the Ordinance, are not in common use for self-defense. Courts have noted that they are "most useful in military service," *Heller*, 554 U.S. at 627, and are unsuited and uncommon for self-defense purposes, *see Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017) ("[M]ost individuals choose to keep other firearms for [self-defense].").

Tellingly, Plaintiffs offer no evidence, such as survey data or studies, showing that assault weapons are used frequently in self-defense. An FBI database reflects defensive use of an assault weapon in only 0.2% of active-shooter incidents between 2000 to 2021. (*Bevis*, Dkt. 57, Ex. G, Klarevas' Highland Park Decl., ¶ 25). Plaintiffs instead argue that the firearms subject to the Ordinance are in common use because of their purported popularity, quoting statistics of the quantity sold in recent years.

(*See* Motion at 8) ("The AR-15 in particular . . . is America's 'most popular semi-automatic rifle'" (quoting *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1287 ("*Heller II*") (citation omitted))).

The phrase "in common use" in *Heller*, however, does not simply refer to a weapon's popularity among a niche segment of society, or the quantities manufactured or sold. *See Kolbe*, 849 F.3d at 142 (noting that "the *Heller* majority said nothing to confirm that it was sponsoring a popularity test"). Relying solely on "how common a weapon is at the time of litigation" would be "circular," because commonality depends in part on what the law allows. *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). For example, machine guns were "all too common" during Prohibition, but that did not immunize them from heavy regulation and an eventual ban because they were military-grade weapons. *Id.* at 408–09; *see also Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical"). Nothing in *Bruen* undermines that "in common use" means exactly that.

Plaintiffs cannot offer evidence that assault weapons are "in common use," let alone in "common use" for lawful self-defense, because the weapons are not in common use by civilians for anything. Out of the 462 million firearms in circulation nationwide, only 24 million (5%) were assault weapons in circulation in the United States. (*Bevis*, Dkt. 57, Ex. G, Klarevas' Highland Park Decl., ¶ 13). And unlike handguns, which are owned broadly across the country, ownership of assault weapons is highly concentrated—less than 2% of the current population of approximately 333

million Americans own an assault weapon. (*Id.* ¶ 27). This means that more than 98% of Americans do *not* own an assault weapon.

Setting aside their "common use" test problem, Plaintiffs ignore that assault weapons are "dangerous [or] unusual"[3] weapons that receive no Second Amendment protection. *See* U.S. Const. amend. II; *Heller*, 554 U.S. at 627. Assault rifles like those contemplated by the Ordinance have been used in the majority of American mass shootings. (*Bevis*, Dkt. 57, Ex. G, Klarevas' Highland Park Decl., ¶¶ 11–23). Indeed, the mass shootings with the most deaths in recent years—including the Independence Day Highland Park Parade shooting—were carried out with these weapons. (*See also Bevis*, Dkt. 57-12 Mass Shootings Involving Assault Weapons).[4]

---

[3] Plaintiffs rely heavily on *Heller*'s use of "and" in "dangerous and unusual," 554 U.S. at 627, which describes Blackstone's statement about the tradition of gun regulations. Blackstone's actual statement cited by *Heller* was that "dangerous **or** unusual" weapons were historically prohibited. *See, e.g.*, 4 Sir William Blackstone, *Commentaries on the Laws of England* 149 (1789) ("The offense of riding or going armed, with dangerous **or** unusual weapons, is a crime against the public peace, by terrifying the good people of the land.") (emphasis added). *Heller* must have meant that Blackstone was describing a tradition of prohibiting both "dangerous and unusual" weapons. The other authorities cited after Blackstone confirm the tradition was of prohibiting both dangerous weapons and unusual weapons. *See* Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822) ("Riding or going armed with dangerous **or** unusual weapons, is a crime against the public peace.") (emphasis added); Henry Stephen, *Summary of the Criminal Law* 48 (1840) (includes section titled "riding or going armed with dangerous **or** unusual weapons) (emphasis added); Francis Wharton, *A Treatise on the Criminal Law of the United States* 63 (1852) (referring to "unusual" but not "dangerous" weapons). In any event, the difference is irrelevant: assault weapons are both "dangerous" and "unusual."

[4] *Number of victims of the worst mass shootings in the United States between 1982 and May 2022*, Statista (2022), https://www.statista.com/statistics/476101/worst-mass-shootings-in-the-us/; Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include Buffalo and Uvalde*, Bus. Insider (May 26, 2022), https://www.businessinsider.com/deadliest-mass-shootings-in-us-history-2017-10; Follman et al., *US Mass Shootings, 1982–2022: Data From Mother Jones' Investigation*, Mother Jones (Nov. 23, 2022), https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/.

Mass murderers prefer assault weapons because they are the "perfect killing machine," designed to kill as many people as quickly as possible. (*Bevis*, Dkt. 57-4, Ex. D, Andrews' Highland Park Decl., ¶ 34 n.40). Assault weapons clearly fall into Blackstone's definition of dangerous or unusual weapons as ones that are used to "terroriz[e] the good people of the land." Blackstone's Commentaries on the Laws of England (1769). Thus, even if Plaintiffs could meet their burden that limitations on the commercial sale of assault weapons are governed by the text of the Second Amendment, the Ordinance would still be constitutional because it is consistent with the Nation's tradition of regulating "dangerous [or] unusual weapons." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).

Instead of contending with the "dangerousness" element, Plaintiffs attempt to twist the District Court's finding that assault weapons are dangerous or unusual by arguing that the District Court engaged in allegedly improper "means-end" scrutiny.[5] (Motion at 14–15). This claim is incorrect. By explaining the deadly features of assault weapons and their use in mass shootings, the District Court held that Naperville's Ordinance falls firmly within the historical tradition of regulating dangerous weapons. (Opinion at 30). Moreover, it is evident that the District Court did not conduct a means-end analysis because it did not balance Plaintiffs' interests with the public interest. *Compare* Opinion at 26–30, *with*, *e.g.*, *Kolbe*, 849 F.3d at 138

---

[5] The District Court held that *Friedman*, 784 F.3d at 406 was abrogated by *Bruen* because it conducted a means-end analysis. (Opinion at 16). Naperville argues that *Friedman* is still good law because it did not employ a means-end analysis. (*See Bevis*, Dkt. 57 at 6). Instead, *Friedman* explicitly rejected the means-end analysis, *see Friedman*, 784 F.3d at 410, and followed *Heller* in finding that assault weapons were dangerous and not needed for self-defense, *id.* at 411.

(balancing the public interest with an individual's right to carry a firearm for self-defense). Any balancing test conducted by the District Court properly comes later as part of its preliminary injunction analysis. (*See* Opinion at 33).

Finally, this Court should disregard Plaintiffs' characterization of *Heller* as failing to ban handguns used in mass murders. The *Heller* Court's rationale was narrowly targeted to the handgun regulation before it, which amounted to a complete prohibition on all handguns; it did not address the country's epidemic of mass shootings or the much narrower category of firearms at issue here. Naperville's Ordinance specifically regulates *assault rifles* to decrease mass shootings.

### B.    The Ordinance comports with this Nation's historical tradition of regulating dangerous or unusual weapons

Even if Plaintiffs could show that assault weapons are covered by the plain text of the Second Amendment, Naperville has offered more than enough evidence (as the District Court found) that its Ordinance is consistent with the Nation's tradition of regulating unusually dangerous weapons that are associated with unlawful activities rather than lawful self-defense.

Gun ownership and gun regulation have evolved since the passage of the Second Amendment. In the 18th century, violent crime was at historic lows. The rate at which adult colonists were killed by violent crime was one per 100,000 in New England and, on the high end, five per 100,000 in Tidewater, Virginia. (*Id.* at 19 n. 11). The "pressing problem" for minimizing violence in the colonies was not guns. (*Id.* at 19 (citing *Bevis* Dkt. 34-7, ¶ 9)).

An early regulation concerned the "Bowie knife.". (*Id.* at 20 n.14) In the early

19th century, this "fighting knife" gained notoriety after it was supposedly used in a violent brawl in central Louisiana. (*Id.*) Bowie knives were also more popular in duels than single-shot pistols. (*Id.* at 20 n.17). States quickly regulated them. By the twentieth century, every state except one regulated Bowie knives—thirty-eight states did so by explicitly naming the weapon (*Id.* at 21 n.21), and twelve more states barred the category of knives encompassing them. (*Id.* at 21 n.22 (citing *Bevis* Dkt. 34-4, ¶ 39)). Courts uniformly upheld these laws. *See Aymette v. State*, 21 Tenn. 154, 159 (1840); *see also Cockrum v. State*, 24 Tex. 394, 402 (1859); (Opinion at 22 n.23).

Laws regulating melee weapons targeted more than just the Bowie knife. (Opinion at 22). As early guns proved unreliable, many citizens carried clubs and other blunt weapons. (*Id.* at 22 (citing *Bevis* Dkt. 34-4, ¶ 40)). Popular instruments included the billy club, a heavy, hand-held club usually made of wood or metal, and a slungshot, a striking weapon that had a piece of metal or stone attached to a flexible strip or handle. (*Id.* at 22 (citing *Bevis* Dkt. 34-4, ¶¶ 41–44)).

States responded with regulations. The colony of New York enacted the first "anti-club" law in 1664. (*Id.* at 22 n.24). Sixteen states followed, the latest being Indiana in 1905, which proscribed the clubs in sensitive places of transportation. By the early 1900s, almost half of states and some municipalities regulated billy clubs. (*Id.* at 22 n.27). "Anti-slungshot" carry laws proved the most ubiquitous. (*Id.* at 23 n.30). Forty-three states limited slungshots, which were "widely used by criminals and street gang members in the 19th Century" because "[t]hey had the advantage of being easy to make silent, and very effective, particularly against an unsuspecting

opponent." (*Id.* at 23 (citing *Bevis* Dkt. 34-4, ¶ 44)).

States continued to regulate particularly dangerous weapons from the 18th century through the late 19th and early 20th centuries. Five years before the American Revolution and three decades before the ratification of the Second Amendment, New Jersey banned "any loaded Gun . . . intended to go off or discharge itself, or be discharged by any String Rope, or other Contrivance." (Opinion at 23 n.32). After the Civil War, Minnesota, Michigan, Vermont, and North Dakota passed nearly identical laws. (*Id.* at 23 n.33). Eight states banned gun silencers in the 1900s. (*Id.* at 23–24 n.34). Semiautomatic weapons themselves, of which assault weapons are a category, were directly controlled in the early 20th century. (*Id.* at 24). In total, nine states passed semiautomatic-weapon regulations, (*id.* at 24 n.37) along with Congress, which criminalized the possession of a "machine gun" in D.C., defined as "any firearm which shoots . . . semiautomatically more than twelve shots without reloading," (*id.* at 24 n.38).

Concealed-carry laws also regularly referred to "dangerous" weapons. In 1859, Ohio outlawed carrying "any other dangerous weapon" (Opinion at 25 n.40), and five years later, California prohibited carrying any concealed "dangerous or deadly weapon," followed by a similar law in 1917 with the same "dangerous or deadly" language, (*id.* at 25 n.41). By the 1930s, most states had similar regulations on "dangerous weapons." (*Id.* at 25 n.42). At the federal level, the District of Columbia made it unlawful "for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons." (*Id.* at 26 n.43).

The history of firearm regulations establishes that governments have long retained the ability to regulate highly dangerous arms. Indeed, for more than 200 years, local, state, and federal governments have adopted measures to protect citizens from dangerous weapons. None of that has been controversial.

Assault weapons are part of this long history of dangerous arms. Since their commercial introduction, assault weapons have posed an exceptional danger to citizens—far greater than standard self-defense weapons such as handguns. (Opinion at 26 n.44). Assault weapons fire quickly: a shooter using a semiautomatic weapon can launch thirty rounds in as little as six seconds, with an effective rate of about a bullet per second for each minute of firing. (*Id.* at 26 n.45). This meets the U.S. Army definition for "rapid fire." (*Id.* at 26 n.46).

The muzzle velocity of an assault weapon is four times higher than a high-powered semiautomatic firearm. (*Id.* at 26 n.47). A bullet striking a body causes cavitation, meaning, in the words of a trauma surgeon, "that as the projectile passes through tissue, it creates a large cavity." (*Id.* at 27 n.48). It does not have to actually hit an artery to damage it and cause catastrophic bleeding. (*Id.*) Exit wounds can be the size of an orange. (*Id.* at 27 n.49). Children are even more vulnerable because "the surface area of their organs and arteries are smaller." (*Id.* at 27 n.50). Additionally, "[t]he injury along the path of the bullet from an AR-15 is vastly different from a low-velocity handgun injury." (*Id.* at 27 n.51). Measured by injury per shooting, there is an average of about 30 injuries for assault weapons compared to 7.7 injuries for semiautomatic handguns. (*Id.* at 27 n.52). In a mass shooting involving a non-

semiautomatic firearm, 5.4 people are killed and 3.9 people are wounded on average; in a mass shooting with a semiautomatic handgun, the numbers climb to 6.5 people killed and 5.8 people wounded on average; and in a mass shooting with a semiautomatic rifle, the average number of people rises to 9.2 killed and 11 wounded on average. (*Id.* (citing *Bevis* Dkt. 57-8, ¶ 54)).

Assault-weapons regulations are neither "unusual," *Bruen*, 142 S. Ct. at 2129 (Kavanaugh, concurring), nor "severe," *Heller*, 554 U.S. at 629. The federal government banned assault weapons for ten years. (Opinion at 30). Today, eight states, the District of Columbia, and numerous municipalities maintain assault-weapons bans. (*Id.*) Because assault weapons are dangerous weapons, their regulation accords with history and tradition.

Naperville therefore lawfully exercised its authority to control assault rifles by enacting a ban on their commercial sale. That decision comports with the Nation's historical tradition of regulating highly dangerous weapons consistent with the Second Amendment. As a result, Plaintiffs have not shown the "likelihood of success on the merits" necessary for relief. *See Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022) (citation omitted); *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 644 (7th Cir. 2022) (citation omitted).

## II. Plaintiffs will not be irreparably harmed if the Court denies their Motion.

Plaintiffs have not shown actionable irreparable harm.[6] A specific harm

---

[6] In an affidavit to their motion for injunction pending appeal in the District Court, Plaintiffs alleged for the first time additional supposed irreparable harm. (*See Bevis*, Dkt. 71 at 17; 71-1). Mr. Bevis

stemming from lost profits or customers is not irreparable if those losses are quantifiable, such that concrete monetary damages can be awarded in lieu of an injunction. *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022). In *DM Trans*, this Court affirmed a denial of injunction because the movant could specifically identify the sources of lost customers. *Id.* at 620. The Court held that no irreparable harm existed because the movant could "reasonably estimate the value of its lost profits" such that any harm could be remedied by monetary damages. *Id.* Here, Plaintiffs did not suffer irreparable harm because their "business records enable . . . [them] to calculate the amount of lost sales" from the inability to sell assault weapons. *Id.* at 618. In fact, Plaintiffs have done the math and concluded that "85% of the firearms LWI sells are banned." (Motion at 13). Thus, any quantifiable losses of income, such as what Plaintiffs have alleged here, are not irreparable. (*See* Opinion at 32 ("Bevis has not furnished any evidence that he will lose substantial sales")).

Moreover, as the District Court correctly points out, Plaintiffs are free to sell almost any other type of guns. (Opinion at 32). A sales ban that affects only 5% of firearms should not prevent Plaintiffs from earning a living. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 666 (7th Cir. 2015) (declining to find irreparable harm when the

---

claims his cash reserve has been depleted; he has laid off employees; he is behind on his home and car payments; and that he has taken out loans to pay his bills. (*Id.*) Plaintiffs' new allegations were improper because the District Court was divested of its jurisdiction when Plaintiffs commenced this appeal. *Rakovich v. Wade*, 834 F.2d 673, 674 (7th Cir. 1987). Thus, this Court should not consider these new facts brought improperly before the District Court. *Wham-O, Inc. v. Manley Toys, Ltd.*, No. 08-56188, 2009 WL 1353752, at *1 (9th Cir. May 15, 2009) (holding the court of appeals cannot consider a new declaration submitted to the district court after the district court ruled on a preliminary injunction).

party "can sell other types of roofing without restrictions" and when the inability to sell one type of roofing "does not prevent [plaintiff] from earning a living"); (Opinion at 32). Plaintiffs' insistence on primarily selling assault weapons is "self-inflicted" injury that courts do not consider irreparable. *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("[S]elf-inflicted wounds are not irreparable injury."). Plaintiffs can avoid "financial duress" by selling other firearms. They will not be irreparably harmed if the Court denies their Motion.

### III.    The balance of hardships favors Naperville.

Plaintiffs' Motion should also be denied because an injunction would harm Naperville's (and the public's) interest in safety within the City's limits. Plaintiffs claim Mr. Bevis will "be forced out of business." (Motion at 16). Naperville's aim to ensure public safety and protect its citizens from mass shootings strongly outweighs these illusory and unsupported harms. The balance of hardships heavily favors Naperville. (Opinion at 33 ("Illinois and Naperville compellingly argue that their laws protect public safety by removing particularly dangerous weapons from circulation.")).

Naperville has a compelling interest in regulating assault rifles to protect its citizens. (*Id.*) Weapons like those contemplated by the Ordinance were used in four of the five deadliest mass shootings in U.S. history. (*Bevis*, Dkt. 12 at 13 n.8). When an assault weapon is used in a mass shooting, nearly 14 times as many people are injured, and twice as many people are killed. (*Id.* at 13 n.9). Appellate courts repeatedly have observed the danger. *See, e.g., New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 262 (2d Cir. 2015) ("When used, [assault rifles] tend to

– 17 –

result in more numerous wounds, more serious wounds, and more victims."); *see also* *Kolbe*, 849 F.3d at 114; *Friedman*, 784 F.3d at 411.

Plaintiffs' alleged harm is significantly outweighed by Naperville's interest in protecting its citizens. Moreover, Mr. Bevis' conclusory statement that he will "be forced out of business," with no information about potential lost sales or profits, does not make a "clear showing" that his alleged harm outweighs the public's interest in safety and protection. (Opinion at 33 ("[T]he financial burden and loss of access to effective firearms would be minimal.")). Mr. Bevis can still sell a variety of weapons— just not those prohibited by the Ordinance. (*Id.*) The balancing of harms strongly favors Naperville, and Plaintiffs' request for injunctive relief pending appeal should be denied.

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' Motion.

Dated:  March 21, 2023                    Respectfully submitted,

*/s/ Christopher B. Wilson*
Christopher B. Wilson
Micaela M. Snashall
Kahin Gabriel Tong
**PERKINS COIE LLP**
110 N. Wacker, Ste. 3400
Chicago, IL 60606
Telephone: (312) 324-8400
Facsimile: (312) 324-9603
CWilson@perkinscoie.com
MSnashall@perkinscoie.com
KTong@perkinscoie.com

Douglas N. Letter (admission pending)
Shira Lauren Feldman (admission pending)
**BRADY**
840 First Street NE, Suite 400
Washington, DC 20002
Telephone: (202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

*Attorneys for Defendants-Appellees City of Naperville, Illinois and Jason Arres*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5130 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Seventh Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point Century Schoolbook font.

Dated this 21st day of March, 2023.

*/s/ Christopher B. Wilson*

Christopher B. Wilson *(Counsel of Record)*
PERKINS COIE LLP
110 N. Wacker, Ste. 3400
Chicago, IL 60606
Telephone: (312) 324-8400

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated this 21st day of March, 2023.

*/s/ Christopher B. Wilson*

Christopher B. Wilson *(Counsel of Record)*
PERKINS COIE LLP
110 N. Wacker, Ste. 3400
Chicago, IL 60606
Telephone: (312) 324-8400