No. 23-1353

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

NATIONAL ASSOCIATION FOR GUN RIGHTS; ROBERT C. BEVIS; and LAW WEAPONS, INC d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation,

*Plaintiffs-Appellants,*

v.

CITY OF NAPERVILLE, ILLINOIS and JASON ARRES,

*Defendants-Appellees,*

and

THE STATE OF ILLINOIS,

*Intervening-Appellee*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, NO. 1:22-CV-04775
THE HONORABLE VIRGINIA M. KENDALL, JUDGE PRESIDING

---

## BRIEF OF PLAINTIFFS-APPELLANTS
### Oral Argument Requested

---

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 WADSWORTH BOULEVARD
WHEAT RIDGE, COLORADO 80033
(303) 205-7870

JASON R. CRADDOCK
LAW OFFICE OF JASON R. CRADDOCK
2021 MIDWEST ROAD, SUITE 200
OAK BROOK, ILLINOIS 60523
708) 964-4973

*Attorneys for Plaintiffs-Appellants*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

National Association for Gun Rights, Robert C. Bevis, Law Weapons, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Law Office of Jason R. Craddock, Arrington Law Firm

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

None

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Barry K. Arrington    Date: March 21, 2023

Attorney's Printed Name:  Barry K. Arrington

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address:  4195 Wadsworth Blvd., Wheat Ridge, Colorado 80033

Phone Number:  303-205-7870    Fax Number:  none

E-Mail Address: barry@arringtonpc.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As    Clear Form

Appellate Court No: 23-1353

Short Caption: Robert Bevis; Law Weapons, Inc., and NAGR v. City of Naperville and Jason Arres

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Robert C. Bevis; Law Weapons, Inc. d/b/a Law Weapons & Supply; National Association for Gun Rights (NAGR)

_____

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Law Office of Jason R. Craddock, Arrington Law Firm

_____

(3)  If the party, amicus or intervenor is a corporation:

i)  Identify all its parent corporations, if any; and
None

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
None

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ Jason R. Craddock          Date: 2/28/23

Attorney's Printed Name: Jason R. Craddock

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [X]    No [ ]

Address: 2021 Midwest Rd., Ste. 200, Oak Brook, IL 60523

Phone Number: (708) 964-4973          Fax Number:

E-Mail Address: craddocklaw@icloud.com or cradlaw1970@gmail.com

rev. 12/19 AK

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................iii

JURISDICTIONAL STATEMENT .......................................................2

ISSUES PRESENTED FOR REVIEW ..................................................2

STATEMENT OF THE CASE .............................................................2

I.    Facts .......................................................................................2

    A.    The Challenged Laws ...................................................2

    B.    The Parties ...................................................................3

    C.    The Banned Arms are Commonly Possessed
        for Lawful Purposes ......................................................4

    D.    The Challenged Laws Burden Plaintiffs' Second
        Amendment Rights ........................................................4

II.   Procedural History..................................................................5

SUMMARY OF ARGUMENT ...............................................................5

ARGUMENT......................................................................................10

I.    Standard of Review................................................................10

II.   *Friedman* is no Longer Good Law..........................................11

III.  The Court Should Follow Justice Thomas's and Justice
    Scalia's Guidance in Their Dissent from Denial of Cert.
    in *Friedman* ...........................................................................14

IV.   Plaintiffs Prevail Under *Heller/Bruen's* Simple Rule .........15

V.    The State and the City Cannot Meet Their Burden .............16

    A.    The State's and the City's "Broadly Prohibitory
        Laws" are "Categorically Unconstitutional"
        Under *Heller* and *Ezell* ...............................................16

B.    The State's and the City's "Broadly Prohibitory Laws" are Equally Unconstitutional Under *Bruen* ................17

C.    The Banned Arms are Commonly Possessed for Lawful Purposes ...........................................................18

D.    The is No Founding Era Precedent for an Absolute Ban on Commonly Possessed Arms............................22

VI.    The District Court Erred When It Failed to Apply the *Heller/Bruen* Analytical Framework ................24

VII.    The District Court Erred When It Applied Means-End Scrutiny to the Challenged Laws...........................25

VIII.    The District Court Erred When It Misapprehended the "Dangerous and Unusual" Test...........................30

IX.    The District Court Failed to Distinguish Between Categorical Bans and Regulations............................33

X.    The District Court's Historical Analysis Fails .....................................34

A.    Introduction...................................................34

B.    The Early Laws Identified by the District Court Do Not Establish a Tradition of Regulation Analogous to the Challenged Laws ..............................36

C.    Late Nineteenth Century and Twentieth Century Laws Are Not Relevant to the Historical Inquiry ....................41

D.    Far from Banning Common Arms, Founding Era Laws *Required* Them ....................................42

E.    Laws Regulating Carry Were Not "Uniformly Upheld....................................44

XI.    The City's Absolute Ban on Commercial Sales is Unconstitutional....46

XII.    The Other Injunction Factors Are Met .................................46

CONCLUSION ...................................................51

# TABLE OF AUTHORITIES

Page

## CASES

*Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) .....10, 49

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018), *abrogated on other grounds by Bruen* ............................................................................22

*Aymette v. State*, 21 Tenn. 154 (1840) .................................................. 40, 44, 45

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ..........................................*passim*

*Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544 (7th Cir. 2007) ............................47

*Cockrum v. State*, 24 Tex. 394 (1859) ........................................................44, 45

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) ......................49

*D.C. v. Heller*, 554 U.S. 570 (2008) ...............................................................*passim*

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3rd Cir. 2021) ............................46

*Dumanian v. Schwartz*, 2022 WL 2714994 (N.D. Ill. 2022) ...........................47

*Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019) *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and on *reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated on other grounds*, 142 S. Ct. 2895 (2022) .......................................................................................................21

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir 2020) ..........................................2, 21

*Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020)..................41, 42

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...............................*passim*

*Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019)..............................................................................................11

*Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) .................5, 14

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)... 11, 12, 13, 17

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015)...........................................17

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134
(7th Cir. 1994).................................................................................................48

*Grace v. D.C.*, 187 F. Supp. 3d 124 (D.D.C. 2016)...........................................49

*Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011) ........................................ 19, 22, 30

*Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630 (7th Cir. 2005) .....48

*Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113
(7th Cir. 2017).........................................................................................9, 10, 46

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ...............................................19

*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013) ...........................................11, 46

*Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531 (7th Cir. 2021)....................48

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010)..................................26

*Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897 (S.D. Ind.
 2009), *aff'd sub nom. Midwest Title Loans v. Mills*, 593 F.3d 660
(7th Cir. 2010).............................................................................................. 48, 49

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...........................................28

*Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) .............49

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111
(2022) .....................................................................................................*passim*

*Nken v. Holder*, 556 U.S. 418 (2009)..............................................................48

*Nunn v. State*, 1 Ga. 243 (1846)....................................................................39

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242
(2d Cir. 2015) ...............................................................................................22

*People v. Webb*, 2019 IL 122951, 131 N.E.3d 93 .............................................17

*Praefke Auto Elec. & Battery Co. v. Tecumseh Prod. Co.*,
255 F.3d 460 (7th Cir. 2001) ...........................................................................50

*Preston v. Thompson*, 589 F.2d 300 (7th Cir. 1978) ................................... 10, 49

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984) ........48

*Staples v. United States*, 511 U.S. 600, 603 (1994) ........................................18

*State v. Langford*, 10 N.C. 381 (1824) ............................................................31

*Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014) ...................................20

*Stenberg v. Carhart*, 530 U.S. 914, 1001 (2000)..............................................2

*United States v. Miller*, 307 U.S. 174 (1939) ..................................................30

*United States v. Wahi*, 850 F.3d 296 (7th Cir. 2017) ......................................11

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...............................10

**STATUTES**

28 U.S.C. § 1292(a)(1).........................................................................................1

28 U.S.C. § 1331 ..................................................................................................1

720 ILCS 5/24-1(b)...............................................................................................3

720 ILCS 5/24-1.9 ................................................................................................3

720 ILCS 5/24-1.9(a)(1)(A), (B), (J) .................................................................18

720 ILCS 5/24-1.9(a)(1)(B) ...............................................................................16

720 ILCS 5/24-1.9(c)-(d) ......................................................................................3

720 ILCS 5/24-1.9(a)(8) .....................................................................................16

720 ILCS 5/24-1.10 ..............................................................................................3

720 ILCS 5/24-1.10(c)-(d) ....................................................................................3

720 ILCS 5/24-1.10(g) .......................................................................3

Chapter 19 of Title 3 of the Naperville Municipal Code ...............................1

Naperville Municipal Code Section 3-19-2 ....................................................2

Naperville Municipal Code Section 3-19-3 ....................................................2

Public Act 102-1116 ..........................................................................1

U.S. Const. amend. II ........................................................*passim*

## OTHER AUTHORITIES

1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors
(1831) ..................................................................................31

1 Timothy Cunningham, *A New and Complete Law Dictionary* (1783)

87 Fed. Reg. 24652 (Apr. 26, 2022) ...........................................................31

Ben Williamson, *The Gunslinger to the Ivory Tower Came: Should
Universities Have A Duty to Prevent Rampage Killings?,*
60 Fla. L. Rev. 895 (2008) .................................................................27

Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223 .....................................27

Charles Alan Wright, *et al, Federal Practice and Procedure* § 2948.1
(2d ed. 1995)............................................................................47

Cong. Rsch. Svc., *House-Passed Assault Weapons Ban of 2022*
(H.R. 1808) (Aug. 4, 2022) ................................................................18

Craig R. Whitney*, A Liberal's Case for the Second Amendment,*
31 T.M. Cooley L. Rev. 15 (2014) ..........................................................27

David Kopel, Reason.com, *Bowie Knife Statutes 1837-1899*...........................37

David B. Kopel, *The History of Firearm Magazines and
Magazine Prohibitions*, 78 ALB. L. REV. 849 (2015).....................................21

Emily Guskin, Aadit Tambe, and Jon Gerberg, The Washington
Post, *Why do Americans own AR-15s?* (March 27, 2023)...............................4, 18

Gary Kleck, *Targeting Guns: Firearms and their Control* (1997) .................20

Herbert L. Osgood, The American Colonies in the Seventeenth
Century (MacMillan 1904) ...................................................................43

Kobayashi & Olson et al., *In re 101 California Street: A
Legal and Economic Analysis of Strict Liability for the
Manufacture and Sale of "Assault Weapons,"*
8 Stan. L. & Pol'y Rev. 41 (1997) ......................................................2

Modern Sporting Rifle Comprehensive Consumer Report,
NSSF (July 14, 2022) .........................................................................21

Mother Jones, *US Mass Shootings, 1982–2023* ............................................29

NSSF, *Firearm Production in the United States* (2020 .................................19

U.S. U.S. Dept. of Just., *Expanded Homicide Data Table 8:
Murder Victims by Weapon, 2015-2019, Crime in the United
States*, 2019, FBI ........................................................................ 20, 29

William Blackstone, *Commentaries on the Laws of England* (1769) .... 30, 31, 32

William English, *2021 National Firearms Survey: Updated Analysis
 Including Types of Firearms Owned* (May 13, 2022) .............................18, 19, 22

## JURISDICTIONAL STATEMENT

On August 17, 2022, the City Council of Naperville, Illinois (the "City") enacted Chapter 19 of Title 3 of the Naperville Municipal Code (the "Ordinance"). ECF No. 12-1, p 11. On January 10, 2023, the State of Illinois enacted Public Act 102-1116 (the "Act"). The Ordinance bans the sale of certain commonly possessed firearms. The Act bans the sale and, beginning in 2024, the possession of certain commonly possessed firearms. The Act also bans the possession of certain commonly possessed firearm magazines.

Plaintiffs brought this action challenging the Ordinance and the Act under the Second Amendment. ECF No. 48, pp 6-7. The district court had jurisdiction of this action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States.

Plaintiffs filed a motion seeking a preliminary injunction against the Ordinance on November 18, 2022. ECF No. 10. Plaintiffs filed a motion for preliminary injunction with respect to the Act on January 24, 2023. ECF No. 50. The district court denied Plaintiffs' motions for preliminary injunction in an order dated February 17, 2023. ECF No. 63. Plaintiffs appealed the district court's order to this Court on February 21, 2023. ECF No. 64. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) (order denying request for preliminary injunction appealable).

## ISSUES PRESENTED FOR REVIEW

Can the government ban the sale, purchase, and possession of firearms and magazines tens of millions of which are possessed by law-abiding Americans for lawful purposes when there is no analogous historical ban as required by *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)?

## STATEMENT OF THE CASE

### I.     Facts

#### A.     The Challenged Laws

On August 17, 2022, the City enacted the Ordinance. ECF No. 12-1, p 11. Section 3-19-2 of the Ordinance states that beginning January 1, 2023, "[t]he Commercial Sale of Assault Rifles within the City is unlawful and is hereby prohibited." *Id.* p 9. Section 3-19-3 of the Ordinance provides for substantial penalties for any violation of its provisions. *Id.* p 10.

On January 10, 2023, the State of Illinois passed the Act, which generally prohibits the purchase and sale of "assault weapons"[1] and "large capacity

---

[1] Plaintiffs do not agree with the State's and City's politically charged statutory terms. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n. 16 (2000) (Thomas, J., dissenting), *quoting* Kobayashi & Olson et al., *In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons,"* 8 Stan. L. & Pol'y Rev. 41, 43 (1997) (internal quotation marks omitted). "Large capacity feeding device" (often abbreviated as "LCM") is also a politically charged misnomer. Such magazines come standard with many handguns, which the Supreme Court has recognized as the "quintessential self-defense weapon." *Duncan v. Becerra* ("*Duncan IV*"), 970 F.3d 1133, 1142 (9th Cir. 2020) *vacated on other grounds and remanded*, 49 F.4th 1228 (9th Cir. 2022) (*quoting D.C. v. Heller*, 554 U.S. 570, 629 (2008)). While Plaintiffs object to the politically charged statutory rhetoric, they also recognize that briefs can be confusing if

ammunition feeding devices" (defined as magazines accepting more than 10 rounds of ammunition for a long gun or more than 15 rounds of ammunition for handguns) subject to certain exceptions for law enforcement, members of the military, and others. 720 ILCS 5/24-1.9 and 1.10. The Act will also prohibit the possession of assault weapons and LCMs except for those possessed prior to the Act. *Id*. §§ 1.9(c)-(d) & 1.10(c)-(d). The Act provides for substantial criminal penalties for violation of its provisions. 720 ILCS 5/24-1(b) and 1.10(g).

### B.    The Parties

Plaintiff National Association for Gun Rights ("NAGR") is a nonprofit organization. ECF No. 51 ¶ 2. NAGR seeks to defend the right of all law-abiding individuals to keep and bear arms and brought this action on behalf of its members. *Id*. Plaintiff Robert C. Bevis is a law-abiding citizen and business owner in the City. ECF No. 50-2 ¶ 2. Plaintiff Law Weapons, Inc. ("LWI") is an Illinois corporation which operates in the City. ECF No. 50-2 ¶ 3. LWI is engaged in the commercial sale of firearms. *Id*. A substantial part of LWI's business consists of the commercial sale of arms banned by the challenged laws. *Id*.

Defendant Arres is the City's Chief of Police. ECF No. 59, p 4. Arres confirms that he and the Naperville Police Department will enforce the Ordinance and the Act. *Id*.

---

the parties use different terms for the same categories of arms. Also, the constant use of irony quotation marks (as in "assault weapon") can be cumbersome. Accordingly, Plaintiffs will use the statutory terms in this brief, but they hope the Court will be mindful of their objections to those terms.

### C.     The Banned Arms are Commonly Possessed for Lawful Purposes

At least 20 million AR-15s and similar rifles such as those banned by the challenged laws are owned by millions of American citizens who use those firearms for lawful purposes. ECF No. 50-3 ¶ 6. In a 2022 national survey, the Washington Post found that 6% of American adults (approximately 16 million citizens) own an AR-15-style rifle. Emily Guskin, Aadit Tambe, and Jon Gerberg, The Washington Post, *Why do Americans own AR-15s?* (March 27, 2023) (available at bit.ly/3G0vbG9). The same survey found that AR-15s are owned for a variety of lawful purposes such as self-defense (33% of respondents), target shooting (15%), recreation (15%), and hunting (12%). *Id.* At least 150 million magazines with a capacity greater than ten rounds are owned by law-abiding American citizens, who use those magazines for lawful purposes. ECF No. 50-3 ¶ 7.

### D.     The Challenged Laws Burden Plaintiffs' Second Amendment Rights

Plaintiffs and/or their members and/or customers desire to exercise their Second Amendment right to acquire, possess, carry, sell, purchase, and transfer the banned arms for lawful purposes including, but not limited to, the defense of their homes. ECF No. 51 ¶ 3; ECF No. 50-2 ¶ 4. The challenged laws prohibit or soon will prohibit Plaintiffs from exercising their Second Amendment rights in this fashion. *Id.* LWI asserts the claims in this action on its own behalf and on behalf of its customers who are prohibited by the challenged laws

4

from acquiring arms protected by the Second Amendment. *Id.* NAGR asserts its claims on behalf of its members. *Id.*

## II.    Procedural History

Plaintiffs brought this action challenging the Ordinance and the Act under the Second Amendment. ECF No. 48, pp 6-7. Plaintiffs filed a motion for preliminary injunction with respect to the Ordinance on November 18, 2022. ECF No. 10. Plaintiffs filed a motion for preliminary injunction with respect to the Act on January 24, 2023. ECF No. 50. The district court denied Plaintiffs' motions for preliminary injunction in an order dated February 17, 2023. ECF No. 63. Plaintiffs appealed the district court's order to this Court on February 21, 2023. ECF No. 64. The State moved to intervene in the district court (ECF No. 68), and the district court granted the State's motion. ECF No. 70.

## SUMMARY OF ARGUMENT

This is an exceedingly simple case. The Second Amendment protects arms that are commonly possessed by law-abiding citizens for lawful purposes, especially self-defense in the home. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (*citing D.C. v. Heller*, 554 U.S. 570, 629 (2008)). The arms banned by the State and the City are possessed by literally millions of law-abiding citizens for lawful purposes, including self-defense in the home. And under Supreme Court precedents, "that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas,

J., dissenting from denial of certiorari). Therefore, the challenged laws are unconstitutional.

This is because "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129-30. Plaintiffs desire to keep and bear for lawful purposes (including defense of their homes) the semi-automatic firearms and firearm magazines banned by the challenged laws. ECF No. 51 ¶ 3; ECF No. 50-2 ¶ 4. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132. Thus, because Plaintiffs' conduct is presumptively protected by the Second Amendment (*Id.*, 142 S. Ct. at 2129-30), the challenged laws are presumptively unconstitutional.

Given that the Second Amendment presumptively protects Plaintiffs' conduct, the burden shifts to the government to attempt to rebut the presumption of unconstitutionality by demonstrating that their absolute ban is consistent with the Nation's historical tradition of firearm regulation." *Id*. But it is impossible for Appellees to carry this burden, because no founding era precedent remotely burdens the Second Amendment right as much as an absolute ban on a category of arms commonly held by law-abiding citizens for lawful purpose. *See Bruen*, 142 S. Ct. at 2128 (*citing Heller*, 554 U.S. at 631-32). Indeed, the very fact that millions of Americans own tens or hundreds of millions of these arms confirms that there is no historical tradition of banning them.

The district court erred when it failed to address the evidence that the arms banned by the challenged laws are commonly held by millions of law-abiding citizens for lawful purposes. The court did not dispute the evidence; it simply ignored it. The district court also erred when it failed to address the *Heller/Bruen* rule that a categorical ban of commonly held arms is unconstitutional. As with the evidence, the court did not dispute the existence of the rule; it ignored it. Thus, the district court erred when it failed to apply the *Heller/Bruen* framework to Plaintiffs' challenge to the State's and the City's laws.

*Bruen* prohibits the application of interest balancing tests or means-end scrutiny in reviewing laws burdening Second Amendment rights. *Id.*, 142 S. Ct. at 2126. Nevertheless, the district court engaged in a lengthy discussion of the governments' asserted public safety interest, especially in the context of mass shootings. ECF No. 63, pp 26-30. The point of this discussion is that in the district court's view the end sought to be achieved by the City and the State (enhanced public safety) is justified by the means they have chosen to advance that end (banning certain semi-automatic weapons and magazines) and therefore the challenged laws are constitutional. In other words, the district court erred when it engaged in exactly the sort of means-end scrutiny forbidden by *Bruen*.

In *Heller*, the Court explained that the nation's historical tradition prohibiting the "carrying of 'dangerous and unusual weapons'" to commit the

common law offense of "affray" supports the common use test. *Heller*, 554 U.S. at 627. The district court erred when it misapprehended *Heller's* discussion about dangerous and unusual weapons and, based on that misapprehension, held that "particularly dangerous" weapons are unprotected by the Second Amendment. ECF No. 63, p 18-19. But that is not what *Heller* held at all. The point of *Heller's* (and later *Bruen's* ) discussion is that the common use test is supported by the historical tradition of prohibiting "carrying dangerous and unusual weapons." *Heller*, 554 U.S. at 627; *Bruen*, 142 S. Ct. at 2128. Both weapons in common use and weapons that are "dangerous and unusual" are dangerous. Thus, it was not dangerousness that differentiated the two categories of weapons. Instead, the Court was contrasting weapons that were in common use from weapons that were unusual. In other words, it was the "unusual" part of the phrase "dangerous and unusual" that was relevant to the Court's discussion, because that is what contrasted the prohibited weapons from weapons that were in common use.

Nothing in *Heller* nor *Bruen* even hints that the Second Amendment does not protect a weapon merely because in a reviewing court's view it is "particularly dangerous." This stands to reason. All weapons are dangerous, and if the Second Amendment does not protect a weapon merely because a reviewing court finds a way to hang the epithet "particularly dangerous" on it, the Second Amendment protects nothing at all. This is why Justice Alito wrote that the "dangerous and unusual" test is "a conjunctive test: A weapon may not be

banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (emphasis in the original). And "the relative danger-ousness of a weapon is irrelevant" if it is commonly used for lawful purposes. *Id*. The district court's conclusion that an arm may be banned merely because it is "particularly dangerous" obviously conflicts with Justice Alito's observa-tion.

The district court proffered 93 historical laws as historical analogues to the challenged laws. But the district court's historical analysis failed for a va-riety of reasons. First, nearly half (47 of the 93) of the laws were from the 20th century, which *Bruen* held was irrelevant to the historical inquiry into founding era precedent. *Id*., 142 S. Ct. 2154, n. 28. Moreover, as in *Heller*, none of the remaining laws remotely burdened the right to keep and bear arms as much as an absolute ban on a category of arms commonly held by law-abiding citizens for lawful purposes. This is unsurprising, because far from banning the possession of commonly held arms, founding-era laws (i.e., the various militia acts) affirmatively *required* citizens to possess them.

Finally, in a constitutional case like this one, the preliminary injunc-tion analysis begins and ends with the likelihood of success on the merits. *Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113 (7th Cir. 2017). This is because the loss of Second Amendment rights necessarily es-tablishes irreparable harm. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). And "[t]he existence of a continuing constitutional violation

constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978).

## ARGUMENT

### I.     Standard of Review

To be entitled to preliminary relief enjoining unconstitutional state action, Plaintiffs must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in their favor; and (4) that an injunction is in the public interest. *Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017) (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011) (equating the standard for obtaining a preliminary injunction for Second Amendment violations with the standard for First Amendment violations and preliminarily enjoining Chicago gun ordinance).

In a case involving an alleged violation of a constitutional right, the likelihood of success on the merits will often be the determinative factor. *Higher Soc'y of Indiana*, 858 F.3d at 1116, *citing Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012). That is because even short deprivations of constitutional rights constitute irreparable harm, and the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a

statute that is probably unconstitutional. *Id*. So "the analysis begins and ends with the likelihood of success on the merits" of the constitutional claim. *Id.*, *citing Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013).

This Court reviews the district court's legal conclusions de novo and its balancing of the injunction factors for an abuse of discretion. *Ezell*, 651 F.3d at 694.

## II.     *Friedman* **is no Longer Good Law**

Plaintiffs will begin with a point of agreement. The district court held that the panel opinion in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "cannot be reconciled with *Bruen*." ECF No. 63, p 16. That conclusion is surely correct.fdcdsfds

The State disagrees,[2] but the State's argument on that score is wrong. In *Friedman*, the majority upheld an assault weapons ban that is materially identical to the laws challenged in this case. However, "[s]tare decisis cannot justify adherence to an approach that Supreme Court precedent forecloses." *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 767 (7th Cir. 2019). *See also United States v. Wahi*, 850 F.3d 296, 302 (7th Cir. 2017) ("When an intervening Supreme Court decision unsettles [the Seventh Circuit's] precedent, it is the ruling of the [Supreme] Court that . . . must carry the day.").

---

[2] Intervening State Appellee's Opposition to Plaintiffs' Motion for Injunction Pending Appeal ("State Opp."), 2.

These cases are applicable because *Bruen* plainly forecloses the approach taken by the majority in *Friedman*.[3]

In *Friedman*, the Court announced a unique three-part test to determine Second Amendment questions. Under this test, a court asks: "whether a regulation [1] bans weapons that were common at the time of ratification or [2] those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia' . . . and [3] whether law-abiding citizens retain adequate means of self-defense." *Id.*, 784 F.3d at 410. All three legs of this test are foreclosed by subsequent Supreme Court precedent:

[1] The Second Amendment's "reference to 'arms' does not apply only to those arms in existence in the 18th century." *Bruen*, 142 S. Ct. at 2132 (cleaned up).

[2] The Second Amendment's operative clause "does not depend on service in the militia." *Bruen*, 142 S. Ct. at 2127. Even the dissent in *Bruen* admitted that under the majority's holding the scope of the right to bear arms has "nothing whatever to do with service in a militia." *Bruen*, 142 S. Ct. at 2177-78 (Breyer, J. dissenting).

[3] "[T]he right to bear other weapons is 'no answer' to a ban on the possession of protected arms." *Caetano v. Massachusetts*, 577 U.S. 411, 421 (2016) (*per curiam*), *quoting Heller*, 554 U.S. at 629.

---

[3] This Court subsequently applied *Friedman* without analysis in *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019).

Not only is *Friedman's* three-part test no longer viable, but other central parts of the majority's holding are inconsistent with *Bruen*. First, the Court based its decision in large part on its view of the benefits of the ordinance. *Id.*, 784 F.3d at 411-12 (reviewing the benefits of the ordinance, including the fact that the ban on arms reduced "perceived risk" and "makes the public feel safer"). But *Bruen* emphatically rejected this sort of interest-balancing. *Id.*, 142 S. Ct. at 2127. Second, *Friedman* held that categorical bans may be proper even if the limits do not "mirror restrictions that were on the books in 1791." *Id.*, 784 F.3d 410. This holding is contradicted by the central thrust of *Bruen's* holding that a restriction on Second Amendment rights will survive scrutiny only if "the government identif[ies] a well-established and representative historical analogue" to the regulation. *Id.* 142 S. Ct. 2133. In summary, while the district court got most things wrong, it was correct when it held that it is not possible to reconcile *Friedman* with *Bruen*. Accordingly, *Friedman* should not be considered binding precedent.

The State has argued that the *Friedman* historical test is the same as *Bruen's* historical test, apparently because both tests use the word "history."[4] This is wrong. Yes, *Friedman* looked to history when it held that a court must ask whether the arms were common at the time of ratification. *Id.*, 784 F.3d at 410. But the Court in *Bruen* could not have been clearer that "the Second Amendment's definition of 'arms' … covers modern instruments that facilitate

---

[4] State Opp., 8.

armed self-defense," "'even those that were not in existence at the time of the founding.'" *Id.*, 142 S. Ct. at 2132, *quoting Heller*, 554 U.S. at 582. *See also Caetano*, 577 U.S. at 411-12 (lower court's holding that arms were unprotected because they were not in common use at the time of ratification was "inconsistent with *Heller*").

### III. The Court Should Follow Justice Thomas's and Justice Scalia's Guidance in Their Dissent from Denial of Cert. in *Friedman*

While this Court's opinion in *Friedman* cannot be reconciled with *Bruen*, Justice Thomas (joined by Justice Scalia) issued an opinion in that case that provides a roadmap for this Court's resolution of this matter.[5] *See Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting from denial of certiorari). After all, who knows better how to apply *Bruen* and *Heller* than the authors, respectively, of *Bruen* and *Heller*?

Justice Thomas noted that under *Heller*, the Second Amendment protects arms that are typically possessed by law-abiding citizens for lawful purposes. *Id., quoting D.C. v. Heller*, 554 U.S. 570, 625 (2008). Millions of Americans own AR-style rifles for lawful purposes. *Id.* "Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons." *Id.* (emphasis added). The challenged laws categorically ban weapons commonly possessed by millions of law-abiding citizens for lawful purposes. The challenged laws are therefore unconstitutional. The rest of this

---

[5] The State is correct when it asserts that Plaintiffs' challenge is "materially identical" to the challenge brought in *Friedman*. State Opp., 2.

brief will expand on this point, but the Court could end its analysis here. The analysis really is just that simple.

## IV.     Plaintiffs Prevail Under *Heller/Bruen's* Simple Rule

*Bruen* noted that in the years between 2008 and 2022, the circuit courts failed to apply *Heller* properly and therefore the appropriate test for Second Amendment challenges needed to be reiterated. *Id*., 142 S. Ct. at 2129. The Court then wrote: "We reiterate that the standard for applying the Second Amendment is as follows: [1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*., 142 S. Ct. at 2129-30.

Plaintiffs desire to acquire, possess, carry, sell, purchase, and transfer for lawful purposes (including defense of their homes) the semi-automatic firearms and firearm magazines banned by the challenged laws. ECF No. 51 ¶ 3; ECF No. 50-2 ¶ 4. The challenged laws prohibit or soon will prohibit Plaintiffs from doing so. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct – i.e., acquiring, keeping, and bearing certain bearable arms – "the Constitution *presumptively* protects that conduct." *Id*., 142 S. Ct. at 2126 (emphasis added). Plaintiffs have met their burden. This bears repeating. Under *Bruen*, when the

plain text of the Second Amendment covers a plaintiff's conduct – as it does

here[6] – a law burdening that conduct is presumptively unconstitutional. The

government may in some cases be able to rebut that presumption, but the bur-

den is on it to do so. As set forth in the next section, Appellees cannot rebut the

presumption in this case.

## V.     The State and the City Cannot Meet Their Burden

### A.     The State's and the City's "Broadly Prohibitory Laws" are "Categorically Unconstitutional" Under *Heller* and *Ezell*

Given that the Second Amendment presumptively protects Plaintiffs'

conduct, the burden shifts to the government to demonstrate that their abso-

lute ban is consistent with the Nation's historical tradition of firearm regula-

tion. But under *Heller*, absolute bans of commonly held firearms are "catego-

rially unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir.

2011). ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws

---

[6] The State has argued that the magazines it has banned are nor "Arms." This is wrong.  The plain text covers all "modern instruments that facilitate armed self-defense," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Bruen*, 142 S.Ct. at 2132; *Heller*, 554 U.S. at 581.  That clearly includes ammunition feeding devices, without which semi-automatic firearms cannot operate as intended.  First of all, "fixed magazines" – which are "permanently attached to a firearm, or contained in and not removable from a firearm," 720 ILCS 5/24-1.9(a)(8); *see* 720 ILCS 5/24-1.9(a)(1)(B) (banning fixed magazines) – are obviously "Arms" covered by the Second Amendment's text. Fixed magazines cannot be removed from a firearm without rendering the firearm inoperable as a firearm.  Detachable magazines are no less "Arms."  After all, it is not the gun, but bullets *fed by the magazine*, that "strike another."  *See Heller*, 554 U.S. at 581.  In any event, the fact that magazines may be detached does not make them any less integral to the operation of a firearm.  This is how semiautomatic firearms operate:  When the user pulls the trigger, the round in the chamber fires, and the magazine and semiautomatic action combine to feed a new round into the firing chamber.  Without magazines, modern semiautomatic firearms will not operate at all.

25

restricting the core Second Amendment right – like the handgun bans at issue in those cases … are categorically unconstitutional.").[7] *See also People v. Webb*, 2019 IL 122951, 131 N.E.3d 93 (absolute ban is "necessarily" unconstitutional).[8]

### B.    The State's and the City's "Broadly Prohibitory" Laws are Equally Unconstitutional Under *Bruen*

While this Court post-*Ezell* saw things differently, *see infra* note 7, *Bruen* subsequently shored up any latent confusion. Under *Bruen*, once a court determines that "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts, the question becomes whether the government can "affirmatively prove that its … regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.  In the context of a flat ban on arms, that question turns on whether the banned arms "are in common use today" or instead are "'highly unusual in society at large.'"  *Id.*, 142 S. Ct. at 2143, *quoting Heller*, 554 U.S. at 627.  After all, the very fact that a class of arms is common in American society means that there is no historical tradition of banning them outright.

---

[7] It is true that *Friedman* did not follow *Ezell* in this respect. But as Judge Manion noted, the *Friedman* majority opinion was in "direct conflict" with *Ezell*. *Friedman*, 784 F.3d at 420 (Manion, J., dissenting).

[8] In *Webb*, the Illinois Supreme Court held that a commonly held bearable arm may not be "subjected to a categorical ban." *Id.*, 2019 IL 122951, ¶ 21, 131 N.E.3d 93, 98. And since the Illinois statute in question constituted a categorical ban, "that provision *necessarily* [could not] stand." *Id.* (emphasis added).

### C.     The Banned Arms are Commonly Possessed for Lawful Purposes

First, it is beyond dispute that the banned firearms are in common use in modern America. AR platform rifles are just one of the many types of rifles banned by the Act by name and/or by feature. 720 ILCS 5/24-1.9(a)(1)(A), (B), (J). At least 20 million AR-15s and similar rifles are owned by millions of American citizens who use those firearms for lawful purposes. ECF No. 50-3 ¶ 6. In a 2022 national survey, the Washington Post found that 6% of American adults (approximately 16 million citizens) own an AR-15-style rifle. Emily Guskin, Aadit Tambe, and Jon Gerberg, The Washington Post, *Why do Americans own AR-15s?* (March 27, 2023) (available at bit.ly/3G0vbG9).

The Supreme Court has described semi-automatic rifles such as AR-15s as "widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 603, 612 (1994). This makes sense because tens of millions of Americans own AR-15s or similar rifles. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 2 (May 13, 2022) (hereinafter "English") (available at bit.ly/3K6rL7s), p. 2 (estimating over 24 million AR-15s and similar rifles owned). A Congressional Research Service study shows that in 2020 alone, "2.8 million … AR- or AK-type rifles" "were introduced into the U.S. civilian gun stock." *See* Cong. Rsch. Svc., *House-Passed Assault Weapons Ban of 2022* (H.R. 1808), at 2 (Aug. 4, 2022), bit.ly/3ZsvpwY. In 2022, the Bureau of Alcohol, Tobacco, Firearms, and Explosives acknowledged that "the AR-15-type rifle" is "one of the most popular

firearms in the United States," including "for civilian use." 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022). AR-platform rifles accounted for nearly half of all rifles produced in 2018 and nearly 20% of all firearms of any type sold in 2020. NSSF, *Firearm Production in the United States* 18 (2020) (available at bit.ly/3z67cBx); NSSF, 2021 Firearms Retailer Survey Report 9 (available at bit.ly/42Dw3KB). The challenged laws ban America's "most popular semi-automatic rifle." *Heller v. D.C. ("Heller II")*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). *See also Kolbe v. Hogan*, 849 F.3d 114, 153 (4th Cir. 2017) (Traxler, J., dissenting) ("In terms of absolute numbers, these statistics lead to the unavoidable conclusion that popular semiautomatic rifles such as the AR-15 are commonly possessed by American citizens for lawful purposes within the meaning of *Heller*.").

AR-style rifles are overwhelmingly possessed for lawful purposes. The 2022 Washington Post survey found that AR-15s are owned for a variety of lawful purposes such as self-defense (33% of respondents), target shooting (15%), recreation (15%), and hunting (12%). The Washington Post, *Why do Americans own AR-15s?*, *supra*. In a 2021 survey of 16,708 gun owners, recreational target shooting was the most common reason (cited by 66% of owners) for possessing an AR-style firearm, followed closely by home defense (61.9% of owners) and hunting (50.5% of owners). English, at 33-34. The "AR-15 type rifle . . . is the leading type of firearm used in national matches and in other

matches sponsored by the congressionally established Civilian Marksmanship program." *Shew v. Malloy*, 994 F. Supp. 2d 234, 245 n.40 (D. Conn. 2014).

The fact that AR platform rifles are used extremely rarely in crime underscores that the banned firearms are commonly possessed by law-abiding citizens for lawful purposes. Well under 1% of gun crimes are committed with assault rifles. Gary Kleck, *Targeting Guns: Firearms and their Control* 112 (1997). This conclusion is borne out by FBI statistics. In the five years from 2015 to 2019, there were an average of 14,556 murders per year in the United States. U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI (available at https://bit.ly/31WmQ1V). On average, rifles of all types (of which assault weapons are a subset) were identified as the murder weapon in 315 (or 2.5%) of the murders per year. *Id*. By way of comparison, on average 669 people per year are murdered by "personal weapons" such as hands, fists, and feet. *Id*. Thus, according to FBI statistics, a murder victim is more than twice as likely to have been killed by hands and feet than by an assault weapon. Even in the counterfactual event that an assault weapon had been involved in each rifle-related murder from 2015 to 2019, an infinitesimal percentage of the approximately 24 million assault rifles in circulation in the United States during that time period (0.006%) would have been used for that unlawful purpose.

Second, the banned magazines are, if anything, even more common. At least 150 million magazines with a capacity greater than ten rounds are owned

by law-abiding American citizens, who use those magazines for lawful purposes. ECF No. 50-3 ¶ 7. The most popular handgun in America, the Glock 17 pistol, comes standard with a 17-round magazine. *Duncan v. Becerra ("Duncan III")*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019).[9] The AR-15, the most popular rifle in America as discussed above, is typically sold with a 30-round magazine. *Id*. The Beretta Model 92 is another popular handgun used for self-defense, and it comes standard with a sixteen-round magazine. *Duncan IV*, 970 F.3d at 1142. Indeed, many popular handguns commonly used for self-defense come standard with magazines that are banned by the Act, such as the Smith & Wesson M&P 9 (17-round capacity), the Ruger SR9 (also 17-round capacity) and the Springfield Arms XD non-subcompact pistol (up to 19 rounds). *Id*., n. 4. Recent industry data indicates that over three quarters of "assault rifle" magazines in the country have a capacity of more than 10 rounds. *See* Modern Sporting Rifle Comprehensive Consumer Report, at 31, NSSF (July 14, 2022) (available at https://bit.ly/3GLmErS). *See also* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds.").

---

[9]*aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and on *reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated on other grounds*, 142 S. Ct. 2895 (2022), and *vacated on other grounds and remanded*, 49 F.4th 1228 (9th Cir. 2022).

These magazines, moreover, are typically possessed for lawful purposes. According to the National Firearms Survey, the most common reasons cited for owning these magazines are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%). English, *supra*, at 23. And they may be lawfully owned in nearly all states.

The data conclusively demonstrates that the magazines Illinois has banned are in common use for lawful purposes. Indeed, "courts throughout the country … agree that large-capacity magazines are commonly used for lawful purposes." *Duncan IV*, 19 F.4th at 1155-56 (Bumatay, J., dissenting); *see also Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018), *abrogated on other grounds by Bruen*; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the … large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000").

### D.     The is No Founding Era Precedent for an Absolute Ban on Commonly Possessed Arms

The banned arms are commonly possessed by law-abiding citizens for lawful purposes. Therefore, it is impossible for Appellees to carry their burden

under the *Heller/Bruen* test. The reason for this is apparent from *Heller* and *Bruen* themselves – there is no historical analogue to such a ban. "[A]fter considering 'founding-era historical precedent,' including 'various restrictive laws in the colonial period,' and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional." *Bruen*, 142 S. Ct. at 2131.

In this case, neither the City nor the State has been able to identify a regulation analogous to their absolute bans. This is unsurprising. After a no doubt exhaustive search, D.C. was unable to identify a single founding era analogue (far less a widespread American tradition) of banning any category of commonly held firearms. No one else has come close to doing so in the intervening 15 years, so there is no reason to expect Appellees would be able to do so now. This is not to say that they have not proposed analogues. But as discussed in more detail below, their search was no more successful than D.C.'s, and their proposals can be rejected for the same reason *Heller* rejected D.C.'s proposals – i.e, they do not "remotely burden the right of self-defense as much as [Appellees'] absolute ban." *Heller*, 554 U.S. at 632.

In summary, the complete absence of regulations even remotely analogous to D.C.'s absolute ban allowed *Bruen* to characterize the *Heller* historical inquiry as "relatively simple." *Id*., 142 S. Ct. at 2132. It was simple because, under *Heller*, absolute bans of commonly held firearms are, in the words of *Ezell*, "categorically unconstitutional." Therefore, this case is simple. The

challenged laws cannot withstand constitutional scrutiny because Appellees cannot carry their burden under the *Heller/Bruen* test.

## VI. The District Court Erred When It Failed to Apply the *Heller/Bruen* Analytical Framework

As Justice Thomas noted in *Friedman*, *Heller's* central holding is that the Second Amendment protects arms that are typically possessed by law-abiding citizens for lawful purposes. *Id.*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari). Americans own millions of AR-style rifles, and "that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Id. See also Bruen*, 142 S. Ct. at 2128 (the Second Amendment does not countenance complete prohibition of weapon commonly possessed by Americans for self-defense in the home).

The evidence overwhelmingly demonstrates that Americans own tens of millions of the firearms banned by the challenged laws and over 150 million of the banned magazines. One would suppose, therefore, that the district court would apply the *Heller/Bruen* rule proscribing an absolute ban on such commonly held weapons, or, failing that, at the very least explain why it believed the rule is not applicable. The district court did neither. The court failed to address the evidence that the arms banned by the challenged laws are commonly held by law-abiding citizens for lawful purposes. The court did not dispute the evidence; it simply ignored it. The district court also failed to address the *Heller/Bruen* rule that a categorical ban of commonly held arms is unconstitutional. As with the evidence, the court did not dispute the existence of the

rule; it ignored it. Thus, the district court erred when it failed to apply the *Heller/Bruen* framework to Plaintiffs' challenge to the Act and the Ordinance.

## VII. The District Court Erred When It Applied Means-End Scrutiny to the Challenged Laws

*Bruen* explains that "[t]o justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2126. Perhaps anticipating that governments would push back or ignore its holding, *Bruen* emphasized its rejection of means-end scrutiny by repeating it several times. *See, e.g., id.* (*Heller* does "not support applying means-end scrutiny in the Second Amendment context."). "[*Heller*] expressly rejected the application of any judge-empowering interest-balancing inquiry …" *Id.* (internal citations and quotation marks omitted). "[T]he Second Amendment does not permit – let alone require – judges to assess the costs and benefits of firearms restrictions under means-end scrutiny." *Id.* (cleaned up). It is impossible to come away from even a cursory reading of *Bruen* and not understand that means-end scrutiny is no longer allowed in Second Amendment cases.

The district court acknowledged that *Bruen* prohibits means-end scrutiny. ECF No. 63, p 17. Nevertheless, several pages of the district court's opinion are devoted to a discussion of the governments' asserted public safety interest, especially in the context of mass shootings. ECF No. 63, pp 26-30. The point of this discussion is that in the district court's view the end sought to be

25

achieved by the City and the State (enhanced public safety) is justified by the means they have chosen to advance that end (banning certain semi-automatic weapons and magazines) and therefore the challenged laws are constitutional. In other words, the district court erred when it engaged in exactly the sort of means-end scrutiny forbidden by *Bruen*. To be sure, the district court did not acknowledge that it was engaging in means-end scrutiny. That scrutiny occurred under the guise of the "application" of the historical inquiry. ECF No. 63, pp 26-30. But *Bruen* warned against this, stating that "courts may [not] engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id.*, 142 S. Ct. at 2133 n. 7.

Plaintiffs are tempted to get into the factual weeds, because practically everything the district court said in support of its means-end analysis is either wrong or substantially distorted. But Plaintiffs will resist that temptation, because almost the whole point of *Bruen* is that it is not "legitimate" for judges to make "empirical judgments" about the "costs and benefits of firearms restrictions." *Id.*, 142 S. Ct. at 2130, *quoting McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 790-91 (2010). There is, therefore, nothing to be gained by challenging the empirical predicate of the district court's means-end analysis. That discussion is simply irrelevant to the Court's resolution of this case. Accordingly, as difficult as it is, Plaintiffs will ignore the means-end red herring, and they hope the Court will ignore it as well.

Plaintiffs do, however, note that the basic assumption underlying the district court's discussion – i.e., that *Heller* surely never contemplated that the Second Amendment might protect a category of firearms that can be used in mass shootings – is unfounded. On April 16, 2007, Seung Hui Cho committed a mass shooting at Virginia Tech University.[10] At the time, Cho's crime was the worst mass shooting in American history. *Id*. Cho did not use an "assault rifle" to commit his crimes.[11] He used two semiautomatic handguns. *Id*. *Helle*r was argued less than one year later on March 18, 2008,[12] and D.C. made sure the Court was aware that the worst mass shooting in U.S. history up until then had recently been committed with handguns like those banned by its ordinance. It wrote in its brief: "In the recent Virginia Tech shooting, a single student with two *handguns* discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223, 53 (emphasis added). Thus, when it decided *Heller*, the Supreme Court was keenly aware that semiautomatic handguns can be used in mass shootings. Nevertheless, it struck D.C.'s ban as unconstitutional. In doing so, the Court wrote:

> *We are aware of the problem of handgun violence* in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns, [] *But the*

---

[10] Ben Williamson, *The Gunslinger to the Ivory Tower Came: Should Universities Have A Duty to Prevent Rampage Killings?*, 60 Fla. L. Rev. 895, 895–96 (2008).
[11] Craig R. Whitney*, A Liberal's Case for the Second Amendment,* 31 T.M. Cooley L. Rev. 15, 19 (2014).
[12] *Id*., 554 U.S. at 570.

> *enshrinement of constitutional rights necessarily takes certain policy choices off the table.* These include the absolute prohibition of hand-guns held and used for self-defense in the home.

*Heller*, 554 U.S. at 636 (emphasis added).

Only months after the Virginia Tech shooting, the Supreme Court held that the very weapons used by the shooter were protected by the Second Amendment. It follows that the district court's analysis is flawed. The fact that a weapon can be used in a mass shooting does not disqualify it from Second Amendment protection.

This Court's precedents are in accord with *Heller* on this point. In *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), the Court ruled unconstitutional an Illinois law that prohibited carrying firearms outside of a person's home. *Id*. 702 F.3d at 942. The Court held that the State's evidence that the law would increase public safety was irrelevant to the constitutional analysis, writing: "If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois." *Id*., 702 F.3d at 939. Identical logic applies in this case. "If the mere possibility that [banning certain firearms and magazines would decrease the harm of mass shootings] sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois." *Id*.

28

If anything, the case for upholding Second Amendment rights is even more compelling here than in *Heller* and *Moore*. In *Heller*, the Court held that the rights of the millions of Americans who possess handguns will not be taken away even though handguns are used by thousands of criminals to kill over ten thousand people every year.[13] The Court was unpersuaded by Justice Breyer's dissent in which he pointed out that handguns "are specially linked to urban gun deaths and injuries, and [] are the overwhelmingly favorite weapon of armed criminals." *Id.*, 554 U.S. at 682 (Breyer, J., dissenting). In contrast, as horrific as mass shootings are, they remain exceedingly rare and account for only a fraction of 1% of firearm homicides.[14] Tens of millions of the arms banned by the challenged laws are possessed by citizens who overwhelmingly use those arms for lawful purposes. If the Second Amendment rights of millions of handgun owners cannot be taken away even though over ten thousand murders are committed with handguns every year, it follows that the rights of the millions who possess the banned arms cannot be taken away because a few maniacs use semi-automatic rifles to kill tens of people each year in mass shootings. Then-Judge Kavanaugh expressed the matter this way in his dissent in *Heller II*:

> [C]onsidering just the public safety rationale invoked by D.C., semi-automatic *handguns are more dangerous* as a class than semi-automatic

---

[13] U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI (available at https://bit.ly/31WmQ1V).

[14] Compare FBI total firearm homicides in 2019, *supra* (10,258) to 2019 mass shooting homicides as set forth in Mother Jones, *US Mass Shootings, 1982–2023* (available at bit.ly/40LszUB) (73).

rifles . . . [H]andguns 'are the overwhelmingly favorite weapon of armed criminals.'… So it would seem a bit backwards – at least from a public safety perspective – to interpret the Second Amendment to protect semi-automatic handguns but not semi-automatic rifles. … Put simply, *it would strain logic and common sense to conclude that the Second Amendment protects semi-automatic handguns but does not protect semi-automatic rifles.*

*Heller v. D.C.*, 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (emphasis added).

## VIII.  The District Court Erred When It Misapprehended the "Dangerous and Unusual" Test

In *Heller*, the Court explained that the nation's historical tradition prohibiting the "carrying of 'dangerous and unusual weapons'" supports the common use test. *Heller*, 554 U.S. at 627. *Heller* cited several authorities for this historical tradition, including 4 William Blackstone, *Commentaries on the Laws of England*, 148-49 (1769). The district court misapprehended Blackstone (and *Heller's* citation to that treatise) when it wrote that Blackstone "drew a clear line between traditional arms for self-defense and 'dangerous' weapons," and therefore under *Heller's* history and tradition test "particularly 'dangerous' weapons are unprotected" by the Second Amendment. ECF No. 63, p 18-19, *citing Heller*, 554 U.S. at 627.

But that is not what *Heller* held at all. In the passage cited by the district court, *Heller* stated: "We also recognize another important limitation on the right to keep and carry arms. *Miller*[15] said … that the sorts of weapons protected were those 'in common use at the time.' [] We think that limitation

---

[15] *United States v. Miller*, 307 U.S. 174 (1939).

is fairly supported by the historical tradition of prohibiting the *carrying of 'dangerous and unusual weapons.'"* *Heller*, 554 U.S. at 627 (emphasis added). The Court cited 12 authorities, including Blackstone, for the existence of this historical tradition. None of the cited authorities discussed categories of weapons as such. Instead, in all of the cited passages the authorities were discussing the common law offense of "affray." *See, e.g.*, Blackstone, 148-49 (describing the offense of affray and its origins). The offense of affray is essentially the carrying of weapons in public in such a way as to incite public terror.[16]

Thus, in the passage cited by the district court, *Heller* did not hold that particularly dangerous weapons are unprotected by the Second Amendment. Instead, it held that the "common use" test is supported by the historical tradition of prohibiting carrying dangerous and unusual weapons to commit the offense of affray. *Bruen* reiterates that the common use test is supported by

---

[16] *See e.g.*, *State v. Langford*, 10 N.C. 381, 383-84 (1824) (man commits "affray" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."). Thus, the offense did not prohibit any class of arms (including dangerous and unusual arms) as such. Instead, it prohibited the misuse of dangerous and unusual arms to terrorize the public. Since the core of the offense was inciting public terror, it would have been impossible to commit the offense with weapons kept for self-defense in the home. 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831) (bearing arms does not fall within the offense unless it is "apt to terrify the people"). It follows that a person would be "in no danger of offending … by wearing *common weapons*" in such a way as not to give rise to a suspicion of "an intention to commit any act of violence." *Id.* (emphasis added). *See also* 1 Timothy Cunningham, *A New and Complete Law Dictionary* (1783) (same).

the historical tradition of prohibiting carrying dangerous and unusual weap-

ons to commit the offense of affray as described in Blackstone:

> [In *Heller*], we found it 'fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' 'that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.' *Id*., at 627, 128 S.Ct. 2783 (first citing 4 W. Blackstone, Commentaries on the Laws of England 148–149 (1769).

*Id*., 142 S. Ct. at 2128.

Both weapons in common use and weapons that are "dangerous and un-

usual" are dangerous. Thus, it was not dangerousness that differentiated the

two categories of weapons. Instead, the Court was contrasting weapons that

were in common use from weapons that were unusual. In other words, it was

the "unusual" part of the phrase "dangerous and unusual" that was relevant to

the Court's discussion, because that is what contrasted the prohibited weapons

from weapons that were in common use.

Nothing in *Heller* nor *Bruen* even hints that the Second Amendment

does not protect a weapon merely because in a reviewing court's view it is "par-

ticularly dangerous." This stands to reason. Can there be any doubt that the

handguns the Virginia Tech shooter used to kill 32 people in nine minutes were

"particularly dangerous"? Yet only months later *Heller* held that citizens' right

to possess those particularly dangerous handguns is protected by the Second

Amendment. *Heller's* holding cannot be reconciled with the district court's as-

sertion to the contrary.

Judge Manion's dissent in *Friedman* is instructive on this point. He noted that whether a weapon is dangerous is of no significance for application of the common use test (*Id.*, at 415, n. 2) because "[a]ll weapons are presumably dangerous." *Id.* Thus, the issue for purposes of the test is whether a weapon is also unusual, i.e. "not commonly used for lawful purposes." *Id.* In *Caetano v. Massachusetts*, 577 U.S. 411 (2016), Justice Alito made a similar observation when he wrote that the "dangerous and unusual" test is "a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id*, 577 U.S. at 418 (Alito, J. concurring) (emphasis in the original).

In summary, an arm cannot be subjected to a categorical ban unless it is both dangerous and unusual. *Heller*, 554 U.S. at 627; *Bruen*, 142 S. Ct. at 2128. An arm that is commonly possessed by law-abiding citizens for lawful purposes is, by definition, not unusual. It follows, that "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano*, 577 U.S. at 418 (Alito, J., concurring). Therefore, the district court holding that Appellees' ban of commonly possessed firearms and magazines is constitutional merely because, in its view, the arms are "particularly dangerous" is clearly erroneous.

## IX.  The District Court Failed to Distinguish Between Categorical Bans and Regulations

*Heller* distinguishes between laws that categorically ban arms and laws that regulate arms. Arms typically possessed by law-abiding citizens may not be categorically banned. *Id.*, 554 U.S. at 628. But various regulations short of

bans such as prohibitions on concealed carry, etc. may well be legitimate. *Id.*, 554 U.S. at 627-28. The reason for this dichotomy is that nothing in the Nation's history and tradition of firearm laws remotely burdens the right of self-defense as much as an absolute ban. *Id.*, 554 U.S. at 632. Whereas regulations that do not burden the right as much an absolute ban may be fairly supported by historical tradition. *Id.*, 554 U.S. at 628.

In the face of this clear precedent, the district court held that in its view the "*regulation*" of the banned arms "accords with history and tradition." ECF No. 63, p 30 (emphasis added). Thus, the district court's historical inquiry was fundamentally flawed from the beginning. The court failed to distinguish between categorical bans and lesser regulations. As discussed below, this failure in turn caused the district court to err by treating historical laws that merely regulated arms as analogous to the categorical bans challenged in this case.

## X.    The District Court's Historical Analysis Fails

### A.    Introduction

As discussed above, under *Heller* held that it is impossible to identify a historical analogue to a modern law imposing a categorical ban on arms commonly possessed for lawful purposes. Nevertheless, the district court advanced several historical statutes as potential analogues to the challenged laws. ECF No. 63, p 19-26. Unsurprisingly given *Heller's* holding, the district court's historical analysis fails for the reasons set forth below.

34

The first issue in a historical inquiry is to identify the relevant time period. In *Bruen*, the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*'" *Id.*, 142 S.Ct at 2136, *citing Heller*, 554 U.S. at 634-35 (emphasis in the original). The Second Amendment was adopted in 1791. Thus, the founding era is the relevant time period. The Court cautioned against "giving postenactment history more weight than it can rightly bear." *Id.*, 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citation omitted).

Just as history is not created equal, historical analogues are also not created equal. Not just any historical regulation will meet *Bruen's* standards. Instead, a court must determine whether a challenged law imposes a comparable burden as that imposed by an historical analogue from the founding era. *Id.*, 142 S. Ct. at 2132–33. In other words, the government bears the burden of identifying a "relevantly similar" tradition justifying its regulation. *Id.*

To carry their burden under the *Heller/Bruen* test, Appellees must demonstrate a widespread and enduring tradition of regulation analogous to their ban on commonly possessed arms. A handful of isolated examples and outliers will not do, because "the burden falls on [the government] to show that [its regulation] is consistent with this *Nation's* historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135 (emphasis added). The "bare existence" of "localized restrictions" is insufficient to counter an American tradition. *Id.*,

142 S. Ct. at 2154. A handful of examples is insufficient to show a tradition. *Id.*, 142 S. Ct. at 2142 (three regulations insufficient to show a tradition). Isolated examples do not "demonstrate a broad tradition of [the] States." *Id.*, 142 S. Ct. at 2156.

**B.**     **The Early Laws Identified by the District Court Do Not Establish a Tradition of Regulation Analogous to the Challenged Laws**

The district court advanced 93 statutes as potential analogues to the challenged laws. Exhibit 1 is a list of the 93 laws with all 19th century and earlier laws set out at length.[17] Without examining a single law, the Court can know with certainty that none of them is analogous to a categorial ban of commonly possessed arms. Because if such a law existed, surely the district court would have quoted the law in its opinion and said something to the effect of: "Law X from the founding era categorically banned possession of a weapon commonly held by law-abiding citizens of the time." Of course, the court did not identify any such law, because we have known since *Heller* that no such law exists.

Thus, even if *Heller* had not settled this matter, the district court's proffered statutes are striking in their uniformity and inapplicability to the relevant constitutional question: whether the government may ban purchasing, keeping, and using a class of commonly possessed arms for self-defense in the

---

[17] Plaintiffs have only listed 20th century laws. They did not set those laws out at length because, as discussed below, such laws are irrelevant to the historical analysis.

home. All of the laws identified by the district court are either silent on that question or expressly affirm the right to keep firearms in homes even if they could not be carried publicly.

**Laws Banning Concealed Carry**. The district court identified 10 laws banning concealed carry. But in *Heller*, the Court specifically noted that restrictions on concealed carry outside the home were supported by the Nation's historic tradition of firearms regulation. *Id*., 554 U.S. at 626. Thus, if a tradition of restricting concealed carry outside the home were sufficient to support a law categorically banning arms commonly possessed for defense in the home, *Heller* would have come out the other way. In *Bruen*, the Court held that the Nation's historical tradition supported laws prohibiting concealed carry "so long as they left open the option to carry openly." *Id*., 142 S. Ct. at 2150. It follows that if such laws cannot even support a prohibition of open carry of arms in public, they cannot support a categorial ban of commonly held arms in the home.

The district court focused especially on laws regulating Bowie knives. ECF No. 63 pp 20-21. But the district court was wrong to conclude that those regulations support the challenged laws. Recently, law professor David Kopel (whose work was cited favorably in *Bruen*) reviewed all 19th century Bowie knife regulations. See David Kopel, Reason.com, *Bowie Knife Statutes 1837-1899 (*available at bit.ly/3RNRpQD). After an exhaustive review of the regulations, Kopel concluded: "As of 1899, there were 46 States in the Union; of these,

37

32 had at some point enacted a statute containing the words 'bowie knife' or variant. … At the end of the 19th century, *no state prohibited possession of Bowie knives.*" *Id.* (emphasis added). Kopel concluded that the history of Bowie knife law is no stronger in creating historical precedents for banning common firearms or magazines than that which was examined in *Heller* and *Bruen*. *Id.*

**Territorial, Kingdom and Municipal Laws**. The district court identified 19 laws from various cities and territories and the Kingdom of Hawaii. But *Bruen* rejected the use of territorial and municipal regulations as historical analogues. *Id.*, 142 S. Ct. at 2154–55.[18] The Court held that it would not stake its interpretation of the Second Amendment on a handful of temporary territorial laws that were enacted nearly a century after 1791 and which had never been subjected to judicial scrutiny. *Id.* The territorial "legislative improvisions" identified by the district court are most unlikely to reflect the origins and continuing significance of the Second Amendment and should not be considered instructive. *Id.*, 142 S. Ct. at 2154, *quoting Heller*, 554 U.S. at 614. Nor would the Court rely on laws that governed less than 1% of the Nation's population (such as the municipal laws advanced by the district court). *Id.*

**Regulations on Manner of Use of Weapons**. The district court identified seven laws regulating the use of weapons, primarily laws prohibiting "trap guns." A "trap gun" is a device rigged to fire a gun without the presence of a person. ECF No. 34-4, pp 38-39. These laws did not ban any class of

---

[18] *Bruen* did not specifically address laws from foreign countries, but presumably such laws cannot establish an American tradition of firearm regulation.

arms. Rather, they regulated the manner of using them. That is, they banned setting loaded, unattended guns to prevent unintended discharges. Obviously, a regulation of the use of an arm is not analogous to a complete prohibition on the possession of the arm.

**Laws That Applied to Slaves or Minors Only**. Two of the laws identified by the court prohibited possession of arms by slaves and/or minors. It should go without saying that such prohibitions provide no support for the challenged laws. *See Bruen*, 142 S. Ct. at 2151 (systematic efforts to disarm blacks provide no support for firearm restriction).

**Sensitive Place Regulation**. One of the laws prohibited arms at polling places on election day. *Heller* noted that laws forbidding carrying firearms in sensitive places like schools or government buildings are supported by the Nation's historic tradition of firearms regulation. *Id*., 554 U.S. at 626. Such laws provide no support for a categorical prohibition on the possession of commonly held arms in the home.

**Historical Regulation of Sales**. The district court identified three statutes (from Alabama, Georgia and Tennessee) regulating or taxing sales of weapons. The Georgia Supreme Court held in *Nunn v. State*, 1 Ga. 243, 251 (1846), that the Georgia statute could not constitutionally deprive a citizen of his right to keep and bear arms and was unconstitutional to the extent it prohibited a citizen from bearing arms openly. Thus, the statute did not even prohibit carrying arms openly in public, much less possessing them in the

home. Similarly, in *Aymette v. State*, 21 Tenn. 154, 160 (1840), the Tennessee Supreme Court held that the statute could not deprive a citizen of his "unqualified" right to bear arms. As for the Alabama statute, a tax on sale is not a prohibition on possession and even if it were, a single state statute does not establish an enduring and widespread tradition. *See Bruen*, 142 S. Ct. at 2154.

**Surety Laws**. The district court pointed to two surety laws. But such laws do not even support a restriction of the public carry of arms (*Bruen*, 142 S. Ct. at 2150), much less a categorical prohibition on possession of a class of commonly held arms for self-defense in the home.

**Regulation of Carry Generally**. The district court identified a single law that generally prohibited public carry (though not private possession) of arms. In *Bruen*, the Court held that when States generally prohibited both open and concealed carry of handguns, state courts usually upheld the restrictions when they exempted army revolvers or read the laws to exempt at least that category of weapons. *Id.*, 142 S. Ct. at 2155. But those courts that "upheld broader prohibitions without qualification generally operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*." *Id*. In short, *Bruen* already addressed this history and held that "American governments simply have not broadly prohibited the public carry of commonly used firearms." *Id.*, 142 S. Ct. at 2156. It necessarily follows that

there is no history of broadly prohibiting keeping and using such firearms in one's home.

### C.     Late Nineteenth Century and Twentieth Century Laws Are Not Relevant to the Historical Inquiry

Late 19th century and 20th century laws come too late in time to inform the historical analysis. *Bruen,* 142 S. Ct. at 2153–54 ("As we suggested in *Heller*, [] late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."). The Court expressed this concept even more forcefully in *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2257–2258 (2020), where it held that laws enacted in the second half of the 1800s – even if enacted by the overwhelming majority of states – are not relevant to the "history and tradition" inquiry regarding the scope of a provision of the Bill of Rights. In that case, the plaintiff challenged a Montana regulation that excluded religiously affiliated private schools from a state scholarship program for students attending private schools. The Court held that the law was unconstitutional because there was no founding era tradition supporting Montana's decision to disqualify religious schools from government aid. *Id.*, 140 S. Ct. at 2258. Far from prohibiting such aid, founding era laws actively encouraged it. *Id.* Significantly, Montana pointed out that in the latter half of the 1800s the overwhelming majority of states (30) had enacted no-aid laws. *Id.*, 140 S. Ct. at 2259. The Court rejected Montana's argument, holding that "[s]uch a development, of course, cannot by itself establish an early American tradition. … [S]uch evidence may reinforce

an early practice but cannot create one. … The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause." *Id*.

Whatever the case may be with respect to late 19th century precedents, it is absolutely clear that the 47 20th century laws identified by the district court are not relevant to the historical inquiry. Such precedents do "not provide insight into the meaning of the Second Amendment." *Id*. 142 S. Ct. at 2154, n. 28. The district court acknowledged this limitation, ECF No. 63, p 17 (acknowledging post-ratification practices, particularly from the late 18th and early 19th centuries, as the latest relevant history). Inexplicably, however, nearly half of the historical laws the court relied upon for its historical analysis were from the 20th century (47 of 93). Indeed, only 11 of the laws were from prior to 1850. Thus, most of the statutes identified by the district court are too temporally distant from 1791 and represent too few states to establish any founding era tradition. *See Bruen*, 142 S. Ct. at 2138.

### D.     Far from Banning Common Arms, Founding Era Laws *Required* Them

As discussed above, *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), held Montana's law unconstitutional because there was no founding era tradition supporting bans on religious aid to schools. *Id*., 140 S. Ct. at 2258. Far from banning such aid, founding era laws actively encouraged it. *Id*. A similar dynamic is in play with respect to laws banning the possession of commonly used arms. Far from banning the possession of such arms, founding-

era militia acts affirmatively required citizens to possess them. Those militia acts are the best evidence that the challenged laws are unconstitutional.

"In all the colonies, as in England, the militia system was based on the principle of the assize of arms," where – instead of a large standing army – there was a "general obligation of all adult male inhabitants to possess arms, and, with certain exceptions, to cooperate in the work of defence." Herbert L. Osgood, The American Colonies in the Seventeenth Century 499 (MacMillan 1904) (digitally archived at bit.ly/3lMoa50). Those laws required "the possession of arms and ammunition by all who were subject to military service" and that those individuals "appear in all the important enactments concerning military affairs. Fines were the penalty for delinquency, whether of towns or individuals." *Id*. at 500. In general, men between the ages of 16 and 60 were required to furnish themselves with muskets and ammunition. The typical infantry soldier was outfitted with a matchlock musket, his bandoleer ("a belt two inches wide, to which were attached twelve small cylindrical boxes, each holding one charge of powder," and hanging from it "a priming wire, a bullet bag, and a case containing several yards of match"), and "a short sword." Osgood, 501-02. The required arms evolved to flintlocks, firelocks, or carbines, and pistols became more common as the colonies neared the 18th century. *Id*. See Exhibit 2 for three examples of founding-era militia laws.

There is no way to reconcile this history with the State's disarmament regime and the City's ban on sales. Far from being subjected to arms bans, in

the founding era, ordinary male citizens of eligible age who failed to arm themselves with common weapons and standard ammunition faced fines and punishment. History, especially the history forgotten by Appellants, establishes that banning from the home common weapons suitable for both individual and collective defense is ahistorical. Had such civilian weapons banned by Appellees existed centuries ago, based on this history, they presumably would have been required – not banned – in every household.

### E.     Laws Regulating Carry Were Not "Uniformly Upheld"

The district court noted that laws regulating carrying weapons were "uniformly upheld." ECF No. 63, p 21. In addition to not being analogous to the categorical bans challenged in this action, the district court's assertion concerning these public carry regulations is not accurate. As discussed above, in *Bruen*, the Court held that when states generally prohibited both open and concealed carry of handguns, state courts usually upheld the restrictions only with exemptions. *Id.*, 142 S. Ct. at 2155. And those courts that did not provide such exemptions, "operated under a fundamental misunderstanding of the right to bear arms." *Id.*

The district court cited *Aymette v. State*, 21 Tenn. 154, 159 (1840) and *Cockrum v. State*, 24 Tex. 394, 402 (1859), in support of its conclusion. But both of these cases illustrate *Bruen's* point. In *Cockrum*, the Texas Supreme Court affirmed that the "right to carry a bowie-knife for lawful defense is secured,"

despite being "an exceeding[ly] destructive weapon." *Id.*, 24 Tex. 394, 402 (1859).[19]

In *Aymette*, the court abided by the same distinction between Bowie knives and commonly possessed rifles that Plaintiffs offer here. *Aymette* held that the "Legislature … have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are *not usual* in civilized warfare, or would not conduce to the common defence." *Id.*, 21 Tenn. at 159 (emphasis added). The Court stated that "citizens have the *unqualified right* to keep [a] weapon" that is "usual in civilized warfare," but that "the right to bear arms is not of that unqualified character." *Id.* at 159-160 (emphasis added). Contra the district court, *Aymette* confirms Plaintiffs' right to keep commonly possessed semiautomatic rifles and magazines in their home. The district court acknowledges that *Aymette* upheld the right to openly carry arms. ECF No. 63 p 22, n. 23. It is difficult to understand why the district court would cite *Aymette* in support of a ban on possession of arms while at the same time acknowledging that the case does not even support a ban on open carry in public, much less possession of arms in the home.

---

[19] In *English v. State*, 35 Tex. 473 (1872), *abrogated by Bruen*, the Supreme Court of Texas later restricted protection only to standard arms for militiamen and not more broadly to arms including pistols. 35 Tex. at 476. *Bruen* abrogated *English's* unduly narrow conception of arms. See *Bruen*, 142 S. Ct. at 2153.

## XI.    The City's Absolute Ban on Commercial Sales is Unconstitutional

The district court held that "a right to own a weapon that can never be purchased would be meaningless." ECF No.63 p 18, n. 8, *citing Ezell*, 651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to acquire" them). That is correct. In *Bruen*, the Court cited with approval the Third Circuit's decision in *Drummond v. Robinson Twp*., 9 F.4th 217 (3rd Cir. 2021). *Id.*, 142 S.Ct. at 2133. In *Drummond*, the Court held that laws "prohibiting the commercial sale of firearms would be untenable in light of *Heller*. *Id.*, 9 F.4th at 227 (internal citation and quotation marks omitted). This is why the City's absolute ban on the sale of commonly possessed firearms is unconstitutional.

## XII.    The Other Injunction Factors Are Met

In *Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113 (7th Cir. 2017), the Court held that in a constitutional case like this one, "the analysis begins and ends with the likelihood of success on the merits of [that] claim." *Id.*, 858 F.3d at 1116 (internal quotation omitted). *See also Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (same).

The loss of Second Amendment rights necessarily establishes irreparable harm. In *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the Plaintiffs established probable success on the merits of their Second Amendment claim.

46

The Court held no further showing of irreparable harm was required[20] because "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.*, 651 F.3d at 699, *quoting* Charles Alan Wright, *et al*, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995).

Moreover, Plaintiff LWI is suffering irreparable harm because the challenged laws are forcing it out of business. ECF No. 71-1, ¶ 12. 85% of the firearms LWI sells are banned under the challenged laws. *Id.*, ¶ 12. LWI's cash reserves have been depleted, and as a result, it has had to lay off employees and ask the Bevis family to work without pay. *Id.*, ¶ 13. Mr. Bevis has extended his personal credit, missed personal payments like home and car payments, maxed his credit limits, and taken out loans to pay the monthly bills. *Id.* LWI will not be able to abide by the terms of its 15-year commercial lease for the business real property, as well as pay equipment leases and purchase inventory, if these bans remain in effect any longer. *Id.* In short, LWI will be put out of business if these laws are enforced. *Id.* In *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 546 (7th Cir. 2007), the Court held that the plaintiffs "made a compelling case that it needs the injunction pending appeal to avert serious irreparable harm—the uncompensated death of its business." *See also*, *Dumanian v. Schwartz*, 2022 WL 2714994, at *14 (N.D. Ill. 2022), ("A likelihood of lost

---

[20] The district court clearly erred when it held that "[n]o binding precedent [] establishes that a deprivation of *any* constitutional right is presumed to cause irreparable harm." ECF No. 63, p 31 (emphasis in original).

business is a form of irreparable injury because it is difficult to 'pin[ ] down what business has been or will be lost.'"), *quoting Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (*quoting Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632–33 (7th Cir. 2005); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("[A] damages remedy may be inadequate if it comes 'too late to save plaintiff's business'" (*quoting Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)).

As for the public interest, the district court held that "[t]he protection of public safety is also unmistakably a 'public interest,' one both laws further." ECF No. 63, p 33. However strong the governments' asserted policy interest in protecting public safety may be, the public has no interest in doing so by unconstitutional means. As the Supreme Court stated in *Heller* in response to an identical argument, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of [arms commonly] held and used for self-defense in the home." *Id.*, 554 U.S. at 636.

"Balancing harm to the parties and considering the public interest 'largely overlap' when a Plaintiff sues a government entity to enjoin enforcement of a statute." *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 908 (S.D. Ind. 2009), *aff'd sub nom. Midwest Title Loans v. Mills*, 593 F.3d 660 (7th Cir. 2010); *accord Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party."). "The existence of a

continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978). "While the public has an interest in enforcing laws that promote safety or welfare, the public has no cognizable interest in enforcing laws that are unconstitutional. Indeed, the public interest is best served by preventing an unconstitutional enforcement." *Ripley*, 616 F. Supp. 2d at 908 (cleaned up) (*citing Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)). Thus, even if this Court were to accept Appellees' policy arguments, they would not be "substantially harmed" by injunctive relief because it is always in the public interest to prevent the violation of a party's constitutional rights. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

Where, as here, Plaintiffs have shown they are likely to succeed on the merits of their claim, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012). In summary, the Constitution supersedes Appellees' policy views. *Id*. "Because plaintiffs are likely to prevail in showing that their Second Amendment rights are being violated, the public interest weighs heavily in favor of granting their requested injunction." *Grace v. D.C.*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016).

In addition to the reasons identified above, these interests favor granting relief, because the State is not harmed by an injunction in this Court, because the law is already subject to an injunction in another court, as the district court noted in its order. ECF No. 63, p 4, n. 2. Finally, this is not a case where Plaintiffs have sought an injunction against a law of long standing. Neither of the challenged laws was effective until January 2023. Therefore, an injunction would preserve the status quo. And a preliminary injunction is often said to be designed to maintain the status quo pending completion of the litigation. *Praefke Auto Elec. & Battery Co. v. Tecumseh Prod. Co.*, 255 F.3d 460, 464 (7th Cir. 2001).

Finally, because this action is a facial challenge, the injunction can cover parties beyond the litigants in this case. *Ezell*, 651 F.3d 684, 699 (broad injunction appropriate because the law's "very existence stands as a fixed harm to every Chicagoan's Second Amendment right."). The Second Amendment protects the right to acquire arms. There are two parties to every transaction in which arms are acquired, the purchaser and the seller. Both sides of the transaction must be protected for the right to be effective. An injunction that protects only LWI would be meaningless if all its potential purchasers fear criminal prosecution. It follows that for injunctive relief to be effective, the injunction must extend beyond the parties to this action.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to reverse the district court's decision denying their motions for preliminary injunction and remand this matter with instructions to enjoin the unconstitutional laws.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
barry@arringtonpc.com

Jason R. Craddock
Law Office of Jason R. Craddock
2021 Midwest Rd., Ste. 200
Oak Brook, IL 60523
(708) 964-4973
craddocklaw@icloud.com

**CERTIFICATE OF COMPLIANCE WITH**
**Fed. R. App. P. 32(a)(7), Fed. R. App. P. 32(g) and Cir. R. 32(b) & (c)**

The undersigned, counsel of record for the Appellants furnishes the following in compliance with F.R.A.P. Rule 32(a)(7):

The undersigned hereby certifies that this brief complies with the type volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 13,248 words.

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 12 point Century Schoolbook font.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
barry@arringtonpc.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*

_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
barry@arringtonpc.com

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by

Circuit Rule 30(a) and (b) are included in the Required Short Appendix filed

concurrently with the Brief.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
barry@arringtonpc.com

## TABLE OF CONTENTS TO SHORT APPENDIX

1.  The District Court's Order Denying Motions for Preliminary Injunction .. App001

2.  Exhibit 1: Historical Statutes Cited by the District Court .......................... App034

2.  Exhibit 2: Militia Acts ................................................................... App049

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT BEVIS, et al. | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | No. 22 C 4775 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| CITY OF NAPERVILLE, ILLINOIS, | ) | |
| and JASON ARRES,  in his official | ) | |
| capacity as Chief of Police, | ) | |
| | ) | |
| *Defendants*. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

After several mass shootings nationwide, the City of Naperville enacted an Ordinance prohibiting the sale of assault weapons. Illinois followed shortly after with the Protect Illinois Communities Act, which bans the sale of both assault weapons and high-capacity magazines. Robert Bevis, who owns a local gun store in Naperville, Law Weapons, and the National Association of Gun Rights sued the state and city, alleging their laws violate the Second Amendment. (Dkt. 48). They now move for a temporary restraining order and a preliminary injunction alleging that their constitutional rights are being violated by the bans. (Dkts. 10, 50). For the following reasons, the motions are denied. (*Id.*)

## <u>BACKGROUND</u>

Mass shootings have become common in America. They have occurred in cities from San Bernadino, California to Newtown, Connecticut, and recently, Highland Park, Illinois. (Dkt. 12-1 at 1–3). In response, several states—California, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, New Jersey, and New York—along with many local municipalities have enacted

1

bans on the possession, sale, and manufacture of assault weapons and high-capacity magazines. (*Id.*) Illinois and the city of Naperville decided to put similar restrictions in place.

On August 17, 2022, Naperville's City Council passed its Ordinance banning the sale of "assault rifles" within the city.[1] (Dkt. 12 at 2). Section 3-19-2 declares "[t]he Commercial Sale of Assault Rifles within the City is unlawful and is hereby prohibited." (Dkt. 12-1 at 8). Violators are subject to fines ranging between $1,000 and $2,500. (*Id.* at 9). Section 3-19-1 provides both a general definition of an "assault rifle" as well as specific examples of prohibited guns. (*Id.* at 4). The general definition is as follows:

> (1) A semiautomatic rifle that has a magazine that is not a fixed magazine and has any of the following:
>
>> (A) A pistol grip.
>> (B) A forward grip.
>> (C) A folding, telescoping, or detachable stock, or is otherwise foldable or adjustable in a manner that operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability, of the weapon.
>> (D) A grenade launcher.
>> (E) A barrel shroud.
>> (F) A threaded barrel.
>
> (2) A semiautomatic rifle that has a fixed magazine with the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.
>
> (3) Any part, combination of parts, component, device, attachment, or accessory that is designed or functions to accelerate the rate of fire of a semiautomatic rifle but not convert the semiautomatic rifle into a machinegun.

---

[1]    The parties dispute whether the terms "assault rifle," "assault pistol," and "assault weapon" are appropriate. Proponents of bans believe the language accurately links the class of weapons to military weaponry. Indeed, the gun industry itself used "the terms 'assault weapons' and 'assault rifles' [] in the early 1980s, before political efforts to regulate them emerged in the late 1980s. The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public." Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231, 234 (2020). Opponents now consider the label misleading because the often-included guns, the argument goes, share no similar set of characteristics beyond the fact that they look intimidating. The Court will use the terms, as they are widely accepted in modern parlance and effectively convey the substance of the bans.

(*Id.* at 5). Additionally, twenty-six categories of weapons are specifically banned, including AK-47 and AR-15 rifles. (*Id.* at 5–6). The Ordinance was set to go into effect on January 1, 2023. (*Id.* at 10).

On January 10, 2023, Illinois enacted the Protect Illinois Communities Act, HB 5471. (Dkt. 57 at 1). The statute renders it unlawful "for any person within this State to knowingly manufacture, deliver, sell, or purchase or cause to be manufactured, delivered, sold, or purchased or cause to be possessed by another, an assault weapon," defined by a list of enumerated guns, including the AR-15 and AK-47. 720 ILCS 5/24-1.9(b). Additionally, the law bans the sale of "large capacity ammunition feeding device[s]," which are "magazine[s], belt[s], drum[s], [and] feed strip[s] … that can be readily restored or converted to accept[] more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns." 720 ILCS 5/24-1.10(a). Both state prohibitions went into immediate effect upon the passage of the act (in contrast, the regulations banning assault-weapon and large-capacity magazine ownership and imposing registration requirements have a later effective date and are not being challenged). (Dkt. 57 at 2).

Robert Bevis owns Law Weapons, a firearm store in Naperville. (Dkt. 48 ¶¶ 7–8). He attests, "I and my customers desire to exercise our Second Amendment right to acquire the Banned Firearms … for lawful purposes, including, but not limited to, the defense of our homes." (Dkt. 10-2 ¶ 4). Furthermore, he claims that the prohibition means he and his business will go bankrupt, and "the citizens of Naperville will be left as sitting ducks for criminals who will still get guns." (*Id.* ¶ 5). National Association for Gun Rights ("NAGR") is a nonprofit organization dedicated to "defend[ing] the right of all law-abiding individuals to keep and bear arms" and seeks to represent "the interests of its members who reside in the City of Naperville." (Dkt. 10-1 ¶ 2; *see also* Dkt. 48 ¶ 6).

Before Illinois enacted the Protect Illinois Communities Act, the plaintiffs—Bevis, Law Weapons, and NAGR—sued Naperville alleging its Ordinance violates the Second Amendment. (Dkt. 1). They moved for a temporary restraining order and preliminary injunction preventing its enforcement. (Dkt. 10). The city agreed to stay the Ordinance pending the disposition of the motion. (Dkt. 29). Shortly thereafter, Illinois passed the Protect Illinois Communities Act, and this Court granted the plaintiffs leave to amend their complaint to add the state as a party. (Dkts. 41, 47). The plaintiffs promptly filed their Amended Complaint, adding Jason Arres, Naperville's Chief of Police, as a defendant and asserting that both Naperville's Ordinance and Illinois's Protect Illinois Communities Act violate the Second Amendment. (Dkt. 48). They then notified the Illinois Attorney General of their constitutional challenge and moved for a temporary restraining order and preliminary injunction against both laws.[2] (Dkts. 49, 50). The Court held oral argument on January 27, 2023. (Dkt. 55).

## DISCUSSION

The standards for issuing a temporary restraining order and a preliminary injunction are identical. *Mays v. Dart*, 453 F. Supp. 3d 1074, 1087 (N.D. Ill. 2020). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th

---

[2]    During this litigation, other plaintiffs have challenged the Illinois law in both state and federal court. On January 20, 2023, an Illinois circuit court entered a temporary restraining order enjoining the law based on a violation of the three-readings rule, and the Illinois Appellate Court for the Fifth District affirmed. *Accuracy Firearms, LLC v. Pritzker*, 2023 IL App (5th) 230035 (Jan. 31, 2023). Neither party has raised the possibility of abstention under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941). *Pullman* abstention requires federal courts to stay cases while state courts adjudicate "unsettled state-law issues." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 76 (1997). While abstention doctrines can be raised sua sponte, *International College of Surgeons v. City of Chicago*, 153 F.3d 356, 360 (7th Cir. 1998), doing so here would be inappropriate. "Attractive in theory because it placed state-law questions in courts equipped to rule authoritatively on them, *Pullman* abstention proved protracted and expensive in practice, for it entailed a full round of litigation in the state court system before any resumption of proceedings in federal court." *Arizonans for Off. Eng.*, 520 U.S. at 76. The Protect Illinois Communities Act needs no clarification—it clearly prohibits the sale of assault weapons and high-capacity magazines. No unsettled state-law issue complicates this Court's review of the Act's constitutionality. Moreover, even without the state law, Naperville's Ordinance would still be in effect.

4

Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1324 (7th Cir. 2022) (quoting *Winter*, 555 U.S. at 20).

## I.    Likelihood of Success on the Merits

A plaintiff must "demonstrate that [his] claim has some likelihood of success on the merits, not merely a better than negligible chance." *Doe*, 43 F.4th at 791 (quoting *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020)). Analyzing the likelihood of success, the Seventh Circuit has stressed, is "often decisive"—as it is here. *Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022). As set forth below, although the plaintiffs have standing to bring this lawsuit, they are unlikely to succeed on the merits of their claim because Naperville's Ordinance and the Protect Illinois Communities Act are consistent with the Second Amendment's text, history, and tradition.

### A.    Jurisdiction

Before proceeding to the merits, the Court must be confident in its jurisdiction. *N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 420 (7th Cir. 2022). Article III grants the federal courts jurisdiction only over "cases" and "controversies." U.S. Const. art. III § 2. As such, any person or party "invoking the power of a federal court must demonstrate standing to do so." *Hero v. Lake Cnty. Election Bd.*, 42 F.4th 768, 772 (7th Cir. 2022) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)). The three familiar elements for standing are (1) a concrete and particularized injury actually suffered by the plaintiff that (2) is traceable to the defendant's conduct and (3) can be remedied by judicial relief. *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 937 (7th Cir. 2022). All three plaintiffs here have satisfied the standing requirements to bring their lawsuit.

5

### 1.    Individual Standing

Direct monetary harm is a textbook "injury in fact," and Bevis alleges that, as a gun-store owner in the business of selling the banned weapons, he has lost money in sales, an allegation that clearly establishes harm at this stage. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). Illinois's and Naperville's gun laws undeniably caused the harm.

The only wrinkle here relates to the third element: redressability. Before Illinois enacted the Protect Illinois Communities Act, the plaintiffs sued only Naperville. Municipalities do not enjoy sovereign immunity, so this Court could have redressed the plaintiffs' alleged injury by enjoining the enforcement of a law without issue; the standing inquiry would have been easy. *See Lincoln County v. Luning*, 133 U.S. 529 (1890). Then, Illinois enacted its own gun regulation that, like Naperville's ordinance, banned the sale of assault weapons. The plaintiffs—likely recognizing that, without the state as a party, this Court could not remedy their harm because the state law would still proscribe their conduct—amended their complaint to add Jason Arres, Naperville's Chief of Police. But as Naperville points out, several other parties, such as the state police or other county officials, also must enforce Illinois's gun laws, raising the possibility that relief would be ineffective.

Unlike local governments, state governments are generally immune from suit. *See, e.g.*, *Lukaszczyk v. Cook County*, 47 F.4th 587, 604 (7th Cir. 2022); *Hans v. Louisiana*, 134 U.S. 1, 20–21 (1890). The *Ex parte Young* doctrine is, however, one exception to this rule, and it "allows private parties to sue individual state officials for prospective relief to enjoin ongoing violations of federal law." *Council 31 of the Am. Fed'n of State, Cnty & Mun. Emps., AFL-CIO v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012) (quoting *MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 337 (7th Cir. 2000)). The doctrine represents a legal fiction: a plaintiff can for all intents and

APP006

purposes sue the state provided the complaint lists a state officer instead of the state itself. Little,

then, is gained by imposing hyper-technical pleading requirements about which state official is

named. A complaint must only be consistent with the legal framework laid out in *Ex parte Young*.

In short, it must include a state official with a "connection" to the enforcement of the law instead

of the state itself. *Fitts v. McGhee*, 172 U.S. 516, 529 (1899).[3] This inclusion avoids the sovereign-

immunity issue that prevents a direct suit but still allows appropriate injunctive relief. Forcing

parties to name *every* possible agent that could enforce a state law would be onerous if not

impossible. *Cf. Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 78 (1978) ("Nothing

in our prior cases requires a party seeking to invoke federal jurisdiction to negate ... speculative

and hypothetical possibilities ... in order to demonstrate the likely effectiveness of judicial relief.").

Arres, as Chief of Police, enforces both municipal and state laws, including the Ordinance

and the Protect Illinois Communities Act. Naperville, IL., Mun. Code ch 8, art. A, §§ 2, 3 (2022).

His duty to enforce both laws makes him a state official with the requisite "connection" for an

official-capacity suit against Illinois. *See Fitts*, 172 U.S. at 529. If the plaintiffs succeed, this Court

could enjoin the enforcement of the Protect Illinois Communities Act against any state actor who

---

[3]      *See also Diamond v. Charles*, 476 U.S. 54, 64 (1986) (focusing on "the state officials who were charged with enforcing the [law]"); *Camreta v. Greene*, 563 U.S. 692, 727 (2011) (Kennedy, J., dissenting) ("[T]he proper defendant in a suit for prospective relief is the party prepared to enforce the relevant legal rule against the plaintiff."); *Am. C.L. Union v. The Fl. Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993) ("[W]hen a plaintiff challenges the constitutionality of a rule of law, it is the state official designated to enforce that rule who is the proper defendant …."); *Weinstein v. Edgar*, 826 F. Supp. 1165, 1166 (N.D. Ill. 1993) ("The rule embodied by *Ex parte Young* and its progeny is informed by a familiar fiction. This fiction … is premised on the notion that a State cannot act unconstitutionally, so that any state official who violates anyone's constitutional rights is perforce stripped of his or her official character."); *Southerland v. Escapa*, No. 14-3094, 2015 WL 1329969 at *2 (C.D. Ill. Mar. 20, 2015) ("In *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007), the Supreme Court touched on the question of which parties are proper to a lawsuit when it reiterated that courts must determine whether 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"); *Allied Artists Pictures Corp. v. Rhodes*, 473 F. Supp. 560, 566 (S.D. Ohio 1979) ("All that *Young* requires, as plaintiffs point out, is that the official have 'some connection with the enforcement of the act.'").

seeks to prevent Bevis from selling assault weapons or high-capacity magazines. Because Bevis

and, by extension, Law Weapons have an effective remedy, they have standing to sue.

### 2.    Organizational Standing

NAGR's standing presents a different question. Organizations can have standing to sue by

either showing a direct harm or borrowing the standing of their members, known as associational

or representational standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982);

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). NAGR chooses the latter

method, as neither challenged law has directly harmed the group. "To sue on behalf of its members,

an association must show that: (1) at least one of its members would 'have standing to sue in their

own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3)

'neither the claim asserted nor the relief requested requires the participation of individual

members.'" *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th

Cir. 2021) (quoting *Hunt*, 432 U.S. at 343).

NAGR asserts that several members live in Naperville, an Illinois city.[4] (Dkt. 48 ¶ 6).

Unlike Bevis, who owns a business selling assault weapons and high-capacity magazines, NAGR's

members are not identified as business owners and, therefore, have not lost money. (*Id.*) Instead,

they claim the prohibitions deprive them of a constitutional right. (*Id.*) This harm suffices for

standing. The alleged deprivation of a constitutional right is another "textbook harm." *See Doe v.*

*Sch. Bd. of Ouachita Par.*, 274 F.3d 289, 292 (5th Cir. 2001) ("Impairments to constitutional rights

are generally deemed adequate to support a finding of 'injury' for purposes of standing."). The

Second Amendment differs from many other amendments in that it protects access to a tangible

---

[4]    NAGR identifies its members only by their initials: B.S., D.B., G.S., G.K., L.J., and R.K. (Dkt. 48 ¶ 6). The Court assumes the complaint's accuracy, though the group may need to later establish these facts, likely by filing an addendum under seal.

item, as opposed to an intangible right. *Compare* U.S Const. amend. II. (protecting "the right of the people to keep and bear Arms"), *with id.* amend. I ("Congress shall make no law … abridging the freedom of speech …."), and *id.* amend. V ("No person … shall be compelled in any criminal case to be a witness against himself …."). But individuals deprived of an *in rem* right are not penalized because of this difference. The First Amendment furnishes a close analogue: individuals can sue when the government bans protected books or attempts to close a bookstore based on content censorship. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 349 (2010) ("If [the government is] correct, [it] could prohibit a corporation from expressing political views in media beyond those presented here, such as by printing books. … This troubling assertion of brooding governmental power cannot be reconciled with the confidence and stability in civic discourse that the First Amendment must secure."); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (emphasizing "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom"). So too, residents can sue the government under a similar Second Amendment theory.

NAGR has also satisfied the remaining elements. The organization "seeks to defend the right of all law-abiding individuals to keep and bear arms." (Dkt. 10 ¶ 2). That interest is certainly furthered by joining a lawsuit to challenge gun regulations. The group, together with Bevis and Law Weapons, seeks equitable relief through a temporary restraining order and an injunction, neither of which "requires the participation of individual members." *Prairie Rivers*, 2 F.4th at 1008 (quoting *Hunt*, 432 U.S. at 333). Member participation is typically required only when the party seeks damages, and NAGR explicitly disclaimed compensatory or nominal damages. (Dkt. 48 ¶ 37).

9

### B.  Federal Rule of Civil Procedure 5.1

Turning from standing to civil procedure, a party challenging a statute must "file a notice of constitutional question stating the question and identifying the paper that raises it … if a state statute is questioned and the parties do not include the state … or one of its officers or employees in an official capacity" and "serve the notice and paper … on the state attorney general if a state statute is question—either by certified or registered mail or by sending it to [a designated] electronic address." Fed. R. Civ. P. 5.1(a). The court then certifies that the statute has been questioned to the "appropriate attorney general." *Id.* 5.1(b); *see also* 28 U.S.C. § 2403. The attorney general "may intervene within 60 days," and until the intervention deadline, a court "may not enter a final judgment holding the statute unconstitutional." Fed. R. Civ. P. 5.1(c).

The plaintiffs represent, and Naperville agrees, that they filed the appropriate notice with Illinois's attorney general that a constitutional challenge was being raised to the Protect Illinois Communities Act. (Dkts. 49; 50 at 2; *see also* Dkt. 57 at 5). This Court then promptly certified the question to the appropriate attorney general. (Dkt. 56). Illinois now *may* intervene—but is not required to. The statute is permissive. In the interim, this Court is free to consider the constitutionality of the law and any preliminary relief, such as a temporary restraining order or a preliminary injunction. *See* Fed. R. Civ. P. 5.1 advisory committee's note to 2006 adoption ("Pretrial activities may continue without interruption during the intervention period, and the court retains authority to grant interlocutory relief. The court may reject a constitutional challenge to a statute at any time.").

10

### C.  Second Amendment

#### 1.  Existing Jurisprudence

The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court first recognized that this provision enshrines an individual's right to keep and bear arms for the purpose of self-defense in *District of Columbia v. Heller*, 554 U.S. 570 (2008), a challenge to D.C.'s prohibition on handgun ownership. In interpreting the Amendment, the Court began with the text and its original meaning as "understood by the voters" at the time of ratification. *Id.* at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). The textual elements—including the unambiguous language stating a right to "keep and bear arms"—protects "the individual right to possess and carry weapons in case of confrontation," a meaning "strongly confirmed by the historical background." *Id.* at 592. Several states adopted similar measures in their respective state constitutions, *id.* at 600–01, and post-ratification commentary confirmed this understanding. *Id.* at 605–09.

The Court recognized, however, that the "right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court gave two limiting examples: (1) as *United States v. Miller*, 307 U.S. 174 (1939), explained, "those weapons not typically possessed by law-abiding citizens for lawful purposes" are unprotected, *Heller*, 554 U.S. at 625; and (2) measures related to "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" are presumptively lawful, *id.* at 626–27. So interpreted, a categorical ban on handgun possession in the home was unconstitutional "under any of the standards of scrutiny … applied to enumerated constitutional

11

rights." *Id.* at 628. Indeed, "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." *Id.* at 629.

*McDonald v. City of Chicago*, 561 U.S. 742 (2010), decided two years later, incorporated the Second Amendment right against the states with a similar emphasis on text and history. Under the Due Process Clause, a right that is "fundamental to our scheme of ordered liberty," that is, "deeply rooted in this Nation's history and tradition," restrains the states just as it does for the federal government. *Id.* at 767 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). "Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and … is 'the *central component*' of the Second Amendment right." *Id.* (quoting *Heller*, 554 U.S. at 599). Thus, the Court had little trouble concluding the right recognized in *Heller* was "deeply rooted" in history and tradition. *Id.* at 791.

In handing down *Heller* and *McDonald*, the Supreme Court left the question of how to evaluate gun regulations unresolved. *See* Joseph Blocher & Darrell A. H. Miller, *The Positive Second Amendment: Rights, Regulation, and the Future of* Heller 102 (2018) ("*Heller* had opened a 'vast *terra incognita*,' and gave judges the job of mapping it." (internal citation omitted)). Eventually, the lower courts coalesced around a two-part test: the first question asked "whether the regulated activity falls within the scope of the Second Amendment" based on text and history. *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019) (quoting *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017) (*Ezell II*)); *see also* Blocher & Miller, *supra*, at 110 ("In the decade since *Heller*, the federal courts of appeals have widely adopted the two-part approach."). If so, the second inquiry "looked into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights" and evaluated "the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Kanter*, 919 F.3d at 441

12

APP012

(quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)). In practice, step two did the heavy lifting. Courts regularly assumed without deciding the Second Amendment covered the regulated conduct and proceeded to analyze the regulation under the chosen means-end scrutiny (most often, intermediate scrutiny). *See* Blocher & Miller, *supra*, at 110–12.

Recently, the Supreme Court rejected the two-step approach in *New York State Rifle & Pistol Association, Inc. v. Bruen* and set forth a new standard for applying the Second Amendment. 142 S. Ct. 2111 (2022). In 1911, New York had enacted the so-called "Sullivan Law" that permitted public carry only if an applicant could prove "good moral character" and "proper cause." *Id.* at 2122 (quoting Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. Laws 1627, 1629). The plaintiffs were denied the licenses sought, and they sued for declaratory and injunctive relief. *Id.* at 2124–25. "Despite the popularity of this two-step approach," the Court concluded, "it is one step too many." *Id.* at 2127. "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. The appropriate standard now is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.* at 2129–30. Even accepting that standard, as Justice Kavanaugh emphasized in his concurrence (joined by Chief Justice Roberts), the Second Amendment still permits "a 'variety' of gun regulations," such as the examples already announced in *Heller*. *Id.* at 2162 (Kavanaugh, J., concurring). But the majority opinion—which six justices joined—found the New York licensing scheme to be unconstitutional: the text covered the right to carry a handgun outside of the home

13

for self-defense, and the state could not demonstrate a historical tradition of firearm regulation to support its law. *Id.* at 2156.

Before *Bruen*, every circuit court, including the Seventh Circuit, presented with a challenge to an assault-weapons or high-capacity magazine ban determined such bans were constitutional. *Worman v. Healey*, 922 F.3d 26, 38–39 (1st Cir. 2019); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015); *Kolbe v. Hogan*, 849 F.3d 114, 124 (4th Cir. 2017) (en banc); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) (*Heller II*). The reasoning was similar. The inquiry asked, "whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny." *Heller II*, 670 F.3d at 1252. Most courts assumed without deciding that the Second Amendment covered the regulations.[5] *See, e.g.*, *Worman*, 922 F.3d at 33–35; *Heller II*, 670 F.3d at 1260–61. Intermediate scrutiny, not strict scrutiny, was appropriate because the prohibitions left a person free to possess many lawful firearms. *Heller II*, 670 F.3d at 1262 (citing *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010)). The regulations survived intermediate scrutiny "because semiautomatic assault weapons have been understood to pose unusual risks. When used, these weapons tend to result in more numerous

---

[5]        The Fourth Circuit was the only court to clearly hold, as one of two alternative holdings, that the scope of the Second Amendment did not extend to assault weapons. *Kolbe*, 849 F.3d at 135. In its view, *Heller* offered a "dispositive and relatively easy inquiry: Are the banned assault weapons … 'like' 'M-16 rifles,' i.e., 'weapons that are most useful in military service,' and thus outside the ambit of the Second Amendment?" *Id.* at 136. AR-15 rifles share similar rates of fire and are actually "more accurate and lethal." *Id.* The weapons can also have the "very features that qualify a firearm as a banned assault weapon—such as flash suppressors, barrel shrouds, folding and telescoping stocks, pistol grips, grenade launchers, night sights, and the ability to accept bayonets and large-capacity magazines." *Id.* at 137. The "net effect" is "a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." *Id.* Because the weapons "are clearly most useful in military service," the Fourth Circuit felt "compelled by *Heller* to recognize that those weapons … are not constitutionally protected." *Id.*

14

wounds, more serious wounds, and more victims." *NYSRPA*, 804 F.3d at 262. The "same logic"

applied to large-capacity magazines. *Id.* at 263. "Large-capacity magazines are disproportionately

used in mass shootings," and they result in "more shots fired, persons wounded, and wounds per

victim than do other gun attacks." *Id.* at 263–64 (quoting *Heller II*, 670 F.3d at 1263).

The Seventh Circuit was one of the circuits to uphold such a ban. In *Friedman v. City of*

*Highland Park*, the city enacted an ordinance prohibiting the possession of assault weapons and

large-capacity magazines. 784 F.3d at 407. Several plaintiffs sued seeking an injunction against

the ordinance. *Id.* The district court denied them relief, and the Seventh Circuit affirmed. *See*

*generally id.*

The question after *Bruen* is whether *Friedman* is still good law. *See United States v.*

*Rahimi*, No. 21-11001, 2023 WL 1459240, at *2 (5th Cir. 2023) ("The Supreme Court need not

expressly overrule [] precedent … where an intervening Supreme Court decision fundamentally

changes the focus of the relevant analysis." (cleaned up)). As an initial observation, the opinion

lacks some clarity. The two-part test was the law of the Seventh Circuit for at least five years, *see,*

*e.g.*, *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc), *Ezell*, 651 F.3d 684, yet the

Court did not engage with it. Instead, it explained,

> we think it better to ask whether a regulation bans weapons that were common at
> the time of ratification or those that have 'some reasonable relationship to the
> preservation or efficiency of a well regulated militia' and whether law-abiding
> citizens retain adequate means of self-defense.

*Friedman*, 784 F.3d at 410 (quoting *Heller*, 544 U.S. at 622–25) (internal citation omitted). This

reframed test complicates the task of determining if the case was decided under the now-defunct

step two—which Naperville concedes would render it bad law—or step one—which would make

it binding precedent that dictates the outcome here. Without the benefit of a clear statement, this

Court must examine the opinion's reasoning.

15

The Seventh Circuit observed first, "[t]he features prohibited by Highland Park's ordinance were not common in 1791. Most guns available then could not fire more than one shot without being reloaded; revolvers with rotating cylinders weren't widely available until the early 19th century." *Id.* at 410. The weapons banned, it continued, "are commonly used for military and police functions," and states enjoy leeway "to decide when civilians can possess military-grade firearms, so as to have them available when the militia is called to duty." *Id.* The main consideration, though, was whether the ordinance left residents with ample means to access weapons for self-defense. *Id.* at 411. The Court answered in the affirmative. The concern was principally allayed by the availability of handguns and other rifles. *Id.* "If criminals can find substitutes for banned assault weapons, then so can law-abiding homeowners." *Id.* Moreover, data showed that assault weapons are used in a greater share of gun crimes, and "some evidence" links their availability with gun-related homicides. *Id.* "The best way to evaluate the relation among assault weapons, crime, and self-defense is through the political process and scholarly debate," not a judicial decree. *Id.* at 412.

*Friedman* cannot be reconciled with *Bruen*.[6] The explanation that semiautomatic weapons were not common in 1791 is of no consequence. The Second Amendment "extends … to … arms … that were not in existence at the time of the founding." *Caetano v. Massachusetts*, 577 U.S.

---

[6]        Recognizing *Friedman* was no longer good law, this Court ordered supplemental briefing on the application of *Bruen*. (Dkts. 15, 18, 30, 33). Naperville marshalled an admirable historical record. It protested, though, that "it [had] been unable to conduct primary source research or to retain and disclose an expert under FRCP 26(a)(2)." (Dkt. 34 at 19). On the first point, again, plaintiffs seek preliminary and emergency relief. Naperville may have agreed to stay its Ordinance, but Illinois has made no such guarantees. Supplemental briefing for a TRO is naturally rushed because plaintiffs allege a deprivation of a constitutional right. Naperville will, nevertheless, be able to continue assembling support for its positions as the case proceeds. On the second point, *Bruen* indicates that judges, not party-selected experts, will assess the Second Amendment's history; there was no summary-judgment record before the Court—the district court dismissed the complaint—and no mention of experts. The only two cases Naperville cites in support are the *dissenting* opinion in *State v. Philpotts*, 194 N.E.3d 371, 372 (Ohio 2022) (Brunner, J., dissenting), which contains rejected legal arguments, and the nonbinding district-court opinion in *United States v. Bullock*, 3:18-cr-165, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022), which the government itself rejected, *id.* Dkt. 71 ("If … this Court were to deem it necessary to delve into text and history …, it should look to the parties for argument and evidence on that point, directing the parties to supplement their prior filings as necessary.").

411, 412 (2016) (quoting *Heller*, 554 U.S. at 582). Relatedly, the Supreme Court has unequivocally dismissed the argument that "only those weapons useful in warfare are protected." *Id.* (quoting *Heller*, 554 U.S. at 624–25). To the extent that the Seventh Circuit classified the weapon as either "civilian" or "military," the classification has little relevance. And the arguments that other weapons are available and that fewer assault weapons lower the risk of violence are tied to means-end scrutiny—now impermissible and unconnected to text, history, and tradition. *See Bruen*, 142 S. Ct. at 2127. Accordingly, this Court must consider the challenged assault-weapon regulations on a *tabula rasa*.

### 2. Challenged Laws

*Bruen* is now the starting point. Courts must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2129–30. If not, the regulation is constitutional because the regulation falls outside the scope of protection. But if the text covers "an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. The analogue need not be "a historical twin" or "a dead ringer for historical precursors," so long it is sufficiently analogous "to pass constitutional muster." *Id.* at 2133. Relevant history includes English history from the late 1600s, American colonial views, Revolutionary- and Founding-era sources, and post-ratification practices, particularly from the late 18th and early 19th centuries. *Id.* at 2135–56; *see also Rahimi*, 2023 WL 1459240, at *8–10; *Frein v. Pa. State Police*, 47 F.4th 247, 254–56 (3d Cir. 2022).

"[T]he Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at 2133; *see also id.* at 2162 (Kavanaugh, J., concurring). *Bruen* does not displace the limiting examples provided in *Heller*. States remain free to enact (1) "prohibitions

17

on the possession of firearms by felons and the mentally ill"; (2) "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"; (3) "laws imposing conditions and qualifications on the commercial sale of arms"; and (4) bans on weapons that are not "in common use." *Id.* at 2162 (Kavanaugh, J., concurring) (citation omitted). The Court in the majority opinion never specifies how these examples fit into the doctrine, but *Heller* and Justice Kavanaugh's concurrence reinforce their continued vitality.[7] And most importantly, the "list does not purport to be exhaustive." *Heller*, 554 U.S. at 626 n.26. Additional categories exist—provided they are consistent with the text, history, and tradition of the Second Amendment. *See Bruen*, 142 S. Ct. at 2129–30.

Under this framework, Naperville's Ordinance and the Protect Illinois Communities Act are constitutionally sound.[8] The text of the Second Amendment is limited to only certain arms, and history and tradition demonstrate that particularly "dangerous" weapons are unprotected.[9] *See* U.S. Const. amend. II; *Heller*, 554 U.S. at 627.

---

[7]     These categories may fit into the new doctrinal test in different ways. For instance, bans on weapons not in common use fall outside the Second Amendment's text only protecting certain "arms." In contrast, sensitive-place regulations are better justified by a robust history of keeping arms out of high-risk areas, such as government buildings or schools. The formulation for the standard resembles a rigid two-step test (text, then history), but it boils down to a basic idea: "Gun bans and gun regulations that are longstanding … are consistent with the Second Amendment individual right. Gun bans and gun regulations that are not longstanding or sufficiently rooted in text, history, and tradition are not consistent with the Second Amendment individual right." *Heller II*, 670 F.3d at 355 (Kavanaugh, J., dissenting).

[8]     Today, the challenged laws ban only the sale of assault weapons and high-capacity magazines, not their possession. Nonetheless, the Court considers the state's general authority to regulate assault weapons because logically if a state can prohibit the weapons altogether, it can also control their sales. Inversely, a right to own a weapon that can never be purchased would be meaningless. *See Drummond v. Robinson Township*, 9 F.4th 217, 229 (3d Cir. 2021) ("[I]mmunizing the Township's atypical [gun-sales] rules would relegate the Second Amendment to a 'second-class right'—the precise outcome the Supreme Court has instructed us to avoid." (internal citation omitted)); *cf. Ezell*, 651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."). It may be that governments are afforded more leeway in regulating gun commerce than gun possession, but that argument is for another day.

[9]     Weapons associated with criminality may also be unprotected, but given the strength of the historical evidence regarding "particularly dangerous" weapons, there is no need to consider this alternative ground.

18

i.    *History and Tradition*

William Blackstone, whose writings the Court relied on in *Heller*, drew a clear line between traditional arms for self-defense and "dangerous" weapons. He proclaimed, "[t]he offense of riding or going armed, with *dangerous* or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." 4 William Blackstone, *Commentaries on the Laws of England* 148–49 (emphasis added). And over two centuries of American law has built upon this fundamental distinction. (*See* Dkt. 57-10 ¶ 8 ("From the 1600s through the early twentieth century, the colonies, states, and localities enacted [] thousands of gun laws of every imaginable variety. … [I]t is a tradition that can be traced back throughout the Nation's history."))

Gun ownership and gun regulation have evolved since the passage of the Second Amendment. In the 18th century, violent crime was at historic lows; the rate at which adult colonists were killed by violent crime was one per 100,000 in New England and, on the high end, five per 100,000 in Tidewater, Virginia.[10] The "pressing problem" for minimizing violence in the colonies was not guns. (Dkt. 34-7 ¶ 9). A musket took, at best, half a minute to load a single shot— the user had to pour powder down the barrel, compress the charge, and drop or ram the ball onto the charge—and the accuracy of the weapon was poor. (Dkt. 34-3 ¶ 27; Dkt. 34-7 ¶ 11). Nor did people keep guns loaded. The black powder used to fire a musket was corrosive and prone to attract moisture, which rendered it ineffective. (Dkt. 34-3 ¶ 27). That is also why guns hung over the fireplace mantle—it was the warmest and driest place in the home.[11] This combination of limitations meant that guns were seldom "the primary weapon of choice for those with evil intent."

---

[10]    Randolph Roth, *American Homicide* 61–63 (2009).

[11]    Randolph Roth, *Why Is the United States the Most Homicidal in the Affluent World*, National Institute for Justice (Dec. 1, 2023), https://nij.ojp.gov/media/video/24061#transcript--0.

APP019

(Dkt. 34-3 ¶ 28).[12] Citizens did not go to the town square armed with muskets for self-protection, and only a small group of wealthy, elite men owned pistols, primarily a dueling weapon (Alexander Hamilton being perhaps the most infamous example).[13] Other arms, though, were prevalent—as were laws governing the most dangerous of them.

An early example of these regulations concerned the "Bowie knife," originally defined as a single-edged, straight blade between nine and ten inches long and one-and-half inches wide.[14] In the early 19th century, the Bowie knife gained notoriety as a "fighting knife" after it was supposedly used in the Vidalia Sandbar Fight, a violent brawl that occurred in central Louisiana.[15] Shortly afterwards, many southerners began carrying the knife in public because it offered a better chance to stop an assailant than the more cumbersome guns of the era, which were unreliable and inaccurate.[16] They were also popular in fights and duels over the single-shot pistols.[17] Responding to the growing prevalence and danger posed by Bowie knives, states quickly enacted laws regulating them. Alabama was first, placing a prohibitively expensive tax of one hundred dollars on "selling, giving or disposing" the weapon, in an Act appropriately called "An Act to Suppress

---

[12]    *See also* Dkt. 34-7 ¶ 12 ("The infrequent use of guns in homicides in colonial America reflected these limitations. Family and household homicides—most of which were caused by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives. It did not matter whether the type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery. Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.").

[13]    Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (2001).

[14]    *See* David B. Kopel et al., *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 179 (2013).

[15]    *Id.*

[16]    *Id.* at 185. The knife's inventor, Jim Bowie, died fighting at the Alamo, fueling the "Bowie legend." (Dkt. 34-4 ¶ 35).

[17]    Norm Flayderman, *The Bowie Knife* 485 (2004).

the Use of Bowie Knives," followed two years later by a law banning the concealed carry of the knife and other deadly weapons.[18] Georgia followed suit the same year, making it unlawful "for any merchant … to sell, or offer to sell, or to keep … Bowie, or any other kinds of knives."[19] By 1839, Tennessee, Florida, and Virginia passed similar laws.[20] The trend continued. At the start of the twentieth century, every state except one regulated Bowie knives; thirty-eighty states did so by explicitly naming the weapon,[21] and twelve more states barred the category of knives encompassing them.[22] (Dkt. 34-4 ¶ 39).

State-court decisions uniformly upheld these laws. The Tennessee Supreme Court declared, "The Legislature, therefore, have a right to prohibit the wearing or keeping *weapons dangerous* to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence [sic]." *Aymette v. State*, 21 Tenn. 154, 159 (1840)

---

[18]    Act of Jun 30, 1837, ch. 77, § 2, 1837 Ala. Laws 7, 7; An Act to Suppress the Evil Practice of Carrying Weapons Secretly, ch. 77, § 1, 1839 Ala. Laws 67, 67.

[19]    Act of December 25, 1837, § 1, 1837 Ga. Laws 90, 91.

[20]    Act of January 27, 1837, ch. 137, § 4,1837–1838 Tenn. Pub. Acts 200, 200–01; Act of February 10, 1838, Pub. L. No. 24 §1,1838 Fla. Laws 36, 36; Act of February 2, 1838, ch. 101, § 1, 1838 Va. Acts 76, 76.

[21]    *See, e.g.*, Act of June 30, 1837, No. 11, § 1, 2, 1837 Ala. Acts 7, 7 ("[I]f any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought. … for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury …."); Act of Aug. 14, 1862, § 1, 1862 Colo. Sess. Laws 56, 56 ("If any person or persons shall … carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof … be fined in a sum not less than five, nor more than thirty-five dollars."); Act of Feb. 26, 1872, ch. 42, § 246, 1872 Md. Laws 56, 57 ("It shall not be lawful for any person to carry concealed … any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case ….").

[22]    *See, e.g.*, Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442, 442 ("A person who … carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony."); Act of Apr. 18, 1905, ch. 172, § 1, 1905 N.J. Laws 324, 324 ("Any person who shall carry … any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor …."); Act of March 8, 1915, ch. 83, § 1, 1915 N.D. Laws 96, 96 ("Any person other than a public officer, who carries concealed in his clothes … any sharp or dangerous weapon usually employed in attack or defense of the person … shall be guilty of a felony ….").

21

(emphasis added).[23] "To hold that the Legislature could pass no law upon this subject by which to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce," it continued, "would be to pervert a great political right to the worst of purposes." *Id.* The Texas Supreme Court expressed similar concern, noting that a Bowie knife "is an exceeding[ly] *destructive weapon*," "difficult to defend against," more dangerous than a pistol or sword, and an "instrument of almost certain death." *Cockrum v. State*, 24 Tex. 394, 402 (1859) (emphasis added).

Laws regulating melee weapons also targeted more than just the Bowie knife. As early guns proved unreliable, many citizens resorted to clubs and other blunt weapons. (Dkt. 34-4 ¶ 40). Popular instruments included the billy (or billie) club, a heavy, hand-held club usually made of wood, plastic, or metal, and a slungshot, a striking weapon that had a piece of metal or stone attached to a flexible strip or handle. (*Id.* at ¶¶ 41–44). States responded to the proliferation of these weapons. The colony of New York enacted the first "anti-club" law in 1664,[24] with sixteen states following suit, the latest being Indiana in 1905, which proscribed the use of clubs in sensitive places of transportation.[25] The city of Leavenworth, Kansas passed the first law regulating the billy club in 1862.[26] By the early 1900s, almost half of states and some municipalities had laws relating to billy clubs.[27] (Dkt. 34-4 ¶ 42). Many, such as North Dakota and the city of Johnstown,

---

[23]     *Heller* distinguished its holding from *Aymette*'s "middle position" that "citizens were permitted to carry arms openly, unconnected with any service in a formal militia, but were given the right to use them only for the military purpose of banding together to oppose tyranny." 554 U.S. at 613. It did not, however, cast any doubt on the conclusion reached by the *Aymette* court that the legislature could prohibit "weapons dangerous to the peace." 21 Tenn. at 159.

[24]     The Colonial Laws of New York from the Year 1664 to the Revolution (1894).

[25]     Act of March 10, 1905, ch. 169, § 410, 1905 Ind. Acts 584, 677.

[26]     C.B. Pierce, Charter and Ordinances of the City of Leavenworth, An Ordinance Relating to Misdemeanors, § 23 (1862).

[27]     *See, e.g.*, Act of May 4, 1917, ch. 145, §§ 1, 2, 5, 1917 Cal. Sess. Laws 221, 221–22 (making the manufacture, possession, or use of a "billy" a felony); Act of Feb. 26, 1872, ch. 42, § 1, 1872 Md. Laws 56, 57

Pennsylvania,[28] banned their concealed carry, while others outlawed them entirely.[29] "Anti-slungshot" carry laws proved the most ubiquitous though.[30] Forty-three states limited slungshots,[31] which "were widely used by criminals and street gang members in the 19th Century" because "[t]hey had the advantage of being easy to make silent, and very effective, particularly against an unsuspecting opponent." (Dkt. 34-4 ¶ 44). (Then-lawyer Abraham Lincoln defended a man accused of killing another with a slungshot in the 1858 William "Duff" Armstrong case.) (*Id.* ¶ 45).

States continued to regulate particularly dangerous weapons from the 18th century through the late 19th and early 20th centuries. Five years before the Revolution and three decades before the ratification of the Second Amendment, New Jersey banned "any loaded Gun … intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance."[32] After the Civil War, Minnesota, Michigan, Vermont, and North Dakota passed nearly identical laws.[33] Eight states—South Carolina, Maine, Vermont, Minnesota, New York, Massachusetts, Michigan, and

---

(prohibiting the concealed carrying of a "billy"); Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144, 144 (making unlawful the concealed carrying of a "pocket-billie").

[28]     *See, e.g.*, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7311–13, 1895 N.D. Rev. Codes 1292, 1292–93; Act of May 23, 1889, Laws of the City of Johnstown, Pa.

[29]     *See, e.g.*, Act of February 21, 1917, ch. 377, §§ 7-8 1917 Or. Laws 804, 804–808; Act of June 13, 1923, ch. 339, § 1, 1923 Cal. Stat. 695, 695–96 ("[E]very person who within the State of California manufactures or causes to be manufactures, or who imports into the state, or who keeps for sale … any instrument or weapon … commonly known as a … billy … shall be guilty of a felony ….").

[30]     *See, e.g.*, Act of May 25, 1852, §§ 1–3, 1845–70 Haw. Sess. Laws 19, 19; Act of January 12, 1860, § 23, 1859 Ky. Acts 245, 245–46; Act of March 5, 1883, sec. 1, §1224, 1883 Mo. Laws 76, 76.

[31]     *See, e.g.*, Act of March 18, 1889, No. 13, § 1, 1889 Ariz. Sess. Laws 16, 16 (prohibiting the carrying of a "slung shot"); Act of March 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159, 159 (prohibiting the sale and possession of a "slung shot"); Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss. Laws 175, 175 (prohibiting the concealed carrying of a "slung shot").

[32]     Act of December 21, 1771, ch. 539, § 10, 1763-1775 N.J. Laws 343, 346.

[33]     Act of February 27, 1869, ch. 39, §§ 1–3, 1869 Minn. Laws 50, 50–51; Act of April 22, 1875, Pub. L. No. 97 § 1, 1875 Mich. Pub. Acts 136, 136; Act of November 25, 1884, Pub. Law No. 76 §§ 1–2, 1884 Vt. Acts & Resolves 74, 74–75; Penal Code, Crimes Against the Public Health and Safety, ch. 40, § 7094, 1895 N.D. Rev. Codes 1259, 1259.

Rhode Island—banned gun silencers in the 1900s.[34] Notably, semiautomatic weapons themselves, which assault weapons fall under, were directly controlled in the early 20th century. Rhode Island prohibited the manufacture, sale, purchase, and possession of "any weapon which shoots more than twelve shots semi-automatically without reloading."[35] Michigan regulated guns that could fire "more than sixteen times without reloading."[36] In total, nine states passed semiautomatic-weapon regulations,[37] along with Congress, which criminalized the possession of a "machine gun" in D.C., defined as "any firearm which shoots … semiautomatically more than twelve shots without reloading."[38] Twenty-three states imposed some limitation on ammunition magazine capacity, restricting the number of rounds from anywhere between one (Massachusetts and Minnesota) and eighteen (Ohio).[39]

---

[34]      1869 Minn. Laws 50-51, ch. 39 § 1; 1875 Mich. Pub. Acts 136, No. 97 § 1; 1884 Vt. Acts & Resolves 74-75, No. 76, § 1; The Revised Codes of North Dakota 1259, § 7094 (1895); 1903 S.C. Acts 127-23, No. 86 § 1; 1909 Me. Laws 141, ch. 129; 1912 Vt. Acts & Resolves 310, No. 237; 1916 N.Y. Laws 338-39, ch. 137, § 1; 1926 Mass. Acts 256, ch. 261; 1927 Mich. Pub. Acts 888-89, ch. 372 § 3; 1927 R.I. Pub. Laws 259, ch. 1052 § 8.

[35]      1927 R.I. Pub. Laws 256-57, ch. 1052 §§ 1, 4.

[36]      1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

[37]      1933 Minn. Laws 231-32, ch. 190; 1933 Ohio Laws 189-90; 1933 S.D. Sess. Laws 245-47, ch. 206, §§ 1-8; 1934 Va. Acts 137-40, ch. 96.

[38]      47 Stat. 650, H.R. 8754, 72d Cong. §§ 1, 14 (1932).

[39]      Act of May 20, 1933, ch. 450, § 2, 1933 Cal. Stat. 1169, 1170 ("ten cartridges"); Act of July 8, 1932, ch. 465, § 1, 47 Stat. 650, 650 ("more than twelve shots without reloading"); Act of July 7, 1932, No. 80, § 1, 1932 La. Acts 336, 337 ("more than eight cartridges successively without reloading"); Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413, 413 ( "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged"); Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 887, 888–89 ("more than sixteen times without reloading"); Act of Apr. 10, 1933, ch. 190, § 1, 1933 Minn. Laws 231, 232 ("Any firearm capable of automatically reloading after each shot is fired"); Act of March 22, 1920, ch. 31, § 9, 1920 N.J. Laws 62, 67 ("any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading"); Act of Jan. 9, 1917, ch. 209, § 1, 1917 N.C. Sess. Laws 309, 309 ("any gun or guns that shoot over two times before reloading"); Act of March 30, 1933, No. 64, § 1, 1933 Ohio Laws 189, 189 ("more than eighteen shots"); Act of Apr. 22, 1927, ch. 1052, § 1, 1927 R.I. Pub. Laws 256, 256 ("more than twelve shots"); Act of March 2, 1934, No. 731, § 1, 1934 S.C. Acts 1288, 1288 ("more than eight cartridges"); Act of Feb. 28, 1933, ch. 206, § 1, 1933 S.D. Sess. Laws 245, 245 ("more than five shots or bullets"); Act of March 7, 1934, ch. 96, § 1, 1934 Va. Acts 137, 137 ("more than seven shots or bullets … discharged from a magazine"); Act of July 2, 1931, No. 18, § 1, 1931 Ill. Laws 452, 452 ("more than eight cartridges"); Act of March 9, 1931, ch. 178, § 1, 1931 N.D. Laws 305, 305–06 (firearms "not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and

Concealed-carry laws were also replete with references to "dangerous" weapons. For two early examples, in 1859, Ohio outlawed the carry of "any other dangerous weapon,"[40] and five years later, California prohibited carrying any concealed "dangerous or deadly weapon," followed by a similar law in 1917 with the same "dangerous or deadly" language.[41] By the 1930s, most states had similar regulations on "dangerous weapons."[42] At the federal level, the District of

---

carrying ammunition"); Act of March 10, 1933, ch. 315, § 2, 1933 Or. Laws 488, 488 ("a weapon of any description by whatever name known, loaded or unloaded, from which two or more shots may be fired by a single pressure upon the trigger device"); Act of Apr. 25, 1929, No. 329, § 1, 1929 Pa. Laws 777, 777 ( "any firearm that fires two or more shots consecutively at a single function of the trigger or firing device"); Act of Oct. 25, 1933, ch. 82, § 1, 1933 Tex. Gen. Laws 219, 219 ("more than five (5) shots or bullets … from a magazine by a single functioning of the firing device"); Act of March 22, 1923, No. 130, § 1, 1923 Vt. Acts and Resolves 127, 127 ("a magazine capacity of over six cartridges"); Act of Apr. 13, 1933, ch. 76, § 1, 1931–1933 Wis. Sess. Laws 245, 245–46 ("a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device"); Act of Apr. 27, 1933, No. 120, § 2, 1933 Haw. Sess. Laws 117, 118 ("capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device"); Act of June 1, 1929, § 2, 1929 Mo. Laws 170, 170 (guns "capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device"); Act of March 6, 1933, ch. 64, § 2, 1933 Wash. Sess. Laws 335, 335 (any firearm "not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second").

[40]     1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1.

[41]     An Act to Prohibit the Carrying of Concealed Weapons, § 1; 1917 Cal. Sess. 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.

[42]     Act to Prevent the Carrying of Deadly Weapons, § 1, 1852 Haw. Sess. Laws 19; Act of Feb. 17, 1909, No. 62, § 1 1909 Id. Sess. Laws 6; Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village, at 61, §§ 6, 8, (1876); Act of Feb. 23, 1859, ch. 79, § 1, 1859 Ind. Acts 129; S.J. Quincy, Revised Ordinances of the City of Sioux City, Iowa 62 (1882); ch. 169, § 16, 1841 Me. Laws 709; John Prentiss Poe, Maryland Code. Public General Laws 468-69, § 30 (1888); Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836, at 750, §16 (1836); Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144; The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884, at 289, §§ 1-3 (1884); Act of Jan. 3, 1888, sec. 1, § 1274, Mo. Rev. Stat., 1883 Mo. Laws 76; Ordinance No. 20, Compiled Ordinances of the City of Fairfield, Clay County, Nebraska, at 34 (1899); Act of Feb. 18, 1887, §§ 1-5, 8-10, 1887 N.M. Laws 55, 58; George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5, at 172, § 410 (1885); N.D. Pen. Code §§ 7312-13 (1895); Act of Dec. 25, 1890, art. 47, § 8, 1890 Okla. Sess. Laws 495; Act of Feb. 21, 1917, § 7, 1917 Or. Sess. Laws

Columbia also made it unlawful "for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons."[43]

The history of firearm regulation, then, establishes that governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories). The final question is whether assault weapons and large-capacity magazines fall under this category. They do.

### ii.    *Application*

Assaults weapons pose an exceptional danger, more so than standard self-defense weapons such as handguns.[44] *See NYSRPA*, 804 F.3d at 262 ("When used, these weapons tend to result in more numerous wounds, more serious wounds, and more victims."). They fire quickly: a shooter using a semiautomatic weapon can launch thirty rounds in as little as six seconds, with an effective rate of about a bullet per second for each minute of firing,[45] meeting the U.S. Army definition for "rapid fire."[46] The bullets hit fast and penetrate deep into the body. The muzzle velocity of an assault weapon is four times higher than a high-powered semiautomatic firearm.[47] A bullet striking

---

807; S.D. Terr. Pen. Code § 457 (1877), as codified in S.D. Rev. Code, Penal Code § 471 (1903); William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 44, § 4753 (1867); Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879); Dangerous and Concealed Weapons, Feb. 14, 1888, reprinted in The Revised Ordinances of Salt Lake City, Utah, at 283, § 14 (1893); Act of Mar. 29, 1882, ch. 135, § 7, 1882 W. Va. Acts 421–22; Act of Feb. 14, 1883, ch. 183, § 3, pt. 56 1883 Wis. Sess. Laws 713.

[43]    An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).

[44]    Again, this case is at a preliminary posture: plaintiffs remain free to present evidence discounting the body of literature relied on by the Court.

[45]    E. Gregory Wallace, *Assault Weapon Myth*, 43 S. Ill. U. L. J. 193, 218 (2018).

[46]    Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24 (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in TC 3-22.9 Rifle and Carbine Manual, Headquarters, Department of the Army (May 2016). Available at the Army Publishing Directorate Site (https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf), accessed October 4, 2022.

[47]    Peter M. Rhee et al., *Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths*, 80 J. Trauma & Acute Care Surgery 853, 855 (2016).

a body causes cavitation, meaning, in the words of a trauma surgeon, "that as the projectile passes through tissue, it creates a large cavity."[48] "It does not have to actually hit an artery to damage it and cause catastrophic bleeding. Exit wounds can be the size of an orange."[49] Children are even more vulnerable because "the surface area of their organs and arteries are smaller."[50] Additionally, "[t]he injury along the path of the bullet from an AR-15 is vastly different from a low-velocity handgun injury ...."[51] Measured by injury per shooting, there is an average of about 30 injuries for assault weapons compared to 7.7 injuries for semiautomatic handguns.[52] In a mass shooting involving a non-semiautomatic firearm, 5.4 people are killed and 3.9 people are wounded on average; in a mass shooting with a semiautomatic handgun, the numbers climb to 6.5 people killed and 5.8 people wounded on average; and in a mass shooting with a semiautomatic rifle, the average number of people rises to 9.2 killed and 11 wounded on average. (Dkt. 57-8 ¶ 54).

Assault rifles can also be easily converted to increase their lethality and mimic military-grade machine guns. Some of these "fixes" are as simple as "stretching a rubber band from the trigger to the trigger guard of an AR-15." (*Id.* ¶ 53). Two conversion devices stick out though: bump stocks and trigger cranks, both of which allow an assault weapon to fire at a rate several times higher than it could otherwise. As the Fourth Circuit summarized, "[t]he very features that

---

[48]    Emma Bowman, *This Is How Handguns and Assault Weapons Affect the Human Body*, NPR (June 6, 2022, 5:58 AM), https://www.npr.org/2022/06/06/1103177032/gun-violence-mass-shootings-assault-weapons-victims.

[49]    Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from-parkland-should-change-the-debate-on-guns/553937.

[50]    Bowman, *supra*.

[51]    Sher, *supra*.

[52]    Joshua D. Brown & Amie J. Goodin, *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States, 1982–2018*, 108 Am. J. of Pub. Health 1385, 1386 (2018).

27

qualify a firearm as a banned assault weapon—such as flash suppressors, barrel shrouds, folding and telescoping stocks, pistol grips, grenade launchers, night sights, and the ability to accept bayonets and large-capacity magazines—'serve specific, combat-functional ends.'" *Kolbe*, 849 F.3d at 137.

Moreover, assault weapons are used disproportionately in mass shootings, police killings, and gang activity. Of the sixty-two mass shootings from 1982 to 2012, a thirty-year period, one-third involved an assault weapon.[53] Between 1999 and 2013, the number was 27 percent,[54] and the most recent review placed the figure at 25 percent in active-shooter incidents between 2000 and 2017.[55] While 25 percent may be about half that of semiautomatic handguns, it is greatly overrepresented "compared with all gun crime and the percentage of assault weapons in society."[56] The statistics also reveal a grim picture for police killings and gang activity. About 20 percent of officers were killed with assault weapons from 1998 to 2001 and again from 2016 to 2017.[57] Even conservative estimates calculate that assault weapons are involved in 13 to 16 percent of police murders.[58] Additionally, just under 45 percent of all gang members own an assault rifle (compared

---

[53]    Spitzer, *supra*, at 240.

[54]    William J. Krouse & Daniel J. Richardson, Cong. Rsch. Serv., R44126, *Mass Murder with Firearms: Incidents and Victims, 1999-2013* 29 (2015), https://sgp.fas.org/crs/misc/R44126.pdf.

[55]    Elzerie de Jager et al., *Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States*, 320 J. Am. Med. Ass'n 1034, 1034–35 (2018).

[56]    Spitzer, *supra*, at 241.

[57]    Violence Pol'y Ctr., *"Officer Down" Assault Weapons and the War on Law Enforcement* 5 (2003), https://www.vpc.org/studies/officer%20down.pdf; *New Data Shows One in Five Law Enforcement Officers Slain in the Line of Duty in 2016 and 2017 Were Felled by an Assault Weapon*, Violence Pol'y Ctr. (Sept. 25, 2019), https://vpc.org/press/new-data-shows-one-in-five-law-enforcement-officers-slain-in-the-line-of-duty-in-2016-and-2017-were-felled-by-an-assault-weapon/.

[58]    George W. Knox et al., Nat'l Gang Crime Rsch. Ctr., *Gangs and Guns: A Task Force Report From the National Gang Crime Research Center* 35–36 (2001), https://www.ojp.gov/ncjrs/virtual-library/abstracts/gangs-and-guns-task-force-report-national-gang-crime-research.

APP028

to, at most, 15 percent of non-gang members), and gang members are seven times more likely to use the weapons in the commission of a crime.[59]

High-capacity magazines share similar dangers. The numbers tell a familiar grim story. An eight-year study of mass shootings from 2009 to 2018 found that high-capacity magazines led to five times the number of people shot and more than twice as many deaths.[60] More recently, researchers examining almost thirty years of mass-shooting data determined that high-capacity magazines resulted in a 62 percent higher death toll.[61] It is little wonder why mass murderers and criminals favor these magazines. Thirty-one of sixty-two mass shootings studied involved the gun accessory.[62] Also, extended magazines, one expert estimates, allow semiautomatic weapons to become more lethal: by themselves, semiautomatic weapons cause "an average of 40 percent more deaths and injuries in mass shooting than regular firearms, and 26 percent more than semiautomatic handguns." (Dkt. 57-8 ¶ 56). Add in extended magazines and "semiautomatic rifles cause an

---

[59]    George W. Knox et al., *Gangs and Guns: A Task Force Report*, National Gang Crime Research Center 36 (2001), https://www.ojp.gov/ncjrs/virtual-library/abstracts/gangs-and-guns-task-force-report-national-gang-crime-research.

[60]    Everytown For Gun Safety, *Twelve Years of Mass Shootings in the United States* (June 4, 2021), https://everytownresearch.org/maps/mass-shootings-in-america/.

[61]    Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 1990–2017, 109 Am. J. Pub. Health 1754, 1755 (2019); *see also Worman*, 922 F.3d at 39 ("It is, therefore, not surprising that AR-15s equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history, including horrific events in Pittsburgh (2018), Parkland (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and Aurora (2012)."); *NYSRPA*, 804 F.3d at 263 ("Large-capacity magazines are disproportionately used in mass shootings, like the one in Newtown, in which the shooter used multiple large-capacity magazines to fire 154 rounds in less than five minutes.").

[62]    Spitzer, *supra*, at 242.

average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semiautomatic handguns." (*Id.*)

Assault-weapons and high-capacity magazines regulations are not "unusual," *Bruen*, 142 S. Ct. at 2129 (Kavanaugh, concurring), or "severe," *Heller*, 554 U.S. at 629. The federal government banned assault weapons for ten years. Today, eight states, the District of Columbia, and numerous municipalities, maintain assault-weapons and high-capacity magazine bans—as more jurisdictions weigh similar measures. Because assault weapons are particularly dangerous weapons and high-capacity magazines are particularly dangerous weapon accessories, their regulation accords with history and tradition. Naperville and Illinois lawfully exercised their authority to control their possession, transfer, sale, and manufacture by enacting a ban on commercial sales. That decision comports with the Second Amendment, and as a result, the plaintiffs have not shown the "likelihood of success on the merits" necessary for relief. *See Braam*, 37 F.4th at 1272 ("The district court may issue a preliminary injunction *only if* the plaintiff demonstrates 'some' likelihood of success on the merits." (emphasis added)); *Camelot Bonquet Rooms, Inc. v. United States Small Business Administration*, 24 F.4th 640, 644 (7th Cir. 2022) ("Plaintiffs who seek a preliminary injunction must show that … they have some likelihood of success on the merits.").

## II.      Remaining Preliminary-Injunction Factors

### A.  Irreparable Harm

For thoroughness, the Court addresses the remaining preliminary-injunction factors. The party seeking a preliminary injunction must show, in addition to a likelihood of success on the merits, that absent an injunction, irreparable harm will ensue. *Int'l Ass'n of Fire Fighters, Local 365 v. City of East Chicago*, 56 F.4th 437, 450 (7th Cir. 2022). "Harm is irreparable if legal

remedies are inadequate to cure it," meaning "the remedy must be seriously deficient as compared to the harm suffered." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). Deprivations of constitutional rights often—but do not always—amount to "irreparable harm." *See* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 1998) ("When an alleged deprivation of a constitutional right is involved … most courts hold that no further showing of irreparable harm is necessary."). This principle certainly applies for the First Amendment. The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also Int'l Ass'n of Fire Fighters*, 56 F.4th at 450–51 ("Under Seventh Circuit law, irreparable harm is presumed in First Amendment cases.").

No binding precedent, however, establishes that a deprivation of *any* constitutional right is presumed to cause irreparable harm. *Cf. Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 682 (7th Cir. 2012) ("The judge was right to say that equitable relief depends on irreparable harm, even when constitutional rights are at stake."). *Ezell* does draw upon First Amendment principles. *See* 651 F.3d at 697. For example, the argument that a Second Amendment harm is mitigated "by the extent to which it can be exercised in another jurisdiction" cannot pass muster because a city could never ban "the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs." *Id.* The opinion also acknowledges that "[t]he loss of a First Amendment right is frequently presumed to cause irreparable harms" and that "[t]he Second Amendment protects similarly intangible and unquantifiable interests." *Id.* at 699. But the Seventh Circuit stopped short of holding that injury

31

in the Second Amendment context "unquestionably constitutes irreparable harm." *Elrod*, 427 U.S. at 373.

Absent this presumption, the plaintiffs have not demonstrated that they will suffer irreparable harm. Bevis has not furnished any evidence that he will lose substantial sales, and he can still sell almost any other type of gun. While a high number of assault weapons are in circulation, only 5 percent of firearms are assault weapons, 24 million out of an estimated 462 million firearms. (Dkt. 57-4 ¶ 36; Dkt. 57-7 ¶ 27.) As a percentage of the total population, less than 2 percent of all Americans own assault weapons. (Dkt. 57-7 ¶ 27). NAGR's members also retain other effective weapons for self-defense. Most law enforcement agencies design their firearm training qualification courses around close-quarter shootings, those shooting that occur between the range of three to ten yards, where handguns are most useful. (Dkt. 57-4 ¶ 59). Firearms are certainly effective, necessary tools for protecting law enforcement and civilians alike. But, as one Federal Bureau of Investigation agent describes, "the best insights indicate that shotguns and 9mm pistols are generally recognized as the most suitable and effective choices for armed defense." (*Id.* ¶ 61).

Assuming, though, the deprivation of any constitutional right rises to *per se* irreparable harm, the plaintiffs have still not shown that they are likely to succeed on the merits. *See Winter*, 555 U.S. at 20. A plaintiff need not demonstrate "absolute success," but the chances of success must be "better than negligible." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (quoting *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017)) (cleaned up). "If it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused …." *Id.* (quoting *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir. 1993)); *see also Braam*, 37 F.4th at 1272.

It is plain here—the plaintiffs have "no case on the merits." *Valencia*, 883 F.3d at 966 (quoting *Green River Bottling*, 997 F.2d at 361). The analysis could end there because that failure is dispositive. *See Higher Soc'y of Ind. v. Tippecanoe County*, 858 F.3d 1113, 1116 (7th Cir. 2017).

### B.  The Balance of Equities and the Public Interest

Neither the balance of equities nor the public interest decisively favors the plaintiffs. On the one hand, they suffer an alleged deprivation of a constitutional right. Again though, the financial burden and loss of access to effective firearms would be minimal. On the other side, Illinois and Naperville compellingly argue their laws protect public safety by removing particularly dangerous weapons from circulation. The protection of public safety is also unmistakably a "public interest," one both laws further. *Cf. Metalcraft of Mayville, Inc. v. The Toro Company*, 848 F.3d 1358, 1369 (Fed. Cir. 2017) ("[T]he district court should focus on whether a *critical* public interest would be injured by the grant of injunctive relief." (emphasis added)). Therefore, the plaintiffs have not made a "clear showing" that they are entitled to the "extraordinary and drastic" remedy of an injunction. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2948 (2d ed.1995)).

<u>**CONCLUSION**</u>

For these reasons, the motions for a temporary restraining order and a preliminary injunction are denied. (Dkt. 10, 50).

Virginia M. Kendall
United States District Judge

Date: February 17, 2023

APP033

**EXHIBIT 1**
**Historical Statutes Cited by District Court**

### 1.     Bans on Concealed Carry (10)

1.     An Act to Suppress the Evil Practice of Carrying Weapons Secretly, ch. 77, § 1, 1839 Ala. Laws 67, 67

That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

2.     Act of February 2, 1838, ch. 101, § 1, 1838 Va. Acts 76, 76

That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from this use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offense forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

3.     Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144, 144

It shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot, razor or other offensive and dangerous weapon or instrument concealed upon his person.

4.     Act of March 5, 1883, sec. 1, §1274, 1883 Mo. Laws 76, 76

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the

1

sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

5.    Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss. Laws 175, 175

That any person not being threatened with or havin good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . .

6.    1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1

[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

7.    Act of Feb. 23, 1859, ch. 79, § 1, 1859 Ind. Acts 129

That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

2

8.     John Prentiss Poe, Maryland Code. Public General Laws 468-69, § 30 (1888)

Every person, not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,) concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars, or be imprisoned not more than six months in jail or in the house of correction.

9.     Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144

It shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot, razor or other offensive and dangerous weapon or instrument concealed upon his person.

10.     Act of Jan. 3, 1888, sec. 1, § 1274, Mo. Rev. Stat., 1883 Mo. Laws 76

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the siting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit and such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

3

**2.    Territorial, Kingdom and Municipal Laws (19)**

11.    Act of February 10, 1838, Pub. L. No. 24 §1, 1838 Fla. Laws 36, 36 (Florida Admitted to the Union in 1845)

> That from and after the passage of this act, it shall not be lawful for any person or person in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum . . .

12.    Act of Aug. 14, 1862, § 1, 1862 Colo. Sess. Laws 56, 56 (Colorado admitted to the Union in 1876)

> If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

13.    Act of May 25, 1852, §§ 1, 1845–70 Haw. Sess. Laws 19, 19 (law enacted by the Kingdom of Hawaii; Hawaii admitted to the Union in 1959)

> Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

14.    Act of Feb. 26, 1872, ch. 42, § 246, 1872 Md. Laws 56, 57

> It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected. . .

4

15.    C.B. Pierce, Charter and Ordinances of the City of Leavenworth, An Ordinance Relating to Misdemeanors, § 23 (1862)

For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

16.    Act of May 23, 1889, Laws of the City of Johnstown, Pa

No person shall willfully carry concealed upon his or her person any pistol, razor, dirk or bowie-knife, black jack, or handy billy, or other deadly weapon, and any person convicted of such offense shall pay a fine of not less than five dollars or more than fifty dollars with costs.

17.    Act of March 18, 1889, No. 13, § 1, 1889 Ariz. Sess. Laws 16, 16

If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried.

18.    The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884, at 289, §§ 1-3 (1884)

It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for

5

the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

19.     Ordinance No. 20, Compiled Ordinances of the City of Fairfield, Clay County, Nebraska, at 34 (1899)

It shall be unlawful for any person to carry upon his person any concealed pistol, revolver, dirk, bowie knife, billy, sling shot, metal knuckles, or other dangerous or deadly weapons of any kind, excepting only officers of the law in the discharge or their duties; and any person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be subject to the penalty hereinafter provided.

20.     Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village, at 61, §§ 6, 8, (1876)

No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

21.     S.J. Quincy, Revised Ordinances of the City of Sioux City, Iowa 62 (1882)

No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

22.     Act of Dec. 25, 1890, art. 47, § 8, 1890 Okla. Sess. Laws 495

It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

23.      S.D. Terr. Pen. Code § 457 (1877), as codified in S.D. Rev. Code, Penal Code § 471 (1903)

Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

24.      William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 44, § 4753 (1867)

No person shall ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any dangerous weapon, to the fear or terror of any person.

25.      Dangerous and Concealed Weapons, Feb. 14, 1888, reprinted in The Revised Ordinances of Salt Lake City, Utah, at 283, § 14 (1893)

Any person who shall carry and slingshot, or any concealed deadly weapon, without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

26.      43 An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872)

That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

27.      Act of Feb. 18, 1887, §§ 1-5, 8-10, 1887 N.M. Laws 55, 58

That any person who shall hereafter carry a deadly weapon, either concealed or otherwise, on or about the settlements of this territory, except it be in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family or property, the same being then and there threatened with danger, or except such carrying be done by legal authority, upon conviction thereof shall be punished by a fine of not less than fifty dollars, nor more than three hundred, or by imprisonment not less than sixty days, nor more than six months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

28.    Act of Feb. 14, 1883, ch. 183, § 3, pt. 56 1883 Wis. Sess. Laws 713

To regulate or prohibit the carrying or wearing by any person under his clothes, or concealed about his person, any pistol or colt, or slung shot, or cross knuckles or knuckles of lead, brass, or other metal or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon; and to provide for the confiscation or sale of such weapon.

Note:  Authorizing Legislation for City of Oshkosh

29.    Act of January 12, 1860, § 23, 1859 Ky. Acts 245, 245–46; An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg

If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.

**3.    Regulations on Manner of Use of Weapons (7)**

30.    See, e.g., Act of June 30, 1837, No. 11, § 1 1837 Ala. Acts 7, 7

That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.

31.    Act of December 21, 1771, ch. 539, § 10, 1763-1775 N.J. Laws 343, 346

And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if

any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.

32.     Act of February 27, 1869, ch. 39, §§ 1, 1869 Minn. Laws 50, 50–51

The setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon in this state is hereby prohibited, and declared to be unlawful.

33.     Act of April 22, 1875, Pub. L. No. 97 § 1, 1875 Mich. Pub. Acts 136, 136

[I]f any person shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, he shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or device so set shall be deemed to be manslaughter.

34.     Act of November 25, 1884, Pub. Law No. 76 §§ 1–2, 1884 Vt. Acts & Resolves 74, 74–75

A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. If the person injured dies, his personal representative may have the action, as provided in sections two thousand one hundred and thirty-eight and two thousand one hundred and thirty-nine of the Revised Laws.

35.     Penal Code, Crimes Against the Public Health and Safety, ch. 40, § 7094, 1895 N.D. Rev. Codes 1259, 1259

Every person who sets any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left, except in the immediate presence of some competent person, shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or other device so set shall be deemed to be manslaughter in the first degree.

36.    George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5, at 172, § 410 (1885)

A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits.

### 4.    Applied to Slaves or Minors Only (2)

37.    The Colonial Laws of New York from the Year 1664 to the Revolution (1894)

And be it further enacted by the authority aforesaid that it shall not be lawful for any slave or slave to have or use any gun, pistol, sword, club or any other kind of weapon whatsoever, but in the presence or by the direction of his her or their Master or Mistress, and in their own ground on Penalty of being whipped for the same at the discretion of the Justice of the Peace before whom such complaint shall come or upon the view of the said justice not exceeding twenty lashes on the bare back for every such offense.

38.    Act of March 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159, 159

§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars. § 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nor more than ten dollars.

### 5.    Sensitive Place Regulation (1)

39.    Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879)

If any person other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election , during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of the code. Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by fine . . . in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.

### 6.    Regulation of Sales (3)

40.    Act of Jun 30, 1837, ch. 77, § 2, 1837 Ala. Laws 7, 7

And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

41.    Act of December 25, 1837, § 1, 1837 Ga. Laws 90, 91

it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.

42.    Act of January 27, 1837, ch. 137, § 1,1837–1838 Tenn. Pub. Acts 200,

That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five

hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

### 7.    Surety Laws (2)

43.    Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836, at 750, §16 (1836)

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

44.    ch. 169, § 16, 1841 Me. Laws 709

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

### 8.    Regulation of Carry Generally but Not Possession (1)

45.    Act of Mar. 29, 1882, ch. 135, § 7, 1882 W. Va. Acts 421–22

If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises

APP045

any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

### 9.    Twentieth Century Regulations (47)

46.    Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442, 442

47.    Act of Apr. 18, 1905, ch. 172, § 1, 1905 N.J. Laws 324, 324

48.    Act of March 8, 1915, ch. 83, § 1, 1915 N.D. Laws 96, 96

49.    Act of March 10, 1905, ch. 169, § 410, 1905 Ind. Acts 584, 677

50.    Act of May 4, 1917, ch. 145, §§ 1, 2, 5, 1917 Cal. Sess. Laws 221, 221–22

51.    Act of February 21, 1917, ch. 377, §§ 7-8 1917 Or. Laws 804, 804–808

52.    Act of June 13, 1923, ch. 339, § 1, 1923 Cal. Stat. 695, 695–96

53.    1903 S.C. Acts 127-23, No. 86 § 1

54.    1909 Me. Laws 141, ch. 129

55.    1912 Vt. Acts & Resolves 310, No. 237

56.    1916 N.Y. Laws 338-39, ch. 137, § 1

57.    1926 Mass. Acts 256, ch. 261

58.    1927 Mich. Pub. Acts 888-89, ch. 372 § 3

13

59.    1927 R.I. Pub. Laws 259, ch. 1052 § 8

60.    1927 R.I. Pub. Laws 256-57, ch. 1052 §§ 1, 4

61.    1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3

62.    1933 Minn. Laws 231-32, ch. 190

63.    1933 Ohio Laws 189-90

64.    1933 S.D. Sess. Laws 245-47, ch. 206, §§ 1-8;

65.    1934 Va. Acts 137-40, ch. 96

66.    47 Stat. 650, H.R. 8754, 72d Cong. §§ 1, 14 (1932)

67.    Act of May 20, 1933, ch. 450, § 2, 1933 Cal. Stat. 1169, 1170 ("ten cartridges")

68.    Act of July 8, 1932, ch. 465, § 1, 47 Stat. 650, 650 ("more than twelve shots without reloading");

69.    Act of July 7, 1932, No. 80, § 1, 1932 La. Acts 336, 337 ("more than eight cartridges successively without reloading")

70.    Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413, 413

71.    Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 887, 888–89

72.    Act of Apr. 10, 1933, ch. 190, § 1, 1933 Minn. Laws 231, 232

73.    Act of March 22, 1920, ch. 31, § 9, 1920 N.J. Laws 62, 67

74.    Act of Jan. 9, 1917, ch. 209, § 1, 1917 N.C. Sess. Laws 309, 309

75.    Act of March 30, 1933, No. 64, § 1, 1933 Ohio Laws 189, 189

76.    Act of Apr. 22, 1927, ch. 1052, § 1, 1927 R.I. Pub. Laws 256, 256

77.    Act of March 2, 1934, No. 731, § 1, 1934 S.C. Acts 1288, 1288

78.    Act of Feb. 28, 1933, ch. 206, § 1, 1933 S.D. Sess. Laws 245, 245

14

79.    Act of March 7, 1934, ch. 96, § 1, 1934 Va. Acts 137, 137

80.    Act of July 2, 1931, No. 18, § 1, 1931 Ill. Laws 452, 452

81.    Act of March 9, 1931, ch. 178, § 1, 1931 N.D. Laws 305, 305–06

82.    Act of March 10, 1933, ch. 315, § 2, 1933 Or. Laws 488, 488

83.    Act of Apr. 25, 1929, No. 329, § 1, 1929 Pa. Laws 777, 777

84.    Act of Oct. 25, 1933, ch. 82, § 1, 1933 Tex. Gen. Laws 219, 219

85.    Act of March 22, 1923, No. 130, § 1, 1923 Vt. Acts and Resolves 127, 127

86.    Act of Apr. 13, 1933, ch. 76, § 1, 1931–1933 Wis. Sess. Laws 245, 245–46

87.    Act of Apr. 27, 1933, No. 120, § 2, 1933 Haw. Sess. Laws 117, 118

88.    Act of June 1, 1929, § 2, 1929 Mo. Laws 170, 170

89.    Act of March 6, 1933, ch. 64, § 2, 1933 Wash. Sess. Laws 335, 335

90.    Act of Feb. 17, 1909, No. 62, § 1 1909 Id. Sess. Laws 6

91.    Act of Feb. 21, 1917, § 7, 1917 Or. Sess. Laws 807

92.    An Act to Prohibit the Carrying of Concealed Weapons, § 1; 1917 Cal. Sess. 221-225, § 5

93.    1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5[1]

---

[1] The district court stated: "By the early 1900s, almost half of states and some municipalities had laws relating to billy clubs. (Dkt. 34-4 ¶ 42). Many, such as North Dakota and the city of Johnstown, Pennsylvania, banned their concealed carry, while others outlawed them entirely." ECF No. pp 22-23. The court cited Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7311–13, 1895 N.D. Rev. Codes 1292, 1292–93, for the early 1900 North Dakota law. This law is from 1895 and does not appear to address billy clubs. The court appears to have intended to refer to the listed statute.

**Exhibit 2**
**Militia Acts**

**1. Georgia Act for Revising and Amending the Several Militia Laws of the State (1784);** *see* **19 Candler,** *The Colonial Records of the State of Georgia Statutes, Colonial and Revolutionary 1774 to 1805***, at 353 (Byrd 1910) [Page 3]**

**Text**: [T]hat in any case any person or persons so liable shall neglect or refuse to appear completely armed and furnished with one rifle musket, fowling-piece or fusee fit for action, with a cartridge box or powder-horn answerable for that purpose with six cartridges or powder and lead equal thereto and three flints, at any general musters of the regiment or battalion to which his company belongs, every such person shall forfeit and pay a sum not exceeding five shillings, and if an ordinary muster a sum not exceeding two shillings and six pence

**2. Massachusetts Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for That Purpose (1784);** *see* **Miller,** *Acts and Resolves of Massachusetts* **140, 142 (1784) [Page 4-11]**

**Text**: That every noncommissioned officer and private soldier of the said militia not under the control of parents, masters or guardians, and being of sufficient ability therefor in the judgment of the Selectmen of the town in which he shall dwell, shall equip himself, and be constantly provided with a good fire arm, &c.'

**3. United States Act More Effectually to Provide for the National Defence by Establishing an Uniform Militia Throughout the United States, 1 Stat. 271-74 (May 8, 1792);** *see* **Gooch,** *Military Laws* **75-80 (1820) [Pages 12-17]**

**Text**: Section 1. … That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack. That the commissioned offers shall severally be armed with a sword or hanger and espontoon, and that from and after five years from the passing of this act, all muskets for arming the militia as herein required, shall be of bores sufficient for balls of the eighteenth part of a pound. And every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements required as

1

aforesaid, shall hold the same exempted from all suits, distresses, executions or sales, for debt or the payment of taxes.

…

Sec. 4 … That out of the militia enrolled, as is herein directed, there shall be formed for each battalion at least one company of grenadiers, light infantry or riflemen; and that to each division there shall be at least one company of artillery, and one troop of horse; there shall be to each company of artillery, one captain, two lieutenants, four sergeants, four corporals, six gunners, six bombadiers, one drummer, and one fifer. The officers to be armed with a sword or hanger, a fusee, bayonet and belt, with a cartridge-box to contain twelve cartridges; and each private or matross shall furnish himself with all the equipments of a private in the infantry, until proper ordnance and field artillery is provided….

APP050

Revising and Amending Militia Laws.

shall be liable to the mulct or fine of five
pounds to be levied and placed to such purposes,
as this act hereafter points out and directs, and
the said officer so commanding is hereby requir-
ed to proceed in manner before mentioned to
draw another or others in his or their room:
PROVID'D NEVERTHELESS that this
clause shall not extend to prevent any captain,
previous to such election from appointing any
serjeant or serjeants not exceeding the number
aforesaid who may be found capable and willing
to act in that capacity

AND BE IT FURTHER ENACTED that in
case any person or persons so liable shall neg-
lect or refuse to appear compleatly armed and
furnished with one rifle musket, fowling-piece
or fusee fit for action, with a cartridge box or
powder-horn answerable for that purpose with
six cartridges or powder and lead equal thereto
and three flints, at any general musters of the
regiment or battalion to which his company be-
longs, every such person shall forfeit and pay
a sum not exceeding five shillings, and if an or-
dinary muster a sum not exceeding two shell-
ings and six pence

AND WHEREAS it may much contribute to
the safety and welfare of the state, by en-
couraging volunteer troops of horse and com-
panies subject however to the Field Officers of
each regiment or battalion: BE IT THERE-
FORE

Generated on 2023-03-05 00:45 GMT / https://hdl.handle.net/2027/hvd.32044032302311
Public Domain in the United States, Google-digitized / http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

Original from
HARVARD UNIVERSITY

mile south of a pond, called *Province Pond;* thence east, eight degrees south, by a spotted line, to an elm tree, spotted near a small frog pond; thence north, eight degrees east, by a spotted line, to the bank of *Great Ossipee* river: thence westerly by the said river to the bounds first mentioned; containing by estimation thirty-six square English miles, be, and hereby is, erected into a town by the name of *Parsonsfield;* and that the inhabitants thereof be, and they hereby are, vested with all the powers, privileges and immunities, which the inhabitants of towns within this Commonwealth do, or may by law enjoy. **[Invested with powers.]**

*And be it further enacted,* That *Simon Frye,* Esq; be, and he hereby is, empowered to issue his warrant to some principal inhabitant of the said town, requiring him to warn the inhabitants thereof to meet at such time and place as he shall therein set forth, to choose all such officers as towns are by law required and empowered to choose in the month of *March,* annually. **[Simon Frye, Esq; to call a meeting.]**

*Provided always,* That this act shall be so construed, any thing therein to the contrary notwithstanding, as not to affect the claim of this Commonwealth, or other corporate body, or of any private person whatever, to the said tract of land, or any part thereof, if any such claim exists. **[Proviso.]**

*March 9, 1785.*

---

## 1784. — Chapter 55.

[January Session, ch. 1.]

AN ACT FOR REGULATING AND GOVERNING THE MILITIA OF THE COMMONWEALTH OF *MASSACHUSETTS,* AND FOR REPEALING ALL LAWS HERETOFORE MADE FOR THAT PURPOSE. **[Chap. 55]**

*Whereas the laws now in force, for regulating the militia of the Commonwealth, are found to be insufficient for the said purpose:* **[Preamble.]**

*Be it therefore enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same,* That the several laws heretofore made for regulating the militia aforesaid, be, and hereby are, repealed. **[Laws heretofore made for regulating the militia repealed.]**

*Provided nevertheless,* That all actions and processes commenced and depending in any Court within this Commonwealth, upon or by force of the said laws, shall, **[Proviso.]**

and may be sustained and prosecuted to final judgment and execution; and that all officers elected, appointed and commissionated agreeably to law, shall be continued in commission, and hold their respective commands in the militia, in the same manner as they would in case the said laws were still in force.

**Militia, how formed.**

*And be it further enacted by the authority aforesaid,* That the said militia shall be formed into a Train Band, and Alarm List: the Train Band to contain all able bodied men, from sixteen to forty years of age, and the Alarm List, all other men under sixty years of age, excepting in both cases such as shall be hereafter by this act exempted.

**— to be in four divisions.**

*And be it further enacted by the authority aforesaid,* That the said militia be, and hereby is formed into four divisions; the counties of *Suffolk, Essex* and *Middlesex,* composing the first division; the counties of *Hampshire, Worcester* and *Berkshire,* the second division; the counties of *Plymouth, Barnstable, Bristol, Dukes County* and *Nantucket,* the third division; and the counties of *York, Cumberland* and *Lincoln,* the fourth division.

**General and divisionary staff to each of the divisions.**

*And be it further enacted by the authority aforesaid,* That there shall be a general and divisionary staff to each of the divisions aforesaid, consisting of one Major General, who shall have two aids de camp, a Deputy Adjutant General, who shall also be Inspector, and a Deputy Quarter Master.

**Governor with advice of Council to form divisions into brigades, &c.**

*And be it further enacted by the authority aforesaid,* That the Governor, or Commander in Chief, with the advice of Council, be, and hereby is, authorized and empowered to form the said divisions into brigades, regiments and companies; and from time to time to alter and divide such brigades, regiments and companies, as he shall judge expedient. *Provided notwithstanding,* That the several brigades, regiments and companies of militia, shall remain as they are now formed, until new arrangements thereof shall take place.

**Proviso.**

**Each brigade to have a brigadier general, &c.**

*And be it further enacted by the authority aforesaid,* That there shall be a Brigade General and Staff to each brigade of the militia aforesaid, consisting of a Brigadier General, a Brigade Major, who shall also be sub-inspector, and a Brigade Quarter Master.

**Each regiment to have a regimental, field,**

*And be it further enacted by the authority aforesaid,* That there shall be a regimental, field, commissioned and non-commissioned staff to each regiment of the militia

Case: 23-1353     Document: 27     Filed: 04/03/2023     Pages: 130

aforesaid, consisting of one Colonel, one Lieutenant-Colonel, one Major, one Adjutant, one Quarter Master, one Serjeant Major, one Quarter Master Serjeant, one Drum Major and one Fife Major. *[commissioned and non-commissioned staff.]*

*And be it further enacted by the authority aforesaid,* That there shall be one Captain, one Lieutenant, one Ensign, one Clerk, who shall be sworn to the faithful discharge of his duty, four Serjeants, four Corporals, one Drummer and one Fifer, to each company of the said militia. *Provided, notwithstanding,* That in companies where, in pursuance of the law which by this act is repealed, two Lieutenants are in commission, they shall continue to hold their present rank. *[Companies to have one captain &c. Clerk to be sworn.] [Proviso.]*

*And be it further enacted by the authority aforesaid,* That the Governor, or Commander in Chief, shall appoint the Deputy Adjutant General ; the Major Generals shall appoint the Deputy Quarter Masters of their respective divisions ; the Brigadier Generals shall appoint the Quarter Masters of their respective brigades ; the Colonels shall appoint the Serjeant Majors, Quarter Master Serjeants, Drum Majors and Fife Majors of their respective regiments ; and the Captains shall appoint the non-commissioned officers of their respective companies. *[Deputy Adjutant General, Deputy Qua. Masters, &c. by whom appointed.]*

*And be it further enacted by the authority aforesaid,* That the Adjutant General shall be commissioned with the rank of Brigadier General, the Deputy Adjutant Generals with the rank of Colonels, and the Aids de Camp and Brigade Majors with the rank of Majors ; the Adjutants shall be commissioned with the rank of first Lieutenant, and the Serjeants shall each receive a warrant from the Colonel of the regiment to which they shall belong. *[Adjutant Gen. Deputy Adj. General, &c. their rank.]*

*And be it further enacted by the authority aforesaid,* That each and every Major General be, and hereby is, empowered and it shall be his duty to give all such orders as shall from time to time be necessary, consistent with the law, for electing Brigadier Generals, Field Officers, Captains and Subalterns, in brigades, regiments and companies, within his respective division, which have not been already commissioned ; and for filling up vacancies of such officers, or any of them, where they now are, or may hereafter happen. *Provided always,* That whenever a time shall be appointed for the election of any officer or officers, the electors shall have ten days notice thereof at least ; and all returns of elections, and of neglects or *[Major Generals, their duty.] [Proviso.]*

APP054

refusals to make choice of officers, shall be made to the
Governor, by the Major General, in whose division the
election shall be ordered; and all commissions shall pass
through the hands of the Major Generals to the officers, in
their respective divisions, for whom they shall be made out;
and every person who shall be elected to any office in the said
militia, and shall not within ten days after he shall have
been notified of his election, signify his acceptance thereof,
shall be considered as declining to serve in such office,
and orders shall be forthwith issued for a new choice.

*And be it further enacted by the authority aforesaid,*
That every person who shall be elected or appointed to
any of the offices aforementioned, shall, at the time of
receiving his commission, take and subscribe the oath and
declaration required by the constitution of this Common-
wealth, before some Justice of the Peace, or some general
or field officer, who shall have previously taken and sub-
scribed them himself; and a certificate thereof shall be
made upon the back of every commission by the Justice
of the Peace, or general or field officer, before whom the
said oath and declaration shall have been taken and sub-
scribed.

*And be it further enacted by the authority aforesaid,*
That every non-commissioned officer and private soldier
of the said militia not under the controul of parents,
masters or guardians, and being of sufficient ability
therefor in the judgment of the Selectmen of the town
in which he shall dwell, shall equip himself, and be con-
stantly provided with a good fire arm, with a steel or iron
ramrod, a spring to retain the same, a worm, priming wire
and brush, a bayonet fitted to his fire arm, and a scabbard
and belt for the same, a cartridge box that will hold fifteen
cartridges at least, six flints, one pound of powder, forty
leaden balls suitable for his fire arm, a haversack, blanket
and canteen; and if any non-commissioned officer or pri-
vate soldier shall neglect to keep himself so armed and
equipped, he shall forfeit and pay a fine not exceeding
Three pounds, in proportion to the value of the article
or articles in which he shall be deficient, at the discre-
tion of the Justice of the Peace before whom trial shall
be had.

*And be it further enacted by the authority aforesaid,*
That all parents, masters and guardians, shall furnish
those of the said militia who shall be under their care

Persons elected
to the offices
aforesaid to be
sworn, &c.

Non-commis-
sioned officers
and soldiers to
equip them-
selves with arms
and accoutre-
ments.

Fine for non-
equipment.

Parents, masters
and guardians
to equip those

and command, with the arms and equipments aforemen-
tioned, under the like penalties for any neglect. <span style="float:right">under their care under the like penalties.</span>

*And be it further enacted by the authority aforesaid,*
That whenever the Selectmen of any town shall judge any
inhabitant thereof, belonging to the said militia, unable to
arm and equip himself in manner as aforesaid, they shall,
at the expence of the town, provide for and furnish such
inhabitant with the aforesaid arms and equipments, which
shall remain the property of the town at the expence of
which they shall be provided ; and if any soldier shall
embezzle or destroy the arms and equipments, or any part
thereof, with which he shall be so furnished, he shall upon
conviction before some Justice of the Peace in the county
where such offender shall live, be adjudged to replace the
article or articles which shall be by him so embezzled or
destroyed, and to pay the cost arising from the process
against him ; and in case he shall not within fourteen
days after such adjudication against him perform the
same, it shall be in the power of the Selectmen of the
town to which he shall belong, to bind him out to service
or labor, for such term of time as shall, in the discretion
of the said Justice, be sufficient to procure a sum of
money equal to the amount of the value of the article
or articles embezzled or destroyed, and to pay the cost
arising as aforesaid.

<span style="float:right">Persons unable to equip themselves to be provided by the town.</span>

<span style="float:right">Soldiers embezzling or destroying their arms &c. furnished them, how punished upon conviction.</span>

<span style="float:right">In case.</span>

*And be it further enacted by the authority aforesaid,*
That every captain or commanding officer of a company,
shall call the Train Band of his company together four days
in a year, and oftener if he shall judge necessary, not
exceeding six days in the whole, for the purpose of exam-
ining their arms and equipments, and instructing them
in military exercises ; and shall also once in a year, on a
day when he shall muster the Train Band of his company,
call together the Alarm List belonging to his company,
within the limits of the town of which they shall be inhab-
itants, for the purpose of examining their arms and
equipments

<span style="float:right">Officers to call together the train band four days in a year and the alarm list once a year.</span>

*And be it further enacted by the authority aforesaid,*
That when any captain or commanding officer of a com-
pany shall think fit to muster or call his company together,
he shall issue his orders therefor to one or more of his
non-commissioned officers, if he shall have any, otherwise
to one or more of the private soldiers belonging to his com-
pany, directing him or them to notify and warn the said

<span style="float:right">Manner of calling together militia companies.</span>

company to appear at such time and place as shall be appointed, and with such arms and equipments as shall be mentioned in the said orders; and the non-commissioned officer or officers, or other person or persons who shall receive such orders, shall give notice of the time and place appointed for, and of the arms and equipments to be carried to the said muster, to each and every person he or they shall be ordered to warn, either verbally or by leaving a written notification thereof at the usual place of abode of the person thus to be notified and warned; and no notice shall be deemed legal for musters for the purpose of common and ordinary military exercises, unless it shall be given four days at least previous to the time appointed therefor; and every non-commissioned officer or other person who shall neglect to give the said notice and warning when ordered thereto, by the captain or commanding officer of the company to which he shall belong, shall, for such offence, forfeit and pay a sum not exceeding Forty shillings, nor less than Twenty shillings, at the discretion of the Justice of the Peace, before whom trial shall be had.

*And be it further enacted by the authority aforesaid,* That every non-commissioned officer and private soldier belonging to the Train Band, and every person belonging to the Alarm List, who, being duly notified of the time and place appointed for the muster of the company to which he shall belong, shall unnecessarily neglect to appear armed and equipped as the captain or commanding officer shall direct, shall pay a fine of ten shillings; and every non-commissioned officer and private soldier of the Train Band, and every person belonging to the Alarm List, who shall be disorderly or disobedient on a muster day, shall be confined during the time of said muster at the discretion of his officers, and shall pay a fine not exceeding Forty shillings, nor less than Twelve shillings, at the discretion of the Justice of the Peace to whom complaint shall be made. *Provided nevertheless,* That when any non-commissioned officer or private soldier belonging to the Train Band, or any other person belonging to the Alarm List, shall neglect to appear on a muster day when notified as aforesaid, and shall within eight days thereafter make application to the captain or commanding officer of the company to which he shall belong, and obtain the excuse of the said captain or commanding officer, or shall

*Penalties for neglect of duty and misbehaviour in non commissioned officers and privates.*

*Proviso.*

pay him the aforesaid fine of ten shillings, and shall pro-
cure a certificate thereof, in every such case he shall be
barred against any action or suit for such offence.

*And be it further enacted by the authority aforesaid,*
That the testimony of any non-commissioned officer or
other person, under oath, who shall have received orders
agreeably to law for notifying and warning any company,
or a part thereof, to appear at a time and place appointed
for a muster, shall be sufficient to prove that due notice
shall have been given to the party against whom complaint
may be made, unless such testimony shall be invalidated
by other sufficient evidence.

*And be it further enacted by the authority aforesaid,*
That when any person belonging to the Train Band or
Alarm List, shall, by neglect of duty by not appearing on
muster days, or by not being provided with arms and
equipments as this law directs, or by disobedience of
orders, or by disorderly behaviour, forfeit any sum of
money set and affixed by this law to such offences, or
either of them, under the sum of four pounds, the same
shall be recovered in manner following, *that is to say,*
The clerk of the company to which the offender shall
belong, shall after the expiration of eight days, and
within sixty days after the offence shall be committed,
make complaint thereof, and of all matters of substance
and material circumstances attending the same, to some
Justice of the Peace in the county where such offender
shall live, who shall make a record thereof, and shall issue
a summons to the party complained of, to be served seven
days at least before the time appointed for the trial, in
the form following, *mutatis mutandis.*

[SEAL.]                    ss.

*To the Sheriff of the said County, or his Deputy, or
any or either of the Constables of the Town of
within the same County,*        GREETING.

In the name of the Commonwealth of *Massachusetts,*
you are hereby required to summon *C. D.* of        in
the county of        to appear before me *E. F.* one of
the Justices of the Peace for the county aforesaid, at
in        on        the        day of        at        of the
clock in the        noon; then and there to shew cause, if
any he has, why a warrant of distress shall not issue
against him for [here insert the complaint] Hereof fail

*Marginal notes:* Testimony of non-commissioned officers and other persons under oath sufficient to prove due notification. Unless. Persons neglecting duty — forfeiture. How recovered. Form of a summons.

not, and make due return of this writ and of your doings therein, unto myself, at or before the said          day of          . Dated at                aforesaid, the          day of                in the year of our LORD,

*E. F.* Justice of the Peace.

*Party appearing may plead the general issue &c. and if defaulted and shall neglect to satisfy the judgment then in this case.*

And when the said party shall by himself, or his attorney, appear accordingly, he may plead the general issue and give any special matter in evidence; and if the said party shall make default, or if judgment shall be given against him, and he shall neglect for four days thereafter to satisfy the same, and legal costs, then the Justice of the Peace before whom the trial may be had, shall issue his warrant of distress, under his hand and seal, in the form following, *mutatis mutandis.*

[SEAL.]                    ss.

*To the Sheriff of the said County, or his Deputy, or any or either of the Constables of the Town of within the same County,*                    GREETING.

*Form of a warrant of distress.*

Whereas *C. D.* of          upon the          day of          being a private soldier in the Train Band (as the case may be) of the company of foot commanded by          in the regiment of militia in the said county of          , commanded by          , was duly notified to appear upon the          day of          , in the town of          in the county aforesaid, with his arms and equipments, as the law of this Commonwealth directs; and the said *C. D.* in violation of the said law, did unnecessarily neglect to appear, (or did not appear armed and equipped, as the case may be) whereby he hath forfeited and ought to pay the sum of          shillings, to the uses directed by law: And the said *C. D.* having been duly summoned to appear before me *E. F.* one of the Justices of the Peace for the county aforesaid, to shew cause, if any he had, why a warrant of distress should not be issued for the same sum, did not appear, (or appearing, did not shew sufficient cause why the same warrant should not be issued, as the case may be):

In the name of the Commonwealth of *Massachusetts,* you are therefore commanded forthwith, of the goods and chattels of the said *C. D.* within your precinct, to levy by distress and sale thereof the aforesaid sum of          shillings, with          for charges of suit, being in the

75

is amendatory ; and one copy of the laws so to be published, shall be furnished to each court of enquiry to be kept and preserved by the clerk thereof.

5. This act shall be in force from and after the passing thereof.    Commencement.

———

## AN ACT

*More effectually to provide for the National Defence by establishing an Uniform Militia throughout the United States.*

1. *Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled,* That each and every free able-bodied white male-citizen of the respective States, resident therein, who is or shall be at the age of eighteen years, and under the age of forty-five years, (except as is herein after excepted) shall severally and respectively be enrolled in the militia by the captain or commanding officer of the company, within whose bounds such citizen shall reside, and that within twelve months after the passing of this act.   And it shall at all times hereafter be the duty of every such captain or commanding officer of a company to enroll every such citizen, as aforesaid, and also those who shall, from time to time, arrive at the age of eighteen years, or being of the age of eighteen years, and under the age of forty-five years (except as before excepted) shall come to reside within his bounds ; and shall without delay notify such citizen of the said enrollment, by a proper non-commissioned officer of the company, by whom such notice may be proved.—— That every citizen so enrolled and notified, shall within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with   *Militia, how and by whom to be enrolled.*

*How to be armed and accoutred.*

APP060

76

a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or fire-lock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear so armed, accoutred and provided, when called out to exercise, or into ser-vice, except, that when called out on company-days to exercise only, he may appear without a knap-sack. That the commissioned officers shall sever-ally be armed with a sword or hanger and espon-toon, and that from and after five years from the passing of this act, all muskets for arming the mi-litia as herein required, shall be of bores sufficient for balls of the eighteenth part of a pound. And every citizen so enrolled and providing himself with the arms, ammunition and accoutrements re-quired, as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales, for debt or for the payment of taxes.

2. *And be it further enacted,* That the Vice-Pre-sident of the United States; the officers, judicial and executive of the government of the United States; the members of both houses of Congress, and their respective officers; all custom-house offi-cers with their clerks; all post-officers, and stage-drivers, who are employed in the care and convey-ance of the mail of the post-office of the United States; all ferrymen employed at any ferry on the post-road; all inspectors of exports; all pilots; all mariners actually employed in the sea-service of any citizen or merchant within the United States; and all persons who now are or may hereafter be exempted by the laws of the respective States, shall be, and are hereby exempted from militia du-ty, notwithstanding their being above the age of eighteen, and under the age of forty-five years.

3. *And be it further enacted,* That within one year after the passing of this act, the militia of the respective States shall be arranged into divisions, brigades, regiments, battalions and companies, as

**Marginal notes:**

See act 2d March, 1803.

Executive officers, &c. exempted.

Militia, how to be arran-ged, and

the legislature of each State shall direct; and each division, brigade and regiment, shall be numbered at the formation thereof; and a record made of such numbers in the adjutant-general's office in the State; and when in the field, or in service in the State, each division, brigade, and regiment shall, respectively, take rank according to their numbers, reckoning the first or lowest number highest in rank. That if the same be convenient, each brigade shall consist of four regiments; each regiment of two battalions; each battalion of five companies; each company of sixty-four privates. That the said militia shall be officered by the respective States, as follows: To each division, one major-general and two aids-de-camp, with the rank of major; to each brigade, one brigadier-general, with one brigade-inspector, to serve also as brigade-major, with the rank of a major; to each regiment, one lieutenant-colonel commandant; and to each battalion one major; to each company one captain, one lieutenant, one ensign, four sergeants, four corporals, one drummer and one fifer or bugler.— That there shall be a regimental staff, to consist of one adjutant and one quarter-master, to rank as lieutenants; one pay-master, one surgeon, and one surgeon's mate; one sergeant-major; one drum-major, and one fife-major.

*By whom officered.*

*For additional officers, see act 2d March, 1803.*

4. *And be it further enacted,* That out of the militia enrolled, as is herein directed, there shall be formed for each battalion at least one company of grenadiers, light infantry or riflemen; and that to each division, there shall be at least one company of artillery, and one troop of horse: there shall be to each company of artillery, one captain, two lieutenants, four sergeants, four corporals, six gunners, six bombardiers, one drummer and one fifer. The officers to be armed with a sword or hanger, a fusee, bayonet and belt, with a cartridge box to contain twelve cartridges; and each private or matross shall furnish himself with all the equipments of a private in the infantry, until proper ordnance and field artillery is provided. There shall be to

*Each battalion to have one company of grenadiers, &c. and one company of artillery.*

*Officers how to be armed.*

*Troops of horse how*

APP062

78

officered, &c. each troop of horse, one captain, two lieutenants, one cornet, four sergeants, four corporals, one saddler, one farrier, and one trumpeter. The commissioned officers to furnish themselves with good horses, of at least fourteen hands and an half high, and to be armed with a sword, and pair of pistols, the holsters of which to be covered with bearskin caps. Each dragoon to furnish himself with a serviceable horse, at least fourteen hands and an half high, a good saddle, bridle, mail-pillion and valise, holsters, and a breast-plate and crupper, a pair of boots and spurs, a pair of pistols, a sabre, and a cartouch-box, to contain twelve cartridges for pis-

Artillery and horse of whom to be formed ;

tols. That each company of artillery and troop of horse shall be formed of volunteers from the brigade, at the discretion of the commander in chief of the State, not exceeding one company of each to a regiment, nor more in number than one ele-

to be uniformly clad at their own expense.

venth part of the infantry, and shall be uniformly cloathed in regimentals, to be furnished at their own expense ; the colour and fashion to be determined by the brigadier commanding the brigade to which they belong.

What colors, &c. and by whom to be furnished.

5. *And be it further enacted*, That each battalion and regiment shall be provided with the State and regimental colors by the field officers, and each company with a drum and fife or bugle-horn, by the commissioned officers of the company in such manner as the legislature of the respective States shall direct.

Adjutant general in each state, his duty.

6. *And be it further enacted*, That there shall be an adjutant-general appointed in each State, whose duty it shall be to distribute all orders from the commander in chief of the State to the several corps ; to attend all public reviews when the commander in chief of the State shall review the militia, or any part thereof ; to obey all orders from him relative to carrying into execution and perfecting the system of military discipline established by this act ; to furnish blank forms of different returns that may be required, and to explain the principles on which they should be made ; to receive from the

79

several officers of the different corps throughout the State, returns of the militia under their command, reporting the actual situation of their arms, accoutrements and ammunition, their delinquencies and every other thing which relates to the general advancement of good order and discipline: All which the several officers of the divisions, brigades, regiments and battalions, are hereby required to make in the usual manner, so that the said adjutant-general may be duly furnished therewith: From all which returns, he shall make proper abstracts, and lay the same annually before the commander in chief of the State.

7th Section—*obsolete.*

8. *And be it further enacted,* That all commissioned officers shall take rank according to the date of their commissions; and when two of the same grade bear an equal date, then their rank to be determined by lot, to be drawn by them before the commanding officer of the brigade, regiment, battalion, company or detachment.

Officers how to take rank.

9. *And be it further enacted,* That if any person, whether officer or soldier, belonging to the militia of any State, and called out into the service of the United States, be wounded or disabled while in actual service, he shall be taken care of and provided for at the public expense.

Provision in case of wounds, &c.

10. *And be it further enacted,* That it shall be the duty of the brigade inspector, to attend the regimental and battalion meetings of the militia composing their several brigades, during the time of their being under arms, to inspect their arms, ammunition and accoutrements; superintend their exercise and manœuvres, and introduce the system of military discipline throughout the brigade, agreeable to law, and such orders as they shall, from time to time, receive from the commander in chief of the State; to make returns to the adjutant general of the State, at least once in every year, of the militia of the brigade to which he belongs, reporting therein the actual situation of the arms, accoutrements and ammunition of the several corps, and

Brigade inspector's duty.

80

every other thing which, in his judgment, may relate to their government and the general advancement of good order and military discipline; and the adjutant general shall make a return of all the militia of the State, to the commander in chief of the said State, and a duplicate of the same to the President of the United States.

Artillery, &c.
now existing.

And whereas sundry corps of artillery, cavalry and infantry, now exist in several of the said States, which by the laws, customs or usages thereof have not been incorporated with, or subject to the general regulations of the militia:

to retain their privileges.

11. *Be it further enacted,* That such corps retain their accustomed privileges, subject, nevertheless, to all other duties required by this act in like manner with the other militia.

[*Approved, May* 8, 1792.]

———

## AN ACT

*To regulate the pay of the non-commissioned officers, musicians and privates of the Militia of the United States, when called into actual service, and for other purposes.*

Monthly pay
of non-com-
missioned
officers, &c.

1. *Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled,* That from and after the passing of this act, the allowance of bounty, clothing and pay to the non-commissioned officers, musicians and privates of the infantry, artillery and cavalry of the militia of the United States, when called into actual service, shall be at the rate per month, as follows: Each sergeant-major and quarter-master sergeant, nine dollars; each drum and fife-major, eight dollars and thirty-three cents; each sergeant, eight dollars; each corporal, drummer, fifer and trumpeter, seven dollars and thirty-three cents;

APP065