No. 23-1353

---

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

---

NATIONAL ASSOCIATION FOR GUN RIGHTS, ROBERT C. BEVIS, and
LAW WEAPONS, INC d/b/a LAW WEAPONS & SUPPLY,

*Plaintiffs-Appellants,*

v.

CITY OF NAPERVILLE, ILLINOIS and JASON ARRES,

*Defendants-Appellees,*

and

THE STATE OF ILLINOIS,

*Intervenor-Appellee.*

---

APPEAL FROM THE U.S. DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, No. 1:22-CV-04775
THE HONORABLE VIRGINIA M. KENDALL

---

## BRIEF OF *AMICUS CURIAE* DR. JAVIER HERRERA
## IN SUPPORT OF PLAINTIFFS-APPELLANTS FOR REVERSAL

---

GENE HAMILTON
REED D. RUBINSTEIN
MICHAEL DING
AMERICA FIRST LEGAL FOUNDATION
611 PENNSYLVANIA AVE. SE, SUITE 231
WASHINGTON, D.C. 20003
(202) 964-3721

GREGORY ABBOTT BEDELL
KNABE & BEDELL
33 NORTH DEARBORN ST., 10TH FL.
CHICAGO, ILLINOIS 60602
(312) 997-9119

THOMAS R. MCCARTHY
JEFFREY M. HARRIS
TAYLOR A.R. MEEHAN
MATT POCIASK
CONSOVOY MCCARTHY PLLC
1600 WILSON BLVD., SUITE 700
ARLINGTON, VIRGINIA 22209
(703) 243-9423

*Counsel for Amicus Curiae Dr. Javier Herrera*

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Dr. Javier Herrera

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Taylor A.R. Meehan    Date: April 11, 2023

Attorney's Printed Name: Taylor A.R. Meehan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑    **No** ☐

Address: 1600 Wilson Blvd., Suite 700

Arlington, Virginia 22209

Phone Number: (703) 243-9423    Fax Number:

E-Mail Address: taylor@consovoymccarthy.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Dr. Javier Herrera

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Thomas R. McCarthy    Date: April 11, 2023

Attorney's Printed Name: Thomas R. McCarthy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address: 1600 Wilson Blvd., Suite 700

        Arlington, Virginia 22209

Phone Number: (703) 243-9423    Fax Number:

E-Mail Address: tom@consovoymccarthy.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Dr. Javier Herrera

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Jeffrey M. Harris    Date: April 11, 2023

Attorney's Printed Name: Jeffrey M. Harris

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☑

Address: 1600 Wilson Blvd., Suite 700

    Arlington, Virginia 22209

Phone Number: (703) 243-9423    Fax Number:

E-Mail Address: jeff@consovoymccarthy.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Dr. Javier Herrera

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Matt Pociask    Date: April 11, 2023

Attorney's Printed Name: Matt Pociask

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]  No [✔]

Address: 1600 Wilson Blvd., Suite 700

Arlington, Virginia 22209

Phone Number: (703) 243-9423    Fax Number:

E-Mail Address: matt@consovoymccarthy.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Dr. Javier Herrera

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Gene P. Hamilton    Date: April 11, 2023

Attorney's Printed Name: Gene P. Hamilton

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 611 Pennsylvania Avenue SE, Suite 231

Washington, DC 20003

Phone Number: (202) 964-3721    Fax Number:

E-Mail Address: gene.hamilton@aflegal.org

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Dr. Javier Herrera

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Reed D. Rubinstein    Date: April 11, 2023

Attorney's Printed Name: Reed D. Rubinstein

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 611 Pennsylvania Avenue SE, Suite 231

Washington, DC 20003

Phone Number: (202) 964-3721    Fax Number:

E-Mail Address: reed.rubinstein@aflegal.org

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Dr. Javier Herrera

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Michael Ding    Date: April 11, 2023

Attorney's Printed Name: Michael Ding

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☑

Address: 611 Pennsylvania Avenue SE, Suite 231

Washington, DC 20003

Phone Number: (202) 964-3721    Fax Number:

E-Mail Address: michael.ding@aflegal.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As     Clear Form

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Dr. Javier Herrera

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Consovoy McCarthy PLLC, America First Legal Foundation, Knabe & Bedell

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Gregory Abbott Bedell    Date: April 11, 2023

Attorney's Printed Name: Gregory Abbott Bedell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☑

Address: 33 North Dearborn Street, 10th Floor

Chicago, IL 60602

Phone Number: (312) 977-9119    Fax Number:

E-Mail Address: gbedell@kkbchicago.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

INTEREST OF *AMICUS CURIAE* .............................................................. 1

INTRODUCTION .......................................................................................... 4

SUMMARY OF ARGUMENT ....................................................................... 6

ARGUMENT ............................................................................................... 11

    I.   The Second Amendment's Plain Text Covers Keeping A Modern Rifle At Home ................................................................ 11

        A.   Modern rifles are "Arms." ...................................................... 12

        B.   Semiautomatic firearms require standard magazines to function .......... 15

    II.  There Is No Historical Tradition To Support Banning Modern Rifles In The Home. ................................................................ 16

        A.   Colonial-era militia acts required citizens to keep military-style firearms at home. ........................................................ 17

        B.   Laws regulating Bowie knives and other weapons carried in public do not support banning rifles at home. .................................... 18

        C.   There is no historical tradition of banning "particularly dangerous weapons" in the home. ................................................... 20

CONCLUSION ............................................................................................ 25

CERTIFICATE OF COMPLIANCE ........................................................... 27

CERTIFICATE OF SERVICE .................................................................... 28

STATUTORY APPENDIX ................................................................... App.1

i

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State,*
  50 Tenn. 165 (1871) ........................................................5, 8, 12, 15

*ANJRPC v. Att'y Gen.,*
  910 F.3d 106 (3d Cir. 2018) ...................................................16

*Aymette v. State,*
  21 Tenn. 154 (1840) ..............................................................7, 10, 14

*Bevis v. City of Naperville,*
  2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ...........................9, 18, 20, 24

*Bliss v. Commonwealth,*
  12 Ky. 90 (1822) ...................................................................10, 20

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) .............................................................passim

*Cockrum v. State,*
  24 Tex. 394 (1859).................................................................20

*Dean Foods Co. v. Brancel,*
  187 F.3d 609 (7th Cir. 1999) ...................................................6

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .............................................................passim

*English v. State,*
  35 Tex. 473 (1871)...................................................................14

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ...................................................5

*Friedman v. City of Highland Park,*
  784 F.3d 406 (7th Cir. 2015) ...................................................7

*Fyock v. Sunnyvale,*
  779 F.3d 991 (9th Cir. 2015) ...................................................16

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ...............................................8, 13, 23

*Illinois Ass'n of Firearms Retailers v. City of Chicago,*
  961 F. Supp. 2d 928 (N.D. Ill. 2014) .......................................5

*Jackson v. City & Cty. of S.F.,*
   746 F.3d 953 (9th Cir. 2014) ................................................................. 16

*Kolbe v. Hogan,*
   813 F.3d 160 (4th Cir. 2016) ................................................................. 23

*Luis v. United States,*
   578 U.S. 5 (2016) ................................................................. 5, 7, 24

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ................................................................. 10, 25

*McDonald v. State,*
   102 S.W. 703 (Ark. 1907) ................................................................. 10, 17, 18

*Miller v. Bonta,*
   542 F. Supp. 3d 1009 (S.D. Cal. 2021) ................................................................. 10, 23, 25

*Moore v. Madigan,*
   702 F.3d 933 (7th Cir. 2012) ................................................................. 6

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
   804 F.3d 242 (2d Cir. 2015) ................................................................. 23

*New York State Rifle & Pistol Association v. Bruen,*
   142 S. Ct. 2111 (2022) ................................................................. passim

*Nunn v. State,*
   1 Ga. 243 (1846) ................................................................. 10, 20

*O'Neil v. State,*
   16 Ala. 65 (1849) ................................................................. 21

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC,*
   976 F.3d 761 (7th Cir. 2020) ................................................................. 3

*Smith v. Check-N-Go of Ill., Inc.,*
   200 F.3d 511 (7th Cir. 1999) ................................................................. 2

*Staples v. United States,*
   511 U.S. 600 (1994) ................................................................. 20, 23

*State v. Huntly,*
   25 N.C. 418 (1843) ................................................................. 21

*State v. Kerner,*
   107 S.E. 222 (N.C. 1921) ................................................................. 14

*State v. Reid*,
   1 Ala. 612 (1840) ...................................................................8, 12, 15

*State v. Workman*,
   14 S.E. 9 (W. Va. 1891)..................................................................14

*Teixeira v. Cnty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ...........................................................5

*United States v. Miller*,
   307 U.S. 174 (1939) ...............................................................passim

*Voices for Choices v. Ill. Bell Tell. Co.*,
   339 F.3d 542 (7th Cir. 2003) .............................................................2

*Wilson v. State*,
   33 Ark. 557 (1878) .........................................................11, 14, 25

**Statutes**
1882 Acts of West Virginia § 7 ..............................................17, 19

2 Edw. III c. 3 (1328).........................................................................21

**Constitutional Provisions**

U.S. Const. amend. II ................................................................7, 11

**Other Authorities**

*Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
   87 Fed. Reg. 24652 (Apr. 26, 2022)...........................................15, 23

Congressional Research Service,
   *House-Passed Assault Weapons Ban of 2022* (H.R. 1808) (Aug. 4, 2022) .............23

David B. Kopel, *Knives and the Second Amendment*,
   47 U. Mich. J. L. Reform 167 (2013).....................................................20

Hawkins, *A Treatise of the Pleas of the Crown* (1777) ...............................21

NSSF, *Firearm Production in the United States* (2020) ...............................23

Richard Burn, *Justice of Peace and Parish Officer* (1st ed. 1762)....................22

Robert Leider, *Deciphering the "Armed Forces of the United States,"*
   57 Wake Forest L. Rev. 1195 (2022)......................................................17

Robert Leider, *Federalism and the Military Power of the United States*,
   73 Vand. L. Rev. 989 (2020) .............................................................14

Robert Leider, *Our Non-Originalist Right to Bear Arms*,
  89 Ind. L. J. 1587 (2014)........................................................................15

T. Cunningham, *A New and Complete Law Dictionary* (1764) ...................................21

William Blackstone, *Commentaries on the Laws of England* (1769) .........................21

Wood, *An Institute of the Laws of England* (1754) .....................................................21

## INTEREST OF *AMICUS CURIAE*[1]

Dr. Javier Herrera is an ER doctor, a professor of medicine, and a medic for a Chicago-area SWAT team—a team that responds to hostage and active shooter situations and executes high-risk search warrants in Chicagoland's most dangerous neighborhoods. Dr. Herrera is also a law-abiding gun owner. And he is the plaintiff in the related case of *Herrera v. Raoul*, No. 1:23-cv-00532 (N.D. Ill.). His suit challenges the same state firearms ban as Appellants challenge here and similar local firearms bans in Cook County and the City of Chicago. In January, Dr. Herrera moved to preliminarily enjoin these laws. The combination of the challenged state and local laws precludes Dr. Herrera from keeping an AR-15 rifle in his home and purchasing replacement magazines or other components for them. They make it a practical impossibility for Dr. Herrera to participate in regular shooting drills and other firearms training with his SWAT team—training that, consistent with best practices prescribed by the American College of Emergency Physicians for tactical medicine, would ensure that Dr. Herrera could safely disarm downed officers' firearms and otherwise safely handle the firearms that SWAT officers use for the team's dangerous and unpredictable missions. These laws also deem the 17-round magazine that comes standard with his handgun (and millions of others) an illegal "high-capacity" magazine.

---

[1] Counsel for all parties have consented to the filing of this *amicus curiae* brief. *See* Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and their counsel, made any monetary contribution toward the preparation or submission of this brief.

Dr. Herrera's suit raises the same constitutional questions as those now before this Court. His suit, however, is pending before a different judge in the U.S. District Court for the Northern District of Illinois, and his January motion for a preliminary injunction remains unresolved. With the aim of avoiding related lawsuits that proceed along different tracks before different judges and result in multiple appeals, S*mith v. Check-N-Go of Ill., Inc.*, 200 F.3d 511, 513 n.* (7th Cir. 1999), the parties in Dr. Herrera's case—including the State Intervenors here—have asked to have the case reassigned and consolidated with the *Bevis* case now on appeal before this Court. *See* N.D. Ill. Local R. 40.4; Notices of Rule 40.4 Filings, *Herrera v. Raoul*, No. 1:23-cv-00532 (N.D. Ill.), ECF 41, ECF 58, ECF 59. The District Court has not acted on these Rule 40.4 reassignment requests. In the meantime, the parties in Dr. Herrera's case have completed substantial briefing on the question of whether the Constitution permits state and local governments to ban rifles and the standard magazines that come with those rifles and other common handguns from the homes of law-abiding Americans. With those briefs, the parties have submitted more than 500 pages of historical statutes and more than two dozen expert declarations.

Because of the overlapping issues in this appeal and Dr. Herrera's case, the Court's decision could well decide the merits of Dr. Herrera's Second Amendment challenge. *See Voices for Choices v. Ill. Bell Tel. Co.*, 339 F.3d 542, 545 (7th Cir. 2003) (Posner, J., in chambers) (describing circumstances in which "would-be *amici* have a direct interest in another case that may be materially affected"). Dr. Herrera thus seeks to participate as an *amicus curiae* to raise arguments and historical analysis

developed in his ongoing case, so that any later appeal is not foreordained by the Court's decision here without his participation. The *amicus* brief offers a plain explanation of why the challenged laws violate the Second Amendment, in light of *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). It includes a statutory appendix of the historical statutes that the *Bruen* analysis requires. Finally, Dr. Herrera's participation as *amicus* offers a practical perspective on how the challenged laws affect the lives of different law-abiding Illinois residents—for Dr. Herrera, by making it a practical impossibility for him to participate in regular shooting drills and other critical weapons training with his Chicago-area SWAT team. *See Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 976 F.3d 761, 763 (7th Cir. 2020) (Scudder, J., in chambers).

**INTRODUCTION**

There are at least eight cases pending in this Circuit that present different variations on this question: whether the government may ban selling, purchasing, possessing, and using the most commonly owned semiautomatic rifle in the country, as well as the magazines that come standard with that rifle and other commonly owned handguns.[2] Appellants here are particularly concerned about the ability to *sell* or *purchase* such arms. In response, the state and local governments defending the bans focus their sights on the dangers of *publicly carrying* such arms—in particular, the statistically rare but universally horrific instances of mass shootings perpetuated by evil and deranged killers.

The state and local governments are picking the wrong starting point. There is an antecedent question that the Court must first resolve: whether the government may ban modern semiautomatic rifles and standard magazines from law-abiding Americans' *homes*. If the answer to that antecedent question is *yes*, then there is little reason to debate further whether these firearms can be banned from gun stores or whether they can be banned from the streets. But if the answer to that antecedent question is *no*, then there is every reason to conclude that the governments must go

---

[2] In addition to this appeal, *see Herrera v. Raoul*, No. 1:23-cv-00532 (N.D. Ill.) (pending motion for preliminary injunction of Illinois, Cook County, and City of Chicago bans); *Goldman v. Highland Park*, No. 1:22-cv-04774 (N.D. Ill.) (pending motion for preliminary injunction of Highland Park ban); *Viramontes v. County of Cook*, 1:21-cv-04595 (N.D. Ill.) (challenging Cook County ban and stayed in light of related litigation); *Keneally v. Raoul*, No. 2:23-cv-60039 (N.D. Ill.) (pending motion for preliminary injunction of Illinois ban); *Harrel v. Raoul*, No. 3:23-cv-00141 (S.D. Ill.) (same); *Barnett v. Raoul*, No. 3:23-cv-00209 (S.D. Ill.) (same); *Langley v. Kelly*, 3:23-cv-00192 (S.D. Ill.) (same).

back to the drawing board. The laws cannot continue as-is. If the government cannot ban such firearms from homes, then the government cannot also ban "those closely related acts necessary to their exercise," *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring), including purchasing such arms and learning how to safely use them. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011))); *Illinois Ass'n of Firearms Retailers (IAFR) v. City of Chicago*, 961 F. Supp. 2d 928, 930-31 (N.D. Ill. 2014) (outright ban on sale and purchase violates the Second Amendment); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("right of keeping arms … necessarily involves the right to purchase and use them in such a way as is usual").

This brief addresses that antecedent question. Applying the analytical framework required by *Bruen*, is there any historical tradition of the federal, state, or local governments banning commonly owned firearms and the standard magazines that come with them from American homes? The answer is no. After hundreds of pages of expert declarations and hundreds more pages of historical statutes submitted by government defendants in cases throughout the country, no defendant has identified an analogous historical tradition of banning weapons *inside* the home. The history points in the opposite direction—there was a historical tradition of requiring analogous weapons inside colonial homes. The best the government defendants can do is identify a historical tradition of banning "dangerous and

unusual" weapons on *public streets*. But any such tradition cannot justify the government defendants' far more sweeping laws, which extend to the most private spaces of American homes. Such laws must be preliminarily enjoined for the governments to try again at a constitutional version of their currently unconstitutional complete bans on commonly owned firearms and magazines.

## SUMMARY OF ARGUMENT

To decide whether the Second Amendment permits a government to ban modern rifles and magazines in law-abiding Americans' homes, *Bruen* requires the Court to first determine whether the Second Amendment's plain text covers such conduct. 142 S. Ct. at 2129-30. If so, the Court must next determine whether the government has justified such a presumptively unconstitutional law "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. These determinations are ultimately questions of law, with subsidiary determinations about the "application of constitutional principles to historical fact." *See Dean Foods Co. v. Brancel*, 187 F.3d 609, 616-17 (7th Cir. 1999); *see, e.g.*, *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). They require "more searching," *de novo* review in this Court. *Dean Foods*, 187 F.3d at 616-17 (collecting cases).

Once the Court makes those determinations, the inquiry is over. *Bruen* is as important for what it says courts are *not* permitted to do. Courts cannot go on to decide that ahistorical firearms bans that infringe conduct plainly covered by the Second Amendment are nevertheless justified by proffered public safety benefits.

*Compare Friedman v. City of Highland Park*, 784 F.3d 406, 411-12 (7th Cir. 2015) (discussion of "substantial benefit" of firearms ban), *with Bruen*, 142 S. Ct. at 2126-30. Such policy arguments, divorced from an historical tradition of banning arms in the home, are the very arguments that *Bruen* rejected as "one step too many." 142 S. Ct. at 2126. Especially so for the inquiry here—deciding what may be banned *inside* the home, not on the streets of Chicago. Neither Appellants here, nor *amicus* Dr. Herrera, nor any other plaintiff in other cases pending in this Circuit are asking to carry a Tommy gun to a playground, or to terrorize the public streets with Bowie knives or clubs. Dr. Herrera and other law-abiding citizens are asking for the protection of their constitutional rights inside their homes, and "those closely related acts necessary to their exercise." *Luis*, 578 U.S. at 26 (Thomas, J., concurring).

**I.** Applying *Bruen*, the act of keeping in one's home a modern rifle and its standard magazine is covered by the Second Amendment's plain text. The Second Amendment describes "the right of the people to keep and bear Arms." U.S. Const., amend. II. *Heller* confirmed that this enumerated right is an individual right that includes "us[ing] arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

**A.** Such "Arms" to be used in defense of hearth and home include modern rifles. *See, e.g.*, *United States v. Miller*, 307 U.S. 174, 182 (1939) (militia statute allowing citizens to bring from their homes "good rifles with proper accoutrements, in lieu [of muskets]"); *Aymette v. State*, 21 Tenn. 154, 158 (1840) (defining "arms" as those "usually employed in civilized warfare, and that constitute the ordinary military

equipment"). And it is "bordering on the frivolous" to argue that technological advancements render modern semiautomatic rifles beyond the scope of the "Arms" protected by the Second Amendment. *Heller*, 554 U.S. at 581-82; *see also, e.g.*, *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam) (holding stun guns to be protected arms). *Heller* already contemplated—and rejected—banning semiautomatic handguns from homes, leaving no basis "for drawing a constitutional distinction between [those] semi-automatic handguns" in *Heller* "and semi-automatic rifles" at issue here. *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

**B.** Likewise, the Second Amendment's text covers keeping and using the magazines that come with these "Arms," lest they be rendered useless "in defense of hearth and home." *Heller*, 554 U.S. at 635. Without a magazine, the firearms are inoperable, incongruous with the Second Amendment's protection of "Arms." *Id.* at 584, 630; *see also, e.g.*, *State v. Reid*, 1 Ala. 612, 616-18 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be borne so as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."); *Andrews*, 50 Tenn. at 178 ("The right to keep arms, necessarily involves the right … to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.").

**II.** Because the Second Amendment encompasses keeping modern rifles and standard magazines in homes, a government cannot ban such conduct without

establishing that governments have historically banned such conduct. *See, e.g.*, *Bruen*, 142 S. Ct. at 2135-56 (rejecting historical tradition for licensing law at issue). No government can do so.

**A.** The most relevant historical tradition confirms that the modern-day bans are unconstitutional. Colonial-era men were expected to appear for militia musters with arms in common use at the time. *See Miller*, 307 U.S. at 178-79. As detailed in the historical record compiled in *amicus*'s own case, colonial-era laws ordinarily *required* law-abiding men to keep weapons suitable for both individual and collective self-defense in their homes. *See* App.2-13, 75-185; *see also* Reply in Support of Preliminary Injunction & Ex. 1, *Herrera v. Raoul*, No. 1:23-cv-00532 (N.D. Ill.), ECF 63 & 63-1. If today's modern rifles existed then, every household would have been presumably *required* to purchase, keep, and use such arms—not *banned* from doing the same.

**B.** The government cannot defend bans extending into *homes* by resorting to historical regulations banning certain arms from the *public square*. But that is all the government has done in this case and related cases—marshaled examples of common-law treatises and state and local laws that regulate how certain weapons may be *publicly carried* beyond one's home. The court below likewise relied on these public-carry restrictions without asking the antecedent question of what historical tradition there was of banning arms everywhere, including in law-abiding Americans' homes. *See Bevis v. City of Naperville*, 2023 WL 2077392, *10-11 (N.D. Ill. Feb. 17, 2023). That was error multiple times over. Some of the very laws relied upon by defendants

9

and the court below were declared unconstitutional, at least in some respects, beginning 200 years ago. *See, e.g.*, *Bliss v. Commonwealth*, 12 Ky. 90, 90, 93-94 (1822); *Nunn v. State*, 1 Ga. 243, 251 (1846); *Aymette*, 21 Tenn. at 159-60.  Worse, some of those same laws *confirmed* the right to keep arms in the home that might otherwise be restricted outside the home. *See, e.g.*, *McDonald v. State*, 102 S.W. 703, 703 (Ark. 1907) (weapons permitted "upon his own premises").

**C.** Nor are the governments' dangerousness arguments alone enough to ban a class of arms. All protected "Arms" are dangerous. *See Caetano*, 577 U.S. at 418 (Alito, J., concurring) ("[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes."). Allowing such dangerousness arguments to carry the day is at odds with *Bruen*. It would "amount to something like a disfavored 'heckler's veto'" in the First Amendment context. *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1039 (S.D. Cal. 2021), *vac'd and rem. in light of Bruen*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022); *see McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (Second Amendment is not "a second-class right, subject to an entirely different body of rules"). Where, as here, the government concedes that there are millions of *lawful* users of certain firearms, the government cannot constitutionally ban those firearms from those law-abiding citizens' homes based on the wicked acts of a small minority of users. *Compare Heller*, 554 U.S. at 635-36, *with id.* at 682, 694-95 (Breyer, J., dissenting). As has been true for more than a century, the "general deprivation of a constitutional privilege" of such law-abiding citizens cannot be justified by the acts of "cowardly and dishonorable men." *Wilson v.*

*State*, 33 Ark. 557, 560 (Ark. 1878). Their "evil[s] must be prevented by the penitentiary and gallows" as they have always been, *id.*, not by disarming whole cities, counties, or States.

## ARGUMENT

If the challenged laws implicate conduct covered by the Second Amendment's plain text, then the government must overcome a weighty presumption that it cannot ban that conduct. *See Bruen*, 142 S. Ct. at 2126. To justify any such ban, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* There must be a pattern of historical regulations that are "relevantly similar" to the challenged law. *Id.* at 2132. It is not enough for the government to "simply posit that the regulation promotes an important interest." *Id.* at 2126. "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*

Here, the Second Amendment's plain text covers keeping modern rifles and the magazines necessary to use them in law-abiding citizens' homes. There is no historical tradition of banning firearms in homes. Appellees' laws thus infringe "the right of the people to keep and bear Arms," U.S. Const. amend. II, and they should be enjoined.

## I.   The Second Amendment's Plain Text Covers Keeping A Modern Rifle At Home.

The first question under *Bruen* is whether keeping modern rifles in the home falls within the Second Amendment's "plain text." 142 S. Ct. at 2126. Clearly it does.

There is no dispute that law-abiding citizens have an individual constitutional right to keep and "use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. In *Heller*, it was "no answer" to say that handguns could be banned from the home because other firearms were allowed. *Id.* at 629. Here too, it is no answer to say that the most popular modern rifle in the country could be banned from the home (as well as magazines necessary to operate that rifle and other popular handguns) if other firearms are allowed. There should be no dispute that such modern rifles and handguns are "Arms," and that the banned magazines necessary to make them operable are likewise protected. *See Bruen*, 142 S. Ct. at 1232 (the Second Amendment protects "modern arms"); *see, e.g.*, *Andrews*, 50 Tenn. at 178-79 ("arms" includes "rifle[s] of all descriptions" and "necessarily involves the right … to keep them in a state of efficiency for use"); *Reid*, 1 Ala. at 616-18 (statute cannot render arms "wholly useless").

### A.     Modern rifles are "Arms."

The word "Arms" in the Second Amendment includes both "'armour of defence'" and "'weapons of offence.'" *Heller*, 554 U.S. at 581. Since the Founding, "Arms" has described "all firearms" that a person can "bear." *Id.* ("The 18th-century meaning is no different from the meaning today.").

Modern semiautomatic rifles including the AR-15 are "Arms" under the Second Amendment's plain text. It is beyond dispute that rifles as a general category are arms. *See, e.g.*, *United States v. Miller*, 307 U.S. 174, 182 (1939) (discussing Virginia's 1785 militia statute allowing citizens to bring "good rifles with proper accoutrements, in lieu [of muskets]"); *Andrews*, 50 Tenn. at 179. So the question is whether a modern

rifle's improvements—such as semiautomatic fire or a removable magazine—place it outside the Second Amendment's scope. The answer is clearly no, lest the modern handguns with the same features at issue in *Heller* are "Arms" but the rifles at issue here are not. *See Heller*, 554 U.S. at 628-29. In *Heller*, the Court explained that the Second Amendment presumptively protects "*all* instruments that constitute bearable arms, even those that were *not* in existence at the time of the founding." *Id.* at 582 (emphases added); *see also Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("There is no basis in *Heller* for drawing a constitutional distinction between semi-automatic handguns and semi-automatic rifles."). The Court rejected as "bordering on the frivolous" the view that the Second Amendment covers only 18th-century weapons technology. *Heller*, 554 U.S. at 582; *see also Caetano*, 577 U.S. at 412 (holding stun guns to be protected arms).

Government defendants have posited that modern semiautomatic rifles share some features with military-issued weapons, while acknowledging that military-issued weapons are capable of automatic fire. But any such similarities would only *confirm* that modern rifles are "Arms" under the Second Amendment. The term "Militia" in the Second Amendment's prefatory clause clarifies that "Arms" must *at least* include weapons useful as "ordinary military equipment" for individual use. *See Heller*, 554 U.S. at 577-78, 624-25 (discussing "clarifying function" of the prefatory clause and explaining that the Second Amendment protects *more* than "only … weapons useful in warfare"); *see also* Robert Leider, *Federalism and the Military*

*Power of the United States*, 73 Vand. L. Rev. 989, 1008-09 (2020) (Framers' use of "the militia" referred "to the entire national able-bodied population subject to military service"). For that reason in *Miller*, the Supreme Court held that short-barreled shotguns were *not* protected precisely because they had no "reasonable relationship to the preservation or efficiency of a well regulated militia." 307 U.S. at 178 (citing *Aymette*, 21 Tenn. at 158 (defining "arms" as those "usually employed in civilized warfare, and that constitute the ordinary military equipment")). State supreme courts have likewise understood the Second Amendment to protect militia-type arms. *See, e.g., Wilson v. State*, 33 Ark. 557, 560 (Ark. 1878) (cannot "prohibit the citizen from wearing or carrying a war arm"); *Aymette*, 21 Tenn. at 158 ("arms … usually employed in civilized warfare"); *State v. Kerner*, 107 S.E. 222, 224-25 (N.C. 1921) ("arms" are those "whose use was necessary for their protection against the usurpation of illegal power—such as rifles, muskets, shotguns, swords, and pistols"); *English v. State*, 35 Tex. 473, 474 (1871) ("Arms of what kind? Certainly such as are useful and proper to an armed militia."); *State v. Workman*, 14 S.E. 9, 10 (W. Va. 1891) ("in regard to the kind of arms…it must be held to refer to the weapons of warfare to be used by the militia").

That's not to say the Second Amendment's scope is unlimited. The Second Amendment would presumptively tolerate regulation of military-issued weapons "highly unusual in society at large" or non-bearable arms, such as machineguns operated by multiple soldiers or "bombers and tanks." *Heller*, 554 U.S. at 627; *see also* Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 Ind. L. J. 1587, 1595,

14

1638-39, 1649 (2014) (distinguishing between ordinary military equipment and weapons not commonly issued to each individual soldier). But weapons "highly unusual in society at large" are not at issue here. *Heller*, 554 U.S. at 627. Just the opposite—governments are banning "one of the most popular firearms in the United States," including "for civilian use." *Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022). As it was in *Heller*, it is bordering on the frivolous to contend that such firearms are not "Arms." They are, and laws banning them are presumptively unconstitutional. *See Bruen*, 142 S. Ct. at 2126.

## B. Semiautomatic firearms require standard magazines to function.

The Second Amendment also covers the right to keep and use magazines, lest the semiautomatic rifles at issue be rendered inoperable. The phrase "keep and bear Arms" means possessing arms "for the purpose of offensive or defensive action," *not* ornamental display. *Heller*, 554 U.S. at 584 (cleaned up). The right to keep arms thus encompasses the right to keep what is necessary for covered arms to function. *See Reid*, 1 Ala. at 616-17; *Andrews*, 50 Tenn. at 178 ("The right to keep arms, necessarily involves the right … to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair."). Just as the term "automobile" includes a vehicle's gas tank, the term "Arms" includes a weapon's essential components.

Magazines are necessary for many modern firearms to function—including both the semiautomatic handguns protected in *Heller* and the modern rifles at issue

15

here—and thus the Second Amendment presumptively protects them. *See ANJRPC v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018) ("Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."), *abrogated in other part by Bruen*, 142 S. Ct. 2111; *see also Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015); *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014). A semiautomatic firearm's characteristic reloading process depends on a magazine to supply a fresh round into the action. A law banning magazines is thus no different from a law that would require semiautomatic guns to be "rendered and kept inoperable," precisely what *Heller* held unconstitutional. *See* 554 U.S. at 630.

## II.    There Is No Historical Tradition To Support Banning Modern Rifles In The Home.

Because the Second Amendment's plain text covers possessing a modern rifle at home, Appellees must demonstrate that their bans are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. But there is no historical tradition of banning arms in law-abiding citizens' homes. Instead, the most analogous history—militia acts preceding ratification of the Second Amendment—uniformly *required* colonists to keep arms in their home that would be suitable for both individual and collective self-defense. And while the government offers historical statutes that regulate *publicly carrying* firearms outside the home, they provide no support for banning such firearms inside the home. Indeed, some of the very public-carry laws defendants rely upon specifically permit possession and

use of otherwise-restricted arms "about his dwelling house." 1882 Acts of West Virginia 421-22, § 7; *see McDonald*, 102 S.W. at 703.

### A. Colonial-era militia acts required citizens to keep military-style firearms at home.

The most relevant history for assessing the challenged laws are colonial-era militia acts. But far from justifying a *ban* modern rifles in the home, those statutes show that citizens were required to *keep* arms in the home for collective and individual defense. As the historical statutes compiled in *amicus*'s own case confirm, male colonists were often expected to supply their own firearms to form a civilian army for the collective defense of the colonies. *See* App.2-13, 75-185. Fail to keep the required arms in their homes, and they would face fines. *See id.*

Firearms bans that extend into law-abiding citizens' homes thus forbid the very conduct that Founding-era statutes required. Governments today seek to extinguish widely popular semiautomatic rifles. But those very rifles in times of unexpected conflict and arms shortages could be used by civilian forces for the common defense of the country, just as muskets and carbines used by colonists centuries ago.[3] Civilians' proficiency with such arms, moreover, would carry over to proficiency with military-issued weapons. *See* Robert Leider, *Deciphering the "Armed Forces of the United States,"* 57 Wake Forest L. Rev. 1195, 1279 (2022) (explaining how the right to keep and bear arms ensures that non-active duty citizens "can stay proficient with arms in peacetime so that they can use them effectively in wartime,"

---

[3] *See* Ex. 5 to Reply in Support of Preliminary Injunction ¶82, *Herrera v. Raoul*, No. 1:23-cv-00532 (N.D. Ill); Ex. 1 to Reply in Support of Preliminary Injunction at 2-13, *id.*

including any "wartime emergencies that require an immediate expansion of the Armed Forces without time to retool civilian industry for wartime arms production"). The arms banned by Appellees' laws are the modern-day version of the minuteman's musket—arms that in another era would have been *required* to have been kept in American homes. *See Miller*, 307 U.S. at 178; *see also Heller*, 554 U.S. at 636 (Stevens, J., dissenting) ("it is equally clear that [Second Amendment] *does* encompass the right to use weapons for certain military purposes").

### B.    Laws regulating Bowie knives and other weapons carried in public do not support banning rifles at home.

To demonstrate a historical tradition supporting the governments' rifle bans, the court below cited 19th- and 20th-century laws that regulated Bowie knives and similar weapons *outside* the home. *See Bevis*, 2023 WL 2077392, at *10-11. These laws fail *Bruen*'s historical tradition test for three reasons.

***First***, none of the laws cited by the district court banned such weapons *at home*. *See id.* Those law restrict *public* conduct—mostly the concealed carry of Bowie knives, pistols, and other small arms. They are not "relevantly similar" to laws that ban citizens from owning and possessing modern semiautomatic rifles at home. *See Bruen*, 142 S. Ct. at 2132-33. Indeed, many historical statutes regulating Bowie knives contained express exceptions for using those weapons for self-defense at home:

-   An 1881 Arkansas law prohibited carrying bowie knives, swords, or other weapons but expressly permitted carrying such weapons while "on a journey, and on his premises." *See McDonald*, 102 S.W. at 703.

-   An 1881 Nebraska law prohibited "carry[ing]" certain weapons "concealed" with an express exception "for the defense of his person, property or family." Guy Ashton Brown, *The Compiled Statutes of the State of Nebraska, Comprising All Laws of a General Nature in Force July 1, 1881* 666 (1881).

- An 1882 West Virginia law prohibited "carry about his person" of certain arms but added "nothing herein contained shall be so construed as to prevent any person from keeping or carrying" such weapons "about his dwelling house or premises," or "from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done…." 1882 W. Va. Acts 421-22, § 7.

As these laws confirm, governments did not ban classes of arms in American homes even by the late-19th century.[4] Governments cannot now use them to justify their efforts to ban modern rifles today.

**Second**, many such laws are too recent to establish a historical tradition. With the lone exception of New York's "anti-club" law, the laws regulating Bowie knives, billy clubs, and slungshots that were enacted between 1837 and 1923. *See Bevis*, 2023 WL 2077392, at *10-11. These statutes, enacted so many years after the Bill of Rights, can only be "treated as mere confirmation of what" earlier evidence "'already … establish[es].'" *Bruen*, 142 S. Ct. at 2136-2137 (courts may not give "postenactment history more weight than it can rightly bear"); *id.* at 2147 n.22 (rejecting "statute enacted … nearly 70 years after the ratification of the Bill of Rights"); *id.* at 2154 (rejecting "late-19th century" evidence). They are inconsistent with an historical tradition that required keeping certain arms at home. And they are not analogous, restricing automatic weapons or "machine guns," not semiautomatic weapons. *See,*

---

[4] The historical examples of arms restrictions extending into the home were unconstitutionally discriminatory statutes perpetuating the unlawful disarmament of Native Americans, Black Americans, and others based on race or religion. *See* App.16-19, 197-228 (examples of unconstitutional statutes disarming groups of individuals by race or religion).

*e.g.*, App.56-73, 469-559; *see also Staples*, 511 U.S. at 603, 611-12 (distinguishing between banned automatic weapons and commonly owned semiautomatic weapons).

***Third***, it is questionable whether the Bowie knife restrictions were even "perceived" to be "legal[]" at the time. *Bruen*, 142 S. Ct. at 2155; *see* David B. Kopel, *Knives and the Second Amendment*, 47 U. Mich. J. L. Reform 167, 186-190 (2013). The district court stated that such laws were "uniformly upheld," *Bevis*, 2023 WL 2077392, at *11, but they were not. The Court of Appeals of Kentucky invalidated an act proscribing the concealed carry of "a pocket pistol, dirk, large knife, or sword in a cane." *Bliss v. Commonwealth*, 12 Ky. 90, 90, 93-94 (Ky. 1822). Likewise, the Supreme Court of Georgia explained that prohibitions "against bearing arms *openly*"—including Bowie knives—are unconstitutional and "*void*." *Nunn*, 1 Ga. at 251. And the Supreme Court of Texas affirmed that the "right to carry a bowie-knife for lawful defense is secured," despite being "an exceeding[ly] destructive weapon." *Cockrum v. State*, 24 Tex. 394, 402 (1859).

### C.   There is no historical tradition of banning "particularly dangerous weapons" in the home.

Nor can Appellees' rifle bans be justified by a purported historical tradition regulating "particularly dangerous weapons." *Bevis*, 2023 WL 2077392, at *12-14. There is no such tradition relevant here. While governments may prohibit the carrying of certain "dangerous and unusual weapons" outside the home—dating back to the common-law offense of affray—they have no power to ban weapons that are in "common use" for lawful purposes today, *Bruen*, 142 S. Ct. at 2143, and especially not in the home, *Heller*, 554 U.S. at 628.

20

The term "dangerous and unusual" arms traces back to a historical tradition of regulating certain weapons *outside the home*, not banning commonly owned firearms *inside the home*. *See Heller*, 554 U.S. at 627; *Bruen*, 142 S. Ct. at 2143. Citing Blackstone and other Founding-era sources, *Heller* identified a "historical tradition of prohibiting *the carrying* of 'dangerous and unusual weapons.'" 554 U.S. at 627 (emphasis added). Blackstone and others were describing the common-law offense of affray—*i.e.*, "[t]he offense of *riding* or *going armed*, with dangerous or unusual weapons" or "dangerous and unusual weapons,"[5] which "is a crime against the *public peace*, by terrifying the good people of the land." 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (1769) (hereinafter Blackstone) (second emphasis added). The common-law tradition of prohibiting menaces from going into public ("riding or going armed") to "terrify[]" the public offers no support for modern laws

---

[5] Both "dangerous *and* unusual weapons" and "dangerous *or* unusual weapons" appear in other 18th-century legal treatises summarizing English law. *See, e.g.*, 1 Hawkins, *A Treatise of the Pleas of the Crown* 266 (1777); 4 Blackstone 148–149; 3 Wood, *An Institute of the Laws of England* 430 (1754). Different treatises use different conjunctions. *Compare* 1 Hawkins 266 *and* 3 Wood 453 ("and"), *with* 4 Blackstone 149 ("or"). Read in context, the phrase refers to a unified concept, akin to a term of art, to describe a class of weapons that would implicate the common-law offense of affray. "[C]ommon weapons" would not implicate that common-law offense. *See* "Affray," 1 T. Cunningham, *A New and Complete Law Dictionary* (1764); *accord Caetano*, 577 U.S. at 417 (Alito, J., concurring) (weapons must be not just "dangerous" but also "unusual"). The treatises' authors use the phrase to describe the Statute of Northampton, a 14th-century law that codified a special application of that common-law offense of affray. *See* 2 Edw. III c. 3 (1328); *see also Bruen*, 142 S. Ct. at 2139-42. The Statute of Northampton and other similar statutes proscribed certain conduct in public, not a class of arms at home. *See, e.g.*, *State v. Huntly*, 25 N.C. 418, 422-23 (1843) (carrying with "wicked purpose"); *O'Neil v. State*, 16 Ala. 65, 67 (1849) (similar).

that would forbid law-abiding citizens from keeping particular firearms *inside their home*.

But here, because modern semiautomatic rifles like the AR-15 are "in common use" for lawful purposes, they are not "dangerous and unusual" *by definition. See Bruen*, 142 S. Ct. at 2143 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today."). At common law, the class of "dangerous and unusual" or "dangerous or unusual" weapons, depending on the treatise, was distinct from "common weapons." As to the latter, there was no common-law proscription of "wearing *common weapons*, or having their usual number of attendants with them, for their ornament or defence." 1 Richard Burn, *Justice of Peace and Parish Officer* 15-16 (1st ed. 1762) (emphasis added); Ex. 1 at 14-15 (No. 4). *Heller* and *Bruen* confirmed this common-law understanding. *See Bruen*, 142 S. Ct. at 2143 ("[*Heller* explained] that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' *as opposed to* those that 'are highly unusual in society at large.'" (emphasis added)); *Heller*, 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."); *accord Miller*, 307 U.S. at 178-79 (distinguishing short-barreled shotgun from militia weapons as "in common use").

There can be no doubt that modern semiautomatic rifles like the AR-15 are in common use by law abiding citizens and thus cannot be regulated as "dangerous and

unusual" arms.[6] Between 1990 to 2018, nearly 20 million semiautomatic rifles were sold in the United States, with almost 2 million sold in the 2018 alone.[7] Their popularity has only grown. Updated numbers from the Congressional Research Service show that in 2020 alone, "2.8 million … AR- or AK-type rifles" "were introduced into the U.S. civilian gun stock." *See* Cong. Rsch. Svc., *House-Passed Assault Weapons Ban of 2022* (H.R. 1808), at 2 (Aug. 4, 2022).[8] In 2022, the Bureau of Alcohol, Tobacco, Firearms, and Explosives acknowledged that "the AR-15-type rifle" is "one of the most popular firearms in the United States," including "for civilian use." 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022). With respect to magazines, those with a capacity of 11 or more rounds are also commonly owned: about 71 million pistol magazines and about 90 million rifle magazines.[9]

---

[6] Tellingly, before *Bruen* it seemed beyond dispute that AR-15-style semiautomatic rifles were in common use. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255-56 (2d Cir. 2015) ("This much is clear: Americans own millions of the firearms that the challenged legislation prohibits" and "[t]he same is true of large-capacity magazines."); *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) (collecting cases and concluding "it is beyond dispute from the record before us, which contains much of the same evidence cited in the aforementioned decisions, that law-abiding citizens commonly possess semi-automatic rifles such as the AR-15."), *on reh'g en banc* 849 F.3d 114, 141 (4th Cir. 2017) (not disagreeing that arms were "sufficiently popular" but concluding they were still too "violent or dangerous"), *en banc opinion abrogated by Bruen*, 142 S. Ct. 2111; *Heller II*, 670 F.3d at 1261 (finding it "clear enough" that "semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use'"); *Miller*, 542 F. Supp. 3d at 1022 & n.32; *see also Staples v. United States*, 511 U.S. 600, 603, 611-12 (1994) ("widely accepted as lawful possessions").

[7] *See* NSSF, *Firearm Production in the United States* at 7 (2020), https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf.

[8] Available at https://crsreports.congress.gov/product/pdf/IF/IF12174.

[9] NSSF Report, *supra*, at 7.

A government cannot ban such arms from the home. Dangerousness alone is not enough to prohibit constitutionally protected conduct or "those closely related acts necessary to their exercise." *Luis*, 578 U.S. at 26 (Thomas, J., concurring). Because all firearms have the potential to be lethal, "virtually every covered arm would qualify as 'dangerous'" and nothing would be protected if dangerousness alone could ban an arm. *Caetano*, 577 U.S. at 418 (Alito, J., concurring). It is thus incorrect that "particularly 'dangerous' weapons are unprotected." *Bevis*, 2023 WL 2077392, at *9. The Court in *Heller* concluded that banning handguns in homes was unconstitutional over Justice Breyer's dissent that emphasized gun crime and the particular dangerousness of handguns. 554 U.S. at 634; *id.* at 694-95 (Breyer, J., dissenting) (pistols were "7 times more likely to be lethal than a crime committed with any other weapon" (quotation marks omitted)). And as Justice Alito explained in his *Caetano* concurrence, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." 577 U.S. at 418.

So too here: millions of modern rifles are in circulation and are commonly used for lawful purposes, so arguments about their relative dangerousness cannot justify a complete ban on such arms in the home. *See Bruen*, 142 S. Ct. at 2143. But here, the district court focused on what is statistically a small number of murderers who misuse AR-15s in "mass shootings, police killings, and gang activity." *Bevis*, 2023 WL 2077392, at *15. Mass shootings are horrific events. They are also exceedingly rare.[10]

---

[10] *See* Ex. 4 to Reply in Support of Preliminary Injunction ¶¶12-65, *Herrera v. Raoul*, No. 1:23-cv-00532 (N.D. Ill.). Of homicide deaths, only one-tenth of one percent are killed in "gun massacres." *Id.* ¶14. Put another way, the probability of dying in a

Letting that criminal behavior justify bans on commonly owned weapons would amount to a heckler's veto. *See Miller*, 542 F. Supp. 3d at 1039; *see also McDonald*, 561 U.S. at 780 (Second Amendment is not "a second-class right, subject to an entirely different body of rules"). Even with millions of AR-15 rifles in circulation, there are not millions of instances of those arms being used for unlawful purposes. The Second Amendment thus forbids states from banning these commonly owned firearms that law-abiding citizens "prefer," *Heller*, 554 U.S. at 629, even those that are also "the overwhelmingly favorite weapon of armed criminals" intent on doing harm, *id.* at 682 (Breyer, J., dissenting) (discussing handgun violence). The government cannot deprive the "constitutional privilege" of law-abiding citizens by pointing to the acts of "cowardly and dishonorable" criminals. *Wilson*, 33 Ark. at 560. Those "evil[s] must be prevented by the penitentiary and gallows," *id.*, not by banning the country's most commonly owned rifles and magazines from law-abiding Americans' homes.

## CONCLUSION

For the foregoing reasons, the judgment below should be reversed with instructions to preliminarily enjoin the unconstitutional laws.

---

gun massacre is about 1 in 9 million, or 1/8th the risk of being killed by a bolt of lightning. *Id.* ¶15.

Dated: April 11, 2023

Gene P. Hamilton
Reed D. Rubinstein
Michael Ding
AMERICA FIRST LEGAL FOUNDATION
611 PENNSYLVANIA AVE. SE, SUITE 231
Washington, DC 20003
Tel: (202) 964-3721
gene.hamilton@aflegal.org
reed.rubinstein@aflegal.org
michael.ding@aflegal.org

Gregory Abbott Bedell
KNABE & BEDELL
33 North Dearborn St., 10th Fl.
Chicago, Illinois 60602
(312) 997-9119
gbedell@kkbchicago.com

Respectfully submitted,

  /s/ Taylor A.R. Meehan
Thomas R. McCarthy
Jeffrey M. Harris
Taylor A.R. Meehan
Matt Pociask
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
Tel: (703) 243-9423
tom@consovoymccarthy.com
jeff@consovoymccarthy.com
taylor@consovoymccarthy.com
matt@consovoymccarthy.com

*Counsel for Amicus Curiae Dr. Javier Herrera*

26

**CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 29(a)(5) and Cir. R. 29 because it contains 6,922 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) and Cir. R. 32 because it has been prepared in 12-point Century Schoolbook font. This brief has been scanned for viruses and is virus-free.


Dated: April 11, 2023                    */s/ Taylor A.R. Meehan*

                                         Counsel for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I filed a true and correct copy of this brief with the Clerk of this Court via the

CM/ECF system, which will notify all counsel.


Dated: April 11, 2023                    _/s/ Taylor A.R. Meehan_

                                         Counsel for *Amicus Curiae*