No. 23-1353

# In the
# United States Court of Appeals
# for the Seventh Circuit

◆

NATIONAL ASSOCIATION FOR GUN RIGHTS, et al.,

*Plaintiffs-Appellants,*

v.

CITY OF NAPERVILLE, ILLINOIS, et al.,

*Defendants-Appellees,*

and

THE STATE OF ILLINOIS,

*Intervening-Appellee.*

◆

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division
Case No. 1:22-cv-04775

◆

**BRIEF OF *AMICI CURIAE* FIREARMS POLICY COALITION
AND FPC ACTION FOUNDATION IN SUPPORT
OF APPELLANTS AND REVERSAL**

◆

JOSEPH G.S. GREENLEE
FPC ACTION FOUNDATION
5550 Painted Mirage Rd., Ste. 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org
*Counsel for Amici Curiae*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Firearms Policy Coalition and FPC Action Foundation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

FPC Action Foundation

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        Firearms Policy Coalition (None); FPC Action Foundation (None)

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        Firearms Policy Coalition (None); FPC Action Foundation (None)

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Joseph G.S. Greenlee    Date: 04/12/2023

Attorney's Printed Name:  Joseph G.S. Greenlee

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** [✔]  **No** [ ]

Address:  5550 Painted Mirage Rd., Ste. 320

Las Vegas, NV 89149

Phone Number: (916) 517-1665    Fax Number:  (970) 824-1068

E-Mail Address: jgreenlee@fpclaw.org

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................ii

STATEMENT OF INTEREST ...................................................1

SUMMARY OF ARGUMENT ....................................................3

ARGUMENT ................................................................................5

   I.   *Heller* conducted the *Bruen* test for arms prohibitions and held that common arms cannot be banned.............................................5

  II.  Because repeating arms have existed since the Founding, any historical analysis should be limited to traditional regulations on repeating arms—not Bowie knives or other dissimilar weapons. .......................................................................8

 III. Repeating arms with greater than 10-round capacities predate the Second Amendment and were overwhelmingly popular by the Fourteenth Amendment, and were never banned. .................9

      A.   Repeating arms were invented around 1500, and repeating arms capable of firing more than 10 rounds existed by 1580...10

      B.   Repeating arms gained popularity in England during the 17th century, including some with 30-round magazines..........12

      C.   American colonists began manufacturing repeating arms in the mid-1600s and the Founders embraced repeaters capable of firing more than 10 consecutive rounds. ...............................16

      D.   Repeating arms with greater than 10-round capacities became the most popular arms in the 19th century.................22

CONCLUSION .......................................................................31

CERTIFICATE OF COMPLIANCE........................................32

CERTIFICATE OF SERVICE..................................................33

# TABLE OF AUTHORITIES

## Cases

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) ............................................................... 6, 7

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................... *passim*

*Friedman v. City of Highland Park, Ill.*,
  577 U.S. 447 (2015) ................................................................ 7

*Gamble v. United States*,
  139 S. Ct. 1960 (2019) ........................................................... 9

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022) ............................................... *passim*

*United States v. Miller*,
  307 U.S. 174 (1939) ............................................................ 5, 6

## Other Authorities

*16-Shot Wheel Lock*, AMERICA'S 1ST FREEDOM, May 10, 2014 ............... 11

*A New Gun Patent*, ATHENS (TENN.) POST, Feb. 25, 1853 ...................... 25

Antaris, Leonardo M., *In the Beginning: Semi-Automatic Pistols
  of the 19th Century*, AMERICAN RIFLEMAN, Jan. 4, 2018 .................... 30

Bresnan, Andrew L., *The Henry Repeating Rifle*,
  RAREWINCHESTERS.COM, Aug. 17, 2007 ............................................. 27

Brown, M.L., FIREARMS IN COLONIAL AMERICA: THE IMPACT ON
  HISTORY AND TECHNOLOGY, 1492–1792 (1980) ................................... 10

Chapel, Charles Edward, GUNS OF THE OLD WEST (1961) ............... 16, 25

Cleveland, H.W.S., HINTS TO RIFLEMEN (1864) ...................................... 27

Demeritt, Dwight, MAINE MADE GUNS & THEIR MAKERS
(rev. ed. 1997).......................................................................28

Dougherty, Martin, SMALL ARMS VISUAL ENCYCLOPEDIA
(2011)............................................................. 14, 20, 29

Dunlap, Jack, AMERICAN BRITISH & CONTINENTAL PEPPERBOX
FIREARMS (1964) .................................................................24

Flayderman, Norm, FLAYDERMAN'S GUIDE TO ANTIQUE
AMERICAN FIREARMS AND THEIR VALUES (9th ed. 2007) .... 24, 25, 28, 29

Foley, Vernard, *Leonardo and the Invention of the Wheellock*,
SCIENTIFIC AM., Jan. 1998 ...................................................13

Gallay, Alan, COLONIAL WARS OF NORTH AMERICA, 1512–1763
(2015)...................................................................................16

Garavaglia, Louis A. & Worman, Charles G., FIREARMS OF THE
AMERICAN WEST 1866–1894 (1985)......................................27

Garry, James B., WEAPONS OF THE LEWIS AND CLARK EXPEDITION
(2012).........................................................................20, 21

Greener, W.W., THE GUN AND ITS DEVELOPMENT (9th ed. 1910)...........10

Johnson, Nicholas et al., FIREARMS LAW AND THE SECOND
AMENDMENT: REGULATION, RIGHTS, AND POLICY (3d ed. 2021)...........13

Lamb, Roger, AN ORIGINAL AND AUTHENTIC JOURNAL OF
OCCURRENCES DURING THE LATE AMERICAN WAR (1809).....................20

Letter from Joseph Belton to the Continental Congress
(Apr. 11, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS,
COMPILED 1774–1789 (1957)................................................19

Letter from Joseph Belton to the Continental Congress
(July 10, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS,
COMPILED 1774–1789 (1957)................................................19

Lewis, Meriwether & Clark, William, THE JOURNALS OF THE LEWIS
& CLARK EXPEDITION (Gary Moulton ed., 1983) .................................22

McClure, Nancy, *Treasures from Our West: Lukens Air Rifle*, BUFFALO BILL CENTER FOR THE AMERICAN WEST, Aug. 3, 2014................................................................................21, 22

Meyer, David R., NETWORKED MACHINISTS: HIGH-TECHNOLOGY INDUSTRIES IN ANTEBELLUM AMERICA (2006).........................................23

*Model 1892 Rifles and Carbines*, WINCHESTER REPEATING ARMS ..........29

Mouret, Jean-Noel, PISTOLS AND REVOLVERS (1993) ...............................30

*National Museum of American History*, SMITHSONIAN INSTITUTION ARCHIVES ..............................................................................................18

*Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822 ...............23

Niles, Samuel, *A Summary Historical Narrative of the Wars in New England*, *in* MASSACHUSETTS HISTORICAL SOCIETY COLLECTIONS, 4th ser., vol. 5 (1837)..........................................................................17

Peterson, Harold L., ARMS AND ARMOR IN COLONIAL AMERICA (1956).................................................................................... 10, 15, 18

Peterson, Harold L., THE TREASURY OF THE GUN (1962).................*passim*

Pirkle, Arthur, WINCHESTER LEVER ACTION REPEATING FIREARMS: THE MODELS OF 1866, 1873 & 1876 (2010)...........................................28

Plaster, John, THE HISTORY OF SNIPING AND SHARPSHOOTING (2008) ....21

Prenderghast, Gerald, REPEATING AND MULTI-FIRE WEAPONS (2018)....21

Report of the Continental Congress (May 3, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789 (Worthington Chauncey Ford ed., 1907) .............................................19

Report of the Continental Congress (May 15, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789 (Worthington Chauncey Ford ed., 1907) .............................................19

Sawyer, Charles Winthrop, FIREARMS IN AMERICAN HISTORY (1910).....16

*Springfield Armory Museum – Collection Record*, Rediscov.com .........30

Supica, Jim, et al., Treasures of the NRA National
   Firearms Museum (2013).......................................................21, 24, 30

*The Cookson Gun and the Mortimer Pistols*, American Rifleman,
   vol. 63 (Sep. 29, 1917) ..........................................................18

The Diary of Samuel Pepys (Henry B. Wheatley ed., 1893) ...............14

The London Magazine, Jan–June, 1829, vol. 3 (3d ser., 1829) ...........11

Tilloch, Alexander, The Philosophical Magazine and Journal:
   Comprehending the Various Branches of Science, the Liberal
   and Fine Arts, Geology, Agriculture, Manufactures, and
   Commerce (Richard Taylor ed., 1822) .................................................23

U.S. Navy SEAL Sniper Training Program (2011)..............................29

Walter, John, Rifles of the World (3rd ed. 2006)...............................29

Walton, Clifford, History of the British Standing Army. A.D.
   1660 to 1700 (1894) ..............................................................14

Williamson, Harold F., Winchester: The Gun that Won the
   West (1952)..........................................................................25

Wilson, R.L., Winchester: An American Legend (1991).........26, 27, 28

Winant, Lewis, Firearms Curiosa (1955) ...........................11, 23, 24, 25

Winant, Lewis, Pepperbox Firearms (1952) ........................................24

## STATEMENT OF INTEREST

**Firearms Policy Coalition (FPC)** is a nonprofit organization devoted to advancing individual liberty and defending individual rights, including those protected by the Constitution. FPC accomplishes its mission through legislative, regulatory, legal, and grassroots advocacy, education, and outreach programs. FPC Law is the nation's first and largest public interest legal team focused on the right to keep and bear arms and adjacent rights, and the leader in the Second Amendment litigation and research space.

**FPC Action Foundation (FPCAF)** is a nonprofit organization dedicated to restoring human liberty and protecting the rights enshrined in the Constitution. FPCAF conducts charitable research, education, public policy, and legal programs. The scholarship and *amicus* briefs of FPCAF's Director of Constitutional Studies, Joseph Greenlee, have been cited in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022); *Chiafalo v. Washington*, 140 S. Ct. 2316, 2325 (2020); and *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., dissenting).

## CONSENT TO FILE

All parties consented to the filing of this brief.[1]

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund the preparation or submission of this brief. No person other than *Amici* and their members contributed money intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The Supreme Court applied its Second Amendment test to a handgun ban and held that bans on common arms violate the Second Amendment. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court applied the test it later articulated in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). First, analyzing the Second Amendment's plain text, the *Heller* Court determined that the Second Amendment extends, prima facie, to all bearable arms. Next, analyzing the nation's historical tradition of firearm regulation, the Court determined that while dangerous and unusual arms may be banned, a ban on common arms violates the Second Amendment. Because handguns are common, the Court held the handgun ban unconstitutional.

Since the *Heller* Court already conducted the *Bruen* test for arms prohibitions, the Court's test is binding and there is no need to conduct the analysis anew. Rather, the pertinent question here is whether the banned arms are common. Indeed, Appellants' evidence proves they are, as millions of Americans own over 20 million of the banned rifles and over 150 million of the banned magazines. Supreme Court precedent therefore requires that the bans be held unconstitutional.

If this Court does conduct a historical analysis, only traditional regulations on repeating arms should be considered. Just as the *Bruen* Court considered only historical regulations on the carrying of handguns—not Bowie knives or other non-handguns—in considering a modern-day restriction on the carrying of handguns, only historical regulations on repeating arms may be relevant to the bans challenged here.

Repeating arms have existed for half a millennium, and predate the Second Amendment by nearly three centuries. Repeating arms with a capacity greater than 10-rounds existed by 1580, and predate the Second Amendment by over two centuries. Despite continuous technological advancements over hundreds of years and widespread popularity once they became affordable, traditionally, repeating arms—including those with greater than 10-round capacities—were never banned in America. Therefore, the challenged bans are inconsistent with the nation's tradition of firearm regulation and violate the Second Amendment.

## ARGUMENT

**I.   *Heller* conducted the *Bruen* test for arms prohibitions and held that common arms cannot be banned.**

The Supreme Court applied its Second Amendment test to a handgun ban in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and held that bans on common arms violate the Second Amendment.

The *Heller* Court conducted the test later articulated in *N.Y. State Rifle & Pistol Ass'n v. Bruen*:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

142 S. Ct. 2111, 2129–30 (2022).

Analyzing "Arms" in the Amendment's plain text, the *Heller* Court determined that "[t]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582.

Moving next to the nation's tradition of firearm regulation, the Court held that common arms are protected and cannot be banned. Historically, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Therefore,

"the sorts of weapons protected were those 'in common use at the time.'" *Id.* at 627 (quoting *Miller*, 307 U.S. at 179). As for regulations on particular arms, the Court identified "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* This traditional regulation "fairly supported" protection for common arms because common arms are necessarily not dangerous *and unusual. Id.*; *see also Bruen*, 142 S. Ct. at 2143 ("Drawing from this historical tradition, we explained [in *Heller*] that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'") (quoting *Heller*, 554 U.S. at 627).

Concluding that the nation's tradition of firearm regulation allows only dangerous and unusual arms to be banned, and that handguns—as "the most popular weapon chosen by Americans," *Heller*, 554 U.S. at 629—are common, the *Heller* Court held that "a complete prohibition of their use is invalid," *id.*

The concurrence in *Caetano v. Massachusetts* later confirmed this approach: "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the

country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment." 577 U.S. 411, 420 (2016) (Alito, J., joined by Thomas, J., concurring).

Thus, for arms prohibitions, "the pertinent Second Amendment inquiry is whether [the arms] are commonly possessed by law-abiding citizens for lawful purposes today." *Id.* (Alito, J., joined by Thomas, J., concurring) (emphasis omitted). "Under [the Court's] precedents, that [arms are commonly owned for lawful purposes] is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Friedman v. City of Highland Park, Ill.*, 577 U.S. 447, 136 S. Ct. 447, 449 (2015) (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari).

Here, Appellants have demonstrated that millions of Americans own over 20 million of the banned rifles and over 150 million of the banned magazines. ECF No. 50-3 ¶¶ 6–7. The banned arms are thus common and "a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629.

II.   **Because repeating arms have existed since the Founding, any historical analysis should be limited to traditional regulations on repeating arms—not Bowie knives or other dissimilar weapons.**

Because the *Heller* Court already conducted the *Bruen* test for arms prohibitions, this Court is bound by *Heller*'s holding and need not conduct the analysis anew. If the Court does conduct a historical analysis, however, the analysis should consider only traditional regulations on repeating arms. Indeed, the *Bruen* Court, in considering a modern-day restriction on the carrying of handguns, considered only historical regulations on the carrying of *handguns*. The Court did not consider any laws regulating the carrying of Bowie knives, slungshots, dirks, daggers, brass knuckles, razors, or any other non-handgun for which carry was historically restricted.

As the following historical analysis shows, repeating arms predate the Second Amendment by three centuries. And those capable of firing over 10 consecutive rounds predate the Second Amendment by two centuries. The Continental Congress embraced 16-shot repeating arms, the state-of-the-art as of 1791 was a 22-shot rifle, and by 1868, the 16-shot Henry Rifle and the 18-shot Winchester Model 1866 were overwhelmingly popular. Also by 1868, Americans had seen 24-barreled pistols, 12-

chambered rifles, 21-shot revolvers, 20-round belt-fed chain pistols, 42-shot Ferris Wheel pistols, and rifles capable of firing 60 shots in 60 seconds. By the end of the 19th century, semiautomatics were on the market. Thus, repeating arms were well-known throughout American history, and any analogy to nonrepeating arms is inappropriate here.[2]

### III. Repeating arms with greater than 10-round capacities predate the Second Amendment and were overwhelmingly popular by the Fourteenth Amendment, and were never banned.

Repeating arms—arms capable of firing multiple times without reloading—have existed for half a millennium, and predate the Second Amendment by nearly three centuries. Repeating arms with a capacity greater than 10-rounds existed by 1580, and predate the Second

---

[2] To be sure, while this brief's historical analysis covers all the historical periods reviewed by *Bruen*, the original 1791 understanding of the Second Amendment controls. *See Heller*, 554 U.S. at 625 (concluding with "our adoption of the original understanding of the Second Amendment"); *Bruen*, 142 S. Ct. at 2132 (the Second Amendment's "meaning is fixed according to the understandings of those who ratified it"); *id.* at 2136 ("'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*'") (quoting *Heller*, 554 U.S. at 634–35) (emphasis *Bruen*'s). Historical evidence from beyond the Founding Era may be used to confirm Founding-Era evidence. *See id.* at 2137 ("19th-century evidence [i]s 'treated as mere confirmation of what . . . ha[s] already been established'") (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019)).

Amendment by over two centuries. Despite continuous technological advancements over hundreds of years and widespread popularity in the 19th century, traditionally, repeating arms were never banned in America.

### A. Repeating arms were invented around 1500, and repeating arms capable of firing more than 10 rounds existed by 1580.

"The desire for . . . repeating weapons is almost as old as the history of firearms, and there were numerous attempts to achieve this goal, beginning at least as early as the opening years of the 16th century." Harold L. Peterson, ARMS AND ARMOR IN COLONIAL AMERICA 215 (1956).

The first known repeating firearms were 10-shot matchlock arquebuses invented between 1490 and 1530. "The cylinder was manually rotated around a central axis pin." M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY, 1492–1792, at 50 (1980). King Henry VIII (reigned 1509–1547) owned a similar firearm.[3]

Henry VIII also owned a multi-shot combination weapon called the Holy Water Sprinkler. "It is a mace with four sperate steel barrels, each

---

[3] W.W. Greener, THE GUN AND ITS DEVELOPMENT 81–82 (9th ed. 1910).

9" long. These barrels are formed into a wooden cylinder held with four iron bands, two of which have six spikes each." Lewis Winant, FIREARMS CURIOSA 14 (1955). These German-made weapons became known as "Henry VIII's walking staff," because "with it, he is represented to have traversed the streets at night, to see that the city-watch kept good order." 3 THE LONDON MAGAZINE, JAN–JUNE, 1829, at 46 (3d ser., 1829).

The first known repeater capable of firing more than 10 shots was invented around 1580; it could consecutively fire 16 superimposed rounds in Roman candle fashion[4]—meaning with each round stacked on top of another and that the user "could not stop the firing once he had started it." Winant, FIREARMS CURIOSA, at 166.

A similar firearm was patented in England in 1682 by Charles Cardiff. Cardiff's patent protected "an Expedient with Security to make Musketts, Carbines, Pistolls, or any other small Fire Armes to Discharge twice, thrice, or more severall and distincte Shotts in a Singell Barrell and Locke with once Primeing." *Id.* at 167.

---

[4] *16-Shot Wheel Lock*, AMERICA'S 1ST FREEDOM, May 10, 2014, http://bit.ly/2tngSDD; *see also* Winant, FIREARMS CURIOSA, at 168–70.

These Roman candle-style firearms were innovative, but they were no match for the magazine-fed arms that had gained popularity by the mid-17th century. Unlike the Roman candle-style arms, the magazine-fed repeaters, discussed next, allowed the user to fire one bullet and then pause to decide whether to fire again.

**B.   Repeating arms gained popularity in England during the 17th century, including some with 30-round magazines.**

"Successful systems [of repeating arms] definitely had developed by 1640, and within the next twenty years they had spread throughout most of Western Europe and even to Moscow." Harold L. Peterson, THE TREASURY OF THE GUN 229 (1962). "[T]he two principal magazine repeaters of the era [were] the Kalthoff and the Lorenzoni. These were the first guns of their kind to achieve success." *Id.*

"The Kalthoff repeater was a true magazine gun. In fact, it had two magazines, one for powder and one for balls. The earliest datable specimens which survive are two wheel-lock rifles made by Peter Kalthoff in Denmark in 1645 and 1646."[5] *Id.* "[T]he number of charges in the magazines ran all the way from six or seven to thirty." *Id.* at 230.

---

[5] The wheel-lock was invented by Leonardo da Vinci in the late 16th century. Vernard Foley, *Leonardo and the Invention of the Wheellock*,

Kalthoff repeaters "were undoubtedly the first magazine repeaters ever to be adopted for military purposes. About a hundred flintlock rifles of their pattern were issued to picked marksmen of the Royal Foot Guards and are believed to have seen active service during the siege of Copenhagen in 1658, 1659, and again in the Scanian War of 1675–1679." *Id.*

"Examples [of Kalthoff-type repeaters] spread throughout Europe wherever there were gunsmiths with sufficient skill and knowledge to make them, and patrons wealthy enough to pay the cost. . . . [A]t least nineteen gunsmiths are known to have made such arms in an area stretching from London on the west to Moscow on the east, and from Copenhagen south to Salzburg. There may well have been even more." *Id.*

"The Lorenzoni also was developed during the first half of the Seventeenth Century." *Id.* It was a magazine-fed Italian repeating pistol that "used gravity to self-reload." Martin Dougherty, SMALL ARMS VISUAL

---

SCIENTIFIC AM., Jan. 1998, at 96. It was superior to its predecessor, the matchlock, because it could be kept always ready for sudden use, and was more reliable. Nicholas Johnson et al., FIREARMS LAW AND THE SECOND AMENDMENT 148 (3d ed. 2021).

ENCYCLOPEDIA 34 (2011). The Lorenzonis' ammunition capacity was typically around seven shots. The gun's repeating mechanism quickly spread throughout Europe and to the colonies, and the mechanism was soon applied to rifles as well.[6]

On July 3, 1662, famed London diarist Samuel Pepys wrote about experiencing "a gun to discharge seven times, the best of all devices that ever I saw, and very serviceable, and not a bawble; for it is much approved of, and many thereof made." 4 THE DIARY OF SAMUEL PEPYS 258 (Henry B. Wheatley ed., 1893).[7]

Abraham Hill patented the Lorenzoni repeating mechanism in London on March 3, 1664.[8] The following day, Pepys wrote about "several people [] trying a new-fashion gun" that could "shoot off often, one after another, without trouble or danger, very pretty." 7 *id*. at 61. It is believed that

---

[6] Peterson, THE TREASURY OF THE GUN, at 232.

[7] Most famous for his compelling diary covering the years 1659–1669, Pepys was also a naval administrator and member of Parliament.

[8] The patent was for a "gun or pistol for small shot carrying seven or eight charges of the same in the stock of the gun." Clifford Walton, HISTORY OF THE BRITISH STANDING ARMY. A.D. 1660 TO 1700, at 337 (1894).

Pepys was referring to a Lorenzoni-style firearm in his March 4, 1664 entry,[9] and perhaps he also was in his 1662 entry.

Despite Hill's patent, "[m]any other English gunsmiths also made guns with the Lorenzoni action during the next two or three decades." Peterson, THE TREASURY OF THE GUN, at 232. Most notably, famous English gunsmiths John Cookson and John Shaw adopted the Lorenzoni action for their firearms. So did "a host of others throughout the 18th century." Peterson, ARMS AND ARMOR IN COLONIAL AMERICA, at 215.

"The Kalthoff and Lorenzoni actions . . . were probably the first and certainly the most popular of the early magazine repeaters. But there were many others. Another version, also attributed to the Lorenzoni family, boasted brass tubular magazines beneath the forestock . . . Guns of this type seem to have been made in several parts of Europe during the Eighteenth Century and apparently functioned well." Peterson, THE TREASURY OF THE GUN, at 233.

"The Lorenzoni system even found its way to America where records indicate that at least two New England gunsmiths actually manufactured such guns." *Id.* at 232.

---

[9] Peterson, THE TREASURY OF THE GUN, at 232.

### C. American colonists began manufacturing repeating arms in the mid-1600s and the Founders embraced repeaters capable of firing more than 10 consecutive rounds.

Lorenzonis were not the only repeaters manufactured in America. As of the mid-1600s, American repeaters sometimes employed a revolving cylinder that was rotated by hand.[10] "A few repeating arms were made use of in a military way in America." 1 Charles Winthrop Sawyer, FIREARMS IN AMERICAN HISTORY 28–29 (1910). For example, there is "record that [Louis de Buade de] Frontenac in 1690 astonished the Iroquois with his three and five shot repeaters."[11] *Id.* at 29.

As is often the case, the cost of the most advanced firearms precluded much of the population from owning them. But "[b]eginning about 1710 commerce brought wealth to some of the merchants in the northern

---

[10] *See, e.g.,* 2 Charles Winthrop Sawyer, FIREARMS IN AMERICAN HISTORY 5 (1939) (six-shot flintlock); Charles Edward Chapel, GUNS OF THE OLD WEST 202–03 (1961) (revolving snaphance).

[11] Frontenac was the governor of New France at the time. Frontenac's army was active in 1690, carrying out attacks against English settlements in Schenectady, New York, Fort Loyal, Maine, and Salmon Falls, New Hampshire, then defending against counterattacks, in addition to attacking the Iroquois. *See* Alan Gallay, COLONIAL WARS OF NORTH AMERICA, 1512–1763, at 240–42 (2015).

Colonies, and with other luxuries fancy firearms began to be in demand."
*Id.* at 31.

In September 1722, John Pim, a Boston gunsmith, entertained some Native Americans with a repeater he sold. "[L]oaded but once," it "was discharged eleven times following, with bullets, in the space of two minutes, each which went through a double door at fifty yards' distance." 5 Samuel Niles, *A Summary Historical Narrative of the Wars in New England*, *in* MASSACHUSETTS HISTORICAL SOCIETY COLLECTIONS, 4th ser., at 347 (1837). Pim produced other repeaters, including a "six-shot, .52 caliber snaphaunce revolver." Brown, FIREARMS IN COLONIAL AMERICA, at 257.

The most common American repeaters of the early 18th century may have been Lorenzoni variants known as Cooksons. "Many Americans call[ed] this [Lorenzoni] type of magazine repeater a Cookson because the first such gun to receive attention in this country bore the name of the English gunsmith John Cookson." Peterson, THE TREASURY OF THE GUN, at 230. Mimicking the Lorenzoni system, John Cookson of London invented the Cookson repeater in the latter half of the 17th century. *Id.* at 231–32. A Cookson repeater with a 10-round magazine, "believed to

have found its way into Maryland with one of the early English colonists," "form[ed] perhaps the capstone of the collection of arms in the National Museum at Washington, D.C."[12] *The Cookson Gun and the Mortimer Pistols*, AMERICAN RIFLEMAN, vol. 63, at 3, 4 (Sep. 29, 1917).

A Boston gunsmith also named John Cookson—possibly the same person as the English gunsmith—advertised a 9-shot repeater in the *Boston Gazette* on April 12 and again on April 26, 1756, explaining that the rifle was,

> made by John Cookson and to be sold at his house in Boston: a handy gun . . . having a Place convenient to hold 9 Bullets, and Powder for 9 Charges and 9 Primings; the said gun will fire 9 Times distinctly, as quick, or as slow as you please . . . .

Peterson, ARMS AND ARMOR IN COLONIAL AMERICA at 215. "Thus this type of repeating flintlock popular in England from the third quarter of the 17th century, was known and manufactured in Massachusetts early in the 18th century." *Id.*

---

[12] "The US National Museum ceased to exist as an administrative entity in 1967, and at that time the National Museum of History and Technology became a separate museum within the [Smithsonian] Institution." *National Museum of American History*, SMITHSONIAN INSTITUTION ARCHIVES, https://siarchives.si.edu/history/national-museum-american-history (last visited Apr. 11, 2023).

In 1777, the Continental Congress ordered one hundred rifles from Joseph Belton,[13] who had informed the Congress that his rifles could "discharge sixteen, or twenty [rounds], in sixteen, ten, or five seconds." Letter from Joseph Belton to the Continental Congress (Apr. 11, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774–1789, at 123 (1957). Belton demonstrated one such rifle before leading military officers—including General Horatio Gates and Major General Benedict Arnold—and scientists—including David Rittenhouse—who verified that "[h]e discharged Sixteen Balls loaded at one time." Letter from Joseph Belton to the Continental Congress (July 10, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774–1789, at 139.

Ultimately, the deal fell through when Belton demanded what the Congress deemed "an extraordinary allowance." Report of the Continental Congress (May 15, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 361. But the exchange between Belton and the Continental Congress nevertheless proves that the Founders knew about and embraced repeating arms capable of firing

---

[13] Report of the Continental Congress (May 3, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 324 (Worthington Chauncey Ford ed., 1907).

more than 10 consecutive rounds prior to the ratification of the Second Amendment.

The British similarly recognized the advantage of repeaters, employing the Ferguson Rifle during the Revolutionary War, which "fired six shots in one minute" in a government test on June 1, 1776. Roger Lamb, AN ORIGINAL AND AUTHENTIC JOURNAL OF OCCURRENCES DURING THE LATE AMERICAN WAR 309 (1809).

The Nock volley gun was another multi-shot firearm introduced during the war. Designed for Britain's Royal Navy in 1779, it had seven barrels (six outer barrels around a center barrel) that fired simultaneously.[14]

When the Second Amendment was ratified, the state-of-the-art repeater was the Girardoni air rifle that could consecutively shoot 21 or 22 rounds in .46 or .49 caliber by utilizing a tubular spring-loaded magazine.[15] Although an air gun, the Girardoni was ballistically equal to

---

[14] Dougherty, SMALL ARMS VISUAL ENCYCLOPEDIA, at 22–23.

[15] Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION, at 100–01.

a powder gun,[16] and powerful enough to take an elk with a single shot.[17] Indeed, at the time, "there were many gunsmiths in Europe producing compressed air weapons powerful enough to use for big game hunting or as military weapons." James B. Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 91 (2012). The Girardoni was invented for the Austrian army—1,500 were issued to sharpshooters and remained in service for 25 years, including in the Napoleonic Wars between 1796 and 1815.[18] Isaiah Lukens of Pennsylvania manufactured such rifles,[19] along with "many makers in Austria, Russia, Switzerland, England, and various German principalities." Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION, at 99.

---

[16] John Plaster, THE HISTORY OF SNIPING AND SHARPSHOOTING 69–70 (2008).

[17] Jim Supica, et al., TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

[18] Gerald Prenderghast, REPEATING AND MULTI-FIRE WEAPONS 100–01 (2018); Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION, at 91–94. As a testament to the rifle's effectiveness, "[t]here are stories that Napoleon had captured air riflemen shot as terrorists, making it hard to recruit men for the air rifle companies." *Id.* at 92.

[19] Nancy McClure, *Treasures from Our West: Lukens Air Rifle*, BUFFALO BILL CENTER FOR THE AMERICAN WEST, Aug. 3, 2014, https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/.

Meriwether Lewis is believed to have acquired from Lukens the Girardoni rifle that he famously carried on the Lewis and Clark Expedition.[20] Lewis mentioned it in his journal at least 22 times. Sixteen times, Lewis was demonstrating the rifle to impress various Native American tribes encountered on the expedition—often "astonishing" or "surprising" them,[21] and making the point that although the expedition was usually outnumbered, the smaller group could defend itself.[22]

## D. Repeating arms with greater than 10-round capacities became the most popular arms in the 19th century.

Repeating arms—including those that could fire more than 10 consecutive rounds—became some of America's most popular arms during the 19th century.[23]

---

[20] *Id.*

[21] *See e.g.*, 6 Meriwether Lewis and William Clark, THE JOURNALS OF THE LEWIS & CLARK EXPEDITION, Jan. 24, 1806 entry, at 233 (Gary Moulton ed., 1983) ("My Air-gun also astonishes them very much, they cannot comprehend it's [sic] shooting so often and without powder; and think that it is *great medicine* which comprehends every thing that is to them incomprehensible.").

[22] *See generally id.* (13 vols.).

[23] To function properly, repeaters require much closer fittings among their parts than do single-shot firearms. Through the 18th century, gun manufacture was artisanal. By the middle of the 19th century, repeaters were widely available due to a revolution in firearms manufacturing. The federal armories at Springfield, Massachusetts and Harpers Ferry,

In 1821, the *New York Evening Post* lauded New Yorker Isaiah Jennings for inventing a repeater, "importan[t], both for public and private use," whose "number of charges may be extended to fifteen or even twenty . . . and may be fired in the space of two seconds to a charge." *Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822, *in* 59 Alexander Tilloch, THE PHILOSOPHICAL MAGAZINE AND JOURNAL: COMPREHENDING THE VARIOUS BRANCHES OF SCIENCE, THE LIBERAL AND FINE ARTS, GEOLOGY, AGRICULTURE, MANUFACTURES, AND COMMERCE 467–68 (Richard Taylor ed., 1822). "[T]he principle can be added to any musket, rifle, fowling piece, or pistol" to make it capable of firing "from two to twelve times." *Id.* "About 1828 a New York State maker, Reuben Ellis, made military rifles under contract on the Jennings principle." Winant, FIREARMS CURIOSA, at 174.

---

Virginia, led an industrial revolution in mass production. Machine tools (tools that can make uniform parts), such as jigsaws for cutting wooden gun stocks, allowed firearms to be produced at a greater rate, with greater uniformity, greater quality, and lower cost. The technological advances from the federal armories were widely shared among American manufacturers. By mid-century, what had begun as the mass production of firearms from interchangeable parts had become globally known as "the American system of manufacture"—a system that encompassed sewing machines, and, eventually typewriters, bicycles, and automobiles. *See, e.g.*, David R. Meyer, NETWORKED MACHINISTS: HIGH-TECHNOLOGY INDUSTRIES IN ANTEBELLUM AMERICA 81–84, 252–62, 279–80 (2006).

In the 1830s, the popular pepperbox handguns were introduced. These pistols had multiple barrels—some as many as 24—that could fire sequentially.[24] That same decade, the Bennett and Haviland Rifle used a chain-drive system with 12 rectangular chambers—each loaded with powder and ball—to fire 12-rounds consecutively.[25]

Revolvers were also introduced in the 1830s, by Samuel Colt. They fire repeating rounds like the pepperbox, but use a rotating cylinder rather than rotating barrels.[26] A "rotary pistol"—also with a mechanically turned cylinder—was patented in 1836.[27] Pin-fire revolvers with capacities of up to 21 rounds entered the market in the 1850s.[28] So did the Walch 12-Shot Navy Revolver, with each of its six chambers holding two rounds that fired separately. It was used in the Civil War and made

---

[24] Jack Dunlap, AMERICAN BRITISH & CONTINENTAL PEPPERBOX FIREARMS 148–49, 167 (1964); Lewis Winant, PEPPERBOX FIREARMS 7 (1952).

[25] Norm Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 711 (9th ed. 2007).

[26] *See* Winant, FIREARMS CURIOSA, at 25.

[27] *Id.*

[28] Supica, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM, at 48–49; Winant, PEPPERBOX FIREARMS, at 67–70.

its way to the western frontier.[29] In 1866, the 20-round Josselyn belt-fed chain pistol made its debut. Some later chain pistols had greater capacities.[30]

Alexander Hall's rifle with a 15-round rotating cylinder was introduced in the 1850s.[31] In 1851, Parry Porter created a rifle with a 38-shot canister magazine. The Porter Rifle could fire 60 shots in 60 seconds.[32] In 1855, Joseph Enouy invented a 42-shot Ferris Wheel pistol.[33]

In 1855, an alliance between Daniel Wesson (later, of Smith & Wesson) and Oliver Winchester led to a series of famous lever-action repeating rifles. First came the 30-shot Volcanic Rifle, which an 1859 advertisement boasted could be loaded then fired 30 times within a minute.[34]

---

[29] Chapel, GUNS OF THE OLD WEST, at 188–89.

[30] Winant, FIREARMS CURIOSA, at 204, 206.

[31] Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 713, 716.

[32] *A New Gun Patent*, ATHENS (TENN.) POST, Feb. 25, 1853, http://bit.ly/2tmWUbS (reprinted from N.Y. Post); Sawyer, vol. 2, at 147.

[33] Winant, FIREARMS CURIOSA, at 208.

[34] Harold F. Williamson, WINCHESTER: THE GUN THAT WON THE WEST 26–27 (1952).

Then came the 16-shot Henry Rifle in 1861. Tested at the Washington Navy Yard in 1862, "187 shots were fired in three minutes and thirty-six seconds (not counting reloading time), and one full fifteen-shot magazine was fired in only 10.8 seconds . . . hits were made from as far away as 348 feet, at an 18-inch-square target. . . . The report noted, 'It is manifest from the above experiment that this gun may be fired with great rapidity.'" R.L. Wilson, WINCHESTER: AN AMERICAN LEGEND 11–12 (1991).[35] "Advertisements claimed a penetration of eight inches at one hundred yards, five inches at four hundred yards, and power to kill at a thousand yards." Peterson, THE TREASURY OF THE GUN, at 240.

"[F]ueled by the Civil War market, the first Henrys were in the field by mid-1862." *Id.* at 11. Indeed, one of the most famous testimonials of the Henry came from Captain James M. Wilson of the 12th Kentucky Cavalry, who used a Henry Rifle to kill seven of his Confederate neighbors who broke into his home and ambushed his family. Wilson praised the rifle's 16-round capacity: "When attacked alone by seven guerillas I found it (Henry Rifle) to be particularly useful not only in

---

[35] The earlier repeating rifles sometimes had reliability problems, but these were solved with the 1861 Henry and 1866 Winchester—and both models are still made today.

regard to its fatal precision, but also in the number of shots held in reserve for immediate action in case of an overwhelming force." H.W.S. Cleveland, HINTS TO RIFLEMEN 181 (1864). Soon after, Wilson's entire command was armed with Henry rifles.[36]

The Henry evolved into the 18-shot Winchester Model 1866, which was touted as having a capacity of "eighteen charges, which can be fired in nine seconds." Louis A. Garavaglia & Charles G. Worman, FIREARMS OF THE AMERICAN WEST 1866–1894, at 128 (1985). Another advertisement contained pictures of Model 1866 rifles underneath the heading, "Two shots a second." Peterson, THE TREASURY OF THE GUN, at 234–35.

"The Indians labeled these guns the 'many-shots' or 'heap-firing.'" Wilson, WINCHESTER: AN AMERICAN LEGEND, at 32. In 1876, Native American tribes used the Model 1866 and Henry rifles in their victory at the Battle of Little Bighorn, also known as "Custer's Last Stand." *Id.*

"One of the most popular of all Winchester arms, the Model 1866 was widely used in opening the West and, in company with the Model 1873, is the most deserving of Winchesters to claim the legend 'The Gun That

---

[36] Andrew L. Bresnan, *The Henry Repeating Rifle*, RAREWINCHESTERS.COM, Aug. 17, 2007, https://www.rarewinchesters.com/articles/art_hen_00.shtml.

Won the West.'" *Id.* at 22. Over 170,000 Model 1866s were produced. And over 720,000 Model 1873s were produced by 1919.[37] "Easily one of the most treasured endorsements of the 1873 was from Colonel William F. 'Buffalo Bill' Cody," who praised the firearm's versatility. Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 55.[38] Magazine capacity for the Model 1873 ranged from 6 to 25.[39]

The Evans Repeating Rifle, manufactured in Maine, was also introduced in 1873; its innovative rotary helical magazine held 34 rounds.[40]

Winchester's other iconic 19th-century rifles were the Model 1886, and then the Model 1892, made legendary by Annie Oakley, and later by John

---

[37] Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 306–09.

[38] *Id.* at 55.

[39] Arthur Pirkle, WINCHESTER LEVER ACTION REPEATING FIREARMS: THE MODELS OF 1866, 1873 & 1876, at 107 (2010).

[40] Dwight Demeritt, MAINE MADE GUNS & THEIR MAKERS 293–95 (rev. ed. 1997); Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 694.

28

Wayne.[41] These arms had a capacity of 15 rounds.[42] Over a million were produced from 1892 to 1941.[43]

The most famous pump-action rifle of the 19th century was the Colt Lightning, introduced in 1884. It could fire 15 rounds.[44]

The first functional semiautomatic firearm was the Mannlicher Model 85 rifle, invented in 1885.[45] Mannlicher introduced new models in 1891, 1893, and 1895.[46] Additionally, numerous semiautomatic handguns utilizing detachable magazines were introduced before the turn of the century: including the Mauser C96,[47] Bergmann Simplex,[48] Borchardt

---

[41] *Model 1892 Rifles and Carbines*, WINCHESTER REPEATING ARMS, http://bit.ly/2tn03IN (last visited Apr. 11, 2023).

[42] *Id.*

[43] Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 307–12.

[44] *Id.* at 122.

[45] U.S. NAVY SEAL SNIPER TRAINING PROGRAM 87 (2011).

[46] John Walter, RIFLES OF THE WORLD 568–69 (3rd ed. 2006).

[47] Dougherty, SMALL ARMS VISUAL ENCYCLOPEDIA, at 84.

[48] *Id.* at 85.

M1894,[49] Borchardt C-93,[50] Fabrique Nationale M1899,[51] Mannlicher M1896 and M1897,[52] Luger M1898 and M1899,[53] Roth-Theodorovic M1895, M1897, and M1898,[54] and the Schwarzlose M1898.[55] Many of these were issued with magazines greater than 10 rounds, including Luger's M1899, which could be purchased with 32-round magazines.[56]

Thus, by the late 19th century, semiautomatic firearms were in use, and repeating arms that could rapidly fire more than 10 rounds had been popular for decades.

---

[49] *Springfield Armory Museum – Collection Record*, REDISCOV.COM, http://ww2.rediscov.com/spring/VFPCGI.exe?IDCFile=/spring/DETAILS .IDC,SPECIFIC=9707,DATABASE=objects.

[50] Leonardo Antaris, *In the Beginning: Semi-Automatic Pistols of the 19th Century*, AMERICAN RIFLEMAN, Jan. 4, 2018, https://www.americanrifleman.org/content/in-the-beginning-semi-automatic-pistols-of-the-19th-century/.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] Jean-Noel Mouret, PISTOLS AND REVOLVERS 126–27 (1993); Supica, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM, at 86.

## CONCLUSION

The district court's decision should be reversed, and the bans should

be held unconstitutional.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
FPC Action Foundation
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org
*Counsel of Record*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 29 because this brief contains 5,690 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Joseph G.S. Greenlee*
*Counsel of Record*

## CERTIFICATE OF SERVICE

I certify that on April 12, 2023, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Joseph G.S. Greenlee*
*Counsel of Record*