No. 23-1353

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| ROBERT C. BEVIS; LAW WEAPONS, INC., d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation; and NATIONAL ASSOCIATION FOR GUN RIGHTS, | ) ) ) ) ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| CITY OF NAPERVILLE, ILLINOIS, and JASON ARRES, | ) ) ) | No. 1:22-cv-04775 |
| Defendants-Appellees, | ) ) | |
| and | ) ) | |
| THE STATE OF ILLINOIS, | ) ) | The Honorable VIRGINIA M. KENDALL, |
| Intervening Appellee. | ) ) | Judge Presiding. |

**BRIEF OF INTERVENING APPELLEE**

**SARAH A. HUNGER**
Deputy Solicitor General
**CARSON R. GRIFFIS**
**IVAN PARFENOFF**
Assistant Attorneys General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

Attorneys for Intervening Appellee

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... i

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUE PRESENTED FOR REVIEW ..................................................... 2

INTRODUCTION ................................................................................... 3

STATEMENT OF THE CASE ................................................................ 5

A.     Regulatory background...................................................... 5

B.     Plaintiffs file suit and seek preliminary injunctive relief................................. 6

C.     The district court denies preliminary injunctive relief...................................... 8

D.     Plaintiffs' motions for injunction pending appeal are denied............................ 9

SUMMARY OF ARGUMENT ............................................................ 11

ARGUMENT ........................................................................................ 13

I.     Plaintiffs must show that they are entitled to a preliminary injunction, which is granted only in exceptional circumstances...................................... 13

II.    Plaintiffs have not shown a likelihood of success on the merits of their Second Amendment claim. ...................................................... 13

       A.     Plaintiffs have not carried their burden of showing that the Act regulates conduct protected by the Second Amendment................ 15

              1.     LCMs are not "bearable arms." .................................... 16

              2.     Plaintiffs did not show that assault weapons and LCMs are in common use for self-defense.............................. 19

              3.     Plaintiffs' arguments to the contrary lack merit. ...................... 26

       B.     The Act is consistent with the Nation's history of regulating firearms. ............................ 30

i

1.   There is a historical tradition of regulating "dangerous and unusual" weapons. ............................................................... 32

2.   The Act responds to "unprecedented societal concerns" prompted by "dramatic technological changes." ......................... 36

3.   When compared to historic regulations, the Act "impose[s] a comparable burden on the right of armed self-defense" and "that burden is comparably justified." ........... 41

4.   Plaintiffs' arguments to the contrary lack merit. ...................... 46

III.   Plaintiffs have not shown they lack an adequate remedy at law or will suffer irreparable harm absent a preliminary injunction. ...................... 52

IV.   Plaintiffs have not shown that the equities, including the public interests, balance in their favor. ........................................................ 53

V.   Plaintiffs are not entitled to a statewide injunction. ....................................... 54

CONCLUSION ................................................................................................ 56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accuracy Firearms, LLC v. Pritzker,*
    2023 IL App (5th) 230025 .................................................................. 54

*Authenticom, Inc. v. CDK Global, LLC,*
    874 F.3d 1019 (7th Cir. 2017)........................................................... 53

*Bradley v. Vill. of Univ. Park,*
    59 F.4th 887 (7th Cir. 2023) .............................................................. 52

*Caulkins v. Pritzker,*
    No. 129453 (Ill. Sup. Ct.) ................................................................... 54

*Cavel International, Inc. v. Madigan,*
    500 F.3d 544 (7th Cir. 2007)......................................................... 52, 53

*City of Chicago v. Barr,*
    961 F.3d 882 (7th Cir. 2020).............................................................. 54

*Del. State Sportsmen's Ass'n, Inc. v. Delaware,*
    No. 22-951-RGA, 2023 WL 2655150 (Mar. 27, 2023) ................................ 21, 44

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)................................................................. *passim*

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011)......................................................... 50, 52

*Friedman v. City of Highland Park,*
    784 F.3d 406 (7th Cir. 2015).................................................... *passim*

*Friedman v. Highland Park,*
    136 S. Ct. 447 (2015) ......................................................................... 27

*GEFT Outdoors, LLC v. City of Westfield,*
    922 F.3d 357 (7th Cir. 2019).............................................................. 13

*Hanson v. District of Columbia,*
    No. 1:22-cv-02256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ........................ 24

*Harmon v. Gordon,*
    712 F.3d 1044 (7th Cir. 2013) ........................................................ 17

*Kolbe v. Hogan,*
    849 F.3d 114 (4th Cir. 2017) .......................................................... 24

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ........................................................................ 13

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ........................................................................ 15

*McIntosh v. Wexford Health Sources, Inc.,*
    987 F.3d 662 (7th Cir. 2021) .......................................................... 30

*Midwest Fence Corp. v. U.S. Dep't of Transportation,*
    840 F.3d 932 (7th Cir. 2016) .......................................................... 28

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) .......................................................... 48

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ............................................................ *passim*

*Ocean State Tactical LLC v. Rhode Island,*
    No. 22-cv-246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) ........... 16, 17

*Or. Firearms Fed'n, Inc. v. Brown,*
    No. 2:22-cv-01815-IM, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ........ 18

*PepsiCo, Inc. v. Redmond,*
    54 F.3d 1262 (7th Cir. 1995) .......................................................... 54

*Simon Prop. Grp. v. mySimon, Inc.,*
    282 F.3d 986 (7th Cir. 2002) .......................................................... 55

*Staples v. United States,*
    511 U.S. 600 (1994) ........................................................................ 29

*State v. Huntly,*
    25 N.C. 418 (1843) ......................................................................... 47

*United States v. Miller*,
   307 U.S. 174 (1939) ........................................................................ 36

*Wilson v. Cook County*,
   937 F.3d 1028 (7th Cir. 2019) ................................................ 7, 51, 52

**Statutes, Regulations, and Rules**

28 U.S.C. § 1292(a)(1) ........................................................................... 1

28 U.S.C. § 1331 .................................................................................... 1

28 U.S.C. § 2107(a) ............................................................................... 1

42 U.S.C. § 1983 .................................................................................... 1

720 ILCS 5/24-1.9 ............................................................................. 5, 6

720 ILCS 5/24-1.10 ........................................................................... 5, 6

1750 Mass. Acts 544, ch. 17, § 1 ......................................................... 33

1686 N.J. 289, 289-90, ch. 9 ................................................................ 32

1642 N.Y. Laws 33 ............................................................................... 33

Fed. R. App. P. 4(a)(1)(A) ..................................................................... 1

**Other Authorities**

ABC7 Chicago Digital Team, Highland Park Shooting (July 8, 2022) ........................ 5

Associated Press, Highland Park Parade Shooting Suspect Pleads Not Guilty,
   (Aug. 3, 2022) ............................................................................... 5

4 William Blackstone, *Commentaries on the Laws of England*, 148-49 (1769) ......... 32

*A Collection of the Statutes of the Parliament of England in Force in the State of
   North-Carolina* 60, ch. 3 (1792) .......................................................... 33

William English, *2021 National Firearms Survey:  Updated Analysis Including
   Types of Firearms Owned* (May 13, 2022) ................................................ 20, 28

Peter Hancock, *Lawmakers Hear from Advocates for Assault Weapon Ban*, Capitol News Illinois (Dec. 12, 2022) ................................................................. 5

Shia Kapos, *Illinois House Passes Assault Gun Bill*, Politico (Jan. 6, 2023) ............. 5

Victoria Kim & Amanda Holpuch, *What We Know About The Shooting In Highland Park*, N.Y. Times (July 7, 2022) ........................................ 5

Law Weapons & Supply, *Law Weapons In-House Gun-Smithing Service* ............... 53

Law Weapons & Supply, *Law Weapons Training Courses* ....................................... 53

Law Weapons & Supply, *Online Store* ....................................................................... 53

Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 J.L. & Contemp. Probs. 331 (2020) ............................................................ 24

## JURISDICTIONAL STATEMENT

The jurisdictional statement of Plaintiffs-Appellants National Association for Gun Rights, Robert C. Bevis, and Law Weapons, Inc. is not complete and correct. Intervening Defendant-Appellee the State of Illinois provides this jurisdictional statement under Circuit Rule 28(b).

Plaintiffs brought this action in the district court under 42 U.S.C. § 1983, alleging in the operative complaint that Defendants-Appellees City of Naperville and Naperville Police Chief Jason Arres (collectively, "Naperville") violated their rights under the Second Amendment to the United States Constitution. Docs. 1, 48.[1] The district court had subject matter jurisdiction over this federal claim under 28 U.S.C. § 1331.

On February 17, 2023, the district court denied plaintiffs' motions for preliminary injunction. SA1. On February 21, 2023, plaintiffs filed a timely notice of appeal within 30 days of that order. Doc. 64; *see* 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A). On February 23, 2023, the State filed motions to intervene in the district court and this court, which were allowed. Docs. 68, 70; 7th Cir. Docs. 3, 7. This court has jurisdiction over the appeal from a denial of a preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1).

---

[1] The district court's docket is cited as "Doc.__," this court's docket as "7th Cir. Doc. __," Plaintiffs-Appellants' brief as "AT Br. __," the short appendix as "SA__," and the Appendix to State Defendants' response to the motion for injunction pending appeal, 7th Cir. Docs. 14-15, as "A__."

## ISSUE PRESENTED FOR REVIEW

Whether the district court acted within its discretion in denying plaintiffs' motions for preliminary injunction, where:  (1) plaintiffs are unlikely to succeed on the merits of their Second Amendment claim, (2) plaintiffs have not shown they will suffer irreparable harm absent an injunction, and (3) the balance of equities favor defendants and the public interest.

**INTRODUCTION**

In January 2023, after a devastating mass shooting at a local Independence Day parade, the Illinois legislature enacted the Protect Illinois Communities Act ("Act"), which imposes restrictions on the sale, manufacture, and possession of the instruments that are so often chosen by mass shooters:  assault weapons and large capacity magazines ("LCMs").  Shortly thereafter, plaintiffs amended their complaint in an already-existing challenge to the Naperville assault weapons ordinance to allege that the Act violates the Second Amendment.  But as the district court correctly determined when denying preliminary injunctive relief, plaintiffs are unlikely to succeed on the merits of that claim, SA5, because the Act is constitutional under the two-step standard set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

For starters, plaintiffs have not carried their burden at the first step of the *Bruen* test, which requires challengers to demonstrate that the regulated items fall within the plain text of the Second Amendment.  Plaintiffs did not, and cannot, make that showing here, because neither assault weapons nor LCMs are "bearable arms" in "'common use' today for self-defense."  *Id.* at 2132, 2134 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).  LCMs do not qualify as "bearable arms" within the meaning of the Second Amendment and are instead accessories that fall outside of its scope.  Furthermore, the record is replete with evidence that assault weapons and LCMs are offensive, militaristic weapons with features that make them ill-suited for self-defense purposes.  As such, experience shows that

3

Americans select other weapons, like handguns and shotguns, for individual self-defense.

But even if plaintiffs had carried their step-one burden, they have not shown a likelihood of success at the second step, which assesses whether the regulation at issue is consistent with historical tradition in both its "burden on the right of armed self-defense" and the justifications for that burden. *Id.* at 2133. Here, too, there is ample evidence that the Act satisfies this standard. The evidence reveals a longstanding tradition of regulating dangerous and unusual weapons whereby a weapon is introduced into society, proliferates to the point where its use creates a novel or escalating public-safety threat, and then is restricted to curb the violence and other harm caused by its use. This pattern emerged in the 18th and 19th centuries through state restrictions on clubs, knives, pistols, and revolvers, and continued into the early 20th century with state and federal restrictions on possessing semiautomatic and automatic weapons. The Act—which was implemented in response to the harm wrought by mass shootings perpetrated with assault weapons and LCMs—follows in this historical tradition. Indeed, the Act is similar in all relevant respects to the laws regulating semiautomatic and automatic weapons that arose out of this tradition, including the federal machine gun restrictions that *Heller* deemed permissible. 554 U.S. at 624-25.

For these reasons and those detailed below, this court should affirm the district court's denial of preliminary injunctive relief.

## STATEMENT OF THE CASE

### A.  Regulatory background.

On July 4, 2022, a shooter armed with a semiautomatic AR-15 rifle and 30-round magazines opened fire on an Independence Day parade in Highland Park, Illinois.[2]  The weapon allowed the shooter to fire 83 rounds in less than a minute, killing seven and wounding 48.[3]  Among the victims were an eight-year-old boy left paralyzed from the waist down and both parents of a two-year-old child.[4]  A Highland Park ordinance prohibited the sale of assault weapons, but the shooter had legally purchased the murder weapon elsewhere in Illinois.[5]

One month later, Naperville passed an ordinance prohibiting the sale of assault weapons within city limits.  Doc. 57-2.  And on January 10, 2023, the State passed the Act, which restricts the sale, purchase, manufacture, delivery, or importation of "assault weapon[s]" and LCMs in Illinois subject to certain exceptions, including for law enforcement, members of the military, and other professionals with similar firearms training and experience.  720 ILCS 5/24-1.9, 1.10.  The Act adopts a two-fold definition of assault weapons, in which it identifies

---

[2]  Victoria Kim & Amanda Holpuch, What We Know About The Shooting In Highland Park, N.Y. Times, http://bit.ly/3ytxFZv (July 7, 2022).

[3]  Peter Hancock, Lawmakers Hear from Advocates for Assault Weapon Ban, Capitol News Illinois, http://bit.ly/3Jw80WG (Dec. 12, 2022); Shia Kapos, Illinois House Passes Assault Gun Bill, Politico, http://bit.ly/3YwxU0E (Jan. 6, 2023).

[4]  Associated Press, Highland Park Parade Shooting Suspect Pleads Not Guilty, http://bit.ly/423ISxG (Aug. 3, 2022); ABC7 Chicago Digital Team, Highland Park Shooting, https://bit.ly/3J7WI9v (July 8, 2022).

[5]  Kim & Holpuch, *supra* note 2.

specific weapons by name (*e.g.*, AR-15 and AK-47 rifles) and lists features that, individually or in combination, make specific firearms "assault weapons" (*e.g.*, flash suppressors, barrel shrouds, or grenade launchers). *Id.* 5/24-1.9(a)(1)(A)-(L). The Act excludes handguns, as well as firearms operated by bolt, pump, lever, or slide action, from that definition. *Id.* 5/24-1.9(a)(2). LCMs are defined as a magazine or similar device that can accept more than 10 rounds of ammunition for a long gun or more than 15 rounds for handguns. *Id.* 5/24-1.10(a).

Individuals who lawfully possessed assault weapons and LCMs prior to the Act can continue to do so. *Id.* 5/1.9(c)-(d) & 5/1.10(c)-(d). To continue lawfully possessing an assault weapon, an individual must submit to the State Police an endorsement affidavit by January 1, 2024. *Id.* 5/24-1.9(d). This requirement does not extend to LCMs. *Id.* 5/24-1.10(d).

## B.   Plaintiffs file suit and seek preliminary injunctive relief.

In September 2022, plaintiffs—an advocacy group, a gun store, and the store's owner—filed a complaint against Naperville claiming that its ordinance violated their Second Amendment rights. Doc. 1. Two months later, plaintiffs filed a motion for a temporary restraining order and preliminary injunction to prohibit the Naperville ordinance from taking effect. Doc. 10. Naperville filed a response and supplemental brief defending the ordinance's constitutionality. Docs. 12, 34. As support, Naperville relied on declarations from experts that addressed the historical underpinnings of state and local regulations of assault weapons, the

evolution of firearms technology, and the emergence of deadly mass shootings in recent decades, among other topics.  Doc. 34-1.

On January 24, 2023, plaintiffs filed an amended complaint adding a claim that the Act violated the Second Amendment.  Doc. 48 at 1, 6-7.  Plaintiffs named no state officials as defendants, but named Naperville Police Chief Jason Arres on the theory that he was responsible for enforcing the Act against them.  *Id.* at 1, 3.  That same day, plaintiffs filed a motion for a temporary restraining order and preliminary injunction seeking to enjoin Arres from enforcing the Act.  Doc. 50 at 1, 13-25.  Plaintiffs' motion did not include any argument related to inadequate remedy at law, irreparable harm, or equitable balancing.  *Id.*  In support, plaintiffs attached a declaration from James Curcuruto, the former Director of Research and Development at the National Shooting Sports Foundation, Inc., estimating that, between 1990 and 2021, more than 20 million AR-platform rifles were manufactured in the United States, such rifles were "owned by millions of persons," and there were at least 150 million LCMs "in possession of American citizens."  Doc. 50-3 at 2.  They also attached a declaration from the gun store owner stating that a "substantial part" of the store's business included sales of assault weapons and LCMs.  Doc. 50-2 at 1.

Naperville responded, arguing that plaintiffs were unlikely to succeed on the merits because *Bruen* had not overruled this court's decisions upholding restrictions on assault weapons and LCMs in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), and *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), and

because the Act was constitutional under *Bruen*'s text-and-history standard.  Doc. 57 at 6-12.  In support, Naperville attached eight expert declarations.  Many of these described the unique danger and lethality of assault weapons, Docs. 57-4, 57-6, 57-9, and explained that they were developed and marketed as military-style offensive weapons rather than for self-defense, Docs. 57-5, 57-11.  In fact, the experts recounted, assault weapons and LCMs are not as effective for self-defense as handguns and shotguns, and are not commonly used for that purposes. Doc. 57-4.  On the contrary, they are increasingly used in crimes of violence, including mass shootings.  Docs. 57-4, 57-7, 57-8.

Naperville also presented historical evidence demonstrating that from the colonial era onward, States have regulated weapons thought to be especially dangerous and unusual—from knives, clubs, pistols, and revolvers in the 18th and 19th centuries to automatic and semiautomatic firearms in the early 20th century.  Docs. 57-8, 57-10, 57-11.  In particular, as detailed below, *infra* Section II.B.1., there is a longstanding and regular course of practice in this country of restricting dangerous and usual weapons whereby a weapon is introduced into society, proliferates to the point where its use presents a novel threat to public safety, and is then regulated by the government to curb violence and protect the public, Doc. 57-10.

**C.    The district court denies preliminary injunctive relief.**

On February 17, the district court denied plaintiffs' motions.  SA1.  First, the court determined that plaintiffs "are unlikely to succeed on the merits of their claim

because Naperville's Ordinance and the [Act] are consistent with the Second Amendment's text, history, and tradition."  SA5.  In particular, the court explained, "the text of the Second Amendment is limited to only certain arms, and history and tradition demonstrate that particularly 'dangerous' weapons are unprotected." SA18.  "Because assault weapons are particularly dangerous weapons and high-capacity magazines are particularly dangerous weapon accessories, their regulation accords with history and tradition."  SA30.

The court also found that plaintiffs had not demonstrated that they would suffer irreparable harm because the gun store could "still sell almost any other type of gun" and the advocacy group's members could acquire "other effective weapons for self-defense."  SA32.  Finally, as to the balancing of equities, the court found that Naperville had "compellingly argue[d]" that the Act and the ordinance would protect public safety.  A33.

## D.    Plaintiffs' motions for injunction pending appeal are denied.

On February 21, plaintiffs filed a notice of appeal.  Doc. 64.  Two days later, the State filed motions to intervene in the district court and this court, which were allowed.  Docs. 68, 70; 7th Cir. Docs. 3, 7.  On February 28, plaintiffs filed a motion for injunction pending appeal in the district court, arguing for the first time that they established irreparable harm, any injunction protecting their alleged constitutional rights would be in the public interest, and the injunction should apply statewide.  Doc. 71.  As support, plaintiffs cited a supplemental declaration from the store's owner claiming that it would be "forced out of business."  Doc. 71-1

at 3.  The State filed a motion for leave to respond.  Doc. 72.  The district court denied plaintiffs' motion based on its February 17 order and denied the State's motion as moot.  Doc. 73.

On March 7, plaintiffs moved for injunction pending appeal in this court.  7th Cir. Doc. 8.  Defendants filed responses objecting to an injunction, either statewide or limited to plaintiffs.  7th Cir. Docs. 13, 17.  The State submitted appendices in support of its response that included expert declarations it has submitted in defense of the Act in other federal cases and that it intends to submit in this case when afforded the opportunity by the district court.  7th Cir. Docs. 14-15.  This court denied plaintiffs' motion on April 18.  7th Cir. Doc. 51.

## SUMMARY OF ARGUMENT

The district court acted well within its discretion in denying plaintiffs' motions for preliminary injunction, which were deficient in a number of independent respects. To begin, plaintiffs failed to show that they are likely to succeed on the merits of their Second Amendment claim under *Bruen*'s two-step test, which directs courts to first assess whether the regulated conduct is within the scope of the Second Amendment's text and then, if necessary, whether the challenged regulation is consistent with the country's historical tradition of regulating firearms.

At the first step, plaintiffs bore the burden of showing that assault weapons and LCMs are "bearable arms" in "common use today for self-defense." *Bruen*, 142 S. Ct. at 2132, 2134 (internal quotations omitted). But plaintiffs did not satisfy that burden for at least two reasons. First, LCMs are accessories, and not "arms" within the scope of the Second Amendment. Second, plaintiffs presented no evidence demonstrating that assault weapons or LCMs are in common use for self-defense. Instead, the record confirms that these are offensive, militaristic instruments that are not commonly used or suitable for individual self-defense.

Plaintiffs likewise cannot succeed at the second step because the historical evidence shows that the Act's restrictions on assault weapons and LCMs are consistent with the country's historical tradition of regulating dangerous and unusual weapons. There is a well-established tradition pre-dating the Founding whereby a weapon is introduced into civilian society, proliferates to the point where

11

it causes a substantial threat to public safety, and is then regulated to curb the public harm stemming from its use.  This "regular course of practice" has "liquidate[d] & settle[d]" the meaning of the Second Amendment to allow for such restrictions.  *Id.* at 2136.  Additionally, the record shows that a "more nuanced approach" to the historical inquiry is appropriate here, where the Act was passed in response to "unprecedented societal concerns" that emerged as a result of "dramatic technological changes" in weapons technology, *id.* at 2132:  the increasing frequency of deadly mass shootings that are committed by individuals armed with assault weapons and LCMs.  And under this approach, the Act's restrictions are consistent in all relevant respects with the historical tradition of regulating dangerous and unusual weapons, including the minimal burden that those restrictions impose on the right to individual self-defense and the justifications for imposing that burden.

Finally, the district court's denial of preliminary injunctive relief was warranted because plaintiffs waived their arguments on the remaining preliminary injunction factors by failing to raise them in their motions before the district court. But even if considered, plaintiffs have not shown that they lack an adequate remedy at law or would suffer irreparable harm absent an injunction.  Similarly, plaintiffs cannot prevail on the balance of equities, which weighs heavily in favor of the State and the public interest.  Alternatively, if this court finds that plaintiffs have carried their burden on the preliminary injunction factors, it should limit any injunction to the parties in the case because plaintiffs have made no showing that the extraordinary remedy of statewide relief is warranted.

## ARGUMENT

### I.    Plaintiffs must show that they are entitled to a preliminary injunction, which is granted only in exceptional circumstances.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (cleaned up). The plaintiff "must establish that it has some likelihood of success on the merits; that it has no adequate remedy at law; [and] that without relief it will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (cleaned up). If the plaintiff satisfies those requirements, then the court must weigh the harm that the plaintiff will incur without an injunction against the harm to the defendant if one is entered, and "consider whether the injunction is in the public interest." *Id.* (cleaned up). This analysis is done on a "sliding scale"—if the plaintiff is less likely to win on the merits, the balance of harms must weigh more heavily in its favor, and vice versa. *Id.* (cleaned up).

When reviewing a district court's order denying a preliminary injunction, this court reviews legal conclusions *de novo*, findings of historical or evidentiary fact for clear error and the balancing of the injunction factors for an abuse of discretion. *Id.*

### II.    Plaintiffs have not shown a likelihood of success on the merits of their Second Amendment claim.

The Second Amendment confers the right to "ordinary, law-abiding, adult citizens" to possess and carry firearms "for self-defense." *Bruen*, 142 S. Ct. at 2125, 2134. In *Bruen*, the Supreme Court clarified that the appropriate legal framework

for Second Amendment claims is a two-step test that "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. At the first step, as plaintiffs acknowledge, AT Br. 6, 16, they bear the burden to show that the "Second Amendment's plain text covers [the regulated] conduct" and thus "presumptively protects that conduct," *Bruen*, 142 S. Ct. at 2126; *see also id.* at 2141 n.11. If the plaintiffs satisfy that burden, then at the second step, the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

Plaintiffs have not shown that they are likely to succeed under either step. As to the first, they have not carried their burden of showing that the Second Amendment protects assault weapons or LCMs. As explained below, LCMs are not "bearable arms" within the scope of the Second Amendment and, in any event, neither assault weapons nor LCMs are in common use for self-defense. As to the second step, plaintiffs have not shown that the State will be unable to demonstrate that the Act is consistent with historical tradition. On the contrary, the historical evidence shows that the Act's regulation of assault weapons and LCMs aligns with our country's longstanding tradition of regulating dangerous and unusual weapons pursuant to which a weapon is introduced into society, proliferates to the point where it becomes a significant threat to public safety, and is then regulated by the government to curb violence and protect the public while leaving available ample means of armed self-defense.

14

**A.    Plaintiffs have not carried their burden of showing that the Act regulates conduct protected by the Second Amendment.**

First, plaintiffs are not likely to succeed on the merits of their Second Amendment claim because they failed to demonstrate that assault weapons and LCMs fall within the Second Amendment's plain text.  To satisfy this burden, plaintiffs must prove that the regulated items fit within the category of "bearable arms" presumptively protected by the Second Amendment.  *Bruen*, 142 S. Ct. at 2132, 2134.  *Bruen* confirmed that the Second Amendment "'is not unlimited.'"  *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626).  On the contrary, it "extends only to certain types of weapons."  *Heller*, 554 U.S. at 623; *see also id.* at 626 (no "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose").  Namely, the Amendment protects firearms that are "commonly used" for self-defense.  *Bruen*, 142 S. Ct. at 2138; *id.* at 2132 (amendment protects only "instruments that facilitate armed self-defense"); *McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010) ("[T]he Second Amendment protects the right to keep and bear arms for the purpose of self-defense.").  Accordingly, firearms that do not fit within that category, such as "weapons that are most useful in military service—M-16 rifles and the like—may be banned[.]"  *Heller*, 554 U.S. at 627.

Plaintiffs have not carried their step-one burden for at least two reasons.  First, they make no meaningful argument that LCMs—which are accessories and not themselves arms—are "bearable arms" within the Second Amendment.  Second, they failed to present any evidence before the district court showing that LCMs and

15

assault weapons are commonly used for self-defense.  And in fact, the evidence presented by defendants confirms that the regulated items are offensive, militaristic instruments that are not commonly used or suitable for self-defense.[6]

### 1.    LCMs are not "bearable arms."

At the threshold, plaintiffs failed to satisfy their step-one burden with respect to LCMs, which are accessories, not "arms," and thus are not within the Second Amendment.  As a historical matter, the term "arms" referred to weapons and excluded related accessories like ammunition or ammunition containers, which were referred to as "accoutrements."  *Heller*, 554 U.S. at 581 (citing 1773 edition of dictionary defining "arms" as "weapons of offence, or armour of defence") (cleaned up); *Ocean State Tactical LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175, *14 (D.R.I. Dec. 14, 2022) (from Founding through Reconstruction, "[t]he word 'Arms' was a general term for weapons such as swords, knives, rifles, and pistols, but it did not include ammunition, ammunition containers, flints, scabbards, holsters, or 'parts' of the weapons such as the trigger, or a cartridge box"); A523 (common phrase "arms and accoutrements" distinguished weapons from items that stored ammunition); A538 (compiling examples of this distinction and explaining that "in literally hundreds of cases, 'arms' and 'accoutrements' are treated as separate categories of military gear").

---

[6]  Additionally, while the Second Amendment protects an individual right to armed self-defense, it does not protect a commercial right to sell any weapon to any consumer.  The State adopts Naperville's arguments on this point.

In fact, there is ample historical data demonstrating that during the Founding era and Reconstruction, cartridge cases and boxes were "viewed as accoutrements," not "arms."  A530-31; *see also* A531-36 (collecting historical examples of cartridge boxes being considered "accoutrements").  Because LCMs, like cartridge cases and boxes, "are containers which hold ammunition," A492, they do not constitute "arms" within the meaning of the Second Amendment.  Indeed, although LCMs can be used alongside firearms, they are not themselves arms with offensive or defensive uses.  *E.g.*, *id.*; *see also Ocean State Tactical*, 2022 WL 17721175, *12 ("LCMs, like other accessories to weapons, are not used in a way that 'cast[s] at or strike[s] another.'") (quoting *Heller*, 554 U.S. at 581); A496 ("Because a [LCM] is not a required component for a firearm to operate, it is characterized as an accessory by the industry.").

Plaintiffs assert in a footnote, however, that LCMs fall within the plain text because the Second Amendment covers "all modern instruments that facilitate armed defense," including "ammunition feeding devices, without which semi-automatic firearms cannot operate as intended."  AT Br. 16 n.6 (cleaned up).  Plaintiffs further assert that for certain weapons, including "modern semiautomatic firearms" and firearms with "fixed magazines," removing the magazine would render them inoperable.  *Id.* (cleaned up).  At the threshold, these arguments should be rejected because arguments raised only "in an undeveloped footnote" are waived.  *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013).

In any event, plaintiffs cite no authority for the proposition that LCMs are necessary to operate firearms for any purpose, let alone for self-defense, and there is none in the record. *See, e.g.*, *Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 WL 17454829, *9 (D. Or. Dec. 6, 2022) (rejecting argument that LCMs are necessary for self-defense because no evidence that firearms "can *only* operate with magazines that accept more than ten rounds") (emphasis in original). On the contrary, the record evidence confirms that LCMs are not necessary to operate firearms. All firearms that can accept a detachable LCM can also accept a magazine that holds fewer rounds and work just as well. Doc. 57-5 ¶ 23. This is also true for firearms with "fixed magazines," which are "not necessary to operate any firearm as designed." *Id.* ¶ 22.

And plaintiffs' reliance on *Bruen* for the assertion that the plain text covers "all 'modern instruments that facilitate self-defense'" is incorrect. AT Br. 16 n.6 (quoting *Bruen*, 142 S. Ct. at 2132). Rather, *Bruen* supports the notion that "the Second Amendment's definition of 'arms' is fixed according to its historical understanding," 142 S. Ct. at 2132, which, as explained, does not include accessories like ammunition containers. But *Bruen* also made clear that the instruments included within that definition do not "apply only to those arms in existence in the 18th century." *Id.* (cleaned up). Instead, that definition also "covers modern instruments that facilitate armed self-defense." *Id.* Because LCMs are the modern version of ammunition containers—which were not within the historical definition of "arms"— they fall outside of the plain text of the Second

Amendment.  And, in any event, plaintiffs' argument proceeds from the assumption that LCMs are commonly used for self-defense, which, as now explained, they are not.

### 2. Plaintiffs did not show that assault weapons and LCMs are in common use for self-defense.

Even if LCMs were "bearable arms," plaintiffs did not satisfy their burden at step one for the additional reason that they failed to provide evidence that assault weapons or LCMs are commonly used for self-defense.  On the contrary, the record is replete with evidence that assault weapons and LCMs, which were designed as offensive weapons of war, are not.  In fact, the very features that render assault weapons and LCMs effective military weapons—including their high rate of fire, long-range and sustained accuracy, and destructive capabilities—make them a poor fit for typical individual self-defense scenarios, especially as compared with handguns and shotguns.

To satisfy their step-one burden, plaintiffs relied in the district court primarily on a handful of sources providing ownership and manufacture estimates for varying categories of firearms and accessories.  Doc. 50 at 16-17; Doc. 50-3 at 2. This evidence is insufficient for several reasons.

At the threshold, plaintiffs' evidence is not probative of the relevant question: whether the instruments regulated by the Act are commonly used for self-defense. *Bruen*, 142 S. Ct. at 2132, 2138.  Rather, as plaintiffs admit, their evidence purports to show commonality of manufacture, sale, and ownership for any lawful purpose.

AT Br. 18-22.  But this proves nothing about whether assault weapons and LCMs are commonly used for self-defense.

Moreover, the metric plaintiffs propose—which, in effect, "rel[ies] on how common a weapon is at the time of litigation"—is "circular." *Friedman*, 784 F.3d at 409.  Under it, a State would need to carefully monitor the introduction of new weapons into the marketplace so that it could regulate them before they became commonly sold and possessed—even if there were no evidence at that point that the weapons posed a public-safety threat that would justify such regulation—or risk being left powerless to regulate these weapons, no matter how destructive or deadly they are, at a later point in time.  Such an approach is unworkable and incorrect. *See id.* ("it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned" because a "law's existence can't be the source of its own constitutional validity"); *id.* at 408 (submachine guns' popularity during Prohibition did not provide "constitutional immunity").

And even if relevant, plaintiffs' evidence—primarily online studies and news articles—is unreliable and otherwise flawed.  For instance, plaintiffs relied heavily on the claim that 24.6 million Americans have, at some point, owned "AR-15 or similar rifles" for lawful purposes.  Doc. 50 at 16-17.  This estimate, however, comes from an unpublished, non-peer-reviewed paper recounting an online survey that does not disclose its sources of funding or measurement tools, *id.* (citing William English, *2021 National Firearms Survey* (May 13, 2022)); A28 n.28, and is

contradicted by industry and government data showing that only 6.4 million gun owners (less than 8% of the 81 million gun owners in the United States and 2% of all Americans) possess assault weapons, Doc. 57-7 ¶ 27.[7]  For LCMs, plaintiffs cited an estimate that 150 million magazines with a capacity greater than 10 rounds are "in possession of American citizens."  Doc. 50-3 at 2.  But this estimate was proffered by a declarant who provided no information on how he reached that number, nor did he attribute it to any specific source.  *Id.*  Plaintiffs' other sources— for example crime statistics that focus on murder, to the exclusion of other criminal activity—are similarly unhelpful because they offer no insight into whether assault weapons and LCMs are used for self-defense.  Doc. 50 at 17.  Finally, plaintiffs make no attempt to explain how their cited statistics, which use undefined and otherwise vague terms, line up with the items regulated by the Act.  *Del. State Sportsmen's Ass'n, Inc. v. Delaware*, No. 22-951-RGA, 2023 WL 2655150, *5-6 (Mar. 27, 2023) (plaintiffs failed to carry burden where they provided no evidence that "assault pistols" as defined by Delaware statute are in common use).

Because plaintiffs' meager evidence fell well short of satisfying their step-one burden, the district court's denial of preliminary injunctive relief was warranted on this basis alone.  In any event, defendants also presented evidence showing that assault weapons and LCMs are not commonly used for self-defense, and are instead

---

[7]  One expert noted that while there are approximately 24.4 million assault weapons (out of an estimated 461.9 million firearms) in circulation, they are owned by only 6.4 million Americans.  Doc. 57-7 ¶ 27.

offensive, militaristic weapons designed for use on the battlefield.  As such, they are not covered by the Second Amendment's plain text.  *E.g.*, *Bruen*, 142 S. Ct. at 2143 (handguns protected by the plain text because they are "in common use for self-defense today") (cleaned up); *Heller* 554 U.S. at 627 ("weapons that are most useful in military service—M-16 rifles and the like—may be banned").

The evidence showed that the items regulated by the Act derive from rifles and magazines designed for the military with features that "increase the effectiveness of killing enemy combatants in offensive battlefield situations."  Doc. 57-5 ¶ 25; A596 ("The lineage of high capacity detachable magazines can be traced directly to a military heritage."); 57-4 ¶ 35 (military origin is "featured heavily in [their] marketing to the civilian public").  Indeed, the AR-15 models in circulation today trace their origin to rifles designed in the 1950s for use by the American military.  Doc. 57-4 ¶ 25; A585-87.   Following field tests in Vietnam in the early 1960s, which demonstrated the potency of these rifles on the battlefield, the Army adopted the AR-15 as a combat rifle, rechristening it the M-16.  Doc. 57-4 ¶¶ 26-32.

Not only do assault weapons and LCMs derive from military-grade weaponry, their features render them uniquely effective as weapons of war but not commonly used or suitable for personal self-defense.  For instance, the sustained accuracy during rapid fire makes assault weapons uniquely potent on the battlefield, especially when used with LCMs.  Assault weapons enable high-velocity rounds to be fired at "a high rate of delivery" and "a high degree of accuracy at long range."  Doc. 57-6 ¶ 14 & n.5.  Accordingly, assault weapons cause "more victims and

22

injuries per event." Doc. 57-9 ¶ 25. And LCMs "only increase this destructive

potential by increasing the number of rounds someone can fire without having to

reload, thereby increasing the number of bullets that can be fired during a given

time period." Doc. 57-6 ¶ 30; Doc. 57-4 ¶ 41 (discussing the ability "to fire rapidly

with high-capacity magazines and remain accurate at ranges well beyond 100

yards"). In addition, the massive amount of energy imparted by AR-15 rounds

produce much larger cavities in the human body than other weapons like handguns,

"with devastating effects to tissue and surrounding organs." Doc. 57-9 ¶ 24. When

the bullet of an AR-15 "strikes the body, the payload of kinetic energy rips open a

cavity inside the flesh—essentially inert space—which collapses back on itself,

destroying inelastic tissue, including nerves, blood vessels, and vital organs." Doc.

57-4 ¶ 34 (cleaned up). And while a "handgun wound is simply a stabbing with a

bullet [by going] in like a nail," with the AR-15, "it's as if you shot somebody with a

Coke can." *Id.* (cleaned up).

   While these features are incredibly potent on the battlefield, they are

unnecessary in the civilian self-defense context, where "most confrontations

involving gunfire are at close range," and therefore do not require the long-distance

accuracy of assault weapons. *Id.* ¶ 59 ("most armed defense takes place within 3-7

yards"); A598 ("Home defense and/or self-defense situations are rarely, if ever,

lengthy shootouts at long ranges with extensive exchanges of gunfire."). In fact,

assault weapons are also inherently dangerous in "a home defense scenario"

because they "pose a serious risk of over-penetration in most home construction

23

materials." A598-99. Firing an assault weapon in close quarters thus poses "substantial risks to individuals in adjoining rooms, neighboring apartments or other attached dwelling units." A599. And as compared with handguns, assault weapons produce much larger cavities in the body, making them especially catastrophic for children, given the relative proximity of vital organs in their smaller bodies. Doc. 57-6 ¶¶ 32-35. Finally, some weapons regulated by the Act, such as assault pistols, are a poor choice for self-defense for the additional reason that they often require two hands to aim and shoot effectively, meaning that an individual would be precluded from taking other necessary actions while handling the firearm, such as calling the police, picking up a child, or assisting an elderly relative. A600.

There is also no need in self-defense scenarios for the round capacity that LCMs provide. *Id.* ("an abundance of ammunition" is no substitute for "weapons familiarization and shot placement"). As studies examining "armed citizen" incidents have confirmed, "the average number of shots fired in self-defense was 2.2 and 2.1, respectively." *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017) (en banc), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Hanson v. District of Columbia*, No. 1:22-cv-02256, 2023 WL 3019777, *10 (D.D.C. Apr. 20, 2023), (relying on the "2.2 bullets per incident figure" when denying preliminary injunction) (citing Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 J.L. & Contemp. Probs. 331, 244-45 (2020)). Smaller magazines, moreover, are preferable for self-defense purposes: "the physical size/profile of the shorter

24

magazine is easier to carry, shoot and conceal." Doc. 57-5 ¶ 23. This is why the most "respected" and "effective" self-defense firearms, like the "Model 1911" and "Sig P938," are handguns built to function with magazines that hold fifteen or fewer rounds. *Id.*

Indeed, it is "widely accepted" that handguns and shotguns are preferable for self-defense. A489; Doc. 57-4 ¶ 61 ("shotguns and 9mm pistols are generally recognized as the most suitable and effective choices for armed defense"); Doc. 57-7 ¶ 25 (between 2000 and 2021, "only 1 incident out of 406" active shootings "involved an armed civilian intervening with an assault weapon," whereas 12 incidents involved the defensive use of handguns). With these firearms, there are "no complicated safety mechanisms to manipulate in a high stress solution," and there is a "low probability of over penetration" resulting in unintended death or injury to others in the household. A601. And when using a handgun, individuals gain the advantage of concealability and an ability to "quickly extricate" without engaging "in a protracted gunfight." *Id.*

Finally, not only do these characteristics make AR-15s and other, similar assault weapons poorly suited for self-defense, they make them as effective on the battlefield (if not more so) as automatic weapons like the M-16, which the Court deemed permissible to ban. *Heller*, 554 U.S. at 627; *see also, e.g.*, Doc. 57-4 ¶ 33 (Army's 2008 Field Manual stressed that semiautomatic fire is "the most important firing technique during fast-moving modern, combat," in part because it is "devastatingly accurate") (cleaned up); Doc. 57-5 ¶ 26 (semiautomatic is "the mode

that is most often deployed in battle to efficiently target and kill enemy troops" and is viewed by Special Forces trainers as "the preferred and most lethal setting in most wartime scenarios"). In fact, the most commercially successful weapons regulated by the Act—AR-15 rifles—are M-16s in every way except one: the ability to toggle between semiautomatic and automatic fire. Doc. 57-11 ¶ 55 ("The military M-16 and the civilian AR-15 are closely related."); A604 (civilian AR-type rifles "retain the identical performance capabilities and characteristics (save full automatic capability) as initially intended for use in combat" and are not less dangerous or lethal).

In short, given plaintiffs' lack of relevant evidence, on the one hand, and the substantial evidence showing that assault weapons and LCMs are offensive, militaristic weapons not suitable for self-defense, on the other, plaintiffs cannot succeed on their burden at step one.

### 3.    Plaintiffs' arguments to the contrary lack merit.

For their part, plaintiffs claim that the step-one inquiry requires courts to assess only whether the regulated instruments are "bearable arms." AT Br. 15 (cleaned up). This is untrue. As explained, *Bruen* stated in its plain-text analysis that Second Amendment protects arms "'in common use' today for self-defense," and concluded that the firearms at issue in that case (handguns) satisfied that standard. 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627).

By contrast, the passage plaintiffs cite as support for their proposed legal standard—that the "Second Amendment extends, prima facie, to all instruments

26

that constitute bearable arms," *id.* at 2132 (cleaned up)—is taken from *Bruen*'s description of the historical methodology required under the second step. Specifically, that passage describes instances in which the "Second Amendment's historically fixed meaning applies to new circumstances." *Id.* As one example, the Court explained that the "reference to 'arms' does not apply only to those arms in existence in the 18th century," but instead "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* (cleaned up). Thus the Court reaffirmed the existence of historical limitations on the definition of "arms," while recognizing that modern arms can satisfy that definition. The Court did not, as plaintiffs suggest, include all weapons that a single person can carry in that definition.

Plaintiffs next assert that the regulated instruments are protected by the Second Amendment because they are commonly possessed for lawful purposes. AT Br. 14, 18. Plaintiffs base this alternate theory on a dissent from denial of certiorari, where Justice Thomas stated: "[t]he overwhelming majority of citizens who own and use [the regulated semiautomatic weapons] do so for lawful purposes, including self-defense and target shooting," which is "all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Friedman v. Highland Park*, 136 S. Ct. 447, 449 (2015). This assertion is at odds with the governing standard set forth in *Bruen*, which requires courts to assess whether firearms are in common use for self-defense. 142 S. Ct. at 2134. Furthermore, to the extent plaintiffs suggest that this court should engage in a single-step inquiry

27

based solely on whether firearms are commonly possessed by law-abiding citizens, AT Br. 14-15, that, too, conflicts with *Bruen*, which directs courts to proceed to a second step if plaintiffs show that the regulated conduct falls within the plain text of the Second Amendment, 142 S. Ct. at 2126.

Thus, plaintiffs were required to show that assault weapons and LCMs are in common use for self-defense. As explained, *supra* pp. 19-21, plaintiffs did not satisfy their burden before the district court. And on appeal, plaintiffs improperly attempt to backfill the record by citing new sources. AT Br. 18-22. But even if these sources could be considered at this stage (which they cannot, *see Midwest Fence Corp. v. U.S. Dep't of Transportation*, 840 F.3d 932, 946 (7th Cir. 2016)), they are insufficient. Indeed, like plaintiffs' evidence in the district court, these sources do not address whether each of the regulated instruments is commonly used for self-defense and instead largely provide ownership and manufacturing statistics for certain categories of the regulated items, like AR-15s. *E.g.*, AT Br. 18 (citing Washington Post survey for proposition that "6% of American adults . . . own an AR-15-style rifle" and a Congressional Research Service Study indicating that "in 2020 alone, 2.8 million AR- or AK-type rifles were introduced into the U.S. civilian gun stock").

And to the extent these sources provide information beyond ownership or manufacturing statistics, they do not support plaintiffs. In fact, at least one of plaintiffs' sources found that handguns—not assault weapons—accounted for the large majority of defensive firearms use. William English, *2021 Nat'l Firearms*

28

*Survey:  Updated Analysis* (May 2022), at 10-11 (cited at AT Br. 18, 19).  According to this paper, only 13% of incidents of self-defense with guns involve rifles of any kind.  *Id.*  And because the paper does not distinguish among types of rifles, it is unclear whether *any* of this 13% includes weapons restricted by the Act.  *Id.*

The cases cited by plaintiffs suffer from the same flaw and are otherwise inapposite.  *See Staples v. United States*, 511 U.S. 600, 619 (1994) (reversing conviction under the National Firearms Act where government failed to prove that defendant "knew of the features of his AR-15 that brought it within the scope of the Act"); AT Br. 19, 22 (citing dissenting opinions for proposition that AR-platform rifles and LCMs are "popular" and commonly possessed); *id.* at 21 (citing district court decision for proposition that "popular handguns" are sold "standard" with LCMs).

Finally, plaintiffs contend that the district court ignored their evidence "that the arms banned by the challenged laws are commonly held by law-abiding citizens for lawful purposes."  AT Br. 24.  But there is no indication that this is the case; on the contrary, the court made several references to the nature and use of the regulated instruments, as well as the fact that they are not "standard self-defense weapons," in reaching its conclusion that plaintiffs had not shown likelihood of success on the merits.  SA26; SA28 (discussing disproportionate use of assault weapons in "mass shootings, police killings, and gang activity").  It was not required to offer an explanation as to why it was rejecting plaintiffs' underlying sources in doing so.  But to the extent the district court failed to consider that evidence, the

29

appropriate relief would be a remand to consider and test that evidence, especially

given that plaintiffs are citing new, untested sources on appeal.  AT Br. 18-22; *see

also, e.g.*, *McIntosh v. Wexford Health Sources, Inc.*, 987 F.3d 662, 666 (7th Cir.

2021) (instructing district court to review two affidavits on remand that it had not

considered in first instance).

### B.     The Act is consistent with the Nation's history of regulating firearms.

Even if plaintiffs had shown that the Second Amendment's plain text applies

to assault weapons or LCMs, affirmance is warranted because they did not show

that the State will be unable to satisfy its burden at *Bruen*'s second step.  As

explained, the Second Amendment allows firearms regulations when the

government can show the regulation is "consistent with this Nation's historical

tradition" by demonstrating that it is analogous to historical regulations.  *Bruen*,

142 S. Ct. at 2126.  To determine whether a historical regulation is an appropriate

analogue, courts must assess "whether the two regulations are relevantly similar."

*Id.* at 2132 (cleaned up).

*Bruen* did not "provide an exhaustive survey of the features that render

regulations relevantly similar under the Second Amendment" but noted that "*Heller*

and *McDonald* point toward at least two metrics:  how and why the regulations

burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2132-32.  Stated

differently, "whether modern and historical regulations impose a comparable

burden on the right of armed self-defense and whether that burden is comparably

justified are central considerations."  *Id.* at 2133 (cleaned up).  When reasoning by

analogy, courts should begin with the public understanding of the right during the Founding and Reconstruction eras.  *Id.* at 2132-33.  But "a regular course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases in the Constitution."  *Id.* at 2136 (cleaned up).  And when the regulation at issue implicates "unprecedented social concerns or dramatic technological changes," courts should apply a "more nuanced approach" to reasoning by analogy.  *Id.* at 2132.

Applying *Bruen*'s guidance here, plaintiffs are not likely to succeed on the merits because the Act is "relevantly similar" to historical regulations with respect to dangerous and unusual weapons.  To start, the evidence in the record reveals a robust historical tradition pre-dating the Founding whereby a weapon is introduced into civilian society, proliferates to the point where it causes a substantial threat to public safety, and is then regulated to curb the public harm stemming from its use. The evidence further demonstrates that the Act—which follows in this historical tradition—was enacted in response to unprecedented societal concerns about frequent and deadly mass shootings that are enabled by dramatic technological changes in weapons technology.  As such, a "more nuanced approach" to the historical inquiry is required.  And under that approach, the evidence confirms that the Act's regulation of assault weapons and LCMs is consistent with this historical tradition in all relevant respects, including the minimal burden that it imposes on self-defense and the justifications for imposing that burden.

1.    **There is a historical tradition of regulating "dangerous and unusual" weapons.**

As the Court recognized in *Heller* and reaffirmed in *Bruen*, our country has a longstanding historical tradition of regulating dangerous and unusual weapons. *Bruen*, 142 S. Ct. at 2128; *Heller*, 554 U.S. at 627.  Relevant here, these regulations have limited the sale, possession, and use of such weapons since the colonial era— from pistols and "fighting knives" in the 18th and 19th centuries, to revolvers in the second half of the 19th century, and machine guns and semiautomatic weapons in the early 20th century.  In each historical era, legislatures have imposed restrictions on dangerous and unusual weapons when their proliferation caused escalating or novel forms of violence resulting in harm to the public.  Doc. 57-10 ¶¶ 9-11.  And as the harm wrought by these weapons increased, the scope of regulation expanded through a regular course of practice that "liquidated & settled" the meaning of the Second Amendment.  *Bruen*, 142 S. Ct. at 2136.

The origins of this tradition pre-date the Founding era.  *E.g.*, 4 William Blackstone, *Commentaries on the Laws of England*, 148-49 (1769) ("riding or going armed with dangerous or unusual weapons is a crime against the public peace, by terrifying the good people of the land").  For instance, a 1686 East New Jersey law restricted concealed carrying of "any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons."  1686 N.J. 289, 289-90, ch. 9; *see* Doc. 57-10 ¶ 81.  Other colonies, too, regulated dangerous and unusual weapons like trap guns, clubs, and knives that posed a danger to the public.  *E.g.*, Doc. 57-10 ¶¶ 81-82,

32

Ex. F; 1750 Mass. Acts 544, ch. 17, § 1 (Doc. 57-10, Ex. E); 1642 N.Y. Laws 33 (outlawing the drawing of knives).

During the Early Republic and Founding eras, legislatures continued to impose restrictions on specific dangerous or unusual weapons.  For example, States began to regulate new "objectional" and "vicious" weapons like clubs, which had increasingly been used by criminals and as fighting instruments.  Doc. 57-10 ¶¶ 72, 79 (cleaned up); *id.* ¶ 75 (compiling six laws enacted between 1750 and 1799 restricting the carrying of weapons like clubs); *see also, e.g.*, *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* 60, ch. 3 (1792) (cited at Doc. 57-11 ¶ 8 n.5).  By the end of the 19th century, "every state in the nation had laws restricting one or more types of clubs."  Doc. 57-10 ¶ 72; *id.* Ex. C (compiling state laws).

As new dangerous and unusual weapons emerged during the 19th century, States continued to exercise their traditional regulatory authority to impose categorical restrictions on their use, possession, and sale.  One such weapon was the Bowie knife, which was invented in the 1820s and gained notoriety in the 1830s as a particularly effective fighting knife, "especially at a time when single-shot pistols were often unreliable and inaccurate."  *Id.* ¶ 62.  The knives became so popular and proliferated so quickly that one historian referred to their spread as "the craze for the knives."  *Id.* (cleaned up).  As "[h]omicide rates increased," in part as a result of knife-dueling, so did laws restricting the use, sale, and possession of Bowie knives.  *Id.* ¶¶ 63, 69; Doc. 57-8 ¶ 24.  By the beginning of the 20th century, "every state

plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie knives" in some manner, whether by outlawing concealed and/or open carry, enhancing criminal penalties, taxing ownership, or barring their sale. Doc. 57-10 ¶¶ 69-70.

The categorical regulation of Bowie knives parallels the response to other emergent dangerous and unusual weapons during the same era, such as percussion cap pistols and multi-shot handguns. While 17th and 18th century pistols were not often used for committing crimes because they misfired and reloaded slowly, advancements in firearms technology during the 19th century rendered pistols more effective for criminal purposes. *E.g.*, *id.* ¶ 81; Doc. 57-8 ¶¶ 16-17. In particular, these firearms could be kept loaded and carried around for longer periods without risk of corrosion. Doc. 57-8 ¶ 25. To account for the increased danger posed by these concealable weapons associated with criminal violence, States began enacting prohibitions on carrying certain concealable weapons, including pistols. *Id.* ¶ 26 (identifying examples, including Louisiana, Indiana, Arkansas, Georgia, and Virginia regulations). By the turn of the century, there was near unanimity among the States in prohibiting or severely restricting concealable firearms and other weapons*, id.* ¶ 28, a practice that has since been deemed constitutional, *e.g.*, *Bruen*, 142 S. Ct. at 2128.

The historical tradition of regulating firearms in response to criminal misuse and violence continued into the 20th century. During World War I, advancements in weapons technology led to the invention of hand-held semiautomatic and

34

automatic weapons.  Doc. 57-10 ¶¶ 14-15.  Like the 18th and 19th century technological advancements, these new weapons proliferated, and "their uniquely destructive capabilities" began to impact civilian life through criminal violence.  *Id.* ¶ 15.  The Thompson submachine gun and the Browning Automatic Rifle, in particular, were used in high-profile crimes, like the 1929 St. Valentine's Day Massacre in Chicago.  *Id.* ¶¶ 14-15, 21-22.  These weapons were used "relatively infrequently by criminals generally, but when they were used, they exacted a devastating toll and garnered extensive national attention."  *Id.* ¶ 15.

As in prior eras, States responded:  between 1925 and 1934, "at least 32 states enacted anti-machine gun laws."  *Id.* ¶ 22.  States also regulated removable magazines and magazine capacity:  between 1917 and 1934, "at least twenty-three states enacted . . . restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity."  *Id.* ¶ 31.  Many of these laws regulated conduct beyond the carriage restrictions imposed in the 19th century by banning possession subject to limited exceptions, and at least seven of the anti-machine gun laws extended these bans to both automatic and semiautomatic weapons.  *Id.* ¶ 31 & Ex. B.  In 1932, Congress took similar action by banning machine guns, which it defined as "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading," from the District of Columbia.  *Id.* ¶ 23.  Two years later, in 1934, Congress enacted the National Firearms Act, which regulated the sale, transfer, and transport of machine guns and other firearms associated with criminal violence, like short-barreled shotguns

and rifles. *Id.* ¶ 24. The Act was upheld over challenges to the ban on short-barreled shotguns in *United States v. Miller*, 307 U.S. 174, 178 (1939), and its restrictions on automatic weapons were recognized as permissible in *Heller*, 554 U.S. at 624, 627.

In all, there is a well-established pattern preceding the Founding and continuing into the 19th and 20th centuries: when new weapons technology emerged, proliferated among citizens, and contributed to increased violence, governmental entities responded by imposing categorical regulations designed to reduce homicide, violence, and other disruptions to public order. This incremental expansion over the course of three centuries, as well as the corresponding judicial approval of such measures, thus has "liquidate[d] & settle[d]" the meaning of the Second Amendment to allow for such restrictions. *Bruen*, 142 S. Ct. at 2136 (cleaned up).

**2.    The Act responds to "unprecedented societal concerns" prompted by "dramatic technological changes."**

Also relevant to *Bruen*'s second step is the record evidence showing that that the Act was passed in response to the unprecedented problem of mass shootings committed with assault weapons and LCMs. Indeed, *Bruen* acknowledged while some historical analogies are "straightforward," others are not "simple to draw." 142 S. Ct. at 2131-32. This is because "[t]he regulatory challenges posed by firearms today" are not the same as those that "preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. Yet the Second Amendment must "apply to circumstances beyond those . . . anticipated" during the Founding

36

era and Reconstruction. *Id.* To resolve the difficulties posed by applying historical evidence to circumstances unanticipated by previous generations, the Court instructed courts to apply a "more nuanced approach" to analogical reasoning in cases involving "unprecedented societal concerns or dramatic technological changes." *Id.* Because the Act regulates instruments that would not exist without enormous advancements in firearms technology and have generated unprecedented public-safety concerns, application of that approach is appropriate here.

To begin, the Act regulates items that were not in existence at the Founding (or during Reconstruction) and that were made possible only by "dramatic technological changes" in weapons technology. And though Second Amendment protections are not limited to arms available at the Founding, *id.*, the absence of assault weapons and LCMs when the Second and Fourteenth Amendments were adopted confirms the existence of a dramatic technological change. During the Founding era, Americans typically owned muskets, which were used for militia service, and fowling pieces, which were designed to hunt birds and control vermin. Doc. 57-8 ¶ 15. Given their technological limitations, they were infrequently used as murder weapons. *Id.* ¶¶ 16-17. These muzzle-loading firearms were "liable to misfire" and could generally only shoot a single shot before reloading, which typically took at least 30 seconds. *Id.* ¶ 16. And because these weapons "were difficult to keep loaded for any length of time" given the risk of corrosion, they "could not be used impulsively unless they were already loaded for some other purpose." *Id.*

37

Single-shot, muzzle-loading firearms remained the standard weapon up to and including the Civil War.  Doc. 57-10 ¶¶ 43-44.  While a few "experimental, multi-shot guns" existed in and before the Founding era, Doc. 57-10 ¶ 35, these were flawed curiosities that were dangerous to the shooter, highly unusual, and, in most instances, "never advanced beyond the prototype stage," *id.* ¶¶ 35-38.  The first practical firearm that could shoot more than one bullet without reloading was a revolver designed by Samuel Colt in the 1830s.  *Id.* ¶ 44.  But adoption of this technology was slow, with proliferation in American society beginning only after the Civil War.  *Id.*  Likewise, reliable rifles capable of firing more than one round, such as the 1866 Winchester rifle, did not appear in significant numbers until after the Civil War, and even then had significant limitations.  *Id.* ¶ 45.  In particular, these late 19th century weapons had no semiautomatic capabilities and required manually reloading one round at a time.  *Id.*

Since that time, technological advancements have dramatically altered the rate of fire, ease of reloading, power, range, sustained accuracy, and ultimately, lethality of multi-shot weapons.  *Supra* Section II.A.2.  As one example, the near-instantaneous firing of an assault weapon is materially different than manually re-filling each chamber of a Colt revolver, individually inserting rounds into a Winchester repeating rifle, or loading a single musket ball in half a minute.  Likewise, according to a study that compared the damage caused by a standard caliber AR-15 round's energy release with that of other weapons, the destructive potential of an AR-15 weapon is more significant than Thompson Machine guns,

handguns, muskets, and hunting rifles.  Doc. 57-6 ¶ 29.  These differences have lethal implications:  a shooter cannot inflict the same carnage with a musket, a Colt revolver, or a Winchester repeating rifle as with an AR-15 and LCMs.  *Id.* ¶ 32; Doc. 57-8 ¶ 54 (danger posed by semiautomatic rifles "is intrinsically different from past weaponry").

 Unsurprisingly, the lethality associated with these technologically advanced weapons has wrought unprecedented societal concerns—specifically, about lone shooters equipped with assault weapons and LCMs murdering dozens of people in minutes, if not seconds, and bringing entire communities to a halt.  The increasing frequency and severity of mass shootings confirms this is a new phenomenon.  The first known mass shooting by a single individual resulting in 10 or more deaths occurred in 1949; it took 17 years (until 1966) for another comparably lethal shooting to occur, another nine (to 1975) before the third such shooting, and an additional seven before the fourth (in 1982).  Doc. 57-7 ¶¶ 18-19.  But in recent years—and especially since the expiration of the federal assault weapons ban in 2004—the frequency and cumulative lethality of mass shootings has increased dramatically.  From 1949 to 2004, there was "a total of 10 mass shootings resulting in double-digit fatalities." *Id.* ¶ 21.  Since 2004, however, there have been 20 such mass shootings, and the average rate of such shootings "has increased over six-fold." *Id.*  And when the definition of mass shootings includes six or more casualties (as opposed to 10), there were a total of 93 between 1991 and 2022.  Doc. 57-7, Ex. B.

Assault weapons and LCMs are the chosen instruments for the vast majority of these attacks because of their "unique killing potential." Doc. 57-4 ¶ 34. As explained, *supra* Section II.A.2, "[t]hey are easy to use with limited professionally supervised training, accept [LCMs], are effective at a distance, have little recoil, are light and maneuverable, shoot bullets at a high velocity, and are marketed as military police-style weapons," Doc. 57-4 ¶ 39; Doc. 57-7 ¶ 12 ("62% of all high-fatality mass shooting deaths" from 2019 to 2022 "involve[ed] assault weapons and 100% . . . involv[ed] LCMs"). These weapons thus allow solo shooters to "inflict mass death and injury" by enabling them to "shoot uninterrupted for longer periods, and get more shots off with fewer reloads." Doc. 57-4 ¶¶ 41, 50. According to one estimate, "an assailant with an assault rifle is able to kill and injure twice the number of people compared to an assailant with a non-assault rifle or handgun.*"* *Id.* ¶ 40. And when used in combination with LCMs, "semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms." Doc. 57-8 ¶ 56; Doc. 57-7 ¶ 15 (average death toll for incidents involving LCMs is 11.5 fatalities per shootings, as compared with 7.3 fatalities without LCMs). Assault weapons also pose a "disproportionate risk to law enforcement": in 2016 and 2017, 25% of law enforcement officers slain in the line of duty were killed with assault weapons. Doc. 57-4 ¶ 52; *see also, e.g.*, Doc. 57-8 ¶ 54 (threat to law enforcement is "modern phenomenon"). And beyond the infliction of increased injury and death, mass shootings committed with assault weapons and LCMs have "traumatic

impacts on victims, first responders, and the greater community," as well as "tremendous negative economic effects on communities."  Doc. 57-4 ¶ 45.

Indeed, one reason that the use of these weapons is "particularly terrifying" is "the limited ability that organizations, communities, and law enforcement have to counter them."  *Id.* ¶ 23.  When shooters use assault weapons, which allow for long-range rapid fire, police are required to secure a multi-block radius and are often called to "run into active situations without adequate protection."  *Id.* ¶¶ 41, 49; *id.* ¶ 49 ("Most standard-issue ballistic vests are not rifle-rated and therefore do not protect the body against bullets fired by assault rifles.").  Accordingly, where crimes involving assault weapons and LCMs are concerned, the public remains at "greater risk" "due to the limits of reasonable and practical law enforcement and crisis planning efforts."  *Id.* ¶ 46.

In short, the Act regulates instruments that, as a result of dramatic changes in weapons technology, have caused unprecedented societal concerns; thus, this court should apply a "more nuanced approach" in its historical inquiry.  *Bruen*, 142 S. Ct. at 2132.  And, as now explained, under that approach, plaintiffs are unlikely to succeed on the merits of their Second Amendment claim.

### 3.  When compared to historic regulations, the Act "impose[s] a comparable burden on the right of armed self-defense" and "that burden is comparably justified."

The Act is "relevantly similar" to historical regulations of dangerous and unusual weapons both in its "burden on the right of armed self-defense" and the justifications for that burden.  *Bruen*, 142 S. Ct. at 2132-33.  In conducting this

inquiry, courts must consider the entirety of the relevant historical tradition, which begins with an examination of the public understanding of the right when the Second and Fourteenth Amendments were ratified. *Id.* But *Bruen* also contemplates consideration of subsequent historical evidence in at least two ways, both of which are relevant here. First, as a practical matter, it would be impossible to account for the "dramatic technological changes" or "unprecedented societal concerns" that necessitate a "more nuanced approach" without looking at the time period in which those changes and concerns arose. *Id.* at 2132. Second, later history is relevant when there is a "regular course of practice" that "liquidate[s] & settle[s]" the meaning of the Constitution. *Id.* at 2136 (cleaned up). Here, evidence of our country's tradition of regulating dangerous and unusual weapons—beginning prior to the Founding era, continuing through the 18th and 19th centuries, and confirmed by early 20th century regulations—demonstrates that the Act is "relevantly similar" to firearms regulations of the past.

As detailed above, there is a longstanding tradition in this country—from the colonial era to the early 20th century—whereby a weapon is introduced into society, proliferates to the point where its use has become a significant threat to public safety, and is then regulated by the government to curb violence and protect the public. In the 18th and 19th centuries, as explained, *supra* pp. 33-35, States responded to the violence plaguing their communities in a number of ways, but most often through categorical restrictions on the ability to carry certain weapons in public. The scope of these regulations—which the Court recognized as permissible

42

restrictions on "dangerous and unusual" weapons, *Bruen*, 142 S. Ct. at 2128—was directly responsive to the problem at hand:  misuse of weapons like clubs, knives, pistols, and revolvers that could be concealed and brandished in a violent attack or other criminal undertaking, *supra* pp. 33-35.

Then in the early 20th century, States and the federal government followed this tradition when responding to the new threat presented by semiautomatic and automatic weapons.  *Supra* pp. 35-36.  Because the danger posed by these weapons went well beyond their concealable nature, legislatures enacted bans on civilian possession.  *Id.*  In *Heller*, the Court recognized that, as with the concealed carry restrictions of the 18th and 19th centuries, the 20th century bans on automatic weapons are constitutionally permissible.  554 U.S. at 627.  Thus, to the extent that there was ever any ambiguity about whether laws precluding civilians from possessing dangerous and unusual weapons are consistent with the public understanding of the Second Amendment, that question has been "liquidate[d] & settle[d]" by this regular course of practice and subsequent judicial approval. *Bruen*, 142 S. Ct. at 2136 (cleaned up).

The Act is consistent with this historical tradition.  Like its regulatory predecessors, the Act was passed in response to an increase in violence that corresponded with the proliferation of novel and deadly weapons.  *E.g. Herrera v. Raoul*, No. 23-cv-532, 2023 WL 3074799, *7 (Apr. 25, 2023).  As explained, *supra* Section II.B.2, the emergence of assault weapons and LCMs as mass shooting instruments is a recent phenomenon that has inflicted unprecedented death and

injury on communities across the country.  Since September 11, 2001, the deadliest

individual acts of intentional criminal violence in the United States have been mass

shootings, and the frequency of these incidents is only increasing.  Doc. 57-7 ¶ 11 &

figs. 1-2.  In fact, the specific regulations at issue here were enacted in response to a

mass shooting at an Independence Day parade, where a lone gunman used an AR-

15 and LCMs to fire 83 rounds in less than a minute, killing seven and wounding 48

more.  *Supra* p. 5.  In short, the public safety justifications underlying the Act are

nearly identical to those that prompted 18th, 19th, and 20th century legislatures to

regulate categories of weapons associated with an increase in homicides

attributable to specific weapons and other criminal misuse.

The Act is also relevantly similar to historical regulations in that it imposes,

at most, a minimal burden on an individual's right to armed self-defense.  *E.g.*, *Del.*

*State Sportsmen's Ass'n*, 2023 WL 2655150, *12 (assault weapon and LCM

restrictions impose "slight" burden on self-defense).  The instruments regulated by

the Act are weapons of war best suited for combat, not self-defense.  Their defining

characteristics allow them to fire dozens of rounds rapidly and accurately across

long distances, while inflicting injuries that destroy organs and other tissue.  *Supra*

Section II.A.2.  These features are unnecessary (and, in fact, often

counterproductive) for self-defense, but have been used by mass shooters to inflict

untold harm on innocent victims in Illinois and other communities across the

country.  *Supra* Sections II.A.2, II.B.2.  At the same time, there is no evidence that

either assault weapons or LCMs are commonly used for self-defense.  *Supra* Section

44

II.A.2.  Instead, the consensus is that handguns and shotguns are preferred for self-defense scenarios, which typically occur in close quarters and in circumstances where individuals benefit from their concealable nature and facile handling.  *Id.* And because the Act preserves access to a vast array of handguns, rifles, and shotguns, it is consistent with its historical predecessors in that it imposes tailored restrictions on the dangerous and unusual instruments causing harm to the public while retaining the ability for Americans to own and carry weapons for self-defense.

Beyond these similarities, which are themselves sufficient to satisfy *Bruen*'s second step, the Act is materially indistinguishable from the 20th century restrictions on the possession and sale of automatic and semiautomatic weapons. Like its early 20th century analogues, the Act restricts ownership of offensive, militaristic weapons designed for the battlefield that, when introduced into society, were used in mass-casualty acts of criminal violence that affected entire communities, *supra* Section II.B.2.  In fact, the AR-15 and M-16 are virtually identical weapons, except for the M-16's ability to toggle between semiautomatic and automatic fire, *supra* pp. 25-26; *Friedman*, 784 F.3d at 409 (AK-47 and AR-15 rifles are submachine guns in military use, "though civilian versions are restricted to semi-automatic fire").  But this distinction does not render an assault weapon any less an instrument of war than an M-16, which often is used in semiautomatic mode on the battlefield.  *Supra* pp. 25-26.  And because there is no basis to draw a principled distinction between the Act and these early 20th century regulations, plaintiffs' position would call into question the validity of the federal restrictions on

machine guns. *Heller*, 554 U.S. at 624 (deeming this suggestion "startling");
*Friedman*, 784 F.3d at 408 ("*Heller* deemed a ban on private possession of machine
guns to be obviously valid").

All told, there is a longstanding tradition in this country of restricting
dangerous weapons once they proliferate and cause substantial harm to the public.
Because the Act is consistent with this historical tradition, plaintiffs are unlikely to
succeed at the second step of the *Bruen* test, which is another reason to affirm the
district court's order denying preliminary injunctive relief.

**4.    Plaintiffs' arguments to the contrary lack merit.**

Notwithstanding the foregoing, plaintiffs argue that they are entitled to a
preliminary injunction because the State cannot satisfy its step-two burden. None
of their arguments is persuasive.

Plaintiffs' first argument—that there is no Founding-era evidence supporting
a categorical ban on commonly possessed weapons, AT Br. 16-17, 22-23—starts from
the wrong premise because, as explained, assault weapons and LCMs are not in
common use for self-defense, *supra* Section II.A.2. In any event, plaintiffs' attempt
to isolate individual laws and distinguish them by claiming that none "is analogous
to a categorical ban of commonly possessed arms" cannot overcome the evidence,
*supra* Section II.B.3, that the Act is consistent with the historical tradition
(predating the Founding) of regulating dangerous and unusual weapons.
Furthermore, this historical tradition—beginning with restrictions on knives,
pistols, and other melee weapons and culminating in the federal machine gun ban,

46

*supra* Section II.B.1—demonstrates that categorical bans are contemplated by the Second Amendment. And contrary to plaintiffs' suggestion, AT Br. 16-17, each of these categorical restrictions, including the materially indistinguishable machine gun restrictions, is permissible under that Amendment. *Bruen*, 142 S. Ct. at 2128 (carriage restrictions); *Heller*, 554 U.S. at 624, 627 (machine gun restrictions). Finally, to the extent there is any difference in scope between Founding- or Reconstruction-era regulations and the Act, that is because of the dramatic technological and societal shifts that have occurred in the interim. *Supra* Section II.B.2. Under the "more nuanced approach," courts must take those shifts into account when engaging in *Bruen*'s historical analysis. 142 S. Ct. at 2132.

Plaintiffs next assert that assault weapons and LCMs are not "dangerous and unusual" because commonly possessed weapons cannot be "unusual." AT Br. 32-33. As explained, *supra* Section II.A.2, plaintiffs have not made the threshold showing that these instruments are owned by more than a small percentage of Americans. In any event, the historical record refutes plaintiffs' premise that no popular weapon can be considered unusual. History is replete with examples of weapons being both common and characterized as unusual. *E.g.*, *State v. Huntly*, 25 N.C. 418, 422 (1843) (rejecting argument that "double-barrelled gun, or any other gun, cannot in this country come under the description of 'unusual weapons'" just because many "in the community . . . own[ed] and occasionally use[d] a gun"). As discussed, *supra* Section II.B.1, historical evidence shows that weapons only came to be considered dangerous and unusual—thus requiring a regulatory response—

47

after their widespread use created new societal problems.  The Act, which was enacted in response to the modern problem of assault weapons and LCMs being used in mass shootings, adheres to that historical tradition.

Plaintiffs also assert that the public-safety evidence presented by defendants cannot be considered under *Bruen*, which "prohibits means-ends scrutiny."  AT Br. 25.  But the State does not rely on this evidence as part of a means-ends analysis.  Instead, the State invokes public-safety considerations to explain how the Act responds to "unprecedented societal concerns" and why the Act is "comparably justified" to historical regulations, both of which are contemplated by *Bruen*.  142 S. Ct. at 2132-33.  And though plaintiffs do not dispute the validity of defendants' public-safety evidence, AT Br. 26, they nevertheless contend that the mass-shooting information is nullified by both *Heller* and *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).  Specifically, plaintiffs assert that under these decisions, "[t]he fact that a weapon can be used in a mass shooting does not disqualify it from Second Amendment protection."  AT Br. 28.  At the outset, this is not an accurate representation of the State's argument, which engages in a fulsome analysis under *Bruen* and does not rely solely on the existence of mass shootings to defend the Act.  Furthermore, neither *Heller* nor *Moore* weighed in on mass shootings or the question presented by this case—whether the purchase, sale, and possession of assault weapons and LCMs may be restricted—as plaintiffs suggest.  *Heller*, 554 U.S. at 573 (right to possess handguns for self-defense in the home); *Moore*, 702 F.3d at 942 (right to carry handguns for self-defense).

48

Nor is there any merit to plaintiffs' suggestion that this case is resolved under a holding plaintiffs infer from *Heller* to the effect that "semiautomatic handguns" are "protected by the Second Amendment." AT Br. 27-28. As an initial matter, *Heller* did not say anything about semiautomatic handguns in particular; instead, it concluded that a regulation banning possession of *all* handguns was impermissible because it left residents without an adequate means of self-defense in the home. 554 U.S. at 628-29. And that holding is not implicated here because, as explained, *supra* pp. 44-45, the Act leaves individuals with ample alternative means of self-defense.

In any event, many semiautomatic handguns are unaffected by the Act's restrictions, and revolvers that are handguns are not regulated by the Act. Indeed, contrary to plaintiffs' assertions, AT Br. 21, there are many "widely popular" semiautomatic handguns that are designed to function with magazines that hold seven or eight rounds, including those like the Sig P938, that "have been widely acclaimed by dozens of notable firearms industry experts as among the most effective concealed carry/self-defense firearms on the market." Doc. 57-5 ¶ 23; A595-96 ("Semi-automatic pistols from numerous manufacturers are sold with magazines that would be permitted under the Act," including "9mm caliber pistols [that] are available with standard magazines with a capacity of 15, 10, or as few as 7 rounds"). In fact, the Beretta Model 92, which is one of the weapons cited by plaintiffs as a "popular handgun used for self-defense," is not barred by the Act because it comes standard with a 15-round magazine, and not a 16-round magazine

49

as plaintiffs claim. *E.g.*, A494. Even semiautomatic handguns with detachable
magazines of greater than 15 rounds can be sold under the Act by simply replacing
the non-compliant magazine with a 15-round magazine. 720 ILCS 5/24-1.10(a);
Doc. 57-5 ¶ 23.

Plaintiffs further contend that 19th and 20th century evidence is irrelevant
under *Bruen*. AT Br. 6. But this is untrue: *Bruen* recognized that a variety of
historical sources and periods may inform the historical inquiry, and declined to
consider late 19th and early 20th century evidence in its analysis of the regulation
at issue only because it "contradict[ed] earlier evidence" that overwhelmingly
established a contrary tradition." 142 S. Ct. at 2154 n.28. As to the 19th century,
the Court assessed both the public understanding of the right to keep and bear
arms in 1791, when the Second Amendment was ratified, and in 1868, when the
Fourteenth Amendment was ratified, as well as the interpretation of the right in
the years following both ratifications. *Id.* at 2136-38; *Ezell v. City of Chicago*, 651
F.3d 684, 702 (7th Cir. 2011) (applying "wider historical lens" that includes
Reconstruction). And although the Court declined to resolve "whether courts should
*primarily* rely on the prevailing understanding" of the right from 1791 or 1868,
*Bruen*, 142 S. Ct. at 2138 (emphasis added), there is no question that the Court
considered both relevant to the historical analysis.

Likewise, as explained, *supra* p. 42, 20th century evidence is relevant to the
historical inquiry both to show that the regulated items reflect "dramatic
technological changes" that have caused "unprecedented societal concerns," *Bruen*,

50

142 S. Ct. at 2132-33, and as evidence of "a regular course of practice [that] can liquidate & settle the meaning of disputed or indeterminate terms & phrases in the Constitution," *id.* at 2132 (cleaned up). And here, because the historical evidence confirms that the Act responds to technological changes and societal concerns, and is also part of a regular course of practice of restricting dangerous and unusual weapons, it is appropriate for this court to consider the early 20th century restrictions on possessing automatic and semiautomatic weapons.

Finally, plaintiffs do not dispute that *Friedman* and *Wilson* are directly on point. Nor can they: the Act regulates assault weapons and LCMs in substantially the same way as the laws *Friedman* and *Wilson* upheld. *Compare* 720 ILCS 5/24-1.9(a)(1), 1.10(a) *with Friedman*, 784 F.3d at 407, *and Wilson*, 937 F.3d at 1029-30. Instead, plaintiffs assert that *Bruen* abrogated them. AT Br. 11. This is incorrect. The Court emphasized that its holding in *Bruen*—that New York's "may issue" licensing scheme for publicly carrying handguns violated the Second Amendment, 142 S. Ct. at 2123-24—was limited to the statute before it, *id.* at 2134; *id.* at 2157 (Alito, J., concurring) (Court did not "decide anything about the kinds of weapons that people may possess"). Nor does *Bruen* require a different result than this court reached in *Friedman* and *Wilson*. Indeed, *Friedman* and *Wilson* eschewed the levels-of-scrutiny approach that *Bruen* overruled in favor of a historical analysis. *See Friedman*, 784 F.3d at 410 (asking whether regulated items "were common at the time of ratification" and "whether law-abiding citizens retain adequate means of

self- defense"); *Wilson*, 937 F.3d at 1033 (same).  Accordingly*, Bruen* does not require the court to reach a different result than in *Friedman* and *Wilson*.

### III.  Plaintiffs have not shown they lack an adequate remedy at law or will suffer irreparable harm absent a preliminary injunction.

In their preliminary injunction motions before the district court, plaintiffs failed to raise any argument related to inadequate remedy at law or irreparable harm, *see* Doc. 50, and thus failed to satisfy their burden on either factor.  On appeal, plaintiffs rely on two possible forms of alleged irreparable harm, but because they were not presented to the district court, these arguments are waived. *Bradley v. Vill. of Univ. Park*, 59 F.4th 887, 897 (7th Cir. 2023).

In any event, neither argument is persuasive.  First, plaintiffs cite *Ezell* for the proposition that a probable violation of Second Amendment rights presumptively establishes irreparable harm.  AT Br. 46-47.  But *Ezell* is inapposite. In *Ezell*, the ordinance required firing range training "as a prerequisite to lawful gun ownership, yet at the same time prohibit[ed] all firing ranges in the city."  651 F.3d at 689-90.  Because the ordinance made it "impossible" to qualify for gun ownership, it burdened the Second Amendment's "central component"—"the right to possess firearms for protection"—and this court presumed that "[i]nfringements of this right [could not] be compensated by damages."  *Id.*  By contrast, the Act does not preclude anyone from purchasing any number of handguns, shotguns, or other weapons for self-defense.

Second, plaintiffs allege that the gun store and its owner will suffer financial loss.  AT Br. 47.  As support, they rely on *Cavel International, Inc. v. Madigan*, 500

F.3d 544 (7th Cir. 2007), but there, a horsemeat exporter challenged a statute that would have outlawed the exporter's entire business and made its failure "a virtual certainty," *id.* at 545. And the defendants were "state officials sued in their official capacities" from whom the exporter "could not obtain monetary relief." *Id.* at 546. Here, the gun store does not exclusively sell assault weapons and LCMs; it also sells firearms not covered by the Act, and offers gunsmithing and firearms training services.[8] Nor did plaintiffs' declaration make clear that the store would close during this appeal; it gave no estimate of how long the business could survive. Doc. 71-1. Plaintiffs also failed to explain why a damages award could not make the store's owner whole. Doc. 48 at 7 (seeking compensatory damages); *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1024 (7th Cir. 2017) ("Harm cannot be considered irreparable if it can be fully rectified in a final judgment.").

## IV.  Plaintiffs have not shown that the equities, including the public interest, balance in their favor.

The balance of equities and public interest also favor denying preliminary injunctive relief. As an initial matter, plaintiffs have waived this argument by failing to raise it below, *see supra* p. 52. Additionally, as discussed, plaintiffs have not made a strong showing that they will prevail or that their inability to purchase or sell assault weapons and LCMs will irreparably harm them.[9] By contrast, the

---

[8]  Law Weapons & Supply, Online Store, http://bit.ly/3ZTimoU; Law Weapons & Supply, Law Weapons In-House Gun-Smithing Service, https://bit.ly/3Fby3jk; Law Weapons & Supply, Law Weapons Training Courses, https://bit.ly/3ZBbtJ8.

[9]  Additionally, plaintiffs incorrectly state that the State would not be "harmed by an injunction in this Court, because the law is already subject to an injunction in

Act's restrictions on assault weapons and LCMs promote a compelling interest in

protecting the public and saving lives. As explained, *supra* Section II.B.2, assault

weapons and LCMs are disproportionately used in mass shootings. And when used

in crimes, their destructive capabilities inflict substantial injury and death. *Id.*

Indeed, according to a recent epidemiological study, States that have enacted

similar restrictions have "experienced a 56% decrease in high-fatality mass shooting

incidence rates" and a "72% decrease in the rate of deaths resulting from high-

fatality mass shootings" over the past three decades. Doc. 57-7 ¶¶ 36-37. All told,

the balance of equities weighs heavily in favor of affirming the district court's order.

## V.    Plaintiffs are not entitled to a statewide injunction.

Should this court determine that relief is warranted, however, it should deny

plaintiffs' request for a statewide injunction. AT Br. 50. Generally, injunctions

should not exceed "the extent of the plaintiff's protectible right," *PepsiCo, Inc. v.

Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995), and those that extend further

"present real dangers, and will be appropriate only in rare circumstances," *City of

Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020). This case does not qualify.

Plaintiffs did not seek statewide relief in their preliminary injunction motion,

Doc. 50, and expanded their request for relief only when moving for an injunction

---

[state] court." AT Br. 50 (citing SA4 4 n.2). The state-court orders apply only to
their parties; there is no statewide injunction. *E.g.*, *Accuracy Firearms, LLC v.
Pritzker*, 2023 IL App (5th) 230025 ¶ 1. And an appeal in the state-court challenge
to the Act, which is not premised on a violation of the Second Amendment or any
other federal right, is pending before the Illinois Supreme Court. *Caulkins v.
Pritzker*, No. 129453 (Ill. Sup. Ct.).

pending appeal in the district court, Doc. 71 at 18-19.  They have offered no explanation for this delay, which undercuts their claim that sweeping relief is now necessary to prevent irreparable harm.  *Simon Prop. Grp. v. mySimon, Inc.*, 282 F.3d 986, 990 (7th Cir. 2002) (failure to seek preliminary injunction "strongly undermine[d]" plaintiff's assertion of irreparable harm in later request for permanent injunction).  Nor have plaintiffs supported this broad request by offering any evidence of irreparable harm beyond the alleged financial difficulties of a single gun store.  Doc. 71-1.  Instead, they make the conclusory and unsupported argument that broad, injunctive relief is warranted based solely on the Act's purported constitutional defect.  For the same reasons as those discussed above, however, such relief is not appropriate here.

## CONCLUSION

The State requests that this court affirm the district court's denial of preliminary injunctive relief.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Intervening Appellee

/s/ Sarah A. Hunger
**SARAH A. HUNGER**
Deputy Solicitor General
**CARSON R. GRIFFIS**
**IVAN PARFENOFF**
Assistant Attorneys General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

May 3, 2023

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word, in 12-point Century Schoolbook font, and complies with Federal Rule of Appellate Procedure 32(a)(7)(A) in that the brief is 13,978 words.

/s/ Sarah A. Hunger
**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 3, 2023, I electronically filed the foregoing Brief of Intervening Appellee with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ Sarah A. Hunger</u>
**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov