No. 23-1353

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————

National Association for Gun Rights, Robert C. Bevis, and Law Weapons,
Inc., D/B/A Law Weapons & Supply, an Illinois corporation,

*Plaintiffs-Appellants,*

v.

City of Naperville, Illinois, a municipal corporation, and Jason Arres,

*Defendants-Appellees,*

State of Illinois,

*Intervening Appellee.*

———————————

**On Appeal from the United States District Court
for the Northern District of Illinois, Case No. 1:22-cv-04775
The Honorable Virginia M. Kendall, Judge**

**APPELLEES CITY OF NAPERVILLE AND JASON ARRES'
RESPONSE IN OPPOSITION TO APPELLANTS' OPENING BRIEF**

Christopher B. Wilson (*Counsel of Record*)
Kathleen A. Stetsko
Daniel T. Burley
Micaela Snashall
Kahin Gabriel Tong
**PERKINS COIE LLP**
110 N. Wacker, Ste. 3400
Chicago, IL 60606
Telephone: (312) 324-8400
CWilson@perkinscoie.com
KStetsko@perkinscoie.com
DBurley@perkinscoie.com
MSnashall@perkinscoie.com
KTong@perkinscoie.com

Douglas N. Letter
Shira Lauren Feldman
**BRADY CENTER TO PREVENT GUN
VIOLENCE**
840 First Street NE, Suite 400
Washington, DC 20002
Telephone: (202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

*Attorneys for Defendants-Appellees City
of Naperville, Illinois, and Jason Arres*

**Save As**   **Clear Form**

### APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
City of Naperville, a municipal corporation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Perkins Coie LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and
        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
n/a

Attorney's Signature: /s/ Christopher B. Wilson    Date: 02/27/2023

Attorney's Printed Name: Christopher B. Wilson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ✔  **No** ☐

Address: 110 N. Wacker Dr., Suite 3400, Chicago IL 60606

Phone Number: 312.324.8603    Fax Number: 312.324.9603

E-Mail Address: cwilson@perkinscoie.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

City of Naperville, a municipal corporation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Perkins Coie LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

n/a

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Kathleen Stetsko    Date: 05/01/2023

Attorney's Printed Name:  Kathleen Stetsko

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: 110 N. Wacker Dr., Suite 3400, Chicago, IL 60606

Phone Number: 312.324.8400    Fax Number: 312.324.9400

E-Mail Address: kstetsko@perkinscoie.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    City of Naperville, a municipal corporation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Perkins Coie LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Daniel T. Burley    Date: 4/13/2023

Attorney's Printed Name: Daniel T. Burley

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 110 N. Upper Wacker Dr., Suite 3400, Chicago IL 60606

Phone Number: 312.324.8639    Fax Number: N/A

E-Mail Address: DBurley@perkinscoie.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

City of Naperville, a municipal corporation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Perkins Coie LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Micaela Snashall     Date: 03/14/2023

Attorney's Printed Name: Micaela Snashall

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address: 110 N. Wacker Dr., Suite 3400, Chicago IL 60606

Phone Number: 312.324.8423     Fax Number: 312.324.9400

E-Mail Address: msnashall@perkinscoie.com

rev. 12/19 AK

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

        City of Naperville, a municipal corporation

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

        Perkins Coie LLP

(3)     If the party, amicus or intervenor is a corporation:

        i)     Identify all its parent corporations, if any; and

               N/A

        ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

               N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

        N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

        N/A

Attorney's Signature: /s/ Kahin Gabriel Tong     Date: 3/14/2023

Attorney's Printed Name:  Kahin Gabriel Tong

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** [ ]  **No** [✓]

Address:  110 N. Upper Wacker Dr., Suite 3400, Chicago, IL 60606

Phone Number: 312.673.6493     Fax Number:  N/A

E-Mail Address: KTong@perkinscoie.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

City of Naperville, a municipal corporation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Perkins Coie LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Douglas Letter      Date: 03/28/2023

Attorney's Printed Name: Douglas Letter

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address: 840 First St. NE Washington, D.C. 20002

Phone Number: 202.370.8100      Fax Number: 202.370.8102

E-Mail Address: dletter@bradyunited.org

rev. 12/19 AK

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-1353

Short Caption: Robert Bevis, et al. v. City of Naperville, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

City of Naperville, a municipal corporation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Perkins Coie LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

n/a

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Shira Feldman          Date: 03/28/2023

Attorney's Printed Name: Shira Feldman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ✔

Address: 840 First St. NE Washington, D.C. 20002

Phone Number: 202.370.8100          Fax Number: 202.370.8102

E-Mail Address: sfeldman@bradyunited.org

rev. 12/19 AK

# TABLE OF CONTENTS

**PAGE**

JURISDICTIONAL STATEMENT ................................................ 1

ISSUE PRESENTED FOR REVIEW ............................................. 1

STATEMENT OF THE CASE .................................................... 2

SUMMARY OF ARGUMENT ................................................... 7

STANDARD OF REVIEW ...................................................... 9

ARGUMENT ..................................................................... 10

I.    Plaintiffs' challenge to the Sale Ordinance is not likely to succeed on the merits. ........................................................... 10

    A.    The Second Amendment right to "keep" and "bear" arms does not protect the commercial sale of assault weapons. ........................... 15

    B.    Plaintiffs do not show that assault weapons are "Arms" protected by the Second Amendment. ..................................... 17

        1.    Assault weapons are not "in common use" for self-defense. ................................................................ 17

        2.    Assault weapons are "dangerous" and "unusual." .................... 21

    C.    Naperville's Sale Ordinance is consistent with the United States' historical tradition of regulating dangerous and unusual weapons. .................................................... 28

        1.    Under *Bruen*'s framework, Naperville's Sale Ordinance follows the historical tradition of regulating dangerous and unusual weapons, particularly ones frequently employed in unlawful activities rather than lawful self-defense. ................................................ 30

            (a)    Weapons were regulated during early America. ............. 33

            (b)    Dangerous and unusual types of weapons were regulated in the late 19th Century. .................................. 36

            (c)    Government regulations of weapons continued into the early 20th Century. ............................................. 38

**TABLE OF CONTENTS**
**(continued)**

PAGE

2.  Consistent with historical tradition, Naperville's Sale
    Ordinance regulates dangerous and unusual weapons
    in the modern era. ........................................................ 40

II.  Plaintiffs have not met the remaining injunction factors. ............................ 45

A.  Plaintiffs suffered no irreparable harm. ................................................. 45

B.  The balance of equities tips heavily in Naperville's favor. ................... 46

C.  Plaintiffs are not entitled to a statewide injunction. ............................ 47

CONCLUSION ................................................................................................. 48

CERTIFICATE OF COMPLIANCE ........................................................... 50

CERTIFICATE OF SERVICE ..................................................................... 51

# TABLE OF AUTHORITIES

**PAGE(S)**

<small>CASES</small>

*Cassell v. Snyders,*
  990 F.3d 539 (7th Cir. 2021) ................................................................ 10

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.,*
  No. CV 22-951-RGA, 2023 WL 2655150 (D. Del. Mar. 27, 2023) ........................ 20

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................................ passim

*DM Trans, LLC v. Scott,*
  38 F.4th 608 (7th Cir. 2022) ................................................................ 45

*Duncan v. Bonta,*
  19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated,*
  142 S. Ct. 2895 (2022), *and vacated and remanded on other*
  *grounds,* 49 F.4th 1228 (9th Cir. 2022) ................................................ 20

*English v. State,*
  35 Tex. 473 (1872), *abrogated on other grounds by N.Y. State*
  *Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111 (2022) ........................... 27

*Friedman v. City of Highland Park,*
  784 F.3d 406 (7th Cir. 2015), *cert. denied,* 577 U.S. 1039 (2015) ........... passim

*Gould v. Morgan,*
  907 F.3d 659 (1st Cir. 2018) ................................................................ 14

*Hanson v. District of Columbia,*
  No. CV 22-2256 (RC), 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ....................... 14

*Kachalsky v. Cnty. of Westchester,*
  701 F.3d 81 (2d Cir. 2012) ................................................................ 14

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019) ................................................................ 14

*Kolbe v. Hogan,*
  849 F.3d 114, 142 (4th Cir. 2017), *abrogated on other grounds by*
  *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111 (2022) ............. 14, 19, 46

# TABLE OF AUTHORITIES
## (continued)

PAGE(S)

*Lawson Prods., Inc. v. Avnet, Inc.*,
    782 F.2d 1429 (7th Cir. 1986) ................................................. 10

*Life Spine, Inc. v. Aegis Spine, Inc.*,
    8 F.4th 531 (7th Cir. 2021) ..................................................... 9

*Lukaszczyk v. Cook County.*,
    47 F.4th 587, 598 (7th Cir. 2022*), cert. denied sub nom.* ....................... 9

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ................................................ 13, 15, 32

*Midwest Fence Corp. v. U.S. Dep''t of Transp.*,
    840 F.3d 932 (7th Cir. 2016) ................................................. 17

*N.Y. State Rifle & Pistol Ass'n, v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ............................................. 26, 46

*New York State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) .................................................. passim

*Second City Music, Inc. v. City of Chicago*,
    333 F.3d 846 (7th Cir. 2003) ................................................. 46

*State v. Huntly*,
    25 N.C. 418 (1843) .......................................................... 27

*Teixeira v. County of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ............................................. 11, 16

*Textile Banking Co. v. Rentschler*,
    657 F.2d 844 (7th Cir. 1981) ................................................. 47

*Troogstad v. City of Chi.*,
    143 S. Ct. 734 (2023). ....................................................... 9

*Turnell v. CentiMark Corp.*,
    796 F.3d 656 (7th Cir. 2015) ................................................. 45

*United States v. Chafin*,
    423 F. App'x 342 (4th Cir. 2011) ............................................ 16

# TABLE OF AUTHORITIES
## (continued)

**PAGE(S)**

*United States v. Focia,*
   869 F.3d 1269 (11th Cir. 2017) .............................................................. 14

*United States v. Greeno,*
   679 F.3d 510 (6th Cir. 2012*)* ................................................................. 14

*United States v. Miller,*
   307 U.S. 174 (1939) ................................................................................ 12

*United States v. Rowson,*
   No. 22 CR. 310 (PAE), 2023 WL 431037 (S.D.N.Y. Jan. 26, 2023)...................... 14

*United States v. Tilotta,*
   No. 3:19-cr-04768-GPC, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ................ 16

## STATUTES

720 ILCS 5/24-1.9 ........................................................................................... 6

720 ILCS 5/24-1.10 ......................................................................................... 6

28 U.S.C. § 1292(a)(1) ..................................................................................... 1

28 U.S.C. § 1331.............................................................................................. 1

28 U.S.C. § 2107(a) ......................................................................................... 1

42 U.S.C. § 1983.............................................................................................. 1

Illinois Firearm Dealer Certification Act, section 3-19-1................................ 4

Public Safety and Recreational Firearms Use Protection Act, Pub. L.
   No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (1994).......................... 5

## RULES

7th Cir. R. 28(b) .............................................................................................. 1

Fed. R. App. P. 4(a)(1)(A)................................................................................ 1

## OTHER AUTHORITIES

3 Bird Wilson, *Works of the Honourable James Wilson* 79 (1804)............................ 21

**TABLE OF AUTHORITIES**
**(continued)**

**PAGE(S)**

Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822) ............................................................... 21

Christopher S. Koper, *et al.*, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003* (2004) .................................................................... 5

Henry J. Stephen, *Summary of the Criminal Law* 48 (1840) .................................... 21

U.S. Const. amend. II ........................................................................passim

4 William Blackstone, *Commentaries* 148 (1769) ................................................ 21, 27

## JURISDICTIONAL STATEMENT

The jurisdictional statement of Plaintiffs-Appellants National Association for Gun Rights, Robert C. Bevis, and Law Weapons, Inc. is not complete and correct. Defendants-Appellees City of Naperville and Jason Arres provide this jurisdictional statement under Circuit Rule 28(b).

Plaintiffs brought this action in the district court under 42 U.S.C. § 1983, alleging in the operative complaint that Defendants-Appellees City of Naperville and Naperville Police Chief Jason Arres (collectively, "Naperville") violated their rights under the Second Amendment to the United States Constitution. Dkt. 1, 48.[1] The district court had subject matter jurisdiction over this federal claim under 28 U.S.C. § 1331.

On February 17, 2023, the district court denied Plaintiffs' motions for preliminary injunction. Dkt. 63. On February 21, 2023, Plaintiffs filed a timely notice of appeal within 30 days of that order. Dkt. 64; *see* 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A). This court has jurisdiction over the appeal from a denial of a preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1).

## ISSUE PRESENTED FOR REVIEW

Did the District Court abuse its discretion by denying Plaintiffs' motion to preliminarily enjoin Naperville's ordinance regulating the commercial sale of certain assault rifles (the "Sale Ordinance") when (1) the Sale Ordinance does not implicate

---

[1] This appellee brief cites Plaintiffs' merits brief as "AT Br."; Plaintiffs' appendix as "App."; the District Court's docket as "Dkt."; this Court's docket as "7th Cir. Dkt."; and Naperville's supplemental appendix as "Supp. App."

the plain text of the Second Amendment; (2) the Sale Ordinance is consistent with the United States' historical tradition of firearm regulation; and (3) Plaintiffs have not carried their burden on the other preliminary injunction factors?[2]

### STATEMENT OF THE CASE

Mass shootings are a tragic and far too common American phenomenon. Mass shooters attack in public spaces—schools, supermarkets, churches and synagogues, parades, and music festivals—and their weapons of choice, almost exclusively, are semi-automatic assault weapons designed for military use, coupled with large-capacity magazines. These "perfect killing machines," designed as weapons of war, have been used in the highest-fatality mass shootings in recent years—in Uvalde, Buffalo, El Paso, Pittsburgh, Parkland, Sutherland Springs, Las Vegas, San Bernadino, Orlando, and Newtown. 7th Cir. Dkt. 17 at 1, 10; App. 001.

In July 2022, a gunman with a Smith & Wesson M&P15, an AR-15-style assault rifle, opened fire upon a crowded Fourth of July parade in Highland Park, Illinois, killing seven people and wounding 48 others in less than 90 seconds. In response, the City of Naperville recognized a need for greater gun regulation to improve the community's safety and protection.

---

[2] Plaintiffs have also appealed the District Court's decision to deny their motion to enjoin Naperville Police Chief Jason Arres from enforcing the State of Illinois' Public Act 102-1116 (the "Act"). Naperville and Arres incorporate and rely on the arguments and positions of the State of Illinois regarding the constitutionality of the Act, and request that this Court affirm the District Court's decision to deny a preliminary injunction enjoining Arres from enforcing the Act.

Naperville introduced an ordinance regulating the commercial sale of certain assault weapons within Naperville's city limits. Dkt. 12-1. The City Council heard public comments in favor and opposed to the proposed ordinance at meetings in July and August 2022. Scores of citizens spoke or submitted written statements in support of the Sale Ordinance. One recounted a family member killed by an assault weapon in a drive-by shooting. City of Naperville, *City Council Meeting Minutes*, 16 (July 19, 2022), https://naperville.legistar.com/Calendar.aspx. Another told of the mother of a 10-year-old murdered in the Uvalde shooting who later received her daughter's backpack shot through with bullet holes. *Id.* at 17. A mother of two children in Naperville schools recalled the "scariest 15 minutes of [her] life" when her son, at the time a sophomore at a Naperville high school, texted her about a threat after morning drop off. City of Naperville, *City Council Meeting Minutes*, 26 (Aug. 16, 2022), https://naperville.legistar.com/Calendar.aspx. He told her that the school's alarms were going off and an announcement warned that this was not a drill. *Id.* Students barricaded the classroom door and hid under desks and tables. *Id.* Some cried. *Id.* She texted her son to break a window and leave, but he was in an interior room. *Id.* Thankfully, it was a false alarm—there was no active shooter. *Id.* "Please pass this ordinance," she wrote. "We need to put in as many safety nets as we can to prevent that horrible morning from being just a false alarm to a reality." *Id.*

The City Council passed the Sale Ordinance by an 8-1 vote. *Id.* at 30–31. "At the end of the day, we have to do what's right to protect the public and that's our job," said Naperville Mayor Steve Chirico. Christian Piekos, *Ban on Sale of High-Powered*

*Rifles in Hours-Long Naperville City Council Meeting*, ABC7 Chi. (Aug. 18, 2022), https://abc7chicago.com/naperville-city-council-meeting-assault-weapons-ban-il-illinois/12132706/.

Under the Sale Ordinance, a "commercial sale" is a sale that requires the seller to have a valid certificate of license issued pursuant to the Illinois Firearm Dealer Certification Act. Supp. App. 8. The Sale Ordinance provides an exemption for commercial sales to sworn police employees, police agencies, and military agencies. Supp. App. 7-9. Section 3-19-1 of the Sale Ordinance provides that weapons with one or more of the following features are considered an "Assault Rifle," the sale of which is prohibited in the city:

> (1) A semiautomatic rifle that has a magazine that is not a fixed magazine and has any of the following:
> (A) A pistol grip.
> (B) A forward grip.
> (C) A folding, telescoping, or detachable stock, or is otherwise foldable or adjustable in a manner that operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability, of the weapon.
> (D) A grenade launcher.
> (E) A barrel shroud.
> (F) A threaded barrel.
> (2) A semiautomatic rifle that has a fixed magazine with the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.
> (3) Any part, combination of parts, component, device, attachment, or accessory that is designed or functions to accelerate the rate of fire of a semiautomatic rifle but not convert the semiautomatic rifle into a machinegun.

Supp. App. 5.

The Sale Ordinance also regulates the sale of specific assault rifles, named by make and model, along with replicas and duplicates. Supp. App. 4-7. The definition

of "assault rifle" closely mirrors the definition of "semiautomatic assault weapon" in what was commonly known as the Federal Assault Weapons Ban. *See* Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996–2010 (1994). That federal ban lasted a decade and survived multiple constitutional challenges but expired in 2004 and has not been renewed by Congress. Retrospective data show that the federal ban and similar laws have reduced the share of gun crimes involving assault rifles like those contemplated by the Sale Ordinance. *See Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015) (citing Christopher S. Koper, *et al.*, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003*, at 39–60 (2004)), *cert. denied*, 577 U.S. 1039 (2015).

Plaintiffs-Appellants Robert Bevis, his Naperville gun shop Law Weapons, Inc. (d/b/a Law Weapons & Supply), and advocacy group National Association of Gun Rights ("NAGR"), sued Naperville, alleging that the Sale Ordinance violated the Second Amendment. Dkt. 1 at 10. Plaintiffs moved for a temporary restraining order and preliminary injunction against the enforcement of the Sale Ordinance. Dkt. 10. Naperville agreed to stay the Sale Ordinance, initially set to go into effect on January 1, 2023, pending disposition of Plaintiffs' motion. Dkt. 29

On January 10, 2023, the State of Illinois similarly responded to the mass shootings in Highland Park and across the country by enacting the Protect Illinois Communities Act (the "Act"). With some exceptions, the Act prohibits the sale, purchase, manufacture, delivery, and importation of assault weapons and large

capacity magazines. 720 ILCS 5/24-1.9, 5/24-1.10.[3] The Act's definition of "assault weapon" includes the "assault rifles" prohibited in the Sale Ordinance. The Sale Ordinance therefore restricts the sale of a more limited set of weapons—certain assault rifles only—than those banned by the Act. For the reader's convenience, in this brief, Naperville uses the broader term "assault weapon" to describe the firearms at issue, as the District Court did in its opinion and as Plaintiffs did in their opening brief. App. 002; AT Br. 2 n.1.

Shortly after the State passed the Act, the District Court granted Plaintiffs leave to amend their complaint, add Naperville Police Chief Jason Arres as a party, and challenge the Act along with the Sale Ordinance. Dkts. 41, 47, 48. Plaintiffs moved for a temporary restraining order and preliminary injunction against Arres for his role in enforcing the Act. Dkt. 50.

On February 17, 2023, the District Court denied Plaintiffs' motions. *See generally* App. 001. First, the District Court determined that Plaintiffs "are unlikely to succeed on the merits of their claim because Naperville's Sale Ordinance and the . . . Act are consistent with the Second Amendment's text, history, and tradition." *Id.* at 005. The District Court held that under the Second Amendment and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), "governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories)." *Id.* at 026. After carefully examining analogous historical regulations, the District

---

[3] The Act also contains regulations that ban assault-weapon and large-capacity magazine ownership and impose registration requirements, but those regulations are not at issue in this appeal because they are not yet in effect.

Court reasoned that because assault weapons are "particularly dangerous weapons" given their especially deadly features, "their regulation accords with history and tradition." *Id.* at 030. Accordingly, Plaintiffs failed to demonstrate they were likely to succeed on the merits. *Id.* at 032. The District Court also found that Plaintiffs had not demonstrated irreparable harm because Plaintiffs could "still sell almost any other type of gun." *Id.* at 032. Finally, the District Court found that the balancing of equities weighs in favor of Defendants—"Illinois and Naperville compellingly argue their laws protect public safety by removing particularly dangerous weapons from circulation." *Id.* at 033.

Plaintiffs appealed to this Court. 7th Cir. Dkt. 1. Shortly thereafter, Plaintiffs moved in the District Court for an injunction pending appeal, Dkt. 71, which the District Court denied. Dkt. 73. Plaintiffs then sought an injunction pending appeal in this Court, which this Court denied. 7th Cir. Dkts. 10, 51. Plaintiffs then applied for an injunction pending appeal in the United States Supreme Court. *See National Ass'n for Gun Rights, et al., Applicants v. City of Naperville, Illinois, et al.,* No. 22A948 (May 1, 2023). Their application is pending.

## SUMMARY OF ARGUMENT

This Court should affirm the District Court's denial of a preliminary injunction. Plaintiffs are unlikely to succeed on the merits of their constitutional claims.

Plaintiffs claim "[t]his is an exceedingly simple case." AT Br. 5. They argue that the Sale Ordinance is unconstitutional because the regulated assault weapons are "possessed by literally millions of law-abiding citizens for lawful purposes,

including self-defense in the home." *Id.* But the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) called for a considerably more sophisticated two-step analysis. *See generally* App. 001–33. This Court should ignore Plaintiffs' invitation to disregard the Supreme Court's instructions.

Plaintiffs cannot meet either required step of the Second Amendment analysis set forth in *Bruen*. For step one, Plaintiffs must show that the plain text of the Second Amendment covers their proposed actions ("keep and bear"), and their proposed weapons ("Arms"). Plaintiffs have not carried this burden as to either step-one requirement. The action prohibited by the Sale Ordinance—sale of certain assault weapons—plainly is not a prohibition on any person's ability to "keep" or "bear" weapons.

Plaintiffs have also failed to show that assault weapons are "Arms" that fall within the scope of Second Amendment protection under *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008). Plaintiffs have not shown that the assault rifles covered by the Sale Ordinance are commonly used for lawful self-defense. And even if they could make that showing, assault weapons still sit outside the original public meaning of "Arms" because they are "dangerous" and "unusual" weapons, which have historically fallen outside the scope of the Second Amendment's protection. As discussed below, there is no evidence that assault weapons are commonly used for lawful self-defense. And there is a great deal of evidence that assault weapons are dangerous and unusual weapons.

For these distinct reasons, Plaintiffs fail their burden at *Bruen*'s first step. The Court may end its inquiry here and affirm the District Court's ruling.

Plaintiffs also fail at the second step of the *Bruen* analysis. As the District Court found, Naperville has provided voluminous evidence demonstrating that its Sale Ordinance comports with this Nation's historical tradition of regulating dangerous and unusual firearms like those covered by the Sale Ordinance. For this independent reason, the Sale Ordinance is constitutional. Plaintiffs are unlikely to succeed on the merits of their claims.

Finally, Plaintiffs have failed to establish that any of the other injunction factors support preliminary relief: they will not suffer irreparable harm absent an injunction; they do not lack an adequate remedy at law; and the balance of harms strongly weighs against such extraordinary relief.

The District Court's ruling should be upheld.

## STANDARD OF REVIEW

A denial of a preliminary injunction is reviewed for abuse of discretion. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). In doing so, the Court reviews the District Court's legal conclusions *de novo* and its factual findings for clear error. *Lukaszczyk v. Cook County.*, 47 F.4th 587, 598 (7th Cir. 2022), *cert. denied sub nom. Troogstad v. City of Chi.*, 143 S. Ct. 734 (2023) (affirming denial of preliminary injunction in constitutional challenge). "Absent legal or factual errors, [the Court] affords great deference to the [District] court's decision." *Life Spine, Inc.*, 8 F.4th at 539 (citation omitted). As such, "the ultimate evaluation and balancing of the equitable factors is a highly discretionary decision and one to which this court must

give substantial deference." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir. 1986).

## ARGUMENT

The Supreme Court has stated unequivocally that the right to keep and bear arms even for self-defense purposes "is not unlimited." *Heller*, 554 U.S. at 626. The plain text of the Second Amendment allows Naperville to regulate the sale of assault weapons within its city limits. This prohibition is also consistent with the Nation's history and tradition of regulating dangerous and unusual firearms. Plaintiffs must demonstrate a likelihood of success on the merits, and establish that they have no adequate remedy at law and will suffer irreparable harm without preliminary relief. *Cassell v. Snyders*, 990 F.3d 539, 544–45 (7th Cir. 2021). As the District Court's ruling demonstrates, Plaintiffs have not met any of these requirements.

## I.    Plaintiffs' challenge to the Sale Ordinance is not likely to succeed on the merits.

The Second Amendment provides in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court says that the Second Amendment "extends only to certain types of weapons," and since the Founding, not all weapons have been considered "Arms." *Heller*, 554 U.S. at 622–23 (explaining that the Second Amendment's protection may not extend to some particular "type[s] of weapon[s]"). The Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626). The Supreme

Court has held only that the Second Amendment protects "an individual right to keep and bear arms for self-defense." *Id.* at 2125. In other words, consistent with the Second Amendment, firearms are subject to government regulation, including regulating whether certain firearms may be sold, purchased, or possessed.

The Supreme Court in *Bruen* set forth a two-step test to determine whether a government regulation survives a Second Amendment challenge. Challengers bear the burden of proof at the first step. The burden then shifts to the government if the Court reaches step two. *Id.* at 2130.

First, Plaintiffs must establish that that the law they are challenging infringes upon their right to "keep" and "bear" "Arms." Plaintiffs also must show the weapons at issue are "Arms" within the plain meaning of the Second Amendment.[4]

The Supreme Court has said only that the Second Amendment protects the right to "keep and bear" handguns for lawful self-defense in certain situations. No court has found that "keep" and "bear" includes "sell." Thus, no court has found that selling is a protected right, let alone selling weapons other than handguns, such as assault weapons. *See, e.g., Teixeira v. County. of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017) ("[T]he Second Amendment does not independently protect a proprietor's right to sell firearms."). Moreover, the Supreme Court has made clear that commercial regulations governing firearms are "presumptively lawful." *Heller*, 554 U.S. at 626–

---

[4] As a separate textual element, Plaintiffs must show that they are part of "the people" within the meaning of the Second Amendment. *Bruen*, 142 S. Ct. at 2127 (citing *Heller*, 554 U.S. at 579–80). That element is not at issue in this appeal.

27 n.26; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). For this reason, the Sale Ordinance is constitutional on its face.

Alternatively, two questions determine whether specific weapons are "Arms." One, are the weapons in question "weapons that are 'in common use at the time' for lawful purposes like self-defense"? *Heller*, 554 U.S. at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); *see also Bruen*, 142 S. Ct. at 2134 (referencing whether the subject "weapons [are] 'in common use' today for self-defense" (quoting *Heller*, 554 U.S. at 627)). Two, are the weapons "dangerous and unusual"?[5] Weapons not "in common use" for self-defense at the time of the regulation at issue, and "dangerous" and "unusual" weapons, are outside the scope of the Second Amendment. If a firearm fails either test, the regulation is constitutional, and the Court should uphold it.

Plaintiffs have not met their burden at this first step. Plaintiffs have not demonstrated that assault weapons are "Arms" for which the Second Amendment protects the right to "keep" and "bear." The plain text of the Second Amendment says nothing about a right to sell firearms. Selling assault weapons is not a constitutionally protected activity. Separately, assault weapons are <u>not</u> "in common use," as the term was understood at the Founding, for the lawful purpose of self-

---

[5] As discussed below (*see infra* Section I.B.2), the historical sources *Heller* cited for the phrase "dangerous and unusual weapons" demonstrate that both "dangerous" weapons and "unusual" weapons were historically prohibited. Plaintiffs are wrong that the Court can ignore the word "dangerous" in this analysis and ask merely whether assault weapons are "unusual." AT Br. 7–8. In any event, because assault weapons are both "dangerous" and "unusual," the outcome does not change.

defense. They therefore are not covered by the Second Amendment. Finally, because assault weapons are "dangerous" and "unusual," they are not protected by the Second Amendment. The Court may end its analysis at step one and affirm the District Court's decision.

For *Bruen's* second step, the regulation of weapons, even if they are "Arms" that people can "keep" and "bear" under by the Second Amendment, remains constitutional if the government "can demonstrat[e] that [the regulation] is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. To determine whether a historical regulation is an appropriate analogue, courts must assess "whether the two regulations are relevantly similar." *Id.* at 2132 (cleaned up).

In *Bruen*, the Court did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment" but noted that "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* Stated differently, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations." *Id.* at 2133. When reasoning by analogy, courts begin with the public understanding of the right during the Founding and Reconstruction eras. *Id.* at 2132–33. But in certain circumstances, which are present here, that inquiry is more expansive and can include consideration of modern firearm regulation.

*Bruen* made clear that when the regulation at issue implicates "unprecedented social concerns or dramatic technological changes," courts should apply a "more

nuanced approach" to reasoning by analogy. *Id.* at 2132. Second, the Court emphasized, "a regular course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases in the Constitution." *Id.* at 2136 (cleaned up). To make those comparisons, courts deciding Second Amendment cases since *Bruen* have considered evidence from expert historians about analogous regulations. *See, e.g.*, *Hanson v. District of Columbia*, No. CV 22-2256 (RC), 2023 WL 3019777, at \*15 (D.D.C. Apr. 20, 2023); *United States v. Rowson*, No. 22 CR. 310 (PAE), 2023 WL 431037, at \*21 (S.D.N.Y. Jan. 26, 2023). Naperville provided exactly this type of historical evidence to the District Court. *See, e.g.*, Dkt. 57-1–12.

Contrary to Plaintiffs' argument (AT Br. 11–14), *Bruen* does not require the Court to reach a different result than it reached *Friedman*. *Friedman* explicitly rejected the means-end analysis now prohibited by *Bruen*, and strictly adhered to *Heller*, which is consistent with the *Bruen* two-step analysis. *Friedman*, 784 F.3d at 410 (asking (1) whether the firearm regulation "bans weapons that were common at the time of ratification;" and (2) whether the regulation infringes on the individual's right of self-defense). In fact, although *Bruen* explicitly cited and abrogated several appellate court decisions— *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019); *United States v. Focia*, 869 F.3d 1269 (11th Cir. 2017); *United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012); *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017); *Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012)—it did not mention *Friedman* at all.

Even if Plaintiffs could meet their burden at step one, they have not shown that they are likely to succeed at the second step of *Bruen* because the Sale Ordinance is "relevantly similar" to historical regulations with respect to dangerous and unusual weapons.

### A.     The Second Amendment right to "keep" and "bear" arms does not protect the commercial sale of assault weapons.

The Supreme Court has parsed the plain text of the Second Amendment, holding that the right to "keep and bear arms" means exactly what it says—it means the right to "have weapons" and to "carry" or "to wear, bear, or carry . . . upon the person or in the clothing or in a pocket" certain weapons for self-defense purposes. *Heller*, 554 U.S. at 582–84. *Bruen* reaffirmed this central principle, by holding that the "textual elements" of the Second Amendment guarantee only the "individual right to possess and carry weapons." *Bruen*, 142 S. Ct. at 2134.

Even the right to possess firearms for lawful self-defense is not unlimited. *See id.* at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago* about restrictions that may be imposed on the possession or carrying of guns.") (citation omitted); *id.* at 2162 (Kavanaugh, J., concurring) (recognizing an "important limitation" under *Heller* that the right to keep and bear arms is limited to arms in common use).

In short, nothing in *Heller* or *Bruen* suggests that the Second Amendment protects any rights unrelated to *possession* of handguns for self-defense inside or outside the home. Instead, federal courts across the country—pre- and post-*Bruen*—have repeatedly found that the Second Amendment does not protect the commercial sale of firearms. *See, e.g.*, *Teixeira*, 873 F.3d at 690 (9th Cir. 2017) ("[T]he Second Amendment does not independently protect a proprietor's right to sell firearms."); *United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011) ("[W]e have found [no authority], that remotely suggests that, at the time of its ratification, the Second Amendment was understood to protect an individual's right to *sell* a firearm."); *United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) ("The plain text of the Second Amendment does not cover Mr. Tilotta's proposed course of conduct to commercially sell and transfer firearms . . . ."); *see also* Dkt. 34 at 10–11 (listing 23 district court cases post-*Bruen* holding the same).

Thus, to prevail on the merits, Plaintiffs must bridge the gap between this recognized but limited right to *possess* handguns for lawful self-defense and their asserted right to *sell* assault weapons. Plaintiffs have failed to do so.

Because a regulation banning the commercial sale of assault weapons does not eliminate the ability to possess handguns for self-defense, neither the Sale Ordinance nor the Act fall within the text of the Second Amendment. The Court can end its inquiry here and affirm the District Court's decision.

**B.    Plaintiffs do not show that assault weapons are "Arms" protected by the Second Amendment.**

**1.    Assault weapons are not "in common use" for self-defense.**

Plaintiffs carry the burden of showing that assault weapons are "'in common use' today for self-defense." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627). Although, the Supreme Court has established that weapons "in common use" for self-defense fall within the text of the Second Amendment, the Court has not specified how this is to be determined. *See Friedman*, 784 F.3d at 409 ("[W]hat line separates 'common' from 'uncommon' ownership is something the [Supreme] Court did not say"). The Supreme Court has ruled only that handguns—America's "most popular" firearm—are "in common use" for self-defense. *Heller*, 554 U.S. at 629; *Bruen*, 142 S. Ct. at 2134.

Here, Plaintiffs provide no evidence that the assault weapons at issue are commonly used for self-defense, or used for self-defense at all. Instead, Plaintiffs assert that assault weapons are commonly used because "millions" of Americans own "[a]t least 20 million AR-15s and similar rifles." AT Br. 18. Plaintiffs also cite various assault-weapon ownership statistics, some of which they did not present to the District Court. *Id.* at 18–20. This Court should ignore these statistics to the extent they are raised for the first time on appeal. *See Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 946 (7th Cir. 2016) ("As a general rule, we will not consider evidence on appeal that was not before the district court when it rendered its decision."). But as explained *infra*, even taking these ownership statistics into

account, Plaintiffs have failed to carry their burden to show that assault weapons are "in common use" for lawful self-defense.

*First*, historical evidence shows that in the Founding era, small-arms weapons were exceedingly common, and the rates at which Americans possessed them were substantially higher than the rates at which Americans today possess assault weapons. For example, in the late 18th century, 50 to 60 percent of households owned a firearm, which was typically a musket or hunting rifle (single-shot firearms that had to be re-loaded through the muzzle before each shot, and could be fired only a few times per minute). Dkt. 57-8 ¶ 15.

Relative to this data from the Founding era, assault weapons are not "commonly used." Plaintiffs claim there are 24 million assault weapons in circulation in the United States today. AT Br. 18. Even assuming this statistic is true, that represents just 5 percent of the approximately 462 million firearms in circulation nationwide. Dkt. 57-7 ¶ 13. And ownership of assault weapons is unusually concentrated: on average, each civilian owner of an assault weapon owns 3.8 such weapons, and the total estimated number of people who own assault weapons is only 6.4 million—less than 2 percent of the current population of approximately 330 million Americans. *Id.* ¶ 27. There are 124 million households in America today; even on the demographically dubious assumption that no assault-weapon owner shares a household with another owner, that would mean only 5 percent of American households own an assault weapon, less than one-tenth of the 50 to 60 percent of household ownership considered "common" in the Founding era. Dkt. 57-8 ¶ 15.

– 18 –

Ironically, the military nature of assault weapons, makes them a poor choice for personal self-defense in the civilian world. 7th Cir. Dkt. 15, Ex. 8, ¶¶ 96–104. Unlike most handgun-caliber bullets, assault-weapon bullets penetrate walls. Tests on assault-weapon bullets show they "explode one-gallon water jugs" placed three feet behind gypsum board, sheet rock, or wooden 2x4 stud wall. *Id*. Thus, a misfire in a home-defense scenario could kill innocent bystanders in another room. *Id*. Moreover, at least some assault weapons also require an operator to use both arms, making it impossible to simultaneously call 911 or assist others during a home invasion. *Id*. ¶ 104.

And despite Plaintiffs' contention that 33 percent of AR-15 owners possess the guns for supposed self-defense purposes (AT Br. 19), documented use of assault weapons for self-defense is actually quite rare. According to an FBI database, from 2000 to 2021, assault weapons were used defensively in 0.2 percent of active-shooter incidents. Dkt. 57-7 ¶ 25.

Far from establishing "common use," the evidence presented to the District Court strongly supports that ownership of assault weapons is concentrated among a niche group of Americans and that those weapons are used for purposes other than personal self-defense.

*Second*, the Supreme Court's test looks to common *use*, not common ownership. The phrase "in common use" in *Heller* does not simply refer to a weapon's prevalence in society, or the quantities manufactured or sold. *See Kolbe v. Hogan*, 849 F.3d 114, 142 (4th Cir. 2017) (noting "the *Heller* majority said nothing to confirm that it was

sponsoring the popularity test"), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Moreover, relying solely on "how common a weapon is at the time of litigation" would be "circular," because commonality depends in part on what the law allows. *Friedman*, 784 F.3d at 409. For example, machine guns were "all too common" during Prohibition, but that did not immunize them from heavy regulation and an eventual ban on the ground that they were military-grade weapons. *See, e.g.*, *id.* at 408–09; *see also Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, No. CV 22-951-RGA, 2023 WL 2655150, at *9–12 (D. Del. Mar. 27, 2023) (considering Prohibition-era machine gun ban under *Bruen* in holding that an assault weapons ban is consistent with historical tradition).

Courts instead must consider the suitability of the weapon and its actual use *for lawful self-defense* (rather than official military or law-enforcement applications). *See Duncan v. Bonta*, 19 F.4th 1087, 1127 (9th Cir. 2021) (Berzon, J., concurring) ("Notably, however, *Heller* focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon."), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded on other grounds*, 49 F.4th 1228 (9th Cir. 2022); *see also Heller*, 554 U.S. at 629 (explaining the "reasons that a citizen may prefer a handgun for home defense," including that handguns are easier to store in a location readily accessible in an emergency, are easier to lift and aim than a long gun, and can be used with a single hand while the other hand dials the police).

Plaintiffs argue, without supporting case law, that each lawful civilian's *possession* of assault weapons equates to the common *use* of those weapons for lawful

self-defense. AT Br. 18. But the features of assault weapons are designed for military use in war, not for self-defense of the home or person. Dkt. 57-4 ¶¶ 58–61 (noting that other firearms are "more suitable" in the "rare circumstances when armed self-defense is justified"); *see also* Dkt. 57-5 ¶¶ 16–23. And Plaintiffs, at this stage of the proceedings, provide no evidence that would allow this Court to conclude that assault weapons are commonly used for lawful personal self-defense. Plaintiffs have thus failed to carry their burden.

### 2.     Assault weapons are "dangerous" and "unusual."

In *Heller*, the Supreme Court stated that the Second Amendment does not embody "a right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose." 554 U.S. at 626. The source of this understanding was the common law "tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that Blackstone set forth in his *Commentaries on the Laws of England*.[6] *Id*. at 627 (citations omitted). *Heller* therefore excluded "dangerous and unusual" arms from the scope of the Second Amendment. *Id*. Plaintiffs do not meet their burden to show that assault weapons are both *not* dangerous and *not* unusual. Moreover, even though it is Plaintiffs' burden, Naperville's record evidence shows that modern

---

[6] Blackstone's *Commentaries* and several other sources cited in *Heller* refer to the offense of carrying "dangerous *or* unusual weapons[.]" *See* 4 William Blackstone, *Commentaries* 148–49 (1769); Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822); Henry J. Stephen, *Summary of the Criminal Law* 48 (1840). *Heller* also cited sources that use the phrase "dangerous and unusual weapons." *See, e.g.,* 3 Bird Wilson, *Works of the Honourable James Wilson* 79 (1804). Both are conjunctive phrases; to the extent there is a semantic difference, *Heller* did not reconcile it. Any supposed discrepancy does not matter here, however, because assault weapons are both "dangerous" and "unusual."

assault weapons fit the historical understanding of a "dangerous and unusual" firearm. For this independent reason, assault weapons do not garner constitutional protection, and this Court should affirm the District Court's decision.

Assault weapons were originally created as weapons of war during the Cold War. Dkt. 57-4 ¶ 25; Dkt. 57-5 ¶ 24; Dkt. 57-8 ¶ 49. When AR-15s were tested on the Vietnam battlefield, they were deemed "ideal" because of their "[e]xcellent" killing power, which literally ripped opponents apart. Dkt. 57-4 ¶ 31. For example, a single shot to the "bottom of the right foot" of an enemy soldier caused "the leg to split from the foot to the hip," resulting in "instantaneous death"—prompting military reports to remark on the weapons' "phenomenal lethality." *Id.* ¶¶ 26–32. As one surgeon and retired Navy captain put it: "It's a perfect killing machine." *Id.* ¶ 34. "A handgun [wound] is simply a stabbing with a bullet," and "[i]t goes in like a nail." *Id.* But "[w]ith the high-velocity rounds of the AR-15 . . . it's as if you shot somebody with a Coke can." *Id.*

Assault weapons were designed with distinctive features that make them exceptionally dangerous offensive firearms:

- Assault weapons shoot extremely high-powered rounds designed for "maximum wound effect," with bullets that "travel nearly three times the speed of sound." Dkt. 57-4 ¶ 34.

- Assault weapons are exceptionally lightweight and highly maneuverable. *Id.* ¶¶ 25, 31, 39.

- Assault weapons have low recoil. *Id.*

- Assault weapons are extremely accurate from long distances, even hundreds of yards. *Id.* ¶ 41.

As noted by a law enforcement expert with more than 20 years of FBI experience, these features give assault weapons "a highly disproportionate impact on public safety and present a unique modern public safety threat." *Id.* ¶ 19.

The proliferation of assault weapons put weapons of war in civilian hands. The effects have been catastrophic. The dangerous offensive capabilities allow shooters to murder or maim large numbers of people extremely quickly, before victims can escape or police can respond. Dkt. 57-4 ¶¶ 41–51 (an "unmitigable threat"); Dkt. 57-8 ¶¶ 51–61. Assault weapons are the weapons of choice for mass shooters.

As the list below shows, the mass shootings with the most deaths in recent years—including the Fourth of July Highland Park Parade shooting that prompted Naperville's City Council to pass the Sale Ordinance—were carried out with assault weapons. Dkt. 34 at 7–8.

| Date | Mass Shooting | Deaths | Injured | Weapon(s) Used |
|---|---|---|---|---|
| July 4, 2022 | Highland Park Parade Shooting | 7 | 48 | AR-15 |
| May 24, 2022 | Uvalde, Texas Elementary School Shooting | 21 | 17 | AR-15 |
| May 14, 2022 | Buffalo, New York Supermarket Shooting | 10 | 3 | AR-15 |
| August 3, 2019 | El Paso Wal-Mart Shooting | 23 | 23 | AK-47 |
| October 27, 2018 | Pittsburgh Synagogue Shooting | 11 | 6 | AR-15; Glocks |

| Date | Mass Shooting | Deaths | Injured | Weapon(s) Used |
|---|---|---|---|---|
| February 14, 2018 | Stoneman Douglas High School Shooting | 17 | 17 | AR-15 |
| November 5, 2017 | Sutherland Springs Church Shooting | 26 | 22 | AR-15; semi-automatic pistols |
| October 1, 2017 | Las Vegas Strip Shooting | 60 | 867 | AR-15; AR-10; bolt-action rifle; revolver |
| June 12, 2016 | Orlando Pulse Nightclub Shooting | 49 | 58 | Sig Sauer MCX; Glock |
| December 2, 2015 | San Bernardino Shooting | 14 | 24 | AR-15; semi-automatic pistols |
| December 14, 2012 | Sandy Hook Elementary School Shooting | 26 | 2 | AR-15; Glock; bolt-action rifle |
| July 20, 2012 | Aurora, Colorado Movie-Plex Shooting | 12 | 70 | AR-15; shotgun; Glock |
| March 10, 2009 | Geneva County Shootings | 10 | 6 | AR-15; SKS semiautomatic rifle; handgun |

For similar reasons, assault weapons are also uniquely suited for attacks against law enforcement officers. Dkt. 57-4 ¶¶ 54–57 (assault weapons put criminals on "equal, and sometimes greater, footing" with law enforcement); *see also* Dkt. 57-8 ¶¶ 49–51. Assault weapons pose risks that are exceptionally difficult for police departments to manage. Dkt. 57-4 ¶¶ 23, 46–51. They are frequently used to ambush police officers or resist lawful arrest. *Id.* ¶¶ 52–54. To subdue criminals armed with these weapons, police officers are forced to use dangerous and aggressive tactics that often resemble military combat, such as "charging structures with armored vehicles,

use of explosives, robots, and drones with explosives." *Id.* ¶ 54; *see also* Dkt. 57-8 ¶ 51 (police departments have acquired "armored vehicles to defend themselves").

These weapons seriously endanger the lives of law enforcement officers and other first responders. For the most recent years with available statistics, nearly a quarter of police officers killed in the line of duty were killed with an assault weapon. Dkt. 57-4 ¶ 52. Law enforcement's concern about these firearms has caused them to hesitate before confronting gunmen with assault weapons.

For example, despite also being armed with assault weapons, police officers at Robb Elementary School in Uvalde waited more than an hour for a heavily armored SWAT team to arrive and help breach the classroom, while teachers and children were inside, because the officers feared the shooter's assault rifle could cause significant law enforcement casualties. Zach Despart, *"He has a battle rifle": Police feared Uvalde gunman's AR-15*, Tex. Tribune (Mar. 20, 2023), https://www.texastribune.org/2023/03/20/uvalde-shooting-police-ar-15/. "'You knew that it was definitely an AR,' Uvalde Police Department Sgt. Donald Page said in an interview with investigators after the school shooting. 'There was no way of going in. . . . We had no choice but to wait and try to get something that had better coverage where we could actually stand up to him.'" *Id.*

Not surprisingly, even Plaintiffs admit that assault weapons are dangerous. AT Br. 8. But with an astonishing lack of understanding, they retort that "[a]ll weapons are dangerous." *Id.* Handguns, assault weapons and nuclear warheads are all dangerous, but that obviously does not mean that they are of equal danger to the

public. Plaintiffs also attempt to eliminate the required constitutional analysis by arguing that a proper reading of *Heller* and *Bruen* eliminates "dangerousness" from consideration and that only "unusual" weapons that are also "dangerous" are subject to governmental regulation. *Id.* at 32. This oversimplification ignores reality.

The nature of the wounds that assault weapons create, and their ability to fire repeatedly without reloading, make them dangerous *and* unusual, "more so than standard self-defense weapons such as handguns" that have received constitutional protection in certain circumstances. *See* App. 026 (citing *N.Y. State Rifle & Pistol Ass'n, v. Cuomo,* 804 F.3d 242, 262 (2d Cir. 2015) ("When used, [assault] weapons tend to result in more numerous wounds, more serious wounds, and more victims.")).

As the District Court found, "[m]easured by injury per shooting, there is an average of 30 injuries for assault weapons compared to 7.7 injuries for semiautomatic handguns." App. 027. "In a mass shooting involving a non-semiautomatic firearm, 5.4 people are killed and 3.9 people are wounded on average," compared to a mass shooting with an assault weapon, where "the average number of people rises to 9.2 killed and 11 wounded." *Id.* (citing Dkt. 57-8 ¶ 54). As these statistics show, while all weapons *can* be dangerous, assault weapons are *unusually* so. Indeed, they are the exact type of weapons of war that the Supreme Court expressly recognized may constitutionally be banned. *Heller*, 554 U.S. at 627 ("[W]eapons that are most useful in military service—M-16 rifles and the like-—may be banned.").

Plaintiffs also argue that assault weapons are not "unusual" because they are commonly possessed. AT Br. 32. But as explained *supra* Section I.B.1, Plaintiffs have

– 26 –

not shown that assault weapons are owned by more than a small percentage of Americans. Moreover, the meaning of "unusual" is informed by common law, historically meaning a weapon capable of "terrifying the good people of the land." 4 William Blackstone, *Commentaries on the Laws of England*, 148–49 (1769). From Newtown to Highland Park to Uvalde, assault weapons have unquestionably terrified the American people.

The record refutes Plaintiffs' premise that no common weapon can be considered "unusual." Historical evidence shows plenty of examples of weapons that were common and nonetheless characterized as unusual. *See, e.g.*, *State v. Huntly*, 25 N.C. 418, 422 (1843) (rejecting argument "that a double-barrelled gun, or any other gun, cannot in this country come under the description of 'unusual weapons'" just because many "in the community . . . own[ed] and occasionally use[d] a gun"); *English v. State*, 35 Tex. 473, 476–77 (1872) (characterizing "deadly devices" like "dirks, daggers, slungshots, sword canes, brass-knuckles and bowie knives" as dangerous and unusual), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022); The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289–90; Image 293–94 (1881) (1686 law prohibited wearing of "swords, daggers, pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons"); Dkt. 57-8 at 18–19 (describing prevalence and regulation of "pistols, folding knives, dirk knives, and Bowie knives" shortly following the Founding); Dkt. 57-10 at 41–49 (describing proliferation of and legislative response to Bowie knives, dirks, and other fighting knives).

As discussed below, historical evidence shows that weapons only came to be considered dangerous and unusual—requiring a regulatory response—*after* their widespread use created new societal concerns. The Sale Ordinance is a response to the modern problem of "dangerous" and "unusual" assault weapons of war being used in mass shootings and causing unprecedented harm. As explained *infra*, Section I.C, the Sale Ordinance adheres to that historical tradition.

### C.     Naperville's Sale Ordinance is consistent with the United States' historical tradition of regulating dangerous and unusual weapons.

Under *Bruen*'s text-and-history standard, if a firearm regulation implicates the plain text of the Second Amendment, the Court must then determine whether the regulation is consistent with the "historical tradition" of such regulations. *Bruen*, 142 S. Ct. at 2130. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. The Supreme Court fashioned a framework for "reasoning by analogy" to identify "relevantly similar" laws. *Id.* at 2132–33. The ultimate question is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. *Bruen*, therefore, instructs courts to look for a "well-established and representative *analogue,* not a historical *twin.*" *Id.* Additionally, the Court emphasized, "a regular course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases in the Constitution." *Id.* at 2136 (cleaned up).

As the District Court properly concluded, the Nation's historical tradition encompasses regulations of dangerous and unusual weapons, particularly ones frequently employed in unlawful activities.[7] The Sale Ordinance—which follows in this historical tradition—was enacted in response to unprecedented societal concerns about frequent and deadly mass shootings that are enabled only by dramatic technological changes in weapons technology. As such, a "more nuanced approach" is required, and the District Court carefully evaluated the Sale Ordinance using this approach. *Id.* at 2132. After identifying several historical analogues, the District Court properly found that the Sale Ordinance was a lawful exercise of Naperville's authority to control the sale of assault rifles in compliance with the Second Amendment. App. 030.

Plaintiffs fail entirely to show that they are likely to succeed at *Bruen*'s second step. Plaintiffs misleadingly claim that "[t]o carry their burden under the *Heller/Bruen* test, Appellees must demonstrate a widespread and enduring tradition of regulation analogous to their ban on commonly possessed arms." AT Br. 35. This is not the standard set forth in *Bruen*. Instead, the question is whether Naperville's

---

[7] Under the "Arms" analysis, *Heller* expressly recognized the "historical tradition" of banning "dangerous and unusual" weapons. *Heller*, 544 U.S. at 627. In Section B.2, Naperville therefore analyzes whether assault weapons covered by the Sale Ordinance and the Act are "dangerous and unusual" under *Bruen's* textual first step. In *Bruen,* the Court also considered whether the evidence showed the challenged regulation was consistent with the country's historical tradition of regulating "dangerous and unusual" weapons. *Bruen*, 142 S. Ct. at 2128. Naperville therefore additionally analyzes whether the Sale Ordinance and the Act regulate "dangerous and unusual" weapons consistent with that tradition in the second part of the *Bruen* test.

Sale Ordinance is consistent with the Nation's historical tradition of firearm regulations.

> **1. Under *Bruen*'s framework, Naperville's Sale Ordinance follows the historical tradition of regulating dangerous and unusual weapons, particularly ones frequently employed in unlawful activities rather than lawful self-defense.**

*Bruen* provides two key guideposts for courts engaging in this historical analysis. *First*, any valid historical inquiry must recognize that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," and that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2132. Novel technologies or new societal dangers may have no exact historical counterpart—no "twin," yet earlier regulations may have addressed comparable problems with comparable prohibitions. The Second Amendment is not a "regulatory straightjacket" that prevents the government from addressing such problems. *Id.* at 2133.

*Second*, *Bruen* recognized that fewer analogous regulations may be required where the historical record reveals a lack of dispute over the lawfulness of such regulations. *Id.* For example, despite acknowledging "relatively few" historical prohibitions on firearms in "sensitive places," *Bruen* "assume[d] it settled" that courthouses, legislative assemblies, and polling places qualified as "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* In the absence of any dispute about the lawfulness of such prohibitions, the Court accepted that "courts can use analogies to these historical regulations of 'sensitive

places'" to conclude that "modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.* at 2133 (emphasis omitted).

*Bruen* left open the relevant period for historical inquiry, including whether courts should rely on 1791 (when the Second Amendment was ratified); 1868 (when the Fourteen Amendment was ratified, making the Second Amendment applicable to states and state officials); or other periods. *Id.* at 2138. *Bruen* therefore leaves room for the Court to consider 20th-century regulations, especially given that Naperville's Sale Ordinance responds to "dramatic technological changes" that have generated "unprecedented societal concerns." *Id.* at 2132. Under these circumstances, the court may adopt a "more nuanced approach" in determining if the regulation comports with the nation's history of regulating firearms. *Id.*; *see also Friedman*, 784 F.3d at 408 (noting *Heller*'s conclusions that bans on possessing machine guns were "obviously valid" even though such laws did not arise until 1927). This incremental expansion over the course of three centuries, as well as the corresponding judicial approval of such measures, has "liquidate[d] and settle[d]" the meaning of the Second Amendment to allow for such restrictions. *Bruen*, 142 S. Ct. at 2136.

Ignoring the text of *Bruen* and *Heller*, Plaintiffs attempt to fashion their own, stricter requirements for establishing a "tradition." Plaintiffs contend, without support, that "Appellees must demonstrate a widespread and enduring tradition of regulation analogous to their ban on commonly possessed arms," and that "the 'bare

existence' of 'localized restrictions' is insufficient to counter an American tradition." AT Br. 35. But the Supreme Court has never adopted such a standard.

The idea that "tradition" requires all or most jurisdictions in America to have simultaneously adopted similar regulations on advances in weapons technology ignores our federal system, which encourages local solutions to local problems. *See McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (the Second Amendment "limits (but by no means eliminates) [states'] ability to devise solutions to social problems that suit local needs and values," and "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment").

Plaintiffs repeatedly oversimplify the historical inquiry. Relying only on a dissent from the denial of a writ of certiorari in *Friedman*, Plaintiffs assert that solely because some assault weapons are "lawfully possessed by law-abiding citizens," all assault weapons garner Second Amendment protection for all purposes. AT Br. 14 (citing *Friedman v. City of Highland Park*, 577 U.S. 1039 (2015) (Thomas, J., dissenting from denial of certiorari)).

In Plaintiffs' view, any historical analysis simply collapses into an exclusive and determinative "common use" inquiry.[8] *Id.* This view, however, effectively eliminates the second part of the *Bruen* test. Neither *Heller* nor *Bruen* held that "common use" of a weapon for a lawful purpose provides that weapon total protection from regulation. *Bruen*, 142 S. Ct. at 2128 (citing *Heller*, 554 U.S. at 626). *Bruen* made clear that "[l]ike *Heller*, [the Court did] not [then] undertake an exhaustive historical

---

[8] Plaintiffs fail to carry their burden on this point, as explained *supra* Section I.B.

analysis . . . of the full scope of the Second Amendment." *Id.* at 2134 (quoting *Heller*, 554 U.S. at 626). *Bruen* does not foreclose a municipality from making the relevant showing—based on historical antecedents—that the law at issue "is consistent with this Nation's historical tradition of firearms regulation." *Id.* at 2135. Naperville does so here.

### (a)　Weapons were regulated during early America.

While our Nation is now plagued with an epidemic of the immense and terrifying toll from mass shootings and other gun violence, interpersonal violence from firearms was not a significant social problem in 18th-century America, due in substantial part to the limitations of then-existing firearm technology. Dkt. 57-8 ¶¶ 14–22; *see also* Dkt. 57-10 ¶ 34.

The most popular firearms of the time were the "musket" and "fowling pieces." Dkt. 57-8 ¶ 15. These guns could fire only a single round at a time. *Id.* They took half a minute to reload. *Id.* And they could not be kept loaded because the firing powder would corrode the gun. *Id.* At this time, the vast majority of homicides were committed by means other than firearms, such as with bare hands. *Id.* Overall, the rate of homicides conducted with firearms was lower in most states than homicides committed by other means. *Id.*

Nonetheless, even in the Founding era, when the threat of gun violence was very low, laws still restricted particularly dangerous *types* of arms, especially when they were associated with interpersonal violence. For example, the late 18th century and early 19th century saw widespread bans on the carrying of blunt weapons, like clubs, which were frequently used in fights and described by historical sources as

"wicked, cowardly" weapons, "[s]oaked in blood." Dkt. 57-10 ¶¶ 72–80; Dkt. 57-8 ¶¶ 24–26. Between 1750 and 1799, six states (or soon-to-be states) passed anti-club laws. Dkt. 57-10 ¶ 75. Among these, Massachusetts and Maine passed laws in 1750 and 1786, respectively, that prohibited people from assembling in groups "being armed with clubs." Dkt. 57-10, at 39 (citing 1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs and Unlawful Assemblies, chap. 17, § 1); *id*. at 35 (*citing* An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, Maine), Nov. 17, 1786, at 1).

When novel, dangerous ways of using firearms developed, legislatures responded to that, too. In the 18th century, individuals made notorious use of "trap guns," firearms that could fire automatically based on a signal, such as a trip wire. *Id*. ¶¶ 82–84. These weapons were noted for the unique dangers they posed, such as a "likelihood" of killing or injuring "innocent persons." *Id*. ¶¶ 83–84. They were also viewed as an "arbitrary and excessive" means of "meting out of 'justice,'" even to intruders. *Id*. ¶ 83. Over time, jurisdictions banned them. *Id*. ¶ 85. The earliest known ban was enacted by New Jersey in 1771. *Id*. ¶ 85. Eight other states passed similar anti-trap-gun laws later in the 1800s. *Id*.

Legislatures also responded to advances in pistol technology. As explained above, the most popular firearm of the Founding era, the musket, could not be kept loaded because the firing powder would corrode the barrel and firing mechanisms. Dkt. 57-8 ¶ 16. However, in the early 19th century, "percussion-lock mechanisms"

emerged, which addressed the corrosion problem and allowed pistols to be kept loaded for longer periods, making it possible to carry them concealed on one's person. *Id.* ¶ 25. Southern and frontier states saw a rise in gun violence in the early 19th century, exacerbated by this new weapon's technology. *Id.* ¶¶ 23–26.

In response, many of these states enacted laws specifically banning the concealed carrying of pistols. *Id.* ¶ 26; Dkt. 57-10 ¶ 81. The distinctive features of these laws were that they applied to all persons (unlike many prior bans in Southern states, which targeted particular classes of people, such as Native Americans and Blacks), and were tailored specifically to particular *types* of firearms thought to pose unusual dangers. Dkt. 57-8 ¶ 26.

The Bowie knife provides another example of a weapon regulated because it was viewed as especially dangerous. *Id.* ¶¶ 24–26; Dkt. 57-10 ¶¶ 61–71. Developed in the early 19th century, the Bowie knife represented a "technological advance" over prior knives—it was specifically designed for fighting, and had an improved cross guard and blade. Dkt. 57-8 ¶ 25; Dkt. 57-10 ¶ 62. These knives were made to commit violence and became preferred for that purpose over pistols, and they were notorious and widespread in fights and assaults. Dkt. 57-8 ¶ 24; Dkt. 57-10 ¶ 62 (contemporary sources described a "craze for the knives"). In the early 19th century, states widely enacted restrictions on Bowie knives, including criminalizing possession and sale. Dkt. 57-8 ¶ 26; Dkt. 57-10 ¶¶ 64–71. In 1837, for example, both Georgia and Tennessee criminalized the sale of Bowie knives. Dkt. 57-10, Ex. H ("15 states

effectively banned the possession of Bowie knives outright (by banning both concealed carry and open carry).”). *Id.* ¶ 69.

The technology outlawed in those regulations may seem basic to modern eyes, but the governing principle is the same. Earlier generations recognized that, consistent with the Second Amendment, legislatures could outright ban or otherwise regulate particular types of weapons thought to pose unusual social dangers or risks because their characteristics made them dangerous *in comparison with other weapons of the time.* And they did so while preserving the core right of lawful self-defense that the Supreme Court has found in the Second Amendment.

### (b) Dangerous and unusual types of weapons were regulated in the late 19th Century.

Historical practices “through the end of the 19th century” can also be a “critical tool of constitutional interpretation.” *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 605). That is true, in part, because the Fourteenth Amendment, which incorporated the Second Amendment to the states, was ratified in 1868, after a rebellion using firearms against the Federal Government trying to destroy the United States was defeated with immense loss of life. *See id.* And the practice, established in the Founding era, of restricting weapons when new technology poses social dangers, continued through the 19th century. This “regular course of practice can ‘liquidate & settle the meaning of’ disputed or indeterminate ‘terms & phrases’ in the Constitution.” *Id.* (internal citations omitted). Regulations of multi-shot firearms specifically—again, including bans of such weapons—emerged in parallel with their increased availability and use among civilians. Multi-shot weapons such as the Colt

revolver were first used effectively and in appreciable quantities in the late 19th century following the Civil War. Dkt. 57-10 ¶ 44. Around this same time, the Winchester rifle became the first effective and popular multi-shot rifle in civilian use. *Id.* ¶ 45.

As with trap guns and Bowie knives, shortly after these early multi-shot guns emerged into society, they were regulated. Multi-shot capabilities contributed to a dangerous and rising problem of gun violence in the late 19th century. *Id.* ¶ 47; *see also* Dkt. 57-8 ¶¶ 29–34. And, just as in the Founding era, this social problem prompted an overwhelming legislative response. States enacted nearly universal restrictions on concealed carry of multi-shot handguns in the late 19th and early 20th centuries. Dkt. 57-10 ¶ 47; Dkt. 57-8 ¶¶ 28, 35–36. And these restrictions were not limited to concealed carry—half a dozen states banned possession outright, including California, Illinois, Iowa, Kansas, New York, and North Dakota. Dkt. 57-10 ¶ 47 n.104.

Consistent with their effort to construe the historical inquiry more narrowly than *Bruen* provides, Plaintiffs argue that the "[t]he Second Amendment was adopted in 1791. Thus, the founding era is the relevant time period." AT Br. 35. They point to language in which "[t]he Court cautioned against 'giving post-enactment history more weight than it can rightly bear.'" *Id.* But Plaintiffs misstate *Bruen*. *Bruen* did not expressly limit its consideration of history to that of the Founding era, but it also considered other relevant periods. *Bruen*, 142 S. Ct. at 2138. As *Bruen* noted, a State "is bound to respect the right to keep and bear arms because of the Fourteenth

Amendment, not the Second." *Id.* at 2137. Thus, the understandings of the people when they chose to extend the Bill of Rights to the States in 1868 and other periods are relevant to the Court's analysis here.

### (c)   Government regulations of weapons continued into the early 20th Century.

Evidence from periods between the late 19th century and the modern world—such as the early 20th century—can also help to "guide" interpretation of constitutional provisions by showing how early historical practices turned into a "regular course of practice." *Bruen*, 142 S. Ct. at 2136–37. That is particularly true when dealing with new weapons technology.

The early 20th century saw the emergence of the first true handheld semi-automatic and automatic weapons. Dkt. 57-10 ¶¶ 13–14, 47. For example, the Thompson machine gun (the "Tommy" gun), an automatic weapon, became popular following its introduction in World War I. *Id.* ¶ 14. Like modern assault weapons, the Tommy gun was originally developed as a weapon of war. *Id.* Tommy guns reached civilians in large numbers in the late 1920s—along with other similar weapons, such as the Browning Automatic Rifle. *Id.* ¶¶ 14–16.

As with prior weapons technologies, the presence of these new, unusual, and dangerous weapons in civilian life created new societal problems. The weapons were acquired by criminals, who were attracted to their military-grade firepower. *Id.* ¶¶ 14–15; Dkt. 57-8 ¶ 46. They contributed to violent conflicts between gangs, and with law enforcement, including some of the United States' first mass casualty events, such as the St. Valentine's Day massacre. Dkt. 57-10 ¶¶ 14–15; Dkt. 57-8 ¶ 46. These

weapons "were actually used relatively infrequently by criminals generally, but when they were used, they exacted a devastating toll and garnered extensive national attention." Dkt. 57-10 ¶ 15. Numerous newspaper articles of the time documented rising societal concern. *Id.* ¶¶ 16–20.

As they had in earlier eras, legislatures responded. *Id.* ¶ 21 (problems with machine guns "built pressure on the states to enact anti-machine gun laws"). Between 1925 and 1933, 32 states passed anti-machine gun laws. *Id.* ¶¶ 21–22. Eventually, Congress enacted the National Firearms Act of 1934, which imposed a federal ban on machine guns—along with other types of dangerous weapons, such as short-barreled or "sawed-off" shotguns. *Id.* ¶¶ 23–26; Dkt. 57-8 ¶ 27.

These restrictions were *not* limited to fully automatic weapons and short-barreled shotguns. During the same period, weapons manufacturers were developing semi-automatic rifles intended for military applications, such as the Thompson "Autorifle," a "strictly semiautomatic rifle." Dkt. 57-10 ¶ 27. In 1932, Congress banned the possession in the District of Columbia of any semi-automatic rifle capable of firing more than twelve shots. *Id.* ¶ 23. This law followed a model drafted by the National Conference of Commissioners on Uniform State Law (the predecessor to today's Uniform Law Commission)—and was endorsed by the National Rifle Association as legislation that should be "used as a guide throughout the states of the Union." *Id.* At least seven other states enacted laws restricting semi-automatic weapons, too. *Id.* ¶ 27.

Plaintiffs argue that "20th century laws identified by the district court are not relevant to the historical inquiry . . . [and] such precedents do not provide insight into the meaning of the Second Amendment." AT Br. 42. However, the historical inquiry is not limited to regulations enacted contemporaneously with the adoption of the Second Amendment in 1791, or the ratification of the Fourteenth Amendment in 1868. In *Heller*, for example, the Court considered post-Civil-War practices as confirmation of prior historical tradition that bore on the interpretation of the Second Amendment, *Heller*, 554 U.S. at 614, although that evidence had "secondary" significance, *Bruen*, 142 S. Ct. at 2137. *Bruen* only declined to consider late nineteenth and early twentieth century evidence because it "contradict[ed] earlier evidence" that the Supreme Court found overwhelmingly established a contrary tradition. *Id.* at 2154 n.28.

*Bruen* does not bar consideration of early twentieth century evidence when it does not contradict the overwhelming evidence of an otherwise enduring American tradition. *Id.* at 2154. Rather, when courts assess how States today can address recently emerging firearms challenges, they may consider evidence of late nineteenth and early twentieth century firearms regulations—particularly when those regulations respond to unprecedented societal changes and/or dramatic technological changes.

### 2.  Consistent with historical tradition, Naperville's Sale Ordinance regulates dangerous and unusual weapons in the modern era.

Restrictions on contemporary assault weapons—like AR-15s—focus on modern technologies and are motivated by modern societal problems. These regulations are

not new. They are part of America's long tradition of analogous restrictions on dangerous and unusual weapons.

As described above, modern assault weapons were developed by the military as weapons of war in the 1950s and 1960s. But they did not enter civilian life in appreciable quantities until decades later, as the firearms industry aggressively marketed them and reaped immense profits.[9] As late as the 1990s, AR-15s were not commonly available to civilians, and promoting their purchase "was thought to be irresponsible" within the firearms industry. Dkt. 57-5 ¶ 29. In fact, from 1964 to 1994 (the date the federal assault weapons ban took effect), AR-15 sales averaged fewer than 27,000 units per year. *Id.* ¶ 30. The largest retailers refused to carry assault weapons, and that "remained true as late as 2006." *Id.* ¶ 31.

However, even in small quantities, the gradual accumulation of these new weapons in society began to cause highly disproportionate harms. In 1977, the original patent for the technology that allows the AR-15 to fire rapidly with minimal recoil expired, and the technology thus became available for copying by other firearms manufacturers. *Id.* ¶ 29. The 1980s then saw an epidemic of multi-victim shootings carried out with AR-15-style weapons. Dkt. 57-7 ¶¶ 19–21. These attacks, which previously had been largely unknown in American life, prompted a legislative response, beginning with California's 1989 assault weapons ban and culminating in the ten-year federal assault weapons ban in 1994. Dkt. 57-10 ¶ 11. During the life of

---

[9] Todd C. Frankel, et al., *The Gun That Divides A Nation*, Wash. Post (Mar. 27, 2023), https://www.washingtonpost.com/nation/interactive/2023/ar-15-america-gun-culture-politics/.

the federal ban, from 1994 to 2004, only one double-digit-fatalities mass shooting took place. Dkt. 57-7, Table 6.

After the federal assault weapons ban expired, norms in the gun industry and its marketing practices began to change. Dkt. 57-5 ¶¶ 31–42. In the late 2000s, sales of assault weapons rose. Dkt. ¶¶ 31–33. And, beginning in 2009, America saw a renewed epidemic of mass shootings, at dramatically higher rates than in the 1980s. Dkt. 57-7 ¶¶ 21–23. Once again, these attacks prompted a renewed regulatory response from states and local governments, of which Naperville's Sale Ordinance and the Act are part. In 2022, Naperville citizens looked at recent mass shootings— such as the July 4 massacre in Highland Park, where seven people were killed and dozens more injured with an assault weapon—and were terrified that their own community could be next. Dkt. 57-2 at 1.

Naperville turned to a strategy that has been widely used by legislatures across American history in response to new weapons technology causing special societal harms: regulating the weapons most closely linked to these harms. *See supra* Sections I.C.1.a–c. Naperville's Sale Ordinance covers particular types of weapons and follows the City's finding that these weapons pose distinct public safety risks. Dkt. 12-1. And, as with historical regulations, the Naperville Sale Ordinance and the Act leave undisturbed the right to purchase the predominant weapons of the day chosen for self-defense by Americans, such as handguns. *Heller*, 554 U.S. at 629.

The Sale Ordinance and the Act also reflect the Nation's tradition of local variation in the regulation of dangerous weapons. For most of our Nation's history,

firearms regulation occurred at the state and local, not federal, level. Analyzing historical analogues reveals variation in local approaches as differing state legislatures decided whether and how to react to new dangers presented by advances in weapons technology.[10]

Today, nine states plus the District of Columbia have enacted laws restricting assault weapons, covering 30% of the United States' population—including the Act passed by the State of Illinois on January 10, 2023. Dkt. 57-7 ¶ 34. The same pattern has been seen many times throughout American history, where some, but not all, jurisdictions have restricted or banned a new weapons technology that created societal problems. It does not matter that many states chose not to regulate assault weapons. What matters is that many states have, the federal government has, and no authority has ever questioned it. The Sale Ordinance and the Act are not a departure from but a continuation of America's longstanding "historical tradition" of firearm regulation. *Bruen*, 142 S. Ct. at 2130.

Plaintiffs mischaracterize the District Court's reference to these similar bans across the country and its general discussion of the dangerousness of assault weapons as improper "means-end scrutiny." AT Br. 25–30 (citing App. 026–30). But the District Court said nothing about "enhanced public safety" that is "justified" by the Sale Ordinance, as Plaintiffs allege. *Id.* at 26. Instead, the District Court simply

---

[10] Surveys of relevant historical statutes, laws, or regulations have also been submitted by defendants in other post-*Bruen* cases. *See, e.g.*, *Miller v. Bonta*, No. 3:19-cv-1537, Dkt. Nos. 163, 163-1, 163-2 (S.D. Cal. Jan. 11, 2023); *Duncan v. Bonta*, No. 3:17-cv-1017, Dkt. Nos. 163, 163-1, 163-3 (S.D. Cal. Jan. 11, 2023).

explained the dangerousness of assault weapons to show that the ban is similar to bans on dangerous and unusual weapons since the Founding Era and therefore is a "regulation [that] accords with history and tradition." App. 030.

There is no support for Plaintiffs' implication that assault weapons cannot be banned because such a ban would not entirely prevent mass shootings. *See* AT Br. 27–28. That Naperville's Sale Ordinance may not prevent mass shootings altogether does not mean that the Constitution has deprived the Naperville City Council of any tools to combat this violence and to protect its citizens. American history and tradition demonstrate that legislatures have the authority—and the responsibility—to reach their own conclusions about whether assault weapons bans, even limited ones such as Naperville's, promote public safety.

Naperville, like other jurisdictions throughout history, "lawfully exercised [its] authority . . . by enacting a ban on commercial sales." *Id. Bruen* requires courts to evaluate a regulation challenged under the Second Amendment to determine if the regulation imposes a comparable burden on the right of armed self-defense and whether that burden is comparably justified. *Bruen*, 142 S. Ct. at 2126–29, 2132–33 (identifying "two metrics" for evaluating historical analogues: "how and why the regulations burden a law-abiding citizen's right to armed self-defense"). The District Court did just that and determined that the Sale Ordinance follows this historical tradition.

Naperville has more than carried its burden. The Sale Ordinance follows the historical tradition of firearm regulations in the United States. This Court should therefore affirm the District Court's decision.

## II. Plaintiffs have not met the remaining injunction factors.

Plaintiffs have not shown irreparable harm absent a preliminary injunction, and the balance of equities tips heavily in Naperville's favor. Hence, the District Court's denial of Plaintiffs' motion for preliminary injunction should be affirmed.

### A. Plaintiffs suffered no irreparable harm.

Controlling precedent in the Seventh Circuit rejects the sort of harm Plaintiffs allege.

First, while not in any measure agreeing that Plaintiffs would be entitled to monetary damages for lost sales allegedly resulting because of the Sale Ordinance, such damage would not constitute irreparable harm since Plaintiffs have clearly asserted that the alleged damages are *quantifiable*; that they are able to calculate the amount of lost sales resulting from their inability to sell assault weapons. Since Plaintiffs have asserted that they have calculable monetary damages, they cannot also assert irreparable harm. *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022). In the absence of irreparable harm, Plaintiffs are not entitled to injunctive relief. *Id.*

Moreover, as the District Court correctly points out, Plaintiffs "can still sell almost any other type of gun," App. 032. In *Turnell v. CentiMark Corp.*, 796 F.3d 656 (7th Cir. 2015), this Court held that it is not irreparable harm when the plaintiff could "sell other types of roofing without restrictions" and that the inability to sell one type

of roofing "does not prevent [the plaintiff] from earning a living." *Id.* at 666. Plaintiffs' insistence on primarily selling assault weapons is "self-inflicted" injury that courts do not consider irreparable. *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("[S]elf-inflicted wounds are not irreparable injury.").

**B.     The balance of equities tips heavily in Naperville's favor.**

In assessing whether Plaintiffs have alleged irreparable harm absent a preliminary injunction, Plaintiffs' interest in selling assault weapons must give way to the overwhelming public interest in trying to prevent yet another mass shooting committed with assault weapons. This balancing test is not a means-end analysis prohibited by *Bruen*. Rather, it is an essential element in a preliminary injunction analysis that the District Court must consider.

As the District Court noted, "Illinois and Naperville compellingly argue that their laws protect public safety by removing particularly dangerous weapons from circulation." App. 033. Weapons like those contemplated by the Sale Ordinance and the Act were responsible for four of the five deadliest mass shootings in U.S. history. Dkt. 12 at 13 n.8. When an assault weapon is used in a mass shooting, nearly 14 times as many people are injured, and twice as many people are killed. *Id.* at 13 n.9. Appellate courts across the country repeatedly have also observed such catastrophic consequences. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 262 ("When used, [assault weapons] tend to result in more numerous wounds, more serious wounds, and more victims."); *see also Kolbe*, 849 F.3d at 114; *Friedman*, 784 F.3d at 411.

If during the time it takes for this litigation to finish, there is a mass murder in Naperville or any community committed with an assault weapon newly purchased from Plaintiffs, that truly would be irreparable injury.

Plaintiffs' alleged harm is significantly outweighed by Naperville's interest in protecting its citizens. Mr. Bevis's conclusory statement that he will "be forced out of business" does not make a "clear showing" that his alleged harm outweighs the public's interest in safety and protection. App. 033 ("[T]he financial burden and loss of access to effective firearms would be minimal."). Mr. Bevis can still sell a variety of weapons—just not those prohibited by the Sale Ordinance or the Act. The balancing of harms strongly favors Naperville, and the District Court's denial of preliminary injunction should be affirmed.

### C.    Plaintiffs are not entitled to a statewide injunction.

Finally, Plaintiffs are not entitled to a statewide injunction. Plaintiffs now argue that the injunction must extend beyond the parties to this action to be effective. AT Br. 50. This argument is undercut by the fact that Plaintiffs did not seek a statewide injunction in the District Court after the state law went into effect. *See* Dkt. 48 ¶ 35. Moreover, a reviewing court's job is to *review* the lower court's decision. Because Plaintiffs failed to raise this argument before this appeal was filed, the District Court did not rule on it, and this Court thus has nothing to review. *Textile Banking Co. v. Rentschler*, 657 F.2d 844, 853 (7th Cir. 1981) ("It is axiomatic that issues and arguments which were not raised before the district court cannot be raised for the first time on appeal.").

## CONCLUSION

For the foregoing reasons, the City of Naperville and Naperville Police Chief Jason Arres ask this Court to affirm the District Court's decision declining to grant a preliminary injunction.

Dated: May 3, 2023                    Respectfully submitted,

*/s/ Christopher B. Wilson*
Christopher B. Wilson
Kathleen A. Stetsko
Daniel T. Burley
Micaela M. Snashall
Kahin Gabriel Tong
**PERKINS COIE LLP**
110 N. Wacker, Ste. 3400
Chicago, IL 60606
Telephone: (312) 324-8400
Facsimile: (312) 324-9603
CWilson@perkinscoie.com
KStetsko@perkinscoie.com
DBurley@perkinscoie.com
MSnashall@perkinscoie.com
KTong@perkinscoie.com

Douglas N. Letter
Shira Lauren Feldman
**BRADY CENTER TO PREVENT GUN VIOLENCE**
840 First Street NE, Suite 400
Washington, DC 20002
Telephone: (202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

*Attorneys for Defendants-Appellees City of Naperville, Illinois and Jason Arres*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,485 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Seventh Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point Century Schoolbook font.

Dated this 3rd day of May, 2023.

*/s/* Christopher B. Wilson

Christopher B. Wilson *(Counsel of Record)*
PERKINS COIE LLP
110 N. Wacker, Ste. 3400
Chicago, IL 60606
Telephone: (312) 324-8400

161672038.2

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated this 3rd day of May, 2023.

*/s/ Christopher B. Wilson*

Christopher B. Wilson *(Counsel of Record)*
**PERKINS COIE LLP**
110 N. Wacker, Ste. 3400
Chicago, IL 60606
Telephone: (312) 324-8400