No. 23-1353

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ROBERT C. BEVIS; LAW WEAPONS, INC., d/b/a LAW WEAPONS & SUPPLY, an Illinois
Corporation; and NATIONAL ASSOCIATION FOR GUN RIGHTS,

*Plaintiffs-Appellants*,

v.

CITY OF NAPERVILLE, ILLINOIS, and JASON ARRES,

*Defendants-Appellees*,

and

THE STATE OF ILLINOIS,

*Intervening Appellee.*

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division (No. 1:22-cv-04775)
(Hon. Virginia M. Kendall)

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES AND
INTERVENING APPELLEE AND AFFIRMANCE**

Janet Carter
William J. Taylor, Jr.
Kari L. Still
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8215
wtaylor@everytown.org

May 10, 2023

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1353

Short Caption: Bevis v. City of Naperville

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund)

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Everytown Law

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and
        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
n/a

Attorney's Signature: /s/ William J. Taylor, Jr.    Date: May 10, 2023

Attorney's Printed Name: William J. Taylor, Jr.

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ✔    **No** ☐

Address: Everytown Law, 450 Lexington Avenue, P.O. Box 4184, New York, NY 10017

Phone Number: (646) 324-8215    Fax Number: (917) 410-6932

E-Mail Address: wtaylor@everytown.org

rev. 12/19 AK

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 2

ARGUMENT ................................................................................................. 3

    I.    Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct ..................................... 3

    II.    The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations ...................... 8

    III.    This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers" ......................................................... 18

CONCLUSION .......................................................................................... 22

# TABLE OF AUTHORITIES

*Cases*

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018).....................................................................2

*Davenport v. Wash. Educ. Ass'n*,
551 U.S. 177 (2007)................................................................................21

*Def. Distributed v. Bonta*,
No. 2:22-cv-06200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022), *adopted*, 2022
WL 15524983 (C.D. Cal. Oct. 24, 2022) ................................................7

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Security*,
No. 1:22-cv-00951, 2023 WL 2655150 (D. Del. Mar. 27, 2023), *appeal docketed*,
No. 23-1633 (3d Cir. Apr. 7, 2023)...................................................17, 18

*District of Columbia v. Heller*,
554 U.S. 570 (2008)..........................................................................*passim*

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022)...........................................................................21

*Drummond v. Robinson Twp.*,
9 F.4th 217 (3d Cir. 2021) .......................................................................9

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ..............................................................8, 14

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ..............................................................3, 21

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018)....................................................................9

*Hanson v. District of Columbia*,
No. 1:22-cv-02256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ....................7, 17, 18

*Heller v. District of Columbia* (*Heller II*),
670 F.3d 1244 (D.C. Cir. 2011) ..............................................................16

*Herrera v. Raoul*,
No. 1:23-cv-00532, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023), *appeal docketed*,
No. 23-1793 (7th Cir. Apr. 26, 2023) ..............................................16, 18

*Kennedy v. Bremerton School District*,
    142 S. Ct. 2407 (2022) ................................................................................ 5

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ................................................................ 6, 9, 13, 20

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ................................................................ 9

*Nat'l Rifle Ass'n v. Bondi*,
    61 F.4th 1317 (11th Cir. 2023), *pet'n for reh'g en banc filed* (Mar. 30, 2023)...... 8, 9

*New York State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) .........................................................................*passim*

*Ocean State Tactical, LLC v. Rhode Island*,
    No. 1:22-cv-00246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022), *appeal docketed*, No.
    23-1072 (1st Cir. Jan. 18, 2023).................................................... 4, 5, 6, 7

*Or. Firearms Fed'n, Inc. v. Brown*,
    No. 2:22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022), *appeal dismissed*,
    No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022) ..................... 5, 7, 17, 18

*Rehaif v. United States*,
    139 S. Ct. 2191 (2019).......................................................................... 2

*Rupp v. Becerra*,
    401 F. Supp. 3d 978 (C.D. Cal. 2019) *vacated and remanded*, No. 19-56004, 2022
    WL 2382319 (9th Cir. June 28, 2022) ...................................................... 2

*United States v. Greeno*,
    679 F.3d 510 (6th Cir. 2012) ................................................................ 9

*United States v. Tilotta*,
    No. 3:19-cr-04768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ............................ 7

*Wilson v. Cook County*,
    937 F.3d 1028 (7th Cir. 2019) (per curiam) .............................................. 3

### Other Authorities

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ........ 12, 13

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol
    Ass'n v. Bruen*, No. 20-843 (U.S.) .............................................. 14, 19, 20

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018)........ 14, 19, 20

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ...... 12, 13

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022)................................................................................. 11

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021)............................................................................ 15

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including over 370,000 in Illinois. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of 27 cities and other localities in Illinois are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 60 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. *See, e.g.*, *Boland v. Bonta*, No. 23-55276, Dkt. 19 (9th Cir. May 5, 2023); *Miller v. Smith*, No. 22-1482, Dkt. 42 (7th Cir. Oct. 13, 2022); *Barnett v. Raoul*, No.

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to its filing.

3:23-cv-00209, Dkt. 54 (S.D. Ill. Mar. 16, 2023); *Nat'l Ass'n for Gun Rts. v. City of Highland Park, Ill.*, No. 1:22-cv-04774, Dkt. 70 (N.D. Ill. Feb. 1, 2023). Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92, 992 n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs-appellants challenge two gun-safety measures in this case: (i) Illinois's law restricting assault weapons and large-capacity magazines of over 10 rounds for long guns and over 15 rounds for handguns and (ii) the City of Naperville's ordinance restricting the sale of assault weapons. Both measures are constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons set out in the State's brief, Dkt. 56 ("State Br."), and Naperville's brief, Dkt. 59 ("Naperville Br.").[2] Everytown submits this amicus brief to expand on three methodological points. *First*, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden to establish that assault weapons and large-capacity magazines are protected "arms" within the meaning of the Second Amendment, and

---

[2] This amicus brief addresses only aspects of Plaintiffs' Second Amendment claims. The Court should affirm the district court's denial of a preliminary injunction for the reasons the State and Naperville set out.

they have not met that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified. Moreover, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). And, as *Bruen* instructs, this is particularly so where, as here, the challenged ordinance implicates "unprecedented societal concerns or dramatic technological changes." 142 S. Ct. at 2132. *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. Although not directly implicated here, given the robust historical record before the Court, we highlight that point in case the Court chooses to address it.

## ARGUMENT

### I. Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry.[3] A court first must ask whether "the Second Amendment's plain text covers an

---

[3] As the State notes, *see* State Br. 51-52, nothing in *Bruen*'s text-and-history inquiry requires this Court to reach a different result from its prior decisions in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), and *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019) (per curiam), which upheld similar assault weapon and large-capacity magazine restrictions against Second

individual's conduct." 142 S. Ct. at 2129-30.[4] If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry ends: self-evidently, if people, weapons, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See, e.g., Ocean State Tactical, LLC v. Rhode Island*, No. 1:22-cv-00246, 2022 WL 17721175, at *16 (D.R.I. Dec. 14, 2022) (denying plaintiffs' motion for preliminary injunction in Second Amendment challenge to large-capacity magazine prohibition, and noting that "[b]ecause of its holding that [large-capacity magazines] are neither 'Arms' within the meaning of the Second Amendment's text, nor weapons of 'self-defense,' the Court need not investigate whether the [challenged law]'s restrictions are consistent with the regulations of history"), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023).

As the State and Naperville note, *see* State Br. 14; Naperville Br. 11, and Plaintiffs themselves acknowledge, *see* Dkt. 27 ("AT Br.") 6, 15-16, the burden to satisfy the initial, textual inquiry is on the plaintiff challenging a law. *Bruen* makes this clear by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied.

---

Amendment challenges.

[4] *Bruen*'s analysis makes clear that the "people" challenging a gun regulation, the "weapons" they put at issue, and their "proposed course of conduct" must *all* fall within the Second Amendment's plain text. *See id.* at 2134.

*See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an unusual departure from ordinary litigation principles—the Court would have said that the presumption exists from the outset. Placing the initial burden on the plaintiff also accords with the Court's approach to other constitutional issues. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the [First Amendment]. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421. Accordingly, multiple courts have read *Bruen* to place the burden on plaintiffs to establish that the Second Amendment's plain text covers their conduct. *See, e.g.*, *Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815, 2022 WL 17454829, at *11 (D. Or. Dec. 6, 2022) ("Plaintiffs *have not shown* that large-capacity magazines are weapons in common use for lawful purposes like self-defense such that they fall within the plain text of the Second Amendment." (cleaned up) (emphasis added)), *appeal dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022); *Ocean State Tactical*, 2022 WL 17721175, at *2 ("[T]he plaintiffs have failed in *their burden* to demonstrate that LCMs are 'Arms' within the meaning of the Second Amendment's text." (emphasis added)).

Plaintiffs have failed to satisfy their burden under *Bruen*'s textual inquiry, because they have failed to establish that assault weapons and large-capacity magazines are among the "arms" that the Second Amendment protects. To fall

within the Second Amendment's text, *Heller* established that a weapon must not only be a "bearable arm" or "[w]eapon[] of offence," but must also be one "in common use" and "typically possessed by law-abiding citizens for lawful purposes" like self-defense. *Heller*, 554 U.S. at 581-82, 625-27.[5] *Bruen* further confirmed that the inquiry should focus specifically on common use for the lawful purpose of self-defense.[6] As the State and Naperville explain, *see* State Br. 15-30; Naperville Br. 15-28, Plaintiffs have not carried this burden here, as to either assault weapons or large-capacity magazines. That alone is enough for this Court to affirm the denial of

---

[5] Specifically, *Heller* began with dictionary definitions of "arms," including as "[w]eapons of offence, or armour of defence" and observed that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 581-82. But it then made clear that the Second Amendment applies only to weapons "in common use" and "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes" like self-defense. *Id.* at 625-27; *see also id.* at 627 (noting that "M-16 rifles and the like" may be banned). And, as the Supreme Court subsequently explained its ruling, *Heller* "held that the Second Amendment protects the right to keep and bear arms *for the purpose of self-defense*." *McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010) (emphasis added).

[6] *Bruen* did not spell out the textual inquiry with respect to "arms" in much detail, because New York did not dispute either that the "people" in that case ("two ordinary, law-abiding, adult citizens") or the arms they sought to use ("handguns") fell within the Second Amendment's text. *See* 142 S. Ct. at 2134. But in applying that test, the Court's articulation—"[n]or does any party dispute that handguns are *weapons 'in common use' today for self-defense*," *id.* (emphasis added)—indicated that the "arms" the Second Amendment covers are those commonly used for self-defense. This limitation coheres with the Supreme Court's repeated emphasis that "individual self-defense is the central component of the Second Amendment right." 142 S. Ct. at 2133 (cleaned up) (quoting *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599)); *see also id.* at 2132 (explaining that "the Second Amendment's definition of 'arms' … covers modern instruments that facilitate armed self-defense"); *Ocean State Tactical*, 2022 WL 17721175, at *11 (noting, in a Second Amendment challenge to a state law prohibiting large-capacity magazines, that the focus under *Bruen*'s plain-text inquiry "must be on whether the LCM Ban unduly impairs the right of an individual to engage in self-defense").

a preliminary injunction. *See Ocean State Tactical*, 2022 WL 17721175, at *2, *11-15 (denying motion for preliminary injunction in challenge to large-capacity magazine law because "plaintiffs have failed in their burden to demonstrate that LCMs are 'Arms' within the meaning of the Second Amendment's text" and "have failed to prove that LCMs are weapons relating to self-defense"); *Or. Firearms Fed'n*, 2022 WL 17454829, at *9-12 (making similar findings in denying motion for a temporary restraining order as to Oregon large-capacity magazine law); *see also Hanson v. District of Columbia*, No. 1:22-cv-02256, 2023 WL 3019777, at *12 (D.D.C. Apr. 20, 2023) (concluding, under textual inquiry of *Bruen*'s framework, that "the Second Amendment does not cover LCMs because they are not typically possessed for self-defense").

In sum, because Plaintiffs have failed to carry their burden to establish that assault weapons and large-capacity magazines are protected by the Second Amendment's text, they have failed to show likelihood of success on the merits and this Court should affirm.[7]

---

[7] In addition, as Naperville and the State point out, Plaintiffs' challenges to Naperville's restrictions on the sale of assault weapons and Illinois's   restrictions on the sale, as well as the purchase, manufacture, delivery, or importation, of assault weapons and large-capacity magazines fall even further from the mark. Naperville Br. 15-16; State Br. 16 n.6; *cf. United States v. Tilotta*, No. 3:19-cr-04768, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (explaining that, "textually, the ordinary meaning of 'keep and bear' does not include 'sell or transfer'"); *Def. Distributed v. Bonta*, No. 2:22-cv-06200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (explaining that whether the Second Amendment's plain text includes any "implicit[]" right to "acquire and manufacture firearms" or "to purchase arms" is "quite-clearly not a 'plain text' analysis, required under *Bruen*" (internal quotation marks omitted)), *adopted*, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022).

## II.     The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations

If the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states. And it should further conclude, particularly given the "dramatic technological changes" and "unprecedented societal concerns," *Bruen*, 142 S. Ct. at 2132, present in this case, that the historical inquiry also extends thereafter—including into the 20th century.

As to the choice between 1791 and 1868, the Eleventh Circuit recently explained that it is 1868 that controls. *See Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023) ("In short, because the Fourteenth Amendment is what *caused* the Second Amendment to apply to the States, the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth Amendment—is what matters."), *pet'n for reh'g en banc filed* (Mar. 30, 2023).  Several circuits, including the Seventh Circuit, reached that same conclusion in analyzing state and local laws under the Second Amendment at the first, historical step of the framework that applied prior to *Bruen*.[8] *See Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald*

---

[8] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that Second Amendment analysis should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny.

confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and Fourteenth* Amendments' ratifiers approved [the challenged] regulations ...." (emphasis added)).[9]

*Bruen* does not alter that conclusion.[10] The Supreme Court expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when

---

*See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

[9] *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), is not to the contrary. There, the Seventh Circuit referred to 1791, but did not hold that 1791 is the only relevant time period for historical inquiry. Moreover, *Moore* did not acknowledge the implications for originalism of the fact that the Second Amendment did not apply against the states until the 1868 ratification of the Fourteenth Amendment (which is mentioned nowhere in the opinion). Instead, *Moore* cited a passage in *McDonald* saying that the standards against the state and federal governments should be the same. *See* 702 F.3d at 935 (citing *McDonald*, 561 U.S. at 765-66, 766 n.14). But that merely flags the issue that *Bruen* acknowledged, *see* 142 S. Ct. at 2137, before leaving open the question whether the 1868 or 1791 understanding should control, *see* 142 S. Ct. at 2138. Accordingly, *Moore*'s observation has no remaining force after *Bruen*, whereas *Ezell*'s observation remains a faithful application of originalist principles, as well as being the one the Seventh Circuit followed in pre-*Bruen* Second Amendment cases.

[10] To the contrary, as noted, the Eleventh Circuit has expressly affirmed this Reconstruction-era understanding since *Bruen*. *See Nat'l Rifle Ass'n*, 61 F.4th at 1321-24.

defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because public understanding "for all relevant purposes" in case before it was the same in 1791 and 1868). Moreover, although *Bruen* disapproved the second, scrutiny-based step of the predominant framework lower courts had applied, it declared that "[s]tep one of" that framework "is broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

For the reasons set out by the State and Naperville, this Court can uphold the challenged laws under a historical analysis without deciding whether the primary focus of that analysis should be the period around 1791 or the period around 1868.[11] The historical tradition—from the founding era, to the 19th century, through Reconstruction, into the 20th century, and even up to today—is consistent in demonstrating the constitutionality of restrictions on "dangerous and unusual" weapons "relevantly similar" to the restrictions challenged here. *See, e.g.*, State Br. 32-36 (describing relevant historical laws from before the founding and into the 20th century); Naperville Br. 27, 33-40.[12] But if this Court prefers to settle the issue

---

[11] Plaintiffs contend that "the founding era is the relevant time period" for historical analysis under *Bruen*. AT Br. 35. But, as a matter of basic logic, the Court in *Bruen* could not already have resolved the issue it expressly left open. And to the extent the *Bruen* majority put a thumb on the scale, it was in favor of 1868, not 1791. *See infra* pp. 12-13 (explaining that majority cited scholarship arguing for 1868 and none arguing for 1791, and approvingly cited consideration of 19th-century laws in sensitive places analysis).

[12] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the State's and Naperville's evidence), it should rely on 19th-century and 20th-century history to

the Supreme Court left open, it should conclude that, as between 1791 and 1868, it is 1868 that is the correct focus of the Court's inquiry.

To begin with, in a case involving a state or local law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states or localities under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state or local government, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the

---

clarify that meaning. *See, e.g.*, State Br. 32-36; Naperville Br. 27, 33-40; *infra* pp. 15-18.

state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id.* But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states and local governments, but also as to the federal government.[13] More recently, Professor Lash wrote—as quoted in *Bruen*— "When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: Insisting that the 1791 understanding should apply against states and localities does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why this Court

---

[13] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

has read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[14]

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice

---

[14] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen* (No. 20-843) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

Thomas and former Solicitor General Paul Clement as counsel for the NRA's New

York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned
> post-Reconstruction. But, if we are to analyze this based upon the
> history or tradition, should we look at the founding, or should we look
> at the time of the adoption of the Fourteenth Amendment, which then,
> of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case
> where there was a contradiction between those two, you know, and the
> case arose in the states, I would think there would be a decent
> argument for looking at the history at the time of Reconstruction …
> and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

In sum, any historical inquiry this Court chooses to conduct should focus on

the period around 1868 rather than 1791. But 1868 is not a cutoff. *Heller* instructs

that "examination of a variety of legal and other sources to determine *the public*

*understanding* of a legal text in the period *after* its enactment or ratification" is also

"a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis

added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same).[15] *Bruen* clarified that,

under this passage in *Heller*, materially later history that *contradicts* the

established original meaning of the constitutional text at the relevant point in time

would not change that meaning. *See* 142 S. Ct. at 2137 & 2154 n.28. But it

emphasized that, conversely, "a regular course of practice can liquidate [and] settle

---

[15] Nor is 1868 a starting line for the inquiry. Both *Heller* and *Bruen* examined
history preceding even 1791. *See Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at
2135-36, 2142-45. And the State and Naperville correctly point to such history in
their briefs. *See, e.g.*, State Br. 32-33; Naperville Br. 27, 33-34.

the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison).

Furthermore, *Bruen* recognized that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry. *Id.* at 2132; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern technological development or modern societal concern that warrants a modern firearms regulation did not exist in the time period a court is examining, then self-evidently there will be no historical laws addressing the development or concern to be found in that period.

That is precisely the situation in this case. As the State and Naperville explain, *see* State Br. 36-41, Naperville Br. 28-31, the challenged measures were adopted in response to the exponential increase in the lethality of firearms and magazines—*i.e.*, "dramatic technological changes," *Bruen*, 142 S. Ct. at 2132—and the "unprecedented societal concern[]," *id.*, that followed, namely, an epidemic of mass shootings. *See, e.g.*, *Herrera v. Raoul*, No. 1:23-cv-00532, 2023 WL 3074799, at *7 (N.D. Ill. Apr. 25, 2023) (in denying preliminary injunction motion, finding that Illinois law and similar Chicago and Cook County ordinances "responded to 'dramatic technological changes' and 'unprecedented societal concerns' of increasing mass shootings by regulating the sale of weapons and magazines used to perpetrate

them"), *appeal docketed*, No. 23-1793 (7th Cir. Apr. 26, 2023); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Security*, No. 1:22-cv-00951, 2023 WL 2655150, at \*10-11 (D. Del. Mar. 27, 2023) (in denying preliminary injunction motion as to Delaware law, finding "that assault long guns and LCMs implicate dramatic technological change and unprecedented societal concerns for public safety"), *appeal docketed*, No. 23-1633 (3d Cir. Apr. 7, 2023).[16] A "more nuanced approach" to history is thus fully warranted.

Here, state and local laws from the period beginning around Reconstruction and continuing into the 20th century—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of Illinois's law and Naperville's ordinance. *See* State Br. 32-36 (discussing late 19th- and early 20th-century laws regulating particularly dangerous weapons and weapon features soon after they emerged in the commercial market, including prohibitions and restrictions of multi-shot guns and automatic and semiautomatic firearms capable of firing a large number of rounds without reloading, which were consistent with earlier laws restricting access to weapons and weapon features that demonstrably threaten public safety but have no legitimate use for self-defense,

---

[16] *See also Or. Firearms Fed'n*, 2022 WL 17454829, at \*12-13 (in denying plaintiffs' motion for a temporary restraining order as to Oregon law, similarly finding that large-capacity magazines "implicate a dramatic change in firearms technology" and "also implicate unprecedented societal concerns" arising from mass shootings); *Hanson*, 2023 WL 3019777, at \*12-14 (reaching same conclusion in denying plaintiffs' preliminary injunction motion as to D.C. large-capacity magazine law).

such as blunt weapons, trap guns, and Bowie knives); Naperville Br. 27, 33-40;

*Herrera*, 2023 WL 3074799, at *6-7 (holding that Illinois's law and similar Chicago

and Cook County ordinances restricting assault weapons and large-capacity

magazines "are consistent with the Nation's 'history and tradition' of treating

particularly 'dangerous' weapons as unprotected" under the Second Amendment,

and, in analyzing the historical record, noting that "laws regulating weapons,

including various firearms, developed over time in response to the type of harm

those weapons presented").[17] And, indeed, as both the State and Naperville explain,

*see* State Br. 42-43; Naperville Br. 29, 36-40, regardless of whether the Court

concludes that the relevant focus for its analysis is 1791 or 1868, it should consider

this later historical evidence and the "regular course of practice" in the decades that

followed to "settle" the meaning of the right as one that allows for restrictions like

Illinois's law and Naperville's ordinance.

## III.   This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers"

Challengers in other recent Second Amendment cases have sought to dismiss

historical regulations as "outliers" insufficient to satisfy the requirements of *Bruen*.

*See, e.g.*, Pls.' Suppl. Br. 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16,

2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed

as "outliers"). Plaintiffs here likewise assert that "a handful of isolated examples

---

[17] *See also Del. State Sportsmen's Ass'n*, 2023 WL 2655150, at *13 (finding that Delaware's "LCM and assault long gun prohibitions … are consistent with the Nation's historical tradition of firearm regulation"); *Hanson*, 2023 WL 3019777, at *12, *15-17 (same, as to D.C. large-capacity magazine law); *Or. Firearms Fed'n*, 2022 WL 17454829, at *12-14 (same, as to Oregon large-capacity magazine law).

and outliers" are insufficient to establish a historical tradition under *Bruen*. AT Br. 35-36. Even if that assertion were correct, it is not implicated in this case, given the robust and extensive record of historical laws. *See, e.g.*, State Br. 32-36; Naperville Br. 27, 33-40. But to the extent this Court wishes to address the issue, to guide district courts in cases where a government might present a less extensive record, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae 11-12, *Bruen* (No. 20-843).[18] Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were from a single colony, Maryland, and were enacted three years apart, in 1647 and 1650. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235;

---

[18] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133.

Br. for Indep. Inst. as Amicus Curiae 11-12, *Bruen* (No. 20-843).[19] Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[20]

Concluding that a small number of state and local laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or

---

[19] Notably, one of the Court's sources stated that, "[i]n general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed." Kopel & Greenlee, 13 Charleston L. Rev. at 235. Accordingly, the Court's reliance on this source further confirms that widespread acceptance of a practice of carrying guns as a matter of policy does not indicate that the practice was constitutionally protected. *See also infra* pp. 20-21 (explaining that to infer constitutional protection from absence of regulation would run against basic principles of federalism).

[20] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight, given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is indisputably no such "overwhelming" evidence of a right to sell, purchase, manufacture, deliver, import, or possess assault weapons or large-capacity magazines.

conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As this Court explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.[21]

---

[21] Indeed, any such inference would be untenable in light of the Court's statement, in a decision issued the day after *Bruen*—with five of the same Justices in the majority—that "the fact that many States in the late 18th and early 19th century did not criminalize" certain conduct "does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022).

## CONCLUSION

The Court should affirm the district court's denial of Plaintiffs' motions for preliminary injunction.

Dated: May 10, 2023                    Respectfully submitted,

<u>/s/ William J. Taylor, Jr.    </u>
Janet Carter
William J. Taylor, Jr.
Kari L. Still
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8215
wtaylor@everytown.org

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) as modified by Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word, in 12-point Century Schoolbook font, and complies with Circuit Rule 29 in that this brief contains 6,331 words, excluding the portions exempted by Fed. R. App. P. 32(f).

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*


## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2023, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*