No. 23-1353

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

NATIONAL ASSOCIATION FOR GUN RIGHTS; ROBERT C. BEVIS; and LAW WEAPONS, INC d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation,

*Plaintiffs-Appellants*,

v.

CITY OF NAPERVILLE, ILLINOIS and JASON ARRES,

*Defendants-Appellees*,

and

THE STATE OF ILLINOIS,

*Intervening-Appellee*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, NO. 1:22-CV-04775
THE HONORABLE VIRGINIA M. KENDALL, JUDGE PRESIDING

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

BARRY K. ARRINGTON
ARRINGTON LAW FIRM
4195 WADSWORTH BOULEVARD
WHEAT RIDGE, COLORADO 80033
(303) 205-7870

JASON R. CRADDOCK
LAW OFFICE OF JASON R. CRADDOCK
2021 MIDWEST ROAD, SUITE 200
OAK BROOK, ILLINOIS 60523
(708) 964-4973

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..............................................................iii

I.  Introduction.......................................................................1

II.  The Plain Text of the Second Amendment Covers the Banned Arms......2

  A.  The Plain Text Covers the Banned Firearms......................................2

  B.  The Plain Text Covers the Banned Magazines ...................................3

  C.  The State Confuses the "Plain Text" and "History and
      Tradition" Prongs in its Analysis of Magazines ..................................5

III.  An Absolute Ban is Constitutional Only if the Banned Weapon
      is Not in Common Use...............................................................8

IV.  The State Has the Burden of Showing that the Banned Weapons
     Fall into the Category of Weapons that May be Banned........................8

V.  The State Has Failed to Offer Any Evidence that the Banned Arms
    Fall into the Category of Arms That May be Banned.............................10

  A.  The State Offered No Evidence the Banned Arms are Dangerous
      and Unusual ........................................................................10

  B.  The State Did Not Demonstrate That the Banned Arms are
      Military Arms That Are Highly Unusual in Society............................11

VI.  The Court Should Reject the State's Attempt to Distort the Common
     Use Test ...............................................................................13

VII.  The Court Should Disregard the State's Means-End Arguments .........15

VIII.  A Categorial Ban on Commonly Possessed Arms is not Consistent
       with The Nation's History and Tradition of Firearm Regulation ........16

  A.  Introduction........................................................................16

  B.  Repeating Arms Have Existed for Centuries ....................................17

C.  Urban Violence and Mass Shootings are not Unprecedented Societal Concerns ................................................................18

IX.  The State, Like the District Court, Ignores *Bruen's* Mandate Regarding the Relevant Time Period ................................................20

X.  The State's "Ample Alternatives" Argument is Advanced in Defiance of Heller ................................................................21

XI.  A Ban on the Sale of Firearms is Untenable Under Heller ....................22

XII.  The State's "Irreparable Harm" Arguments Are Meritless...................23

A.  Depriving Citizens of the Right to Possess Firearms for Protection Constitutes Irreparable Harm ...............................................23

B.  Plaintiffs Raised These Issues in the District Court............................25

XIII. Conclusion................................................................25

## TABLE OF AUTHORITIES

Page

**CASES**

*Antonyuk v. Bruen*, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) .................24

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen.
New Jersey*, 910 F.3d 106 (3d Cir. 2018), *abrogated on other
grounds by Bruen* ...........................................................................................4, 14

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) .........................................*passim*

*D.C. v. Heller*, 554 U.S. 570 (2008) ............................................................*passim*

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3rd Cir. 2021) ...........................22

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir 2020) .......................................14, 17

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...............................*passim*

*Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015)...................1, 20

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015).............13, 14

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015)..........................................4

*Harmon v. Gordon*, 712 F.3d 1044 (7th Cir. 2013) .......................................7

*Hardaway v. Nigrelli*, 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) .............24

*Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011) ...........................................14, 20

*Jackson v. City and County of San Francisco*, 746 F.3d 953
 (9th Cir. 2014)................................................................................................3

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) .............................................12, 14

*Koons v. Platkin*, 2023 WL 3478604 (D.N.J. May 16, 2023)..........................24

*Luis v. United States*, 578 U.S. 5 (2016).......................................................3, 4

*Midwest Fence Corp. v. United States Dep't of Transportation*,

840 F.3d 932 (7th Cir. 2016) ..........................................................14

*Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011).........................2

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111
(2022) ...............................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242
(2d Cir. 2015) .........................................................................14

*Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829 (D. Or. 2022).....5, 6

*Padgett v. Norfolk S. Corp.*, 2021 WL 2948408 (N.D. Ind. 2021) .................7

*Spencer v. Nigrelli*, 2022 WL 17985966 (W.D.N.Y. Dec. 29, 2022) ...............24

*Staples v. United States*, 511 U.S. 600, 603 (1994) .........................12

*Teixeira v. County. of Alameda*, 873 F.3d 670 (9th Cir. 2017)....................22, 23

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)..............................23

## STATUTES

U.S. Const. amend. II ...............................................................*passim*
U.S. Const. amend. V ...............................................................11

## OTHER AUTHORITIES

Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223 ....................................19

David Kopel, Reason.com, *Bowie Knife Statutes 1837-1899*..........................16

Louis A. Garavaglia & Charles G. Woman, *Firearms of the American
West 1866-1894* (1984).......................................................18

Louis Klarevas, *Rampage Nation* (2016)..........................................19

Mother Jones, *US Mass Shootings, 1982–2023* ...........................................19

NSSF, 2021 Firearms Retailer Survey Report..............................................1

## I.    Introduction

This is a simple case. Tens of millions of firearms and magazines of the type banned by the State[1] are possessed by law-abiding Americans for a variety of lawful purposes. The Second Amendment protects carrying weapons that are in common use as opposed to those that are highly unusual in society at large. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2143 (2022) (internal citation and quotation marks omitted). Thus, these weapons are protected. Indeed, the banned semi-automatic rifles are the second-most popular firearm in the United States, behind only semi-automatic handguns,[2] which *Heller* held are protected by the Second Amendment. *Id.*, 554 U.S. at 628. If the second most popular firearm in the nation is not protected, then only handguns are protected. Trying to cabin *Heller* to its facts, that is how the State suggests the holding should be interpreted. But nothing in *Heller* supports that interpretation. *See Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (rejecting the idea that under *Heller* only handguns are protected). This case is easily resolved by a straightforward application of the common use test. And under that test there cannot be the slightest doubt that the challenged laws are unconstitutional.

---

[1] This brief focuses primarily on replying to the State's Answer. Plaintiffs' arguments are intended to apply also to the largely duplicative arguments raised in the City's Answer. Where the City has raised an issue unique to itself, Plaintiffs will respond to it separately.

[2] NSSF, 2021 Firearms Retailer Survey Report 9 (available at bit.ly/42Dw3KB).

## II.    The Plain Text of the Second Amendment Covers the Banned Arms

### A.    The Plain Text Covers the Banned Firearms

The State argues that the banned firearms are not indisputably "arms" within the Second Amendment's plain text. State Ans. 15. This is more than just incorrect; it defies common sense. All fire*arms* are arms. *Heller*, 554 U.S. at 581-82. "[T]he Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms." *Id*., 554 U.S. at 582 (emphasis added). Therefore, the text of the Second Amendment, prima facie, extends to the banned firearms.

The State confuses the difference between (1) conduct prima facie protected by the text and (2) the subset of that conduct that may be regulated consistent with the Nation's history and traditions. This distinction is not unique to the Second Amendment. For example, on its face, the First Amendment prohibits all laws abridging freedom of speech. But that seemingly absolute guarantee sometimes yields to a regulation that is consistent with the Nation's history and tradition of speech regulation. Thus, "[l]aws punishing libel … are not thought to violate 'the freedom of speech' to which the First Amendment refers because such laws existed in 1791 and have been in place ever since." *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011). Libel is not protected by the First Amendment, but no one would argue that because it is unprotected it is not "speech" in the first instance.

Similarly, the plain text of the Second Amendment extends to all "arms." Nevertheless, a prohibition on a "dangerous and unusual" weapon (such as a short-barreled shotgun) does not violate the Second Amendment because laws banning such weapons existed in 1791 and have been in place ever since. *Heller*, 554 U.S. at 627. A short-barreled shotgun is not protected by the Second Amendment, but no one would argue that because it is unprotected it is not a bearable arm in the first instance. In this case, the semi-automatic firearms banned by the challenged laws are bearable arms, and the plain text of the Second Amendment extends, prima facie, to protect them. The State is free to argue that its ban of these firearms is consistent with the Nation's history and tradition of firearm regulation. But there is no reasonable argument that they are not "arms" covered by the plain text in the first instance.

### B.    The Plain Text Covers the Banned Magazines

The State asserts that so-called "large capacity magazines" are not covered by the plain text of the Second Amendment. St. Resp. 15. This too is wrong. The right to keep and bear firearms implies a corresponding right to items necessary to make the right effective. *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (recognizing right to access to training). *See also Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014) (ammunition protected though it is not an arm per se). Justice Thomas cited both *Jackson* and *Ezell* with approval in *Luis v. United States*, 578 U.S. 5 (2016), in which he explained that a constitutional right implicitly protects those closely

3

related items necessary to its exercise. *Id.*, 578 U.S. at 26-27 (Thomas J., concurring). Similarly, in *Bruen* the Court held that the Second Amendment's definition of "arms" covers all "instruments that facilitate armed self-defense." *Id.*, 142 S. Ct. 2132.

Magazines are an essential component of all modern semi-automatic firearms. A magazine feeds cartridges into the firearm after each shot so that another shot can be fired with each pull of the trigger. Thus, for obvious reasons, if there is no magazine from which cartridges are fed into the firearm, semi-automatic fire is impossible.[3] That is why in *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) (*abrogated on other grounds by Bruen*), the court held that "[b]ecause magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." Similarly, in *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), the court held that magazines are necessary to make semi-automatic firearms work and therefore there is a "right to possess the magazines necessary to render those firearms operable." *Id.* 779 F.3d at 998.

The State asserts that magazines are not covered by the plain text because they are just a box in which ammunition is stored. St. Resp. 16. Astoundingly, the State also asserts that ammunition – without which the right to keep

---

[3] Thus, at the very least, magazines are "instruments that facilitate armed self-defense."

and bear a firearm is meaningless – is also not covered by the plain text.[4] *Id.* The State arrives at these dubious conclusions based on the "corpus linguistics" analysis of its expert, Dennis Baron (*see* A519-A570). Baron offered opinions based on this methodology in *Heller*, which opinions the Court described as "worthy of the Mad Hatter." *Heller*, 554 U.S. at 589. Nothing has changed. Baron opines that a modern magazine, like an 18th-century cartridge box, is merely a box in which ammunition is stored, and boxes are not arms. A529-30. Indeed, mere boxes are not arms. But as discussed above, a modern magazine is not merely a box in which ammunition is stored. Magazines are dynamic and integral components of all semi-automatic firearms without which semi-automatic fire is impossible. Thus, to credit the State's argument, the Court would have to implicitly hold that a ban on all semi-automatic fire would be constitutional. Obviously, such a holding would be radically inconsistent with *Heller* and *Bruen*.

### C.    The State Confuses the "Plain Text" and "History and Tradition" Prongs in its Analysis of Magazines

In *Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829 (D. Or. 2022), the court held that "large capacity" magazines are not protected by the plain text of the Second Amendment. The court reached that conclusion by

---

[4] If the State's analysis were correct and ammunition is not protected by the Second Amendment, it could effectively disarm all of its citizens tomorrow. One suspects that such a result would not be consonant with *Heller* or *Bruen*.

confusing *Bruen's* "plain text" and "history and tradition" prongs, and the State, citing *Brown*, makes the same error here.[5]

In *Brown*, the court got off to a promising start when it held that "magazines in general are necessary to the use of firearms for self-defense." *Id.*, *9, *citing Fyock v. Sunnyvale, supra.* That should have been the end of the plain text analysis. As discussed above, it is true that magazines are necessary to use semi-automatic firearms. Thus, as a category they are covered by the plain text of the Second Amendment. Unfortunately, the court did not stop there. Instead, it erred when it held that while magazines are generally necessary, large capacity magazines are not specifically necessary, and therefore large capacity magazines are not covered by the plain text. *Id.*

The *Brown* court's error resulted from confusing *Bruen's* plain text analysis with its history and tradition analysis. Under the plain text step, a magazine of any size is a bearable arm and thus presumptively protected. Does this mean the State cannot ban so-called large capacity magazines? Not necessarily. Just like any arm, if the State can demonstrate that a law banning large capacity magazines is consistent with the Nation's historical tradition of firearm regulation, it can ban them. But as discussed above in the context of firearms, there is no reasonable argument that they are not "arms" covered by the plain text in the first instance.

---

[5] The court in *Brown* also went astray when it relied on Professor Baron's characterization of a magazine as merely a storage box. *Id.*, *13.

In summary, a magazine of some size is necessary to make the Second Amendment right to fire a semi-automatic rifle effective. Therefore, magazines are prima facie protected by the Second Amendment under prong one (plain text) of the *Bruen* analysis. Whether magazines of a particular size can be banned is a different question that must be resolved under prong two (history and tradition). But as demonstrated in the Opening Brief, there are over 150 million magazines of the type banned by the State. They are obviously in common use for lawful purposes. Therefore, the State cannot hope to demonstrate that banning them is consistent with the Nation's history and tradition of firearm regulation.

The State argues Plaintiffs waived their argument that magazines are bearable arms by presenting the argument only in a footnote. State Ans. 17, *citing Harmon v. Gordon*, 712 F.3d 1044 (7th Cir. 2013). *Harmon* has no application for two reasons. First, Plaintiffs' argument that magazines are bearable arms was not raised in a footnote only. See Op. Br. 6, 15 (arguing that magazines are bearable arms protected by the Second Amendment). In footnote six, Plaintiffs *expanded* on that argument. Expanding on an argument in a footnote is not the same as addressing it only in a footnote. Second, the *Harmon* rule is applicable only to footnotes that are undeveloped and unsupported by authority. *Id.* at 1053. Footnote six contains 227 words and cites several authorities. It is far from undeveloped and unsupported. *See Padgett v. Norfolk S. Corp.*,

2021 WL 2948408, at *2 (N.D. Ind. 2021) ("Seventh Circuit has not disavowed footnotes generally, but only 'undeveloped' or 'unsupported' footnotes.").

## III.    An Absolute Ban is Constitutional Only if the Banned Weapon is Not in Common Use

*Heller* held that the government may ban a weapon only if it demonstrates the weapon is not in common use. *Id*. 554 U.S. at 627. The Court set forth two examples of weapons that fall into this category: (1) "dangerous and unusual" weapons; and (2) military arms like machine guns "that are highly unusual in society at large." *Id*. 554 U.S. at 627. While all bearable arms are presumptively protected under the "plain text" prong, the government can rebut that presumption under the "history and tradition" prong if the weapon is not in common use. Conversely, where tens of millions of the banned arms are owned by law-abiding citizens, it will be impossible for the government to meet its burden.

## IV.    The State Has the Burden of Showing that the Banned Weapons Fall into the Category of Weapons that May be Banned

The State is confused about where the burdens lie in this case. It asserts that Plaintiffs have failed to meet *their* burden under the "plain text" prong of showing that the banned arms are in common use. St. Resp. 16. But Plaintiffs have no such burden. To meet their "plain text" burden, Plaintiffs need only show that the banned arms are bearable arms. The burden then shifts to the government to justify its ban under the "history and tradition" prong.

8

The government can meet its history and tradition burden by demonstrating that its ban is consistent with the "*historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons'" *Id*., at 627 (emphasis added). But the State knows it cannot hope to show the weapons are unusual, so it pretends that it is Plaintiffs' burden to demonstrate the opposite, i.e., that they are usual. This argument fails because the State has the burden of demonstrating its ban is consistent with the historical tradition of banning dangerous and unusual weapons by showing that the weapons are unusual. Plaintiffs do not have the burden of demonstrating that the ban does not fall under that historical tradition by showing that that weapons are usual (i.e., in common use).

The Court might ask why Plaintiffs have submitted so much evidence that the banned arms are in common use if they have no obligation to do so. The answer is that while Plaintiffs are not required to submit such evidence, they may do so to shortcut the resolution of the history and tradition prong. Under *Heller*, an absolute ban of a commonly used arm is categorically unconstitutional because there is no historical tradition supporting such a ban. That means that if Plaintiffs do show that the banned arms are in common use (which they have), it is impossible for the State to meet its burden under the history and tradition prong.

**V.      The State Has Failed to Offer Any Evidence that the Banned Arms Fall into the Category of Arms That May be Banned**

**A.      The State Offered No Evidence the Banned Arms are Dangerous *and Unusual***

The State has not demonstrated that the banned weapons fall into the category of weapons that may be subjected to a categorical ban (i.e., weapons that are not in common use). To be sure, the State quibbles with Plaintiffs' common use evidence (St. Ans. 20-21), but it offers no evidence of its own to refute it. Moreover, it is difficult to understand why the State would quibble with this evidence in the first place because the evidence is so widely accepted that even the City's expert asserts that it is accurate. *See* Declaration of Louis Klarevas, Doc. 57-7, Ex. G, ¶ 13 (acknowledging there are 24.4 million rifles of the type banned).

More importantly, as discussed above, the State has the burden of demonstrating the banned weapons are dangerous and unusual, and it has offered no evidence that the banned arms are unusual. Instead, it drops the "unusual" part and argues it may ban these arms because there is a historical tradition of banning "dangerous weapons" that cause harm. St. Ans. 46. This cannot possibly be true because all weapons are dangerous, and if a weapon can be banned merely because it is dangerous, the Second Amendment means nothing. "If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous." *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J. concurring). This is why a weapon may not be

10

banned "unless it is *both* dangerous *and* unusual." *Id.* at 417 (emphasis in the original).

### B.    The State Did Not Demonstrate That the Banned Arms are Military Arms That Are Highly Unusual in Society

The State argues the banned arms fall under *Heller's* second example of weapons not in common use that may be banned (i.e., military arms like machine guns), because the banned weapons are "most useful in military service" like M-16 rifles. State Ans. 22, *citing Heller*, 554 U.S. at 627. But the very passage from *Heller* cited by the State demonstrates why its argument is wrong. In that passage, the Court held that specialized military arms like M-16 machine guns "that are highly unusual in society at large" are not protected for civilian use by the Second Amendment. *Heller*, 554 U.S. at 627. *See also id.* at 625 (contrasting machine guns, which may be banned, with weapons in common use that may not be banned). The passage cited by the State obviously does not apply to weapons in common use like those banned by the State.

The State seems to be arguing that *Heller's* reference to military arms must mean that any arm that could possibly be used in warfare is not protected. But *Heller* said the very opposite. In the same passage it held that weapons in common use brought to militia service by members of the militia are protected by the Second Amendment. *Id.* What do militia members do with those weapons when they bring them to militia service? They fight wars.[6] It would be extremely anomalous, therefore, if *Heller* were interpreted to mean

---

[6] *See* U.S. Const. amend. V (referring to "the Militia, when in actual service in time of War").

simultaneously that (1) weapons brought by militia members for fighting wars are protected by the Second Amendment, and (2) all weapons used for fighting wars are not protected by the Second Amendment. This is obviously not the law. "*Miller* and *Heller* [merely] recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." *Caetano v. Massachusetts*, 577 U.S. 411, 419 (2016) (Alito, J., concurring). *See also Kolbe v. Hogan*, 849 F.3d 114, 156 (4th Cir. 2017) (Traxler, J., dissenting) (calling an arm a "weapon of war" is irrelevant, because under *Heller* "weapons that are most useful for military service" does not include "weapons typically possessed by law-abiding citizens.").

Nevertheless, the State insists that it can ban AR-15s because they are similar in some ways to M-16s. State Ans. 22. But this argument is surely precluded by *Staples v. United States*, 511 U.S. 600 (1994). In that case the Court distinguished a machine gun like an M-16 from a semi-automatic weapon like the AR-15 at issue in that case. The Court held that such semi-automatic rifles "*traditionally have been widely accepted as lawful possessions.*" *Id.*, 511 U.S. at 612 (emphasis added). To be "widely accepted" an arm must be in common use, and therefore it cannot be banned under the common use test.

## VI.    The Court Should Reject the State's Attempt to Distort the Common Use Test

Unable to rebut the overwhelming evidence that the arms it has banned are possessed by many millions of law-abiding citizens, the State retreats to the argument that an arm is not protected unless it is in fact frequently *actually* used for self-defense. St. Ans. 19. But the State's argument is foreclosed by *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015). In that case, this Court wrote that if "the banned weapons are commonly *owned* . . . then they are not unusual." (emphasis added).[7] This common-sense conclusion is consistent with *Heller*, where the Court held the Second Amendment protects those arms "typically *possessed* by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added). The Court required no empirical study about handguns' actual use in self-defense situations to reach this conclusion.

In *Bruen*, the Court picked up where *Heller* left off. The Court stated that the Second Amendment protects the right to "*possess* and carry weapons *in case of* confrontation." *Bruen*, 142 S. Ct. at 2134 (internal citations and quotation marks omitted; emphasis added). The right encompasses the right to be "*armed and ready* for offensive or defensive action in a case of conflict with another person." *Id*. (internal citations and quotation marks omitted; emphasis added). The right thus encompasses the right to "'keep' firearms …

---

[7] While as discussed at Op. Br. 11-14, the three-part test announced in *Friedman* is not tenable under *Bruen*, this statement is indisputably correct.

at the ready for self-defense … *beyond moments of actual confrontation.*" *Id.* (emphasis added).

The State asserts that evidence of the widespread ownership of an arm does not show whether the arm is in common use.[8] State Ans. 20. This is not accurate, as this Court held in *Friedman.* Other courts are in accord. *See Duncan*, 970 F.3d 1133, 1147 (9th Cir. 2020)[9] ("Commonality is determined largely by statistics."); *Ass'n of N.J Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an arm is commonly owned because the record shows that "millions" are owned); *Kolbe v. Hogan*, 849 F.3d 114, 153 (4th Cir. 2017*), abrogated by Bruen* (2022) (Traxler, J. dissenting) (consensus among courts is that the test is an "objective and largely statistical inquiry"); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), *abrogated on other grounds by Bruen* ("Even accepting the most conservative estimates cited by the parties and by *amici*, the assault weapons at issue are 'in common use' as that term was used in *Heller.*"); *Heller v. D.C.*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'").[10]

---

[8] Even if the State were correct, it would make no difference. Again, Plaintiffs have no obligation to demonstrate common use. It is the State's burden to justify its categorical ban by demonstrating the opposite, i.e., by showing the arms are not in common use. It has not come close to doing so.

[9] *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

[10] The State cites *Midwest Fence Corp. v. United States Dep't of Transportation*, 840 F.3d 932, 946 (7th Cir. 2016), for the proposition that the Court may not consider certain evidence regarding this issue. St. Ans. 28. This is incorrect. In that case, on appeal Midwest Fence attempted to supplement the record with evidence that was not before the district court. But

## VII. The Court Should Disregard the State's Means-End Arguments

The State devotes a substantial portion of its brief to the argument that the means it has chosen (banning commonly possessed arms) is justified by the end it has identified (increased public safety). The State candidly admits that the arms ban should be held constitutional because it has "invoke[d] public safety considerations." State Ans. 48. Naturally, the State does not admit that it is ignoring *Bruen's* prohibition on means-end scrutiny, but large sections of its brief do exactly that. *See* State Ans. 22-26 and 39-41. The argument in these sections takes the form of classic interest balancing. According to the State, (1) the banned arms are a danger to public safety (State Ans. 22-24); and (2) the government's interest in promoting public safety by banning the arms outweighs Plaintiffs' right to possess them because experts assure us the banned arms are not "suitable." State Ans. 24-26. Therefore, according to the State, the ban survives scrutiny. State Ans. 26.[11] But all of these arguments ignore the fact that *Bruen* unambiguously rejected the application of means-end scrutiny in the Second Amendment context (*Id.*, 142 S. Ct. at 2126), and should be rejected for that reason.

---

the case is not applicable because Plaintiffs have not attempted to supplement the record on appeal with new evidence.

[11] *See also* St. Ans. 54, where the State discusses its "compelling interest" to justify its ban.

**VIII.  A Categorial Ban on Commonly Possessed Arms is not Consistent with The Nation's History and Tradition of Firearm Regulation**

### A.     Introduction

The banned weapons are commonly possessed by law-abiding Americans for lawful purposes. This is indisputable, and the Court should end its analysis based on that fact.

Even if further historical inquiry were necessary, however, the State has not come close to meeting its burden of demonstrating any historical tradition of prohibiting firearms capable of firing more than ten rounds without reloading. The fact that the banned weapons are perfectly legal in the overwhelming number of states, combined with the fact that millions of Americans have chosen to possess tens of millions of these arms, confirm that to this day there has never been such a historical tradition.

The State asserts that in the 19th-century a widespread tradition of states categorically banning the possession of certain weapons such as Bowie knives emerged. State Ans. 36. This is not true. See David Kopel, Reason.com, *Bowie Knife Statutes 1837-1899 (*available at bit.ly/3RNRpQD) ("At the end of the 19th-century, no state prohibited possession of Bowie knives."). As *Bruen* explained, the laws advanced by the State as analogous to its categorical ban were not categorical bans. Those laws either prohibited concealed carry (while allowing open carry and possession) or merely "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id.*, 142 S.Ct. at 2145; *see*

16

*id.* at 2142-56. They were never understood to ban the keeping or bearing of commonly owned arms. *See* Brief for *Amicus Curiae* National Shooting Sports Foundation, Inc., 21-22.

Moreover, it is unclear why the State believes regulations of Bowie knives, slungshots, clubs, etc. have any relevance to this matter in the first place. In *Bruen*, the Court considered only historical regulations of carrying handguns in its analysis of New York's carry restriction. It did not consider historical restrictions on carrying other types of weapons.

## B.    Repeating Arms Have Existed for Centuries

The State asserts that its ban should be upheld because it responds to a dramatic technological change. State Ans. 31. But repeating arms predate the Second Amendment by three centuries, and those capable of firing over 10 consecutive rounds predate the Second Amendment by two centuries. *See* Brief of *Amici Curiae* Firearms Policy Coalition and FPC Action Foundation, 8-30. "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020).[12] Several such arms pre-dated the Revolution, some by nearly a hundred years. For example, the popular Pepperbox-style pistol could "shoot 18 or 24 shots before reloading individual cylinders," and the Girandoni air rifle, which had a 22-round capacity, was famously carried on the Lewis and Clark expedition. *Id.* Cartridge-fed repeating firearms existed

---

[12] The panel decision in *Duncan* was vacated when the Ninth Circuit considered it en banc, and the en banc decision was in turn vacated and remanded after *Bruen*.

as early as 1855 with the introduction of the Volcanic Arms lever-action rifle that contained a 30-round tubular magazine. *Id*. at 1148. In 1867 Winchester created its Model 66, a full-size lever-action rifle which could fire 18 rounds in half as many seconds. *Id*.; *see* Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866-1894*, at 128 (1984). In contrast to this long history of legal ownership of repeating firearms, the first "assault weapon" ban was not enacted until California did so in 1989, a full 200 years after the founding era. Length limitations preclude a detailed recitation of this history, but Plaintiffs commend the *amici's* highly detailed and persuasive summary of the history of repeating arms.

Finally, the State's assertion that modern semi-automatic rifles represent the sort of technological change contemplated by the Supreme Court (State Ans. 37) conflicts with *Heller* itself. Modern semi-automatic handguns are the product of exactly the same sort of technological innovation that produced the modern semi-automatic rifles banned by the State. And in *Heller*, the Court held that D.C.'s ban on modern semi-automatic handguns was unconstitutional because it was an extreme historical outlier. *Id*., 554 U.S. at 629.

## C.   Urban Violence and Mass Shootings are not Unprecedented Societal Concerns

The State asserts that its ban should be upheld because it was enacted in response to an "unprecedented societal concern." State Ans. 31. This argument is difficult to understand, because the State's own expert assures the

Court that mass killings occurred during colonial and revolutionary times. *See* Declaration of Randolph Roth, A644-45. Roth adds that "from the 1830s into the early twentieth century, mass killings were common." A645.

Moreover, while mass shootings are undoubtedly horrific, they remain rare. That they do not seem rare results from the psychological phenomenon known as the availability heuristic,[13] not reality. According to *Mother Jones'* comprehensive database of mass shootings, using the FBI's definition of mass shootings, in the 40 years from 1982 to 2022, there were 141 mass shootings with 1,095 fatalities.[14] In a country with a population of 330 million, a phenomenon that, on average, results in 27 deaths per year is not the sort of societal concern the Court had in mind.

This conclusion is reinforced by *Heller* itself. In that case, D.C. informed the Court that in the then-recent Virginia Tech shooting, "a single student with two handguns discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223, 53. The *Heller* dissenters also protested that handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals." *Heller*, 554 U.S. at 682 (Breyer, J., dissenting). The majority did not dispute any of this. Instead, it wrote in

---

[13] The "availability heuristic" is the psychological phenomenon where judgments are heavily biased by dramatic incidents. Louis Klarevas, *Rampage Nation* 61 (2016). An example of the availability heuristic is the fact that many people are afraid to fly because airplanes have crashed, even though airplane crashes are exceedingly rare and airplane travel is very safe.

[14] Mother Jones, *US Mass Shootings, 1982–2023* https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/ (last visited Feb. 20, 2023).

response: "We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised …" *Id.*, 554 U.S. at 636. "But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of [commonly possessed arms] held and used for self-defense in the home." *Id.*

In summary, a few dozen people have used arms like those banned under the challenged laws to commit horrific mass shootings. But the arms used in these events account for less than one one-hundredth of one percent of the millions owned by law-abiding citizens, who, as Justice Thomas pointed out, overwhelmingly use them for lawful purposes. *Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari). The question before the Court is whether these millions of citizens' rights should yield because of the bad acts of dozens. *Heller* answered that question in the negative,[15] and Plaintiffs urge the Court to answer it the same way in this case.

## IX. The State, Like the District Court, Ignores *Bruen's* Mandate Regarding the Relevant Time Period

*Bruen* held that the founding era is the relevant time period for historical analogues. *Id.*, 142 S. Ct. at 2136. Post-ratification laws may be considered only if they are consistent with the text. *Id.* at 2137. Conversely, post-ratification laws that contradict earlier evidence are irrelevant to the constitutional inquiry. *Id.*, 142 S. Ct. 2154, no. 28. New York offered several 20th-

---

[15] Indeed, as then-Judge Kavanaugh pointed out in *Heller II*, if anything, the case for banning handguns on public safety grounds was even more compelling in *Heller* than here. *Heller II*, 670 F.3d 1244, 1286.

century laws as proposed analogues for its licensing law. But the Court rejected all of this evidence, writing: "We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.*, 142 S. Ct. 2154, no. 28.

In this case, the district court flat-out ignored this passage. Indeed, the majority of the laws it cited in its opinion were from the 20th century. The State follows suit. State Ans. 34-36.[16] The State attempts to justify its departure from *Bruen's* guidance by asserting that the Court may consider this later evidence because it responded to dramatic technological changes. But nothing in *Bruen* suggests that the Court closed the door to 20th-century laws that conflict with earlier evidence, only to open it back up again if the government claims the later laws were in response to changed circumstances. Presumably all later laws were enacted in response to changed circumstances, and the exception proposed by the State swallows *Bruen's* rule.

## X.    The State's "Ample Alternatives" Argument is Advanced in Defiance of *Heller*

The State asserts that its arms ban is constitutional because it "leaves individuals with ample alternative means of self-defense." State Ans. 49. The State then goes on to list some of the firearms it has deigned not to ban. *Id.*

---

[16] As does the City. City Ans. 38-40.

This argument seems to be advanced in defiance of *Heller's* clear holding. The Court wrote: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Id.*, 554 U.S. at 629. How is the State's argument not obviously precluded by this passage? The State does not say.

## XI.    A Ban on the Sale of Firearms is Untenable Under *Heller*

The City asserts that "no court has found that selling [firearms] is a protected right." City Ans. 11. This is wrong. In *Bruen*, the Court cited with approval the Third Circuit's decision in *Drummond v. Robinson Twp.*, 9 F.4th 217 (3rd Cir. 2021). *Id.*, 142 S.Ct. at 2133. And in *Drummond*, the court held that laws "prohibiting the commercial sale of firearms would be untenable in light of *Heller*." *Id.*, 9 F.4th at 227 (internal citation and quotation marks omitted).

Not only is the City wrong, but also the very case it cites, *Teixeira v. County. of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017), explains why it is wrong. *Teixeira* was a land use case in which a gun store challenged certain zoning regulations. *Id.*, 873 F.3d at 673. The gun store argued that the Second Amendment granted it the right to the location of its choice "independent of the rights of his potential customers." *Id.*, 873 F.3d at 681. The court rejected this contention, concluding that "the Second Amendment does not confer a freestanding right, *wholly detached from any customer's ability to acquire firearms*, upon a proprietor of a commercial establishment to sell

firearms." *Id.*, 873 F.3d at 682 (emphasis added). On the other hand, citing this Court's holding in *Ezell, supra*, the court held that a gun store has the right to assert the derivative right of its customers to *acquire* arms, *id.*, 873 F.3d at 678, and therefore a ban on sales would be unconstitutional. Specifically, the court stated: "[*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)], rightly observed that … permitting an overall ban on gun sales 'would be untenable under *Heller*.'" *Id.*, 873 F.3d at 688. Thus, the case stands for two propositions: (1) firearms sellers do not have an independent Second Amendment right to sell detached from the rights of potential customers; but (2) a total ban on sales would be unconstitutional because, as this Court recognized in *Ezell*, buyers have a right to acquire arms and sellers may assert that right derivatively. In summary, far from upholding an absolute ban on the sale of firearms, *Teixeira* specifically stated that such a ban would be unconstitutional.

## XII.   The State's "Irreparable Harm" Arguments Are Meritless

### A.   Depriving Citizens of the Right to Possess Firearms for Protection Constitutes Irreparable Harm

In *Ezell*, this Court wrote:

> "The Second Amendment protects [] intangible and unquantifiable interests [similar to those protected by the First Amendment]. *Heller* held that the Amendment's central component is the right to possess firearms for protection. 554 U.S. at 592–95, 128 S.Ct. 2783. *Infringements of this right cannot be compensated by damages.*"

*Id.*, 651 F.3d at 699 (emphasis added). The State has also burdened the right to possess firearms for protection. Indeed, banning firearms that Plaintiffs

would use for protection is the whole purpose of the challenged laws. It follows from *Ezell's* plain holding that the infringement of Plaintiffs' rights cannot be adequately compensated by damages.

The State tries to find a way around *Ezell* by arguing that when it banned magazines and firearms that are owned in the tens of millions by law-abiding citizens, it did not burden Plaintiffs' Second Amendment rights like Chicago did with its range ban. St. Ans. 52. How did the State reach this astonishing conclusion? It says there is no burden on Plaintiffs' rights because it has not totally banned all firearms. *Id*. According to the State, it does not burden a Second Amendment right unless it totally obliterates it. Not only does this argument defy common sense, but also it is specifically foreclosed by *Heller*, which held that an unconstitutional ban on commonly possessed arms is not made any less unconstitutional because other arms have not been banned. *Id.*, 554 U.S. at 629. *See also Koons v. Platkin*, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023) (many decisions find that deprivation of Second Amendment rights is not easily remediable by monetary damages); *Spencer v. Nigrelli*, 2022 WL 17985966, at *13 (W.D.N.Y. Dec. 29, 2022) (citing *Ezell*, infringement of Second Amendment rights cannot be compensated with damages); *Hardaway v. Nigrelli*, 2022 WL 16646220, at *17 (W.D.N.Y. Nov. 3, 2022); and *Antonyuk v. Bruen*, 2022 WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022).

24

### B.    Plaintiffs Raised These Issues in the District Court

The State asserts that Plaintiffs never raised in the district court the argument that violation of their constitutional rights constitutes irreparable harm. State Ans. 52. This is not true. Plaintiffs argued that "even short deprivations of constitutional rights constitute irreparable harm." Mot. for Prel. Inj., ECF No. 10, p. 7. The State asserts that Plaintiffs did not assert that Law Weapons, Inc. and Mr. Bevis would suffer irreparable harm on account of being driven out of business. This is also not true. See Op. Br. 47 where Plaintiffs point to the extensive record of evidence supporting their argument. The State asserts that Plaintiffs did not raise balance of equities or public interest arguments below. State Ans. 53. This is also not true. See ECF No. 10, p. 4, 19 and ECF No. 71, p. 16-18.

## XIII.   Conclusion

For the foregoing reasons, Plaintiffs again respectfully request the Court to reverse the district court's decision denying their motions for preliminary injunction and remand this matter with instructions to enjoin the unconstitutional laws.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
barry@arringtonpc.com

Jason R. Craddock

Law Office of Jason R. Craddock
2021 Midwest Rd., Ste. 200
Oak Brook, IL 60523
(708) 964-4973
craddocklaw@icloud.com

## CERTIFICATE OF COMPLIANCE WITH
## Fed. R. App. P. 32(a)(7), Fed. R. App. P. 32(g) and Cir. R. 32(b) & (c)

The undersigned, counsel of record for the Appellants furnishes the following in compliance with F.R.A.P. Rule 32(a)(7):

The undersigned hereby certifies that this brief complies with the type volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains **6,508** words.

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 12 point Century Schoolbook font.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
barry@arringtonpc.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*

_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
barry@arringtonpc.com